**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

PROGRESSIVE NORTHWESTERN )
INSURANCE COMPANY, )
         )
         **Plaintiff/Counterclaim Defendant,** )
         )
**v.** )   **Case No. 2:15-cv-09267-JAR-KGG**
         )
**GABRIEL GANT** )
         )
         **Defendant/Counterclaim Plaintiff** )

## DEFENDANT/COUNTERCLAIM PLAINTIFF GABRIEL GANT'S MEMORANDUM IN SUPPORT OF HIS MOTION TO COMPEL PROGRESSIVE'S PRODUCTION OF DOCUMENTS IN RESPONSE TO GANT'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND ANSWERS IN RESPONSE TO GANT'S FIRST INTERROGATORIES

Gabriel Gant ("Gant"), by and through counsel, moves this Court to compel Progressive

to produce certain documents and answer certain Interrogatories in response to Mr. Gant's First

Request for Production of Documents and Mr. Gant's First Interrogatories.

## INTRODUCTION

On June 10, 2011, Justin Birk's reckless driving on a rural Coffey County road killed 31-

year-old Katie Gant, the mother of three young children and the wife of Defendant and

Counterclaim Plaintiff Gant (the "Fatality Collision"). Justin Birk pled guilty to Vehicular

Homicide to avoid a trial on criminal charges arising from Katie Gant's death. Mr. Gant later

filed a lawsuit ("the Birk Lawsuit") against Justin Birk; Justin's parents, Edward and Linda Birk;

and the family company, Birk Oil Co. (collectively, "the Birk Defendants").

The Birk Defendants were insured by Progressive Northwestern Insurance Company

("Progressive"), which hired attorney Kevin M. McMaster to investigate claims arising from the

Fatality Collision and to represent its insureds in a potential lawsuit. At the time he was retained,

McMaster had served on Progressive's list of approved "panel counsel" for over a decade and had represented Progressive insureds in a number of other lawsuits.

The underlying case (the "Birk Lawsuit") was highly contested and spanned several years.  During the Birk Lawsuit, McMaster engaged in conduct that Progressive later admitted in court-filed pleadings was "obstructionist," "highly prejudicial," and "to the extreme detriment" of the Birk Defendants, and that Progressive asserted to be in violation of numerous Kansas Rules of Professional Conduct.[1]  After several years and the imposition of certain sanctions, Birk Oil independently sought out an outside attorney to assist in its defense.  Several months later, on February 3, 2015, Progressive retained counsel to assist in the defense of Edward and Linda Birk.  On February 12, 2015, Progressive retained counsel to assist in the defense of Justin Birk.  These additional attorneys are referred to herein as "Additional Counsel."

Shortly before trial of the Birk Lawsuit, Gant signed an agreement with the Birk Defendants, wherein the Birk Defendants assigned all of their rights against Progressive to Gant, in exchange for certain consideration, including Gant's covenant not to execute upon any judgment against the Birk Defendants personally.  The present action arises, in part, from that Agreement and Assignment of Rights (the "Agreement").[2]  Soon thereafter, Progressive filed a *Motion to Intervene*, admitting that McMaster had engaged in "repeated misconduct," that McMaster had violated six Rules of Professional Conduct, and that Progressive had developed "concerns regarding his handling of the case," and therefore seeking to have McMaster removed from the case.  (*See* Doc. 6-5, p. 2).  Shortly thereafter, McMaster withdrew from the Birk Lawsuit.  The Birk Defendants continued to be represented by Additional Counsel.

---

[1] The quoted language is obtained from Progressive's *Motion to Intervene and Suggestions in Support* and exhibits thereto (collectively "*Motion to Intervene*") originally filed by Progressive in the Birk Lawsuit and filed in the present matter as Doc. 6-5.
[2] The Agreement previously was filed as Doc. 6-4.

The case went to trial in June 2015.  The judge who presided over the bench trial returned a verdict in favor of Gant for $6,723,021.  All of the Birk Defendants were liable for some or all of the judgment.  The court apportioned no fault to Katie Gant.  Pursuant to the Agreement, the judgment amount partially was satisfied with certain insurance proceeds.  However, an unpaid balance of the judgment remains in the amount of $5,473,021, plus $7,114.42 in costs and post-judgment interest.  Upon information and belief, $317,923.08 of post-judgment interest already has accrued between the July 15, 2015 written judgment date and the date of the filing of this memorandum.[3]

On September 15, 2015, Progressive filed a Complaint for Declaratory Judgment and asked this Court to find that "its handling of the underlying claim and lawsuit was appropriate, in good faith, and consistent with the Progressive Policy and all duties imposed upon it by law or otherwise."  An Amended Complaint for Declaratory Judgment was filed, as were an Answer and Counterclaim and, later, an Answer and Amended Counterclaim.

On April 12, 2016, Mr. Gant served his First Requests for Production of Documents ("Gant's First Requests") and his First Interrogatories on Progressive.  (*See* Doc. 19).  After receiving extensions from Mr. Gant, Progressive on May 19, 2016 served *Plaintiff, Progressive Northwestern Insurance Company's Response to Defendants' First Requests for Production of Documents to Plaintiff Progressive* (hereinafter "Progressive's Responses") and *Plaintiff, Progressive Northwestern Insurance Company's  Answers to Defendants' First Interrogatories to Plaintiff Progressive* ("Progressive's Answers").  A copy of Progressive's Responses is attached hereto as Exhibit A.  A copy of Progressive's Answers is attached hereto as Exhibit B.

---

[3] Upon information and belief, post-judgment interest accrued at the rate of 4.75% from July 15, 2015-June 30, 2016 (for a total of $249,608.91 of accrued interest) and at the rate of 5.0% from July 1, 2016-June 30, 2017 (for a total of $68,314.17 as of the date of the filing of this memorandum).

Progressive stated that it would soon begin a rolling production of documents. Progressive's first round of documents was produced on June 1, 2016. That production contained extensive redactions and otherwise fell short of the production that was necessitated in response to Gant's First Requests. On June 8, 2016, Mr. Gant's Counsel contacted Progressive's Counsel to schedule a conference call regarding Progressive's discovery responses. That "meet and confer" call, as required under Fed. R. Civ. P. 37(a)(1) and D. Kan. Rule 37.2, took place on June 15, 2016. Although some disputes were unresolved, it was clear that some additional documents were forthcoming. Progressive's rolling production continued with productions on July 1, 2016, July 21, 2016, and August 5, 2016.

As encouraged to do by the Scheduling Order, Mr. Gant's counsel contacted Magistrate Gale to arrange a telephone conference prior to filing any motions.[4] On August 4, 2016, the parties engaged in a teleconference with Magistrate Gale regarding Progressive's discovery responses. At that time, Magistrate Gale provided the parties with guidance as to the areas of dispute that were addressed during the call.

On September 12, 2016, Progressive produced additional documents. After a review of all documents produced to date, it is clear that certain documents and information continue to be withheld by Progressive from production. This Memorandum addresses those items.

The following pertinent dates may be relevant to the matters addressed herein:

---

[4] In recognition of the applicable Rules and the mandates of the Scheduling Order which require motions to compel discovery to be served within 30 days of the default or service of the response, answer, or objection that is the subject of the motion, Gant's Counsel contacted the Court on June 22, 2016 (approximately three weeks after receipt of Progressive's first round of its rolling production) to inquire as to its preference on the timing of the telephone conference in light of the ongoing rolling production. Based on the response to that email, the parties and the Court agreed to postpone a telephone conference until after the next round of Progressive's rolling production.

**2011**

- **June 10, 2011**:    Fatality Collision giving rise to the Birk Lawsuit

**2013**

- **April 26, 2013**:    Filing of the Birk Lawsuit

**2014**

- **Oct. 15, 2014:**    Progressive begins redacting communications concerning "litigation strategy" and "potential bad faith claim"

**2015**

- **Feb. 3/12, 2015:**    Progressive retains Additional Counsel for Edward, Linda, and Justin Birk.

- **May 4, 2015**:    Gant's Counsel sent a letter to attorneys for the Birk Defendants offering the Agreement

- **May 11, 2015**:    Execution of the Agreement

- **May 20, 2015**:    Progressive filed a *Motion to Intervene* in the Birk Lawsuit

- **June1-11, 2015**:    Trial of the Birk Lawsuit

- **Sept. 15, 2015**:    Progressive filed the instant lawsuit


## ARGUMENTS AND AUTHORITIES

I.    **Information and documentation demonstrating Progressive's knowledge of McMaster's conduct in prior claims and cases that put Progressive's insureds at risk of excess exposure and unnecessary litigation are relevant and proportional to the issues in this case and should be produced.**

The Court should compel Progressive to release information and documentation demonstrating Progressive's notice, prior to the Fatality Collision and/or the Birk Lawsuit, of McMaster's conduct in prior claims and cases that put Progressive's insureds at risk of excess exposure and unnecessary litigation because such information falls within the permissible scope of discovery.

Under the recently enacted Rule 26(b), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" *See* F.R.C.P. Rule 26(b)(1).  The requested information and documentation

5

demonstrating Progressive's notice, prior to the Fatality Collision and/or the Birk Lawsuit, of McMaster's conduct in prior claims and cases is relevant to several claims and defenses in this case. For example, in Mr. Gant's Answer he asserts that Progressive assumed the risk of liability for an excess judgment when it retained McMaster as counsel for all Birk Defendants. Progressive had repeatedly received notice regarding McMaster's litigation conduct resulting in sanctions or actions against McMaster, Progressive, and/or Progressive's insureds, as well as notice that McMaster had placed Progressive's insureds at risk of excess exposure. In his Amended Counterclaim, Mr. Gant alleges that Progressive acted negligently and in bad faith, thereby breaching its contract, by failing to hire competent counsel. Progressive had received written and verbal correspondence over several years that provided notice of McMaster's obstructive conduct and his known practices of acting in "bad faith" and in a manner that was "exposing Progressive's insureds to . . .personal excess liability." Also, in response to Interrogatory No. 11, Progressive responded that McMaster "was not the agent of Progressive, nor was he acting with its authority in the manner, method or tactics he chose to defend the Birk lawsuit." Information and documentation demonstrating Progressive's knowledge of the "manner, method or tactics" McMaster used to defend other lawsuits, if consistent with the "manner, method or tactics" used by McMaster in the Birk Lawsuit, is relevant to that aspect of Progressive's defense.

Notably, Mr. Gant's allegations arise from factual details that Gant has obtained and provided to Progressive. For example, in section XVI of his Amended Counterclaim, Gant listed specific Progressive claims and cases involving McMaster, all of which arose prior to the Fatality Collision, with detailed facts demonstrating that Progressive knew or should have known that McMaster's conduct would likely expose its insureds to excess liability. The Counterclaim

outlines the following notice provided to Progressive: (a) written documentation, including admissions by McMaster, describing a court's finding that McMaster's intentional violation of court orders resulted in a mistrial and in sanctions ordered against Progressive and McMaster in excess of $26,000; (b) written correspondence sent to Progressive on January 11, 2006, notifying Progressive that "McMaster is known for causing delay and increased expenses," that McMaster had breached a settlement agreement and failed to show up for a hearing as previously agreed, and that, as a result of McMaster's conduct, "your insured continues to have excess personal exposure"; and (c) written correspondence sent to Progressive on March 13, 2009 notifying Progressive that McMaster's actions were "in bad faith," were a "common problem with Mr. McMaster," were representative of someone who was not "a competent attorney who wishes to protect his client's personal assets," and were "exposing Progressive's insureds to a lawsuit and personal excess liability." As part of his F.R.C.P. 26(a)(1) disclosures, Mr. Gant produced supporting documentation from each of these allegations to Progressive. A representative sampling of such documents is attached hereto as Exhibit C.

Also, in Mr. Gant's Amended Counterclaim, he outlined a fourth example of notice to Progressive regarding McMaster's conduct. Within one week of the filing of the Birk Lawsuit, Stephen L. Brave, a Kansas attorney, informed Progressive that McMaster was untrustworthy and was known for using obstructionist tactics that placed Progressive's insureds at substantial risk of an excess judgment, punitive damages, and being forced to participate in unnecessary litigation. Mr. Brave's notice was provided to the same Progressive claims representative who had received prior notice of McMaster's conduct, as outlined in the Amended Counterclaim. Mr. Gant has produced to Progressive an affidavit from Mr. Brave describing his written and verbal communications with Progressive, as well as a copy of the written correspondence Mr. Brave

7

engaged in with Progressive on May 1, 2013 on this topic.  A copy of that affidavit and the associated written correspondence is attached hereto as Exhibit D.

In Gant's First Requests, he reiterated details underlying several of the prior claims and cases referenced in the Amended Counterclaim (Request Nos. 9-11).  In addition, Gant set out additional case examples which, upon information and belief, provided notice to Progressive of McMaster's conduct similar to some of the conduct he exhibited in the Birk Lawsuit.  For example, in Gant's First Requests he detailed cases where, upon information and belief, McMaster failed to answer Requests for Admissions on behalf of his clients (Request No. 12), McMaster refused to provide signed verifications to discovery and then argued, in the Kansas Court of Appeals, that "unsigned interrogatories have no evidentiary value" and thus should not have been permitted at trial (Request No. 13), and cases where McMaster attempted to continue with representation of a client despite that client's belief that McMaster had a conflict of interest with his representation (Request  No.14).  Again, Gant sent Progressive supporting documentation of these matters on April 25, 2016 as part of his F.R.C.P. 26(a)(1) disclosures.

In short, Gant has not blindly alleged that Progressive had advance notice of McMaster's conduct in prior claims and cases that put Progressive's insureds at risk of excess exposure and unnecessary litigation, nor is Gant on any sort of fishing expedition to determine whether McMaster's conduct in the Birk Lawsuit was an anomaly.  Rather, the evidence Gant independently has compiled from outside sources already shows that Progressive received advance notice of McMaster's conduct that put Progressive's insureds at risk of excess exposure and unnecessary litigation.

Mr. Gant is attempting to discover information regarding Progressive's notice of McMaster's conduct, as described above.  For example, in Gant's First Requests, Nos. 9-14,

Gant requested information regarding many of the claims and cases described above.  In Request 15 (and companion Interrogatory No. 19), Gant requested that Progressive identify all cases in which sanctions have been ordered against Progressive, McMaster, and/or a Progressive Insured(s) represented by McMaster, as well as the motions, orders, and transcripts of hearings regarding the issue of sanctions.  In Request No. 16 (and companion Interrogatory No. 20), Gant requested all documents providing notification to Progressive that McMaster was or may be acting with improper conduct and/or had a history of acting with improper conduct with regard to his handling of a case in which he was retained by Progressive to represent Progressive and/or a Progressive Insured(s).[5]  In Interrogatory No. 21, Gant inquired as to whether Progressive ever had been sued for bad faith, breach of contract, and/or negligence with regard to a claim and/or case in which had retained McMaster to represent it and/or its insureds.  In Interrogatory No. 22, Gant requested that Progressive provide the cases in which Progressive replaced McMaster with new counsel despite having originally appointed McMaster to represent Progressive and/or a Progressive insured.[6]  Progressive has objected to Request Nos. 9-16 and Interrogatory Nos. 19-22, asserting that the Requests were overbroad, were not relevant, posed an undue burden, or otherwise were not within the proper scope of discovery.

Progressive's argument that McMaster's conduct in other cases is not relevant to this case is without merit.  "Under Kansas law, even though an insurer's duties to its insured are contractually based, breach of such duties is determined by a tort standard of care."  *Roberts v. Printup*, 595 F.3d 1181, 1186 (10th Cir. 2010) (citing *Moses v. Halstead*, 581 F.3d 1248, 1251 (10th Cir. 2009)).  "As a result, Kansas courts use negligence, due care, and other tort concepts

---

[5] Gant already has produced at least some information to Progressive on each of those topics and therefore knows that such information undeniably exists.  As such, this is not a fishing expedition which might come up empty.
[6] Again, Gant already has obtained and produced to Progressive evidence that such events have taken place in conjunction with prior notice provided to Progressive of McMaster's litigation conduct as described herein.

to describe the substance of this contract duty." *Id.* Judge Robinson acknowledged this concept in her recent Amended Memorandum and Order, explaining:

> Kansas has adopted "the principle that the insurer's duties are contractually based and then approved a tort standard of care for determine when the contract duty has been breached" . . . "Inherent in virtually every contract – including an insurance policy – is the duty of all parties to perform their contractual obligations in good faith"…The duty to exercise good faith includes "the duty to hire counsel that is competent to defend the allegations against its insured and to provide such counsel with adequate resources to competently defend the suit."

(Doc. 93, pp. 7-8). Similarly, as Magistrate Gale explained to Progressive during the August 4, 2016 teleconference regarding discovery, any notice provided to Progressive of McMaster's prior conduct is relevant to, among other things, the issue as to whether it was negligent and/or in bad faith for Progressive to retain McMaster to represent its insureds. Thus, the information requested in Request Nos. 9-16 and Interrogatory Nos. 19-22 is relevant to several claims and defenses in this lawsuit.

Likewise, this information is proportional to the needs of the case. Under F.R.C.P. 26(b), a court is to consider the following elements for the analysis of proportionality: (1) the importance of the issues at stake in the action; (2) the amount in controversy; (3) the parties' relative access to relevant information; (4) the parties' resources; (5) the importance of the discovery in resolving the issues, and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit.

First, the fact that Progressive had years of notice of McMaster's conduct, yet retained him for the Birk Lawsuit, demonstrates Progressive's bad faith and negligence. Second, even setting aside the independent tort claims, there is an outstanding judgment and costs in the amount of $5,480,135.42 plus post-judgment interest that, upon information and belief, currently has accrued to $317,923.08. Upon information and belief, interest will continue to accrue at the

rate of $750.70 per day. Thus, there is a significant amount in controversy. Third, only Progressive has full access to the relevant information as to its notice of McMaster's conduct. While Mr. Gant's counsel has obtained select documents from other litigation, only Progressive possesses the full information it has been provided about McMaster. Fourth, Progressive is a massive company that conducts business nationwide; thus, it does not lack resources. Fifth, the issue of Progressive's notice is central to the claims and defenses in this case, as described above, because it bears on whether it was negligent for Progressive to hire McMaster in the first instance. Sixth, the burden or expense of Progressive compiling information in its own possession does not outweigh the likely benefit of such information.

For these reasons, the information requested in Request Nos. 9-16 and Interrogatory Nos. 19-22 is relevant and proportional to the needs of this case, and Progressive should be compelled to produce the same.

**II.    Other discovery seeking information regarding the relationship between McMaster and Progressive is relevant and proportional to the issues in this case and should be produced.**

      a.    <u>Progressive should be compelled to produce complete and unredacted billing statements from McMaster and his law firm.</u>

Gant's First Requests, No. 8, requested that Progressive produce "complete and un-redacted billing statements that Progressive received from Kevin M. McMaster" and/or his law firm with regard to the Birk Lawsuit. Progressive objected, arguing that the billing statements were not relevant and contained protected and proprietary business information. Although select billing statements have been produced because they were attached to discoverable e-mails, a complete set of unredacted billing statements has not been produced.[7]

---

[7] The billing statements submitted by McMaster (or his firm) to Progressive are not protected by any privilege. Magistrate Gale previously informed the parties during the August 4, 2016 telephone conference that communications between counsel retained for the Birk Defendants (such as McMaster and Additional Counsel) and

The billing statements are relevant to the issues in the lawsuit. They contain, for example, details on the information that was communicated to Progressive regarding the actions McMaster was taking, the research McMaster was conducting, and the motions that McMaster was drafting in the Birk Lawsuit. Progressive had, or should have had, notice on issues such as outstanding discovery, discovery disputes, other insurance, the conflict of interest among the Birk Defendants, the pending sanctions motions, the risk of punitive damages, and other items. In that regard, this information is relevant to Progressive's knowledge and actions in this case, as it relates both to the breach of contract claim (i.e., bad faith and negligence) and to Progressive's knowledge on the matters alleged in the remaining counts such as negligent misrepresentation and fraudulent misrepresentation. Further, for the reasons described in the immediately preceding sections, this information is proportional to the needs of the case and, in fact, is expected to be even less burdensome than described in the preceding section, given that they pertain only to the Birk Lawsuit. Accordingly, Progressive should be compelled to produce complete and un-redacted billing statements that Progressive received from Kevin M. McMaster and/or his law firm regarding the Birk Lawsuit.

      b.  <u>Progressive should be compelled to identify the date it first had "concerns" regarding McMaster's handling of the Birk Lawsuit.</u>

Interrogatory No. 12 of Gant's First Interrogatories stated as follows:

> In Progressive's *Motion to Intervene and Suggestions in Support* filed in the Birk Lawsuit, Progressive admitted it had "concerns regarding his [Kevin M. McMaster's] handling of the case." Identify the date Progressive first had "concerns" regarding Kevin M. McMaster's handling of the *Gant v. Birk* case, who at or on behalf of Progressive

---

Progressive was not privileged. Progressive then released correspondence in its possession between counsel for the Birk Defendants and Progressive. There is no reason that the billing statements McMaster submitted to Progressive would be entitled to Progressive if all other communications he engaged in with Progressive are not entitled to protection.

developed these "concerns," and identify any documents evidencing such "concerns."

Progressive objected, arguing that the requested information is irrelevant, that Progressive was not a party when it filed that Motion in the Birk Lawsuit, and that the Motion was withdrawn and not ruled upon.

The date that Progressive first developed "concerns" regarding McMaster's handling of the case is relevant to the claims and defenses in this case. Progressive initiated the present lawsuit and asked the Court to find that Progressive's "handling of the underlying claim and lawsuit was appropriate, in good faith, and consistent with the Progressive policy and duties imposed upon it by law or otherwise." Yet, a year prior, Progressive represented to the District Court that it had "concerns" regarding McMaster's conduct in the Birk Lawsuit. Information as to when Progressive developed "concerns" regarding McMaster's conduct in the Birk Lawsuit, and as to Progressive's actions in the days, weeks, and months that followed its initial concerns, is relevant to whether its "handling of the underlying claim and lawsuit was appropriate, in good faith, and consistent with the Progressive policy and duties imposed upon it by law or otherwise."

Thus, Progressive should be compelled to respond to Interrogatory No. 12.

        c. <u>Progressive should be compelled to produce files it has created and/or maintained on McMaster</u>.

Request No. 20 from Gant's First Requests requested that Progressive produce "any file you maintain on Kevin M. McMaster." Progressive responded that it "does not maintain a specific file on Kevin McMaster" and then proceeded to assert general objections such as "overbroad," "vague," and "burdensome."

Discovery has shown that Progressive's response was false. Buried in Progressive's document production is a single document, sent from McMaster to Progressive, confirming that

13

Progressive had conducted reviews and applied ratings to McMaster's work on Progressive's behalf and had provided McMaster with formal documents outlining Progressive's review and ratings of his performance. (*See* Exhibit E).

This information is highly relevant to the lawsuit.  As described above, Progressive had notice of McMaster's litigation conduct which had been described to Progressive by numerous attorneys over several years as in bad faith and subjecting Progressive's insureds to excess liability and unnecessary litigation.  Likewise, Progressive had knowledge of McMaster's "tactics" in other litigation that were similar to those employed in the Birk Lawsuit.  That knowledge, as well as other files, evaluations, and assessments regarding McMaster are relevant to the issues in this lawsuit.  For instance, if an evaluation praised McMaster for protecting Progressive's interests first, or if it downgraded him for putting insureds at risk, either evaluation would bear on whether it was negligent to hire and retain McMaster for the Birk Lawsuit.

As evidenced by Exhibit E, it appears that Progressive possesses certain forms and evaluations that are accessible by a simple word search.  Presumably, associated or similar files maintained on McMaster should be readily accessible.  Thus, the burden on Progressive in providing this production is light.

For these reasons, Progressive should be compelled to provide an accurate answer and to provide the responsive documents.

                d.   <u>Progressive should be compelled to produce documents reflecting internal communications regarding McMaster.</u>

Request 21 of Gant's First Requests provided:

> Produce all internal communications among individuals at Progressive regarding Kevin M. McMaster. *This includes but is not limited to communications by letter, email, fax, and/or internal instant message.*

Progressive responded with several general objections, such as that the Request was overbroad, burdensome, and not limited to the Birk Lawsuit.

For the reasons described above in section I, Progressive's notice of McMaster's litigation conduct in other matters is relevant to the present matter.  Likewise, Progressive's internal communications about McMaster, such as communications that occurred each time an attorney informed Progressive that McMaster was acting in a manner that prejudiced Progressive's insureds, is relevant.  For example, more than one attorneys over the course of several years informed Kristin Beckman, both in writing and verbally, that McMaster was acting in a manner which was in bad faith, was exposing Progressive's insureds to excess personal liability, and that such conduct was "common" with McMaster.  If Ms. Beckman sent those notifications to her supervisor with a cover e-mail that stated "here are more complaints about McMaster," such information is relevant to the present matter.  Likewise, if Progressive employees and agents engaged in internal communications regarding their reasons for continuing to retain McMaster on behalf of Progressive's insureds, despite the repeated warnings about the risks of such representations, such information is relevant.

This information should be accessible and relatively easily searchable in Progressive's database.  Thus, the burden on Progressive is light, and Progressive should be compelled to produce the requested information.

> e.  <u>Progressive should be compelled to provide a list of all claims and cases on which it has retained McMaster as legal counsel.</u>

Interrogatory No. 21 and Request No. 19 sought a list of every claim and/or case for which Progressive retained McMaster as legal counsel, as well as basic information regarding the claim and/or case (such as the Progressive claim number, the adjuster, and the case caption).

Again, Progressive has objected that the requested discovery is overbroad, irrelevant, and outside the proper scope of discovery.

For the reasons listed above, McMaster's actions in other cases and Progressive's knowledge of actions or events in other cases are relevant to the claims and defenses in this lawsuit.  A simple listing of cases would allow Mr. Gant to perform his own investigation into Progressive's history with McMaster, to complement whatever documents he receives as a result of his other Requests.  This information is relevant to McMaster's litigation "tactics" and Progressive's knowledge of the same.

From a proportionality standpoint, this information should be simple to provide.  In fact, Exhibit E suggests that Progressive can pull a listing of files or the full files of cases based on the outside legal counsel assigned to the case.   Progressive should be compelled to produce this information.

**III.    <u>Applying the three-part legal test utilized by Kansas courts, Progressive has waived any claim to attorney-client privilege by seeking a declaration that it acted reasonably in defense of the Birk Defendants, and by asserting that its actions did not cause or contribute to the excess verdict.</u>**

The Court should compel Progressive to release internal communications and other documents that address Progressive's handling of the underlying lawsuit.  Progressive's Amended Complaint put those communications at issue, thereby waiving any privilege that may have attached.  For instance, Progressive's Amended Complaint alleged that Progressive's "handling of the underlying claim and lawsuit was appropriate, in good faith, and consistent with the Progressive policy and duties imposed upon it by law or otherwise."  (Amended Complaint, Doc. 14, at ¶ 42).[8]  For this reason, any privilege that may have existed now has been waived.

---

[8] In addition to this allegation, Progressive claims to have acted "reasonably" throughout its Amended Complaint.  Progressive asserts that (1) it "acted reasonably and consistently with the terms of the subject insurance policy in its handling of the claim"; (2) it "conducted a reasonable investigation into the facts of the accident"; (3) it

Progressive seems to be withholding certain communications involving certain individuals who have been involved in Progressive's own defense.  Thus, before getting into the legal rationale for Mr. Gant's argument, some background information is necessary.  Some of Progressive's in-house counsel—and Jean Kelly in particular—became heavily involved in directing the defense of the underlying case.  To the extent that Progressive's internal communications and other documents bear on the defense in the Birk Lawsuit, those communications are documents are "at issue" and should be discoverable.

In its Interrogatory Answers, Progressive responded that Ms. Kelly, among others, had a role in handling the matters in the Birk Lawsuit.  (*See* Progressive's Answers, Interrogatory No. 7).  For example, immediately after the retention of Additional Counsel, Jean Kelly scheduled a meeting and then traveled to Kansas City with Al Provorse, a claims supervisor in the Birk Lawsuit, to have a "joint defense meeting with all D[efense] C[ounsel]" regarding the Birk Lawsuit. (*See* Exhibit F).  For the remainder of the Birk Lawsuit, the majority of Additional Counsel's reporting on the Birk Lawsuit was sent to Jean Kelly, rather than to a claims representative.  Ms. Kelly made entries into the claims file for the Birk Lawsuit, which is separate from the Claims File for the present lawsuit. (*See* Exhibit G). Prior to the execution of the Agreement, Ms. Kelly participated in "defense team" telephone conferences with McMaster and Additional Counsel regarding their strategy for hearings.  (*See* Exhibit H; Exhibit I).  Prior to the execution of the Agreement, Ms. Kelly dictated when Additional Counsel were to file certain motions in the Birk Lawsuit. (*See* Exhibit J).  Prior to the execution of the Agreement, Ms. Kelly

---

"conducted a reasonable evaluation of the claim"; (4) it "reasonably communicated with the Birks about the claim" and about the "status of settlement negotiations"; (5) it "acted reasonably in fulfilling its duties to its insureds prior to the lawsuit being filed"; and (6) it "handled the Gant (and Birk) claims reasonably, in good faith, and consistent with the Progressive Policy and all duties imposed upon it by law, The Policy, or otherwise."  (Amended Complaint at ¶¶ 7, 10-11, 13, 15, 23, 45).  Progressive further asked for a declaration from this Court that "Progressive reasonably fulfilled all of its duties to its insureds under The Policy, including its duties to defend and indemnify."  (*Id.* at ¶ 49(b)).

met with the Birk Defendants to discuss "the defense, settlement potential and other issues going forward." (*See* Exhibit K).   In fact, Ms. Kelly, rather than Additional Counsel, sometimes informed the assigned claims representatives about developments in the Birk Lawsuit, such as the division of labor among Additional Counsel or meetings that had been scheduled with the Birk Defendants. (*See* Exhibit M).  Ms. Kelly's role also appeared to non-parties to be that of the claims adjuster in the Birk Lawsuit. (*See* Exhibit N).

Ms. Kelly's active involvement in the events in the Birk Lawsuit continued after execution of the Agreement. She continued to schedule defense meetings with Additional Counsel. (*See* Exhibit O).  She continued to dictate whether certain filings should be made at certain times in the Birk Lawsuit. (*See* Exhibit P). In fact, she coordinated an in-person meeting between herself and Additional Counsel the day before the trial of the Birk Lawsuit began. (*See* Exhibit Q).  It appears that she even went so far as to meet with at least one witness called by the Birk Defendants prior to their testimony at the trial of the Birk Lawsuit. (*See* Exhibit R).  She even participated in discussions with Additional Counsel regarding the damage figure that should be presented at trial. (*See* Exhibit S).

Thus, Ms. Kelly's role in the Birk Lawsuit was not limited to acting as "bad faith counsel" for Progressive in the present action.  Ms. Kelly began engaging in communications regarding "litigation strategy" months before Progressive took any steps to hire Additional Counsel for the Birk Defendants.  Then, she began pulling strings and directing events in the Birk Lawsuit.  There may be other Progressive in-house counsel involved in the Birk Lawsuit, but Ms. Kelly's role in particular helps to demonstrate why Progressive's categorical withholding of all internal communications involving counsel is improper, in light of its own claims about its handling of the Birk Lawsuit.

a.      Under Kansas law, as adopted from a Washington federal court, the attorney-client privilege is waived when a party places attorney-client communications "at issue" through some affirmative act, such as filing a lawsuit.

Because this is a diversity case, this Court applies state privilege law. *Cincinnati Ins. Co. v. M.S. ex rel. Serrano*, No. 11-CV-2075-JAR/KGG, 2011 WL 6304086, at *6 (D. Kan. Dec. 16, 2011). Mr. Gant believes it is undisputed that Kansas law applies to this issue. On the topic of an "at issue" privilege waiver, Kansas courts have consistently applied the doctrine laid out in *Hearn v. Rhay*, 68 F.R.D. 574 (E.D. Wash.1975). *See, e.g.*, *AKH Co. v. Universal Underwriters Ins. Co.*, 300 F.R.D. 684, 694 (D. Kan. 2014) (citing *Hearn*, 68 F.R.D. at 579-81); *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 376, 22 P.3d 124, 142 (2001) (same).

The issue in *Hearn* was whether certain defendants' good faith immunity defense, raised in a suit brought by a federal inmate, acted as a waiver of any attorney-client privilege asserted by the defendants. *Hearn v. Rhay*, 68 F.R.D. at 577-78. The plaintiff asserted that the defendants "have ipso facto waived the attorney-client privilege to the extent the privilege would protect information relevant to that [good faith immunity] defense from disclosure." *Id.* at 580. The *Hearn* court noted several instances in which courts have held parties to have waived a privilege by their claims or defenses, including: personal-injury plaintiffs (physician-patient privilege), legal malpractice plaintiffs (attorney-client privilege), patent infringement plaintiffs (attorney-client privilege), and habeus corpus petitioners (attorney-client privilege). *Id.* at 580-81.

In evaluating the issue, the *Hearn* court laid out a three-part test for determining whether a party has waived the privilege by putting attorney-client communications at issue:

- (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party;

19

- (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case;

- (3) application of the privilege would have denied the opposing party access to information vital to his defense.  *Id.* at 581.

Applying that test, the court determined that the defendants had waived the attorney-client privilege by raising the "good faith" immunity defense.  The "defendants invoked the privilege in furtherance of an affirmative defense they asserted for their own benefit"; "through this affirmative act they placed the protected information at issue, for the legal advice they received is germane to the qualified immunity defense they raised"; and "one result of asserting the privilege has been to deprive plaintiff of information necessary to 'defend' against defendants' affirmative defense, for the protected information is also germane to plaintiff's burden of proving malice or unreasonable disregard of his clearly established constitutional rights."  *Id.* at 581.

Finally, the court explained that the privilege is an "obstacle to the investigation of the truth," and therefore it should apply "only to the extent that the injury the relationship would suffer from disclosure is greater than the benefit to be gained thereby."  *Id.* at 582.  That balance favored discovery of the allegedly privileged communications because they were not "incidental to the case; they inhere in the controversy itself, and to deny access to them would preclude the court from a fair and just determination of the issues."  *Id.*

      b.    <u>Progressive placed its conduct in the underlying case at issue by filing this lawsuit and asking for a declaration that it acted reasonably in defending the Birk Defendants.</u>

Here, the Court should reach the same conclusion because Progressive placed its conduct at issue when it filed this lawsuit and claimed that its "handling of the underlying claim and lawsuit was appropriate, in good faith, and consistent with the Progressive policy and duties imposed upon it by law or otherwise."  (Amended Complaint, Doc. 14, at ¶ 42).  Progressive also

specifically alleged: (1) that it conducted a *reasonable* investigation into the facts of the accident; (2) that it conducted a *reasonable* evaluation of the claim; (3) that it retained defense counsel; (4) that it acted *reasonably* in fulfilling its duties to its insureds; and (5) that it did not cause or contribute to cause the excess verdict. (*Id.* at ¶¶ 10-11, 19, 23, 48). As a result, Progressive claims it is entitled to this Court's declaration, stating, *inter alia*, that "Progressive reasonably fulfilled all of its duties to its insureds under The Policy, including its duties to defend and indemnify." (*Id.* at ¶ 49(b)). These allegations clearly put into issue the reasonableness of Progressive's actions in defending the underlying case.

The categories of discovery most directly at issue by this motion are Progressive internal communications, and related documents, during the pendency of the underlying Birk Lawsuit. Progressive's position seems to be that many communications involving Progressive counsel and others within Progressive are privileged. Thus, Progressive has redacted communications between Progressive's in-house counsel (for example, Jean Kelly) and the claims adjuster assigned to the Birk Lawsuit (Robert Hansel) that took place regarding the Birk Lawsuit long before the May 11, 2015 execution of the Agreement. (*See* Exhibit T). Progressive also claims privilege for its internal communications during the pendency of the Birk Lawsuit, dating back more than six months before the Agreement. For example, Progressive has redacted internal communications between in-house counsel (such as Jean Kelly and her supervisor, Eric Ostrom) in October 2014, describing those communications in its Privilege Log as involving "litigation strategy." (*See* Exhibit U, Privilege Log, Exhibit V, at pp. 8-9, 90; *See also* Exhibit W, Exhibit V, at p. 86). Progressive also is claiming privilege for its internal communications about its own potential extra-contractual exposure during the pendency of the Birk Lawsuit, and for all communications with Frankie, Schultz & Mullen, a law firm hired while the Birk Lawsuit was

21

still pending and who filed the *Motion to Intervene* in the Birk Lawsuit, describing Progressive's views on McMaster's conduct, expressing the detrimental effect Progressive believed McMaster's conduct had and may continue to have in the Birk Lawsuit, and requesting the District Court to take certain actions in the Birk Lawsuit.  (*See, e.g.*, Exhibit V, at p. 15).

The three-part test laid out in Hearn has been adopted by Kansas courts.  *See, e.g.*, *Sprint Commc'ns Co., L.P. v. Comcast Cable Commc'ns, LLC*, No. 11-2684-JWL, 2015 WL 11121848, at *2 (D. Kan. Apr. 16, 2015); *Simmons Foods, Inc. v. Willis*, 191 F.R.D. 625, 635 (D. Kan. 2000).  Application of that test to this case demonstrates why any Progressive communications regarding the underlying case—including communications about the case's impact on Progressive—are discoverable due to Progressive's "at issue" waiver.

First, there can be little doubt that Progressive engaged in "some affirmative act, such as filing suit."  *See Hearn*, 68 F.R.D. at 581; *see also Willis*, 191 F.R.D. at 635.  Progressive instigated this lawsuit, asserting that its "handling of the underlying claim and lawsuit was appropriate, in good faith, and consistent with the Progressive policy and duties imposed upon it by law or otherwise."  (Amended Complaint, Doc. 14, at ¶ 42).

Second, Progressive "put the protected information at issue by making it relevant to the case."  *See Hearn*, 68 F.R.D. at 581; *see also Willis*, 191 F.R.D. at 635.  Again, Progressive affirmatively and repeatedly alleged that its actions in the underlying case were "appropriate" and "in good faith."  (Amended Complaint, Doc. 14, at ¶ 42).  Progressive also asked for a court declaration that "Progressive reasonably fulfilled all of its duties to its insureds under The Policy, including its duties to defend and indemnify."  (*Id.* at ¶ 49(b)).  To make that determination, the Court needs to evaluate the steps that Progressive took in defending the Birk Defendants.  Certainly, any communications about the conduct of that defense are integral to Progressive's

claim—such as the "litigation strategy" discussions referenced above, during the pendency of the Birk Lawsuit. In addition, communications about Progressive's own bad faith exposure are "relevant to the case." If Progressive was prioritizing its own exposure over the defense of its insureds, that information would contradict Progressive's allegations in its amended complaint. This is particularly relevant in correspondence dating back to October 2014, when Progressive was having communications regarding "litigation strategy" and analyzing "potential extra-contractual liability," several months before Progressive retained Additional Counsel to assist in the Birk Lawsuit, and more than six months before the Agreement was executed. (*See* Exhibit X).

Finally, for similar reasons, "application of the privilege would [deny] the opposing party access to information vital to his defense." *See Hearn*, 68 F.R.D. at 581; *see also Willis*, 191 F.R.D. at 635. Progressive seeks a declaration that it "reasonably fulfilled … its duties to defend and indemnify." (Amended Complaint, Doc. 14, at ¶ 49(b)). Without access to Progressive's internal communications—and any related documents—Mr. Gant is handcuffed in his ability to contest that assertion. As the *Hearn* court did, this Court could draw analogies to other privilege waivers. For instance, if a personal-injury plaintiff says that she is only going to rely on her doctor's testimony, not her medical records, she still has put her medical records into issue. *See Hearn*, 68 F.R.D. at 580. It would be unfair to deny the defense the opportunity to use the medical records to demonstrate its lack of culpability, even if the plaintiff is not expressly introducing the medical records.

Similarly, even if Progressive is not expressly relying on its internal communications, it is asking the Court to declare its actions reasonable and in line with its contractual duties to the Birk Defendants. Mr. Gant, as the holder of the Birks' claim, should be able to test that assertion

23

by evaluating the conduct of the defense, including internal communications.  In *Willis*, this Court wrote that information is "vital," under the third prong of the *Hearn* test, if it is "otherwise unavailable from any other source."  *Id.* at 635.  Certainly, there is no other source that would reveal Progressive's approach to defending the Birk Lawsuit at the time that Progressive was making those decisions—including information about whether Progressive was prioritizing its own interests over those of its insureds.

Because the three-part test from *Hearn* is satisfied, this Court should hold that Progressive has waived the privilege.

> c. <u>Because Progressive's claims directly implicate the actions of attorneys, the communications at issue are integral to the claims; thus, this case is more like *Willis* than certain other cases in which the privilege has been upheld.</u>

This case is unlike certain cases in which this Court rejected the assertion of a privilege waiver because the privileged communications were merely incidental to the larger claim.  *See, e.g.*, *AKH Co.*, 300 F.R.D. at 694 (D. Kan. 2014) (holding that the attorney-client communications were not "integral" to the claim itself); *Cincinnati Ins.*, 2011 WL 6304086, at *1 (rejecting the argument that the assertion of a bad faith claim, "standing alone," waives the attorney-client and work-product privileges).  In this case, Progressive's legal strategy is clearly integral to its claim that it acted reasonably in discharging its duty to defend the Birk Defendants.  Therefore, this case is much more like *Willis* than like *AKH* or *Cincinnati Insurance*.

In *Willis*, a debtor filed a petition for relief under Chapter 11 of the bankruptcy code.  The debtor then filed an adversarial proceeding against Simmons Foods, Inc., seeking to set aside a claimed security interest.  *Willis*, 191 F.R.D. at 629.  Later, Simmons approved the debtor's bankruptcy plan, on the condition that Simmons be treated as secured creditor.  *Id.*  However, Simmons did not receive the payments that it was expecting.  Simmons claimed that the plan

included many uncollectable accounts, and that the debtor's attorneys were to blame for the poor

plan. *Id.* Simmons then filed suit against the debtor's attorneys, based on their actions in

conjunction with the bankruptcy proceeding. The attorney defendants sought to depose

Simmons's attorney about his actions in the underlying case, and Simmons's attorney claimed

privilege—both attorney-client and work product. *Id.*

Applying the *Hearn* test, this Court determined that Simmons had waived any claim of

privilege.[9] Simmons acted affirmatively by filing suit; Simmons's suit had placed the attorney-

client communications at issue by making proximate cause relevant to the case (i.e., whether the

actions of the debtor's attorneys or the actions of Simmons and/or his counsel were responsible

for the losses in the underlying case); and application of the privilege would hinder the attorneys'

defense on the issue of proximate cause. *Id.* at 637. Thus, even though the plaintiff had not

inserted any of its communications with counsel into the case, this Court recognized that it would

be unfair to the defendant not to allow exploration of those communications. *Id.*[10]

Similarly, here, the actions of counsel are not merely relevant to the claims, they are

integral to the claims that Progressive itself has raised, claiming its own "good faith" discharge

of its duty to defend. The entire claim is based on Progressive's **defense of a lawsuit**. Thus, the

actions that Progressive took—or did not take—in defending that lawsuit are the entire basis for

the claim. The actions of Progressive's own counsel, including but not limited to its

communications about strategy, are inextricably intertwined with the question of whether

---

[9] The Court did not allow the attorney to be deposed because the Court believed that there was another source of the information. The Simmons corporate representative had been refusing to testify about the underlying case, citing the attorney-client and work product privileges. Thus, the Court concluded that its ruling against the privilege would allow the same information to come from another source. *Id.* at 637.

[10] While some cases only refer to the attorney-client privilege, the *Willis* Court applied the waiver to assertions of attorney-client and work product privileges. *Willis*, 191 F.R.D. at 637. In addition, although this Court upheld the privilege in *Cincinnati Insurance*, this Court recognized that the waiver, if it applied, would cover both the attorney-client privilege and the work product privilege. *Cincinnati Ins.*, 2011 WL 6304086, at *1.

Progressive faithfully discharged its duty to defend the Birk Defendants.  In *Willis*, the communications were relevant only on the issue of causation, and yet this Court allowed discovery.  Here, the argument for discovery is stronger, as Progressive's communications are relevant to all aspects of its claims—including whether it was negligent in defending the Birk Defendants, and whether its negligence proximately caused damage to the Birk Defendants. Again, Progressive has affirmatively sought a declaration that it reasonably defended the Birk Defendants, and has claimed that it "did not cause or contribute to cause the adverse verdict and excess judgment entered against the Birks … ."  (Amended Complaint, Doc. 14, at ¶¶ 48, 49(b)). Mr. Gant should have a fair opportunity to contest those assertions.

**IV.      Progressive should be compelled to remove "confidential" designations from items specific to the Birk Lawsuit.**

The Protective Order (Doc. 95) defines "Confidential Information" as "information that the Producing Party designates in good faith has been previously maintained in a confidential manner and should be protected from disclosure and use outside the litigation because its disclosure and use is restricted by statute or could potentially cause harm to the interests of the disclosing party or non-parties."  Further, during the August 4, 2016 telephone conference, Magistrate Gale advised that confidential designations should not be applied to (a) communications between Progressive and defense counsel retained by Progressive in the underlying case to represent the Birk Defendants and (b) communications specific to the Birk Lawsuit.  He explained that such designations should not turn this lawsuit into "a secret lawsuit." Yet, Progressive has broadly applied confidential designations to numerous documents that fall outside the definition of Confidential Information in the applicable Protective Order.  As a result, time and again, Gant has been required to file Motions for Leave to File Under Seal in order to

26

simply mention basic principles or attach exhibits that should not be entitled to protection.  Some

examples are as follows:

- PROGRESSIVE 0018326-0018327: Communication between Additional Counsel for the Birk Defendants, Jean Kelly, and Courtney Schroeder (Progressive Claims Specialist) describing Additional Counsel's review of the Birk Lawsuit, his opinions on proposed briefing in the Birk Lawsuit, and his opinions on the status of the Birk Lawsuit in light of its defense prior to his involvement. (Exhibit Y).

- PROGRESSIVE 0027572: internal message between Progressive Claims Specialist and Progressive Claims Director regarding conference call on the Birk Lawsuit.[11] (Exhibit Z).

- PROGRESSIVE 0018441-0018442 – Communication among counsel for the Birk Defendants sent to Progressive Claim Specialist regarding insurance applicable to the Birk Lawsuit. (Exhibit AA).

- PROGRESSIVE 0028891-288992: Communication between Hansel (Progressive Claims Adjuster assigned to the Birk Lawsuit) and McMaster regarding the Birk Lawsuit. (Exhibit BB).

- PROGRESSIVE 28859-28860: Correspondence from expert retained by Progressive to Hansel (Progressive Claims Adjuster assigned to the Birk Lawsuit) enclosing his CV and cost estimate for expert work on the Birk Lawsuit. (Exhibit CC).

- PROGRESSIVE 0012765: Invoice from expert retained by Progressive for work on the Birk Lawsuit. (Exhibit DD).

- PROGRESSIVE 0029370-29371: Correspondence from McMaster (counsel for Birk Defendants) to Hansel (Progressive Claims Adjuster assigned to the Birk Lawsuit) outlining the status of discovery and budgeting in the Birk Lawsuit. (Exhibit EE).

- PROGRESSIVE 0016107: Correspondence between Hansel (Progressive Claims Adjuster assigned to the Birk Lawsuit) and his non-attorney supervisor regarding the events in the Birk Lawsuit. (Exhibit FF).

- PROGRESSIVE 0016314: Communication between non-attorneys within Progressive simply authorizing payment to Additional Counsel for the Birk Defendants for legal services provided in the Birk Lawsuit and briefly describing why Additional Counsel

---

[11] This is the only internal messaging conversation Progressive has produced to Gant.  To the extent other internal messaging regarding the Birk Lawsuit, Kevin McMaster, or other requested topics exists in Progressive's files, Gant specifically requested such items in discovery and reiterates herein that they should be produced. Therefore, consistent with the Court's orders regarding the topics of discovery that Progressive is compelled to produce, Gant expects internal messages to be produced.

27

was retained to assist with the defense of the Birk Defendants in the Birk Lawsuit. (Exhibit GG).

- PROGRESSIVE 0016127-0016128: Communication between outside legal counsel retained in the Birk Lawsuit and Hansel (Progressive Claims Adjuster assigned to the Birk Lawsuit) regarding expert retained in the Birk Lawsuit, then forwarded to a non-attorney Progressive Claims Supervisor. (Exhibit HH).

- Representative sampling of Progressive Face Sheet Notes and Claims Sheet Notes comprised of information specific to the Birk Lawsuit (Exhibit G).

Upon information and belief, there are hundreds of additional documents, like these, that have improper confidentiality designations applied.  Mr. Gant has not yet totaled that number or compiled a full listing of such improper markings, as Progressive's document production of earlier this month contains changes to the application of confidentiality designations on many documents produced by Progressive to date.  However, Gant reiterates herein his statements, previously outlined in his *Response to Progressive's Motion for Entry of Protective Order* (Doc. 47), that Progressive has continually failed to use good faith in the application of its confidential designations and should have been subjected to the burden shifting provision proposed by Mr. Gant in Section II of that motion.  Instead, however, Gant has been required to file numerous motions for leave to file under seal because of improper, liberally applied, confidential designations, and Mr. Gant will be required to file further motions if Progressive continues in its refusal to remove such confidentiality designations.

As a result, Mr. Gant requests that the Court hold that the attached documents are not "confidential," that the Court provide further direction to Progressive as to what can—and cannot—properly be designated as such, and that the Court order Progressive to produce clean copies of any such documents previously and improperly marked as "confidential."

## CONCLUSION

Gabriel Gant respectfully requests that this Court grant his motion to compel and order Progressive to do all of the following:

- Respond appropriately to Request Nos. 9-16 and Interrogatory Nos. 19-22;

- Respond appropriately to Request No. 8 (regarding billing records); Interrogatory No. 12 (regarding when Progressive became concerned about McMaster); Request No. 20 (regarding Progressive's files on McMaster); Request No. 21 (regarding internal communications about McMaster); and Request No. 19/Interrogatory No. 21 (regarding other cases in which Progressive has retained McMaster).

- Disclose any internal communications and related documents, including those involving in-house counsel, that bear on the defense of the Birk Lawsuit, in light of Progressive putting that defense at issue through its allegations; and

- Remove the confidential designation from the attached documents referenced in Section IV, provide additional direction to Progressive as to when it is appropriate to label a document as "confidential," and order Progressive to produce clean copies of any such documents previously and improperly marked as "confidential."

Respectfully submitted,

WAGSTAFF & CARTMELL LLP

/s/ Vanessa H. Gross

| | |
|---|---|
| Jonathan P. Kieffer | KS #18707 |
| Vanessa H. Gross | KS #24005 |
| Adam S. Davis | KS #24263 |

4740 Grand Ave., Ste 300
Kansas City, MO 64112
Office: 816-701-1100; FAX: 816-621-3395
jpkieffer@wcllp.com; vgross@wcllp.com
**ATTORNEYS FOR DEFENDANT/
COUNTERCLAIM PLAINTIFF GANT**

29

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed the foregoing document via the CM/ECF electronic filing system on September 29, 2016, thereby sending notice of the filing to all counsel of record of this matter.

/s/ Vanessa H. Gross
Attorney for Defendant