## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **PROGRESSIVE NORTHWESTERN** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff/Counterclaim Defendant,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:15-cv-09267-JAR-KGG** |
| | ) | |
| **GABRIEL GANT** | ) | |
| | ) | |
| **Defendant/Counterclaim Plaintiff** | ) | |

## <u>DEFENDANT/COUNTERCLAIM PLAINTIFF GABRIEL GANT'S<br>MEMORANDUM IN SUPPORT OF HIS<br>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Gabriel Gant ("Mr. Gant"), by and through counsel, files this Memorandum in Support of his Motion for Partial Summary Judgment.

## <u>INTRODUCTION</u>

Plaintiff Gabriel Gant has brought this case to collect the balance of a $6,723,021 judgment—plus costs and interest—against Justin Birk, Linda Birk, Edward Birk, and the entity commonly known as Birk Oil Co. ("the Birk Defendants"). Mr. Gant lost his wife and the mother of his three young children when Justin Birk crested a hill, crossed the center line of a highway, and crashed head-on into Ms. Gant's on-coming vehicle. Insurance has paid $1.25 million of the judgment, and this suit seeks to collect the remainder from Progressive Northwestern Insurance Co. ("Progressive"). Through an assignment, Mr. Gant holds the claim of the Birk Defendants for the excess liability caused by the bad faith and negligence of Progressive, both through its own actions and inactions and through the actions and inactions of and its retained counsel, Kevin McMaster.

4852-8805-6922, v. 4

In defending itself, Progressive has been unrestrained by the content of its prior representations to this Court and other courts regarding Mr. McMaster.  When seeking to remove Mr. McMaster as its hired counsel on a different case pending in this Court, Progressive represented that it had "the exclusive right to investigate the case, employ and control counsel to defend any suit," the "right to control the litigation all of its aspects," and the right to "modify or change representation as necessary."  Such control establishes, under Kansas law, that Mr. McMaster is the agent of Progressive.  *See Pac. Employers Ins. Co. v. P.B. Hoidale Co.*, 789 F. Supp. 1117, 1122 (D. Kan. 1992) (quoting *Brinkley v. Farmers Elevator Mutual Ins. Co.*, 485 F.2d 1283, 1286 (10th Cir. 1973)).  Yet, Progressive now denies having controlled Mr. McMaster, and denies that he was acting as Progressive's agent.

Progressive also sought Mr. McMaster's withdrawal from the underlying case to this action in the Coffey County District Court a few weeks before trial (the underlying case is referred to herein as "the Birk Lawsuit.").  In its *Motion to Intervene* and the accompanying *Motion to Disqualify and/or Compel the Withdrawal of Defendants' Attorney Kevin McMaster*, Progressive represented that Mr. McMaster had made numerous critical errors, including being sanctioned by the court multiple times and failing to respond to hundreds of Requests for Admission.  Progressive further asserted that Mr. McMaster had violated six provisions of the Kansas Rules of Professional Conduct.  Such statements clearly establish breaches in the defense provided to the Birk Defendants.  Yet, Progressive now denies that Mr. McMaster's actions amounted to any breaches.

In addition, Progressive's motion seeking to remove Mr. McMaster stated that Mr. McMaster's failure to respond to hundreds of Requests for Admission—which were then deemed admitted—was to the "extreme detriment" of the Birk Defendants, and was "highly prejudicial"

to them.  Now, however, Progressive and its experts assert that nothing that Mr. McMaster did

had any effect on the verdict against the Birk Defendants.

The Court should not permit Progressive to "play fast and loose" with the judicial system

in this manner.  *See Gilmore v. Shearson/Am. Exp. Inc.*, 811 F.2d 108, 113 (2d Cir. 1987).

Under the doctrine of judicial estoppel, Progressive should be held to its prior statements.  Those

statements achieved their intended goals, as Mr. McMaster almost immediately ceased

representing the defendant(s) in both cases.  It would be unfair, and damaging to the integrity of

the judicial system, for Progressive to now be permitted to change positions and again gain a

benefit.

If Progressive's prior statements are taken as established fact, either based on judicial

estoppel or if they are treated as judicial admissions, then these statements establish a right to

summary judgment on the liability issues in the case.  Under Kansas law, Mr. Gant must

establish that Progressive defended the Birk Defendants in bad faith or negligently, and that the

defense caused damage to the Birk Defendants.  *See Glenn v. Fleming*, 247 Kan. 296, 305, 799

P.2d 79, 85 (1990).  The admission that Progressive controlled Mr. McMaster establishes

agency, making Progressive liable for Mr. McMaster's actions.  The numerous admissions about

Mr. McMaster's serious mistakes and ethical violations clearly establish that Mr. McMaster's

actions and inactions amounted to breaches of a duty.  Finally, the admission that Mr.

McMaster's actions were to the "extreme detriment" of the Birk Defendants, and "highly

prejudicial," establish that his actions caused some damage.  The amount of damage will be an

issue for the factfinder at trial.

For all of these reasons, this Court should grant summary judgment to Gabriel Gant on

the issues of agency, breach of duty, and causation.  Thus, the only issues remaining for trial

should be the extent of the damages caused by Mr. McMaster, as well as any direct liability for

Progressive's own actions.

## STATEMENT OF THE ISSUES

I.     Should Progressive be judicially estopped from contradicting in this case prior representations made to this Court, and to the District Court of Coffey County, Kansas, when those representations achieved their desired effect—the end of representation by Kevin McMaster in two separate cases?

II.    Given Progressive's admissions that it had the right to control Mr. McMaster's actions, that Mr. McMaster violated at least six rules of professional conduct in the underlying lawsuit, and that Mr. McMaster's mistakes were "extreme[ly] detriment[al]" and "highly prejudicial" to the Birk Defendants, has Mr. Gant established a right to summary judgment on liability issues?

## STATEMENT OF FACTS

Mr. Gant's counterclaim alleges bad faith/negligence by Progressive in its defense of the

underlying case of *Gant v. Birk*, 13-CV-019 (Kan. Dist. Ct. Coffey Co.) ("the Birk Lawsuit").

This Statement of Facts will summarize the underlying litigation, and then will provide facts that

relate to each of the facts that Mr. Gant is asking this Court to find have been conclusively

established: that Mr. McMaster was acting as Progressive's agent in the underlying litigation;

that Mr. McMaster's actions amounted to breaches of a duty to provide a defense to the Birk

Defendants in good faith and without negligence; and that Mr. McMaster's actions and inactions

caused harm to the Birk Defendants.

### I.     The Underlying Lawsuit

1.    The Birk Lawsuit arose from a fatal auto accident on June 10, 2011 in Coffey

County, Kansas between Justin Birk and Kathryn Gant.  (*See* Gant's Amended Counterclaim,

Dkt. No. 104, at ¶ 14; Progressive's Answer and Affirmative Defenses, Dkt. No. 247, at ¶ 14).

4852-8805-6922, v. 4

2.      Progressive retained Mr. McMaster to represent the Birk Defendants[1] with respect to the claims arising from the fatal accident.  (*See* Pre-Trial Order, Dkt. No. 259, at Stipulations of Fact ¶ 7).

3.      On April 26, 2013, Gabriel Gant filed the Birk Lawsuit.  (Pre-Trial Order, Dkt. No. 259, at Stipulations of Fact ¶ 10).

4.      Additional attorneys eventually were retained on behalf of the Birk Defendants.  Attorney Steven Pigg was retained by Birk Oil Company.  Todd Barrett was retained on behalf of Edward and Linda Birk on February 3, 2015.  Brette Hart was retained on behalf of Justin Birk on February 12, 2015. (Answer to Defs.' First Interrog. to Plaintiff Progressive, attached as Ex. 1, at ¶ 14).

5.      On May 11, 2015, Gant and the Birk Defendants executed an Agreement and Assignment of Rights and Claims Against Bitco General Insurance Corporation and Progressive Northwestern Insurance Company and Covenant Not to Execute ("the *Glenn v. Fleming* Agreement").  (*See* Pre-Trial Order, Dkt. No. 259, at Stipulations of Fact ¶ 15).

6.      Under the *Glenn v. Fleming* Agreement signed by Mr. Gant and the Birk Defendants, Mr. Gant has been assigned by each individual Defendant, including Birk Oil Co., "any and all of their rights against Progressive for breach of contract, negligence and/or bad faith[.]" (*See Glenn v. Fleming* Agreement, attached as Ex. 2, at pp. 1, 6 at ¶ 4, 14).

7.      On May 20, 2015, Progressive filed a *Motion to Intervene and Suggestions in Support* in the Birk Lawsuit.   Attached as an exhibit to the *Motion to Intervene* was a *Motion to*

---

[1] The "Birk Defendants" ultimately included Justin Birk, Edward Birk, Linda Birk, and the company known both as "Birk Oil Company" and "B&B Cooperative Ventures," a general partnership.  The official name of the entity is "B&B Cooperative Ventures," but it is commonly known as "Birk Oil Company" and will be referred to as "Birk Oil Company" in this brief.

*Disqualify and/or Compel the Withdrawal of Defendants' Attorney Kevin McMaster.*[2]  (Motion to Intervene, Dkt. No. 6-5).

8.      On May 22, 2015, McMaster filed a *Notice of Withdrawal* from the Birk Lawsuit. (*See* Pre-Trial Order, Dkt. No. 259, at Stipulations of Fact ¶ 16).

9.      The Birk Lawsuit proceeded to trial in June 2015. Attorneys Pigg, Hart and Barrett represented their respective Birk Defendants at this trial. This trial resulted in judgment in Gant's favor in the amount of $6,723,021.00.  In addition, the Court also approved of Plaintiff's request for $7,114.43 as set forth in a Bill of Cost and post-judgment interest pursuant to K.S.A. §16-204. (*See* Pre-Trial Order, Dkt. No. 259, at Stipulations of Fact ¶ 17).

10.     The trial concluded and the judgment was announced on June 11, 2015.  A written Journal Entry and Judgment later was entered which memorialized the judgment. (*See generally* Trial Journal Entry and Judgment, attached as Ex. 3).

11.     The Court assigned 75% of the fault to Justin Birk and 25% of the fault to his parents, Edward and Linda Birk. (*See id*. at p. 6).

12.     The Court concluded that Justin Birk's driving at the time of the accident was reasonably incidental to his employment and, therefore, that Birk Oil Co. was liable for Justin Birk's negligence under the doctrine of respondeat superior. (*See id.* at p. 6).

13.     As a result of the Court's conclusion that Birk Oil Co. was liable for Justin Birk's negligence under the doctrine of respondeat superior, Birk Oil Company became vicariously liable for Justin Birk's 75% of the fault. (*See id.*).

---

[2] Unless otherwise specified, those documents collectively are referred to herein as the "*Motion to Intervene*."

6

II.     **Facts Related to Agency**

A.      **Progressive Admits Control of McMaster But Denies Agency**

14.     During the time period that the Birk Lawsuit was pending, Progressive engaged

Mr. McMaster to represent the defendant in the case of *Master Machinery Transport v. Stowell*,

15-7993-CM-TJJ (D. Kan.) (*See* Defs.'  Mot. to Intervene & Suggestions in Supp., *Master*

*Machinery Transp. v. Stowell* (2:15-cv-07993-CM-TJJ), attached as Ex. 4, at ¶ 2).

15.     On June 24, 2015, only 35 days after Progressive filed its *Motion to Intervene* in

the Birk Lawsuit, Progressive filed a *Motion to Intervene and Suggestions in Support* in this

Court, in the case of *Master Machinery v. Doris Stowell*.  (*See id.*).  The motion filed in *Master*

*Machinery* stated that "Progressive seeks to intervene in this action for the sole and limited

purpose of filing a motion to disqualify or, alternatively, to compel the withdrawal of attorney

Kevin McMaster and the law firm McDonald Tinker as counsel for Defendants. (*See id*. at ¶7).

16.     The *Motion to Intervene and Suggestions in Support* filed in the case of *Master*

*Machinery v. Doris Stowell* was filed by John Mullen of the law firm Franke Schultz & Mullen,

P.C.  Attorney Christopher M. Harper is also listed on the signature block to that motion.  (*See*

*id.* at p. 3).

17.     Attached as an exhibit to the *Master Machinery Motion to Intervene*, and filed as

Document 11-1, was Progressive's *Motion to Disqualify and/or Compel the Withdrawal of*

*Defendant's Attorney Kevin McMaster*.  (*See* Defs.' Mot. To Disqualify and/or Compel the

Withdrawal of Defs.' Att'y Kevin McMaster, *Master Machinery Transp. v. Stowell* (2:15-cv-

07993-CM-TJJ), attached as Ex. 5).

18.     In its motion to compel Mr. McMaster's withdrawal, Progressive asserted:

> The insurer has the first right to control the litigation with the cooperation
> of the insured, so long as just actions are taken. *Traders and General Ins. Co. v.*

7

*Rudco Oil and Gas Co.* 129 F.2d 621, 626-627 (10th Cir. 1942). Additionally, "[T]he insurance company has the exclusive right to investigate the case, employ and control counsel employed to defend any suit, take full control over the litigation." *Ash v. Farwell,* 37 F.R.D. 553, 554-555 (D. Kan. 1965). "The right to control the litigation in all of its aspects carries with it the correlative duty to exercise diligence, intelligence, good faith, honest and conscientious fidelity to the common Examples of where Progressive denies agency interest of the parties." *Traders* 129 F.2d at 627. Because insurer holds the exclusive right to "employ and control" counsel, they may modify or change representation if necessary.  (*See id.* at ¶ 2).

19.     In its motion to compel Mr. McMaster's withdrawal, Progressive stated that it had terminated Mr. McMaster's relationship with Progressive as panel counsel for Progressive insureds, but that Mr. McMaster had refused to withdraw from the case.  It argued "good cause exists to disqualify or otherwise remove Mr. McMaster and the law firm McDonald Tinker from further representing Defendant in this matter."  Again citing *Traders and General Ins. Co.*, and *Ash*, it argued "Progressive should be accorded the right to have competent counsel of its choosing representing the Defendant in this matter."  (*See id.* at ¶¶ 4, 5, 11).

20.     Progressive filed a Supplemental Memorandum in Support of its motion to compel Mr. McMaster's withdrawal on July 10, 2015.  On July 13, 2015, it then filed a withdrawal of its motion to compel Mr. McMaster's withdrawal stating that the matter "has been resolved."  (*See* Master Machinery Supplement to Motion to Intervene and Suggestions in Support, *Master Machinery Transp. v. Stowell* (2:15-cv-07993-CM-TJJ), attached as Ex. 6; Master Machinery Withdrawal of Motion to Intervene, *Master Machinery Transp. v. Stowell* (2:15-cv-07993-CM-TJJ), attached as Ex. 7).  The parties then filed a stipulation of dismissal. (Stipulation of Dismissal, *Master Machinery Transp. v. Stowell* (2:15-cv-07993-CM-TJJ), Dkt. No. 19, attached as Ex. 8).

21.     On May 1, 2015, J. Nick Badgerow, a lawyer retained on behalf of Progressive to collect Mr. McMaster's Progressive files, sent a letter to Mr. McMaster explaining that "the client files belong to the client, and should be promptly returned on request, without condition."  The letter continued: "I understand that you take the position that these files do not belong to Progressive, and that you represent its insureds.  However, as you know, your firm was engaged by Progressive, and the files were initially sent to you by your client, Progressive.  In this instance, **Progressive is your client**, and its files should be returned."  (*See* Badgerow Letter to McMaster (May 01, 2015), attached as Ex. 9) (emphasis added).[1]

22.     Progressive filed its *Answer and Affirmative Defenses of Plaintiff/Counterclaim Defendant Progressive Northwestern Insurance Company* ("Answer") in the present case on September 1, 2017.  (*See* Doc. 247).

23.     One of the allegations in Mr. Gant's counterclaim against Progressive is that Mr. McMaster was acting as Progressive's agent during the time that he was representing the Birk Defendants.  (*See* Gant's Amended Counterclaim, Dkt. No. 104, at ¶¶ 17, 768).  In its Answer, Progressive denies that McMaster is its agent. (*See*, Doc. 247 at ¶ 768 and Affirmative Defenses at ¶¶ 12, 13).

24.     In response to discovery, Progressive stated "Kevin M. McMaster was not the agent of Progressive, nor was he acting with its authority in the manner, method or tactics he chose to defend the Birk lawsuit.  Mr. McMaster was retained to defend the insured(s) as an independent contractor."  (*See* Answer to Defs.' First Interrog. to Plaintiff Progressive, attached as Ex. 1, at ¶ 11).

---

[1] Attached hereto as Exhibit 55 is a Declaration of Counsel pursuant to D. Kan. Rule 56.1(d).  As stated therein and in the Pretrial Order, the parties have agreed to the authenticity of all documents produced in discovery.  (Pretrial Order, Dkt. No. 259, at p. 4).

**B.      Evidence Regarding Agency**

As demonstrated below, Progressive put Mr. McMaster in charge of insurance functions, such as determining coverage.  In addition, Progressive's guidelines ensure control over hired counsel, such as Mr. McMaster.  During the investigation of and defense of the Birk Lawsuit, Mr. McMaster followed those guidelines, allowing for Progressive to maintain control over him.

25.      Progressive paid Mr. McMaster for the time during which he reviewed and analyzed the insurance policies and made coverage determinations.  (*See* 2013-05-07 Invoice, attached as Ex. 10).

26.      A May 1, 2013 entry in Progressive's claims notes indicates that "Kevin is putting all carriers on notice."  (*See* 2013-05-01 Claims Note, attached as Ex. 11).

27.      A May 10, 2013 letter from Mr. McMaster indicates "we have reviewed the insurance coverages available to the defendants at the time of the accident.  It appears that the Progressive policy provides the only coverage for the accident."  (*See* McMaster Letter to Hansel (May 10, 2013), attached as Ex. 12).

28.      Mr. McMaster sent an email to certain Birk Defendants referring to certain individuals from Progressive as "[t]he bosses."  His email stated, in pertinent part, "The bosses called me (claim manager from Omaha, Neb and two Progressive attorneys from Austin, Texas)* after the meeting was over…*They came to K.C.K[.] for [a] meeting." (*See* McMaster E-mail to Birk, (Feb. 24, 2015), attached as Ex. 13)**.**

29.      Mr. McMaster testified at deposition, "I reported in a fashion that they either had guidelines or expectations."  (McMaster Dep., attached as Ex. 14, at 229:5-7).

30.     Progressive's Defense Counsel Guidelines state, in part, that "prior authorization is required for more than one hour of research." (*See* Agreement Regarding Quotations, attached as Ex. 15).

31.     On February 27, 2014, Mr. McMaster sent a letter requesting approval for ten hours of legal research on Motions for Summary Judgment and twelve hours of research on Motions in Limine.  He included a two-page, single-spaced memorandum explaining the need for the research and requested that the claims adjuster "contact the undersigned so that we can discuss how to proceed."  (*See* McMaster Letter to Hansel (Feb. 27, 2014), attached as Ex. 16).

32.     On Wednesday, May 14, 2014, Mr. McMaster sent an e-mail to Progressive explaining that he would like to file a motion for a protective order, that he was "aware of no Kansas appellate court case that specifically addresses this situation," and that he was requesting "approval for 4 hours of research time."  Mr. McMaster stated "[i]f we are going to file such a motion it should be done by Monday or Tuesday, so your prompt attention is greatly appreciated."  (*See* McMaster E-mail to Hansel (May 14, 2014), attached as Ex. 17).

33.     On August 29, 2014, Mr. McMaster sent an e-mail requesting that Progressive approve 10 hours of legal research so that he could research an appeal and/or mandamus action "regarding the Court[']s ruling related to privileged communications…which will also overlap into the sanction matter."  (*See* McMaster E-mail to Hansel (August 29, 2014), attached as Ex. 18).

34.     On January 25, 2015, McMaster sent an e-mail to the Progressive adjuster enclosing four pages of single-spaced proposed research and estimates of associated research time that he would like to perform with regard to summary judgment and *Daubert* motions, as

well as a request that he receive approval for the same.  (*See* McMaster E-mail to Hansel (Jan. 25, 2015), attached as Ex. 19).

35.     Mr. Hansel explained that Progressive requires its attorneys to seek prior approval for any time spent on legal research, and that although they can do any research they want, "if they want to be paid … they're required to seek approval of that time in advance."  (*See* Hansel Dep., attached as Ex. 20, at 184:18-22; 185:14-19).

36.     Mr. Hansel admitted, based on correspondence, that "Mr. McMaster certainly appears to be of the view that he cannot move forward with this [requested] research until such time as he receives approval[.]"  (*See id.,* at 183:9-13).

37.     Progressive's Defense Counsel Guidelines state, in part, that "Once the claims rep has received responses to written discovery, has discussed the future handling with the handling attorney, and all have agreed to the plan of action, oral discovery phase activities are to proceed." (*See* Agreement Regarding Quotations, attached as Ex. 15).

38.     On February 27, 2014, Mr. McMaster sent a letter to Progressive setting forth depositions he "request[s] taking" and asking Mr. Hansel to contact him to discuss this plan of action.  (*See* McMaster Letter to Hansel (Feb. 27, 2014), attached as Ex. 22).

39.     Progressive's Defense Counsel Guidelines state that "[a]ll motions should be discussed with the claims rep prior to being initiated[.]" (*See* Agreement Regarding Quotations, attached as Ex. 15).

40.     On July 15, 2013, Mr. McMaster sent a letter stating that he was "considering" filing a motion asking for plaintiff to be sanctioned and an order to show cause why plaintiff should not be found in contempt of court.  (*See* McMaster Letter to Hansel (July 15, 2013), attached as Ex. 24).

41.     Progressive's Defense Counsel Guidelines state: "Claims management expects to be involved in the decision-making on the retention of any expert, whenever possible." (*See* Agreement Regarding Quotations, attached as Ex. 15).

42.     Mr. McMaster sent a February 27, 2014 letter to Hansel indicating that "[w]ith your approval, we will begin investigating the retaining of a damage expert."  (*See* McMaster Letter to Hansel (Feb. 27, 2014), attached as Ex. 22).

43.     Mr. McMaster sent an April 22, 2014 e-mail with a form requesting approval of an economist, along with the expert's CV, his fee schedule, and a statement from Mr. McMaster explaining that "our report is due 4/30, so time is of the essence."  (*See* McMaster Email to Hansel (April 22, 2014), attached as Ex. 26).

44.     Mr. McMaster sent an April 28, 2014 email to Robert Hansel, of Progressive, stating "TIME IS OF THE ESSENCE" and requesting "your approval, ASAP" for retention of a cell phone expert.   Mr. Hansel forwarded the email up the chain to Mark Campbell, requesting "CAN YOU APPROVE ASAP?"   (*See* McMaster, Hansel & Campbell Email Chain (April 28, 2014), attached as Ex. 27).

45.     On May 15, 2015, John Mullen of Franke Shultz & Mullen, sent a letter to Edward and Linda Birk, explaining that he had been retained by Progressive, and was responding to an alleged request from Mr. and Mrs. Birk to allow Mr. McMaster to direct and lead the defense of their case at trial.  In the letter, Mr. Mullen stated as follows:

> Prior to signing this Agreement, **Progressive acquiesced to your recent request to allow Mr. McMaster to direct and lead the defense of this matter**. Progressive did so because it believed that you should be permitted to direct the choice of counsel and direct the defense strategy since you would be responsible for any excess judgment.  However, as a result of your execution of The Agreement, Progressive is the only entity from which the judgment may be collected.  Therefore, Progressive is no longer willing to allow you to direct Mr. McMaster to take the lead in defending this case or directing defense strategy.

(*See* Mullen Letter (May 15, 2015), attached as Ex. 28) (emphasis added).

46.     On May 19, 2015, Mr. McMaster sent a response to Mr. Mullen, on behalf of Linda and Edward Birk, stating, among other things, that "we disagree with your statement that, prior to signing the agreement, Progressive acquiesced and allowed Mr. McMaster to direct and lead the defense of this matter."[2]  (*See* McMaster Response to Mullen (May 19, 2015), attached as Ex. 29).

Progressive also controlled Mr. McMaster—and its other attorneys—through billing practices, often micro-managing which expenses would be approved.  Examples follow.

47.     McMaster billed for his time traveling "t[o] and from Garnett, Kansas for arguments on various discovery disputes and scheduling conference." Progressive reduced the billable time, stating that "Per page 7 of the Claims Billing Protocols, Progressive's expectation is that you will not charge for local travel time within your firm's geographic area.  Roundtrip travel time of one hour or less is considered local travel.  We will therefore reimburse at the approved hourly rate, after the first one hour of travel."  (*See* 2014-01-23 Invoice and Reduction, attached as Ex. 30, at p. 1).

48.     Progressive declined to pay $176.40 of mileage because "Per page 7 of the Claims Billing Protocols, mileage is not reimbursable."  (*See id*. at pp. 1-2).

49.     Progressive rejected a bill from McMaster's office for a $7 QuikTrip sub sandwich purchased during a day of roundtrip travel to Tulsa, Oklahoma, for the attorney's

---

[2] In fact, Mr. McMaster sent several versions of this response letter to Mr. Mullen.  The version which is attached as an exhibit was sent on behalf of Edward and Linda Birk.  However, Mr. Mullen also sent similar versions of the letter, which also contain the statement "we disagree with your statement that, prior to signing the agreement, Progressive acquiesced and allowed Mr. McMaster to direct and lead the defense of this matter," on behalf of other Birk Defendants.  For example, a second letter was sent on behalf of Justin Birk and a third letter was sent on behalf of the company.

attendance at a meeting where a cellphone expert inspected the phone that was in Katie Gant's possession at the time of the accident.  (*See* 2014-12-22 Invoice and Reduction, attached as Ex. 31).

50.      Mr. McMaster sent an April 9, 2014 e-mail to Progressive stating that he was "busting my but[t] to keep time and expense down in this case," that Progressive's "latest write downs are unwarranted," and that "I would rather not be placed in a position of having to write everything down for submission and then have someone hack the heck out of it."  In response to this e-mail, Mr. Campbell commented to others at Progressive that there were "simply protocols that must be followed" at Progressive.  (*See* McMaster & Campbell Email Exchange (April 09, 2014), attached as Ex. 32).

51.      Ms. Hart, the attorney later retained for Justin Birk, sent an August 17, 2015 e-mail to Jean Kelly explaining that Progressive's auditor Traci Toth "was cutting so many legitimate bills with no reason that Robin LaCava called and had her taken off of our bills.  But, it seems that Ms. Toth has made a return. … The most interesting new way the bill auditors have decided to cut our bills is by searching ALL Progressive cases we worked on in one day and then unilaterally deciding that we could not possibly have worked as many hours as we billed.  For example, on long days where we work on 15 Progressive cases which total 14 hours or so, Traci Toth/LSS will arbitrarily cut our bills down to 8 hours."  (*See* August 17, 2015 e-mail chain, attached as Ex. 33, at p. 2).

52.      The same day, Ms. Hart's partner, Dana Harris, sent an e-mail explaining:

> [T]he advent of ever more unreasonable (from my perspective) billing guidelines coupled with aggressive audits services who have to justify their existence by ripping our bills to shreds, is both demoralizing and irritating to an already undercompensated (in my opinion) insurance defense counsel group.  This is in large measure why there is movement by many very competent insurance defense counsel over to the Plaintiff's side.  This adversarial billing

15

system also results in more overhead for small firms in terms of persons who are now dedicated almost exclusively to billing. It is hard to be loyal and zealously advocate under these circumstances. Now back to trial prep on my upcoming multi-million dollar case that the auditors undoubtedly think should be prepped and handled by my unlicensed paralegal.

(*Id.* at p. 1).

## III.   **Admissions Regarding Breach of Duty**

Progressive previously admitted facts demonstrating a breach of duty with regard to Mr. McMaster's actions and inactions in his defense of the Birk Lawsuit. In addition, Progressive's in-house counsel noted several breaches in a letter seeking to procure Mr. McMaster's withdrawal.

53.   In its *Motion to Intervene*, Progressive represented the following:

a) "Initially, Progressive engaged Kevin McMaster to represent all Defendants. However, because of concerns regarding his handling of the case as hereinafter described, Progressive has retained other counsel to represent the Defendants." (*Motion to Intervene*, Dkt. No. 6-5, p. 2, ¶ 4).

b) "Mr. McMasters [sic] has been repeatedly sanctioned and required to compensate Plaintiff and/or their counsel for obstreperous conduct during discovery, including being (in the Court's words) 'obstructionist.'" (*Id.* at 2, ¶ 8).

c) "Additionally, Mr. McMaster also failed to respond to hundreds of Requests for Admission in this matter, to the extreme detriment of Defendants." (*Id.* at 2, ¶ 9).

d) "Due to Mr. McMaster's conduct and handling of this matter, Progressive has terminated Mr. McMaster's relationship with Progressive as panel counsel for Progressive insureds and has retained separate counsel for all defendants in this case." (*Id.* at 3, ¶ 11).

e) "Progressive seeks to intervene in this action for the sole and limited purpose of filing a motion to disqualify or, alternatively, to compel the withdrawal of attorney Kevin McMasters [sic] as counsel for Defendants." (*Id.* at 3, ¶ 13).

54.   In addition, in the *Motion to Disqualify and/or Compel the Withdrawal of Defendants' Attorney Kevin McMaster*, which was filed as an attachment to the *Motion to Intervene*, Progressive represented the following:

16

b) "Initially, Progressive engaged Kevin McMaster to represent all Defendants. However, because of concerns regarding his handling of the case as hereinafter described, Progressive has retained other counsel to represent the Defendants." (*Motion to Disqualify*, Dkt. No. 6-5, p. 8, ¶ 4).

c) "Mr. McMaster has been repeatedly sanctioned and required to compensate Plaintiff and/or their counsel for obstreperous conduct during discovery, including being (in the Court's words) 'obstructionist.'" (*Id.* at 8, ¶ 8).

d) "Additionally, Mr. McMaster also failed to respond to hundreds of Requests for Admission in this matter, to the extreme detriment of Defendants." (*Id.* at 9, ¶ 9).

e) "Due to Mr. McMaster's conduct and handling of this matter, Progressive has terminated Mr. McMaster's relationship with Progressive as panel counsel for Progressive insureds and has retained separate counsel for all defendants in this case." (*Id.* at 9, ¶ 11).

f) "Mr. McMaster wholly failed to timely respond to Plaintiffs Requests for Admission, despite the Court specifically directing him to do so. These matters have been deemed admitted and are highly prejudicial to Defendants and Progressive." (*Id.* at 10, ¶ 13).

g) "Progressive is justifiably concerned regarding Mr. McMaster's ability to effectively advocate on behalf of the defense to minimize the damages awarded in any judgment in this case which may be collected from Progressive." (*Id.* at 12, ¶ 25).

h) "Progressive should be accorded the right to have competent counsel of its choosing representing the defendants at the trial of this matter since it is the only entity from which the plaintiff may seek to satisfy a judgment rendered herein." (*Id.* at ¶ 26).

i) In addition, Progressive set forth several ethical rules that it believed Mr. McMaster had violated, or that were otherwise relevant to Mr. McMaster's actions in the Birk Lawsuit, including KRPC 1.1 (Competence), KRPC 1.3 (Diligence), KRPC 3.1 (Advocate: Meritorious Claims and Contentions), KRPC 3.2 (Advocate: Expediting Litigation), KRPC 3.3 (Candor to the Tribunal), KRPC 3.4 (Fairness to Opposing Party and Counsel). (*Id.* at 10-11, ¶¶ 17-23).

55.     Jean Kelly, a claims attorney for Progressive, testified that she reviewed an advance copy of the *Motion to Intervene*, that "if I wanted anything to be changed, I – I would have had the opportunity to provide my edits and my revisions," and that "I agreed with our

attorneys, who were representing us, that in drafting this and filing this, this was the best thing for Progressive to do[.]"  (*See* Kelly Dep., attached as Ex. 34, at 25:5-8, 229:10-230:2).

56.     John Mullen, counsel for Progressive, explained in correspondence that Progressive was filing the motion "for the sole and limited purpose of seeking the removal of Kevin McMasters [sic] from the case."  (*See* Mullen E-mail to Kieffer (May 19, 2015), attached as Ex. 35).

57.     Mr. Mullen also explained that "the motion will be moot" if Mr. McMaster withdraws from the case.  (*See* Mullen E-mail to McMaster (May 22, 2015), attached as Ex. 36).

58.     Progressive never filed a motion to withdraw its motion to intervene and, according to the docket, the *Motion to Intervene* was not actually withdrawn.  However,  Mr. Mullen sent a letter to the Court stating:

> I recently filed a Motion to Intervene on behalf of proposed Intervenor Progressive Northwestern Insurance Company.  The Motion to Intervene sought intervention for the sole and limited purpose of having Mr. Kevin McMaster removed as counsel for the defendants in this case.  Subsequent to the filing of the Motion to Intervene, Mr. McMaster voluntarily withdrew from this case. Accordingly, I am herewith withdrawing the Motion to Intervene.

(*See* Mullen Letter to Court (May 27, 2015), attached as Ex. 37).

59.     One of Progressive's experts, J. Eugene Balloun, testified that the rules cited in Progressive's motion provide minimum standards for an attorney, and that if "the lawyer did not do what the rules require, then, of course, he didn't meet the standard."  (Balloun Dep., attached as Ex. 38, at 35:2-36:7).

60.     Mr. Balloun testified that Mr. McMaster acted "inappropriately"; that "his conduct in discovery was not up to standard"; that if he allowed Requests for Admission to go unanswered or failed to disclose insurance policies, that this was also inappropriate conduct; and that "[i]f he was less than candid with the Court, that's inappropriate."  (*Id.* at 199:20-200:14).

61.     Mr. Hansel testified that he is not aware of any other case, in his 30-plus year history with Progressive during which he has handled thousands, possibly tens of thousands of claims, where he had hired a lawyer to defend a Progressive insured and Progressive later filed a motion with the Court seeking to have that attorney removed and alleging the attorney committed multiple ethical violations.  (Hansel Dep., attached as Ex. 20, at 14:25-15:6; 147:24-148:6).

62.     Robert Allan Provorse, a litigation supervisor who had worked for Progressive almost 28 years by the time of his deposition and had been involved with "at least 10,000" insurance claims, testified that he does not recall any other case in his time at Progressive where Progressive has engaged an attorney to file a motion seeking permission to intervene in a case for the purpose of having a lawyer removed as counsel for its insureds.  (Provorse Dep., attached as Ex. 39, at 12:22-13:14; 18:8-15; 152:12-24).

63.     Mr. Hansel testified that he is not aware of any other case he has been involved in with Progressive where an attorney he hired had failed to answer hundreds of Requests for Admissions.  (Hansel Dep., Ex. 20, at 152:18-25).

64.     Mr. Hansel testified that he is not aware of any other case he has been involved in with Progressive where an attorney he hired was sanctioned multiple times by a judge to the total tune of $7,500 in fines to be paid by the attorney.  (*Id.* at 155:21-156:10).

65.     In discussing the *Motion to Intervene*, Mr. Hansel testified that he has "never seen a document with these type of allegations before[.]"  (*Id.* at 159:13-19, 160:6-13).

66.     On April 3, 2015, Ms. Kelly sent a letter to Mr. McMaster.  That letter makes the following representations:

> a)   "This letter follows our conversation earlier this afternoon, in which we discussed the concerns Progressive has with respect to your representation of our insureds in

and your handling of the *Gant v. Birk* matter. Those concerns include the potential conflict of interest inherent in your representing all of our insureds, and the repeated discovery sanctions from the bench -- including, most recently, the Court's consideration of default judgment against our insureds as a sanction for perceived expert discovery violations."

b)  "The Court's ruling that requests for admissions as to our insureds Justin Birk. Edward Birk. and Linda Birk have been deemed is also of deep concern, notably those admissions by the Birks that Justin was speeding, was left-of center, that Kathryn Gant is deceased as a result of Justin's material deviation from the standard of care, and that Edward and Linda Birk had knowledge of all of Justin's traffic violations."

c)  "We also discussed that at this point, unfortunately we do not feel the necessary trust, candor, and cooperation exist between you and Progressive for you to continue representing Progressive insureds on our panel of defense counsel."

d)  "Lastly, John Mullen will be calling you to set up a time to speak with you and your partners about the matters addressed in this letter, as well as Progressive's suggestion that your firm notifies its malpractice carrier about the sanctions and the admissions in this matter."

(*See* Kelly Letter to McMaster (April 03, 2015), attached as Ex. 40).

67.  On May 22, 2015, McMaster withdrew from the Birk Lawsuit.  (*See* Notice of Withdrawal, *Gant v. Birk*, No. 13-cv-019, (May 22, 2015), attached as Ex. 41).

**IV.   Facts Regarding Causation**

Progressive also admitted that Mr. McMaster's conduct caused substantial harm to the Birks.  Yet, Progressive is now trying to back away from that statement and claim that Mr. McMaster's actions had no bearing on the outcome of the Birk Lawsuit.  Progressive's admission and the evidence supporting it are laid out below.

**A.  Progressive Admits that Mr. McMaster's Conduct was Detrimental, Then Denies That Same Fact.**

68.  As noted above, Progressive wrote as follows in its *Motion to Intervene* in the Birk Lawsuit: "Additionally, Mr. McMaster also failed to respond to hundreds of Requests for

Admission in this matter, to the **extreme detriment** of Defendants."  (Dkt. No. 6-5 at 2, ¶ 9 (emphasis added)).

69.     In the accompanying Motion to Disqualify, Progressive again noted the failure to respond to hundreds of requests for admission and wrote that "[t]hese matters have been deemed admitted and are **highly prejudicial** to Defendants and Progressive."  (*Id.* at 10, ¶ 13 (emphasis added)).

70.     In this case, however, Mr. Hansel testified as follows regarding Mr. McMaster's actions in the Birk Lawsuit: "I was not aware of anything that [he did that] was detrimental." (Hansel Dep., attached as Ex. 20, at 276:15-24).

71.     Also in this case, Progressive expert, J. Eugene Balloun, has testified that "[t]here's nothing to indicate that any of McMaster's actions had any effect on the verdict itself." (Balloun Dep., attached as Ex. 38, at 288:14-15).

**B.     Evidence That Mr. McMaster's Conduct Was Detrimental**

72.      The Coffey Court District Court issued a discovery sanction against Mr. McMaster in which it declared Birk Oil Co. to be the alter ego of Edward and Linda Birk.  (Nov. 17, 2014 Journal Entry, No. 13-cv-019, attached as Ex. 42, at 4).

73.      The Coffey Court District Court indicated, in a journal entry dated November 17, 2014, that the alter ego determination was being issued as a sanction; it was not based on any evidentiary determination.  (*See id.*).

74.     The court further made this point at oral argument, in stating its frustration with the Birk Defendants' constantly shifting positions as to details as simple as the name of the entity known as Birk Oil Company.  (*See generally* Transcript of Hearing at pp. 42-44 (2014-11-17), attached as Ex. 43).

21

75.     After Mr. McMaster argued that a distinction in the company name justified months of failures to respond to discovery, Judge Godderz stated: "[M]ost of the motions filed in this particular case would have [gone] by the wayside, because of the fact that there would have been a … proper dealing in discovery in this particular case, proper candor with the Court regarding this particular case, and there hasn't been. And for you [McMaster] to stand there today and continue to make this argument, the Court's genuinely surprised." (*See id*. at p. 3).

76.     The court in the Birk Lawsuit specifically held that Birk Oil Co. was the alter ego of Edward and Linda Birk.  (Nov. 17, 2014 Journal Entry, No. 13-cv-019, attached as Ex. 42, at 4).

77.     This alter ego determination was re-affirmed in the journal entry that announced the final judgment.  (Trial Journal Entry & Judgment, No. 13-cv-019, attached as Ex. 3, at 13 (July 15, 2015)).

78.     On February 10, 2015, Todd Barrett—the attorney retained to defend Edward and Linda Birk—explained in an e-mail that "I have spent the better part of a week including the entire weekend getting up to speed on Gant v. Birk and I am working late again tonight."  He stated that "[t]here are over 9,000 pages of well-documented liability and damages on one side and obstructionist legalism on the other in this voluminous file."  (*See* Barrett Email to Schroeder (Feb. 10, 2015), attached as Ex. 44).

79.     In Mr. Barrett's February 10, 2015 e-mail, he explains that "[w]hile there may be some limited opportunity for my small gift of bringing clam in the midst of stormy waters, this rudderless ship will have been at sea almost two years by the time of the scheduled trial." (*See id.*).

80.     In response, Ms. Kelly states "I don't disagree with Todd's position in this email." (*See* Kelly Email to Ostrom (Feb. 11, 2015), attached as Ex. 45).

81.     The following day, on February 11, 2015, a conference call took place that included, at a minimum, Todd Barrett, Courtney Schroeder (of Progressive) and John Neary (of Progressive).  After the call, Mr. Neary noted that Barrett "sounds severe" and "actually sounds pissed."  Courtney Schroeder responded "[I] think he's in a bad position," to which John Neary said "agree."  (*See* Neary & Schroeder Message Chain (Feb. 11, 2015), attached as Ex. 46).

82.     On February 23, 2015, Mr. Barrett described the unanswered Requests for Admissions as a "ticking time-bomb."  (*See* Barrett Email to Kelly (Feb. 23, 2015), attached as Ex. 47).

83.     On February 27, 2015, Mr. Barrett prepared a pre-trial report.  That report stated, among other things, "the counterintuitive defense strategy that played out in front of the court's eyes continues and is counterproductive and clearly has diverted defense counsel's attention from doing adequate pre-trial discovery on the significant damages issues presented." (*See* Barrett E-mail to Schroeder, Pre-trial Report (Feb. 27, 2015), attached as Ex. 48).

84.     Mr. Barrett's pre-trial report also explained that "the Court at best has become tone deaf to defense counsel's high-pitched whining about irrelevant discovery disputed issues, and at worst imposed draconian discovery sanctions for good reason after his patience wore thin with defense counsel."  (*Id.*).

85.     Mr. Barrett further wrote that "a knotty discord of issues created by the prior file handling became readily apparent upon my involvement, but has proven difficult to untangle."  (*Id.*).

86.     On March 2, 2015, Stephen Pigg sent a letter to Progressive.  In it, he explained that the "defense to this claim is hamstrung by the Court's having entered a discovery sanction that the partnership is the alter ego of Edward and Linda."  (*See* Pigg Letter to Schroeder, Pre-trial Report (March 02, 2015), attached as Ex. 49).

87.     Mr. Pigg wrote that "[t]he evidence is insufficient to establish an alter ego claim against B&B on its merits[,]" but that "the Court has already entered a discovery sanction" on alter ego, thereby causing the business to be held "liable for any percentage of fault assessed against Ed and Linda on the negligent entrustment claim."  (*Id.*).

88.     On March 2, 2015, Mr. Pigg also sent a letter to Progressive.  In it, he explained that it "appears that the Judge has become disenchanted with Mr. McMaster's defense tactics and cannot be expected to lean in defendants' favor on issues within the discretion of the Court."  (*Id.*).

89.     In an April 2, 2015 letter, Mr. Pigg wrote that "Excluding evidence of Gant's texting is a significant detriment to the defense on liability.  Judge Godderz is correct that such evidence is highly prejudicial.  If admitted, such evidence could have resulted in a jury placing significant fault on Gant, maybe as much as 35%."  (*See* Pigg Letter to Kelly, Storey, & Birk, (April 02, 2015), attached as Ex. 50).

90.     On April 6, 2015, Mr. Pigg sent an e-mail to Laura Birk, the accountant for Birk Oil Company.  It included the following statement:

> Progressive has decided to terminate Kevin's services on this case. She [Ms. Kelly] said that Progressive believes that the best defense can be afforded by Brette Hart, Todd Barrett and me. They are concerned that Kevin's disputes with [Gant's counsel] have become personal impairing his objectivity and that Kevin has lost all credibility with Judge Godderz, which detracts from his ability to achieve the best possible results for you.

(*See* Pigg E-mail to Birk (April 06, 2015), attached as Ex. 51).

91.     On April 27, 2015, Mark Campbell, of Progressive, sent an e-mail explaining that Brette Hart "is counsel we had to bring in to clean-up for McMasters [sic] on the Birk case[.]"  (*See* Campbell E-mail to Braunholz (April 27, 2015), attached as Ex. 52).

92.     Todd Barrett prepared a letter which states, among other things:

- "[A] discovery sanction was imposed regarding 'alter ego' liability of the Birk family business for the liability of the owners (our clients Edward and Linda Birk) which **dramatically changes the legal landscape**[.]"

- "The *alter ego* sanction is a significant problem for my clients in terms of putting on a defense to the negligent entrustment claim. Furthermore, the bias of Judge Godderz against the defendants created by the disputed discovery issues has put the defense team between a proverbial "rock and a hard place[.]"

- "Certainly, the Birk family and/or Birk Oil have significant collectible assets that have a very real and tangible exposure given the facts and legal ramifications from the non-monetary discovery sanction imposed by Judge Godderz against the Birks."

(*See* Barrett Letter to Sanders (April 8, 2015), attached as Ex. 53 (emphasis added)).

93.     On April 10, 2015, Steve Pigg sent a letter to Laura Birk which includes the following statements:

- "I am convinced that it is counterproductive to the defense of any defendants for Kevin to remain as an attorney of record."

- "I believe, and I think Todd and Brette also believe, that Kevin has and would continue to fight battles that cannot be won, which only causes further loss of credibility for the defense with Judge Godderz[.]"

- "We face a significant problem in that Kevin never answered the Request for Admissions that were served by Kieffer [sic] with the petition."

(*See* Pigg E-mail to Birk (April 10, 2015), attached as Ex. 54).

## ARGUMENTS AND AUTHORITIES

The Court should determine, based on Progressive's admissions, that:

- Kevin McMaster was acting as Progressive's agent in defending the Birk Defendants;

- Progressive, through Kevin McMaster, breached its duty to defend the Birk Defendants in good faith and without negligence.

- Those breaches caused damages to the Birk Defendants.

Based on all of the above, Mr. Gant should obtain summary judgment on liability, with the trial needed only to determine the extent of his damages.[3]

### I.    Summary judgment standard

Under Rule 56, the Court should grant summary judgment if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In assessing a motion for summary judgment, the Court must "view the facts, and all reasonable inferences those facts support, in the light most favorable to the nonmoving party." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1116 (10th Cir. 2013) (alterations omitted).  "A dispute is genuine when a reasonable jury could find in favor of the nonmoving party on the issue." *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712 (10th Cir. 2014).  "At the summary judgment stage, [the Court's] role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate fact-finder, to sustain [the] claim." *Marcus v. McCollum*, 394 F.3d 813, 820 (10th Cir. 2004).

---

[3] As explained in greater detail in Footnote 6, this summary judgment motion is not based on Progressive's direct liability through its own actions and omissions.  It is only based on the actions of Mr. McMaster.  Therefore, the fact-finder would also be asked to address Progressive's direct liability through its own actions and omissions.

**II.      Mr. Gant should be granted summary judgment on the question of whether Mr. McMaster was acting as an agent of Progressive, because Progressive has admitted that it had the right to control Mr. McMaster, which is the dispositive factor under Kansas law.**

The Court should first grant summary judgment to Mr. Gant on his claim that Kevin McMaster was acting as the agent of Progressive in defending the Birk Lawsuit.  The Court should make this determination, as a matter of law, based on the following:

- Progressive admitted in a pleading to this Court, referring to Mr. McMaster, that Progressive had the right to control Mr. McMaster.

- Under Kansas law, if a principal has the right to control the actions of a hired party, then the hired party is the principal's agent.

- This Court has the discretion to bind Progressive to its prior statements about control through the doctrines of judicial estoppel and judicial admissions.

- This Court should exercise that discretion based on Progressive's prior representations, and based on the strong evidence that Progressive was, in fact, controlling Mr. McMaster's conduct during the Birk Lawsuit.

A.      <u>Progressive admitted the right to control Mr. McMaster to this Court, which establishes agency under Kansas law</u>.

During the same time period that the Birk Lawsuit was pending, Progressive retained Mr. McMaster in the case of *Master Machinery Transport v. Stowell*, 15-7993-CM-TJJ (D. Kan.). (Statement of Facts at ¶ 14).  During the same month of the trial of the Birk Lawsuit, Progressive filed a *Motion to Intervene*, for the purpose of filing an attached *Motion for Order Compelling Counsel to Withdraw* in the *Master Machinery* lawsuit.  (*Id.* at ¶¶ 9, 15).  This motion was filed on June 24, 2015, only 35 days after Progressive had moved to intervene to seek Mr. McMaster's withdrawal from the Birk Lawsuit and 13 days after the Court announced a judgment of more

than $6.7 million against the Birk defendants following trial.  (*Id.* at ¶¶ 9, 10, 15).  Progressive's motion stated that it sought intervention "for the sole and limited purpose of filing a motion to disqualify or, alternatively, to compel with the withdrawal of attorney Kevin McMaster and the law firm McDonald Tinker as counsel for Defendants."  (*Id.* at ¶ 15).

In the accompanying *Motion to Disqualify and/or Compel the Withdrawal of Defendant's Attorney Kevin McMaster*, Progressive asserted:

> The insurer has the first right to control the litigation with the cooperation of the insured, so long as just actions are taken.  *Traders and General Ins. Co. v. Rudco Oil and Gas Co.* 129 F.2d 621, 626-627 (10th Cir. 1942).  Additionally, "[T]he insurance company has the exclusive right to investigate the case, employ and control counsel employed to defend any suit, take full control over the litigation."  *Ash v. Farwell*, 37 F.R.D. 553, 554-555 (D. Kan. 1965).  "The right to control the litigation in all of its aspects carries with it the correlative duty to exercise diligence, intelligence, good faith, honest and conscientious fidelity to the common interest of the parties."  *Traders* 129 F.2d at 627.  Because insurer holds the exclusive right to "employ and control" counsel, they may modify or change representation as necessary.

(Statement of Facts at ¶ 18).  Progressive explained that it had terminated Mr. McMaster's relationship with Progressive as panel counsel for Progressive insureds, but that Mr. McMaster had refused to withdraw from the case.  It argued "good cause exists to disqualify or otherwise remove Mr. McMaster and the law firm McDonald Tinker from further representing Defendant in this matter."  Again citing *Traders and General Insurance Co.* and *Ash*, Progressive argued that it "should be accorded the right to have competent counsel of its choosing representing the Defendant in this matter."  (*Id.* at ¶ 19).

Thus Progressive, through the same attorneys that represent it in this case, has told this Court—while referring to the same attorney at issue here, Mr. McMaster, and during the same timeframe as the Birk Lawsuit—that an insurance company has "the first right to control litigation"; has "the exclusive right to investigate the case, **employ and control** counsel to

defend any suit"; has "the right to control the litigation all of its aspects"; and "may modify or change representation as necessary."   (*Id.* at ¶¶ 16, 18, 19) (emphasis added).

One of the allegations in Mr. Gant's counterclaim against Progressive is that Mr. McMaster was acting as Progressive's agent during the time that he was representing the Birk Defendants.  (*Id.* at ¶ 23).  Contrary to Progressive's multiple and emphatic previous representations, cited above, Progressive in this lawsuit has repeatedly denied that Mr. McMaster was acting as its agent.  (*Id.* at ¶¶ 23, 24).

Under Kansas law, the test for agency is largely based on the issue of control.  An attorney will not be considered the agent of the insurance company merely because the insurance company hired the attorney to defend an insured.  *Pac. Employers Ins. Co. v. P.B. Hoidale Co.*, 789 F. Supp. 1117, 1122 (D. Kan. 1992) (citing *Bell v. Tilton*, 234 Kan. 461, 465, 674 P.2d 468 (1983)).  However, Kansas courts have also recognized that "the attorney-client relationship is grounded in agency principles."  *Id.* (citing *Professional Serv. Indus. v. Kimbrell*, 758 F. Supp. 676, 681 (D. Kan.1991).  In the context of an attorney retained by an insurer, this Court has described the inquiry under Kansas law as follows:

> Under Kansas law, the liability of a principal for the negligent acts of his agent is controlled by a determination as to whether, at the time in question, the agent was engaged in the furtherance of the principal's business to such a degree that the principal had **the "right to direct and control"** the agent's activities.

*Id.* (quoting *Brinkley v. Farmers Elevator Mutual Ins. Co.*, 485 F.2d 1283, 1286 (10th Cir. 1973) (emphasis added)).  Thus, the question presented by this motion is whether Progressive had the right to direct and control Mr. McMaster.

Progressive's pleadings in the *Master Machinery* case answer that question affirmatively. Progressive told this Court that it has "the first right to control litigation"; has "the exclusive right to investigate the case, employ and control counsel to defend any suit"; has "the right to

control the litigation all of its aspects"; and "may modify or change representation as necessary." (Statement of Facts at ¶ 18).  As noted, the attorney in that case was Mr. McMaster, who was representing the defendant in that case contemporaneously with his representation of the Birk Defendants.  (*Id.* at ¶ 14).  Further, Progressive, through the same attorneys who now represent it in the present action, made these representations during the same general timeframe that the Birk Lawsuit was pending.  (Statement of Facts at ¶¶ 14, 16).  Because Progressive has unequivocally admitted to having the right to control Mr. McMaster in litigation, and because the test in Kansas is whether the insurer has "the right to direct and control the agent's activities," this Court should conclude that Mr. McMaster acted as Progressive's agent.  The only remaining issue is whether Progressive should be held to its prior judicial statements.

      B.    <u>The doctrines of judicial estoppel and judicial admissions should apply to bar Progressive from denying that it had the right to control Mr. McMaster</u>.

Two related legal doctrines apply in this circumstance to preclude Progressive from now denying what it once openly admitted to this Court—that as the employer of Mr. McMaster, it had the right to control him in litigation.  The applicable doctrines are judicial estoppel and judicial admissions, either of which apply to this situation.

      *1.*    *Judicial Estoppel*

Judicial estoppel is based on the theory that parties should not be permitted to change their positions on issues to suit their needs.  Federal courts apply federal law when determining the applicability of the doctrine.  *Eastman v. Union Pac. R.R. Co.*, 493 F.3d 1151, 1156 (10th Cir. 2007).  As discussed by the U.S. Supreme Court, "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position … ."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  The doctrine of judicial estoppel is designed "to protect the integrity

of the judicial process … by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* at 749-50 (citations omitted).  The doctrine has also been described as a "policy against permitting a party to play 'fast and loose' with the courts." *Gilmore.*, 811 F.2d at 113.

Though *New Hampshire* involved contrary statements within the same case, the doctrine can apply to statements made in one case that contradict statements made in a prior case.  *See Davis v. McCarter*, 569 F. Supp. 2d 1201, 1203–04 (D. Kan. 2008) (applying judicial estoppel to prevent plaintiff who had pleaded guilty to being a felon in possession of a firearm from asserting in a later civil case that he did not have a gun).

Whether to apply judicial estoppel in a particular case is a matter of court discretion. *New Hampshire*, 532 U.S. at 750.  Thus, "[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle."  *Id.* However, the Supreme Court identified three factors to be considered in determining whether to apply the doctrine: (1) the party's later position must be clearly inconsistent with its earlier position; (2) the court should inquire as to whether party succeeded in persuading the court to accept its first position; (3) and the court should also consider whether the party asserting an inconsistent position would gain an unfair advantage if not estopped from claiming the opposite position.  *Id.* at 750-51.  The Supreme Court only framed the first prong as a requirement—using the word "must"—while the second and third prongs were stated as "considerations."  *See id.* This Court has analyzed those same factors in addressing judicial estoppel.  *See, e.g.*, *Davis*, 569 F. Supp. 2d at 1203.

In this case, the Court should exercise its discretion to apply the doctrine of judicial estoppel and preclude Progressive from now denying what it once affirmatively and

4852-8805-6922, v. 4

unequivocally asserted: that it had the right—indeed, the "exclusive right" —to control Mr. McMaster's actions.  Applying the first prong of the test, Progressive's prior and current positions are clearly inconsistent.  Previously, Progressive stated—in reference to Mr. McMaster—that, as an insurer, it had "the first right to control litigation"; that it had "the exclusive right to investigate the case, employ and control counsel to defend any suit"; that it had "the right to control the litigation all of its aspects"; and that it "may modify or change representation as necessary."   (Statement of Facts at ¶ 18).  As noted, the test for agency under Kansas law is whether the principal has the "right to direct and control" the agent's activities. *Hoidale*, 789 F. Supp. at 1122 (quoting *Brinkley*, 485 F.2d at 1286).  Thus, Progressive effectively admitted that Mr. McMaster was its agent, and Progressive's statements were generally applicable—not confined to the facts of *Master Machinery*.  But in this case, where Progressive is at risk of being held liable for Mr. McMaster's actions, Progressive has steadfastly denied that Mr. McMaster was serving as its agent in representing the Birk Defendants. (Statement of Facts at ¶¶ 23-24).  These opposing positions satisfy the first prong of the Supreme Court's test.

The second inquiry goes to whether Progressive was successful in taking the position that it took in the prior case.  *New Hampshire*, 532 U.S. at 750-51.  Though the Court never ruled on Progressive's motion, Progressive was absolutely successful because Progressive obtained the relief that its *Motion to Intervene* intended to achieve.  Progressive's motion was filed "for the sole and limited purpose of filing a motion to disqualify or, alternatively, to compel with the withdrawal of attorney Kevin McMaster and the law firm McDonald Tinker as counsel for Defendants."  (Statement of Facts at ¶ 15).  The motion achieved this "sole and limited purpose," because the matter was settled almost immediately thereafter, and Mr. McMaster no longer

proceeded with representing the defendant in the litigation after the motion was filed.  (*Id.* at ¶¶ 15, 20).[4]  Thus, Progressive received the same relief as if this Court had formally granted its motion.

Finally, it would be unfair to Mr. Gant to allow Progressive to now deny that Mr. McMaster was acting as its agent, in light of its prior representations.  Again, the doctrine of judicial estoppel is designed to protect the integrity of the judicial process.  *New Hampshire*, 532 U.S. at 749.  In a case that analyzed that issue, the Tenth Circuit focused on the benefit already received from the contrary position.  Having already entered pleas in abeyance to assault charges, the plaintiffs in *Johnson v. Lindon City Corp.*, 405 F.3d 1065, (10th Cir. 2005), pressed civil claims for an illegal arrest.  *Id.* at 1069–70 (10th Cir. 2005).  Because the plaintiffs received the benefit of their pleas, the court found it "too much to take" to allow the plaintiffs to benefit financially after the assault charges were dropped, based on the plea.  *See id.*  Similarly, this Court in *Davis* declined to allow a plaintiff the benefit of changing his story, to try to make a claim for excessive force.  *See Davis*, 569 F. Supp. 2d at 1204.

Here, Progressive should not be able to derive a potentially huge benefit by changing its story from, essentially: "We have the right to control McMaster" to, essentially, "McMaster acted entirely on his own."  Although Mr. Gant also has direct liability claims against Progressive, there is at least the potential for a large benefit to Progressive if it can completely wash its hands of the numerous ethical violations and acts of negligence committed by the counsel that Progressive hired, as detailed below.  Thus, this Court should conclude that it would be unfair to allow Progressive to maintain that position, and it should apply the doctrine of

---

[4] Likewise, only weeks earlier in the Birk Lawsuit, Progressive explained its *Motion to Intervene* was filed for the "sole and limited purpose of seeking the removal" of McMaster and that the motion "will be moot" if McMaster withdraws. (Statement of Facts at ¶¶ 56-58).  Mr. McMaster did formally withdraw from the Birk Lawsuit after Progressive's motion was filed.  (*Id.* at ¶ 8).

judicial estoppel to preclude Progressive from denying that it had the right to control Mr.

McMaster.  Then, this Court should grant summary judgment on the issue of agency, based on

that right of control.  *See Hoidale*, 789 F. Supp. at 1122 (quoting *Brinkley*, 485 F.2d at 1286).

>        2.       *Judicial Admissions*

The judicial admissions doctrine is a cousin of judicial estoppel.  "Judicial admissions are

formal admissions ... which have the effect of withdrawing a fact from issue and dispensing

wholly with the need for proof of the fact."  *Grynberg v. Bar S Servs., Inc.*, 527 F. App'x 736,

739 (10th Cir. 2013).  Clients are bound by admissions of counsel that are made on their behalf.

*Frank v. Bloom*, 634 F.2d 1245, 1251 (10th Cir. 1980).

"Judicial admissions are formal concessions in the pleadings, or stipulations by a party or

its counsel, that are binding upon the party making them.  They may not be controverted at trial

or on appeal."  *Koch v. Koch Indus., Inc.*, 996 F. Supp. 1273, 1277 (D. Kan. 1998) (citing *Keller

v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995)).  "A judicial admission is conclusive,

unless the court allows it to be withdrawn; ordinary evidentiary admissions, in contrast, may be

controverted or explained by the party."  *Id.*

In the Tenth Circuit, although statements made in briefs are not considered part of the

official record, "statements made in briefs may be considered admissions at the court's

discretion."  *Boardwalk Apartments, L.C. v. State Auto Prop. & Cas. Ins. Co.*, 11 F. Supp. 3d

1062, 1087 (D. Kan. 2014), *rev'd and remanded on other grounds*, 816 F.3d 1284 (10th Cir.

2016).  *See also Koch*, 996 F. Supp. at 1277 ("[S]tatements made in briefs may be considered

admissions at the court's discretion.").

In *Beat v. United States*, No. 08-1267-JTM, 2011 WL 1375290 (D. Kan. Apr. 12, 2011),

Judge Marten of this Court exercised his discretion to consider a statement in a brief to be a

judicial admission.  *See id.* at **8-9.  The Court held the government to prior representations in which it did not oppose certain deductions sought by the Estate at issue.  *See id.* at *7.  Notably, the Court considered the circumstances under which the government made the representations to which it was being held.  The government acquiesced to the deductions "not during oral argument or in the course of some tangential brief following judgment, but during summary judgment briefing at a pivotal moment in the case, that is, when the opportunity for patient reflection and considered judgment is substantial and essential."  *Id.* at *9.

Here, the Court should exercise its discretion to hold Progressive to its judicial admission, for largely the same reasons discussed above, in reference to judicial estoppel.  In addition, the analysis of *Beat* applies here.  Progressive's comments about its right to control Mr. McMaster were not off-the-cuff remarks made during oral argument.  They were made in a motion that was directed to the sole and specific purpose of having Mr. McMaster removed as counsel, in which Progressive cited legal authorities for its position.  (Statement of Facts at ¶¶ 15-18).  Progressive's counsel surely gave significant thought to the issues before filing an extraordinary motion—one asking this Court to force the attorney that Progressive had hired to withdraw from the case.

Progressive may claim that it eventually withdrew its motion, therefore precluding it from serving as a judicial admission.  But the Court should reject this argument for two reasons.  First, as discussed above, the motion was only withdrawn because there was an almost immediate resolution; therefore, Progressive had achieved what it sought to achieve, which was to end Mr. McMaster's representation.  (See Statement of Facts at ¶¶ 15, 20).  And second, Progressive made the statement in a pleading signed by its counsel.  As this Court has stated in reference to Progressive's representations about Mr. McMaster contained in other papers filed in

this litigation, "[t]he Court is not persuaded by Plaintiff's attempts to put this cat back in the proverbial bag.  It is uncontroverted that the statement was made, regardless of what occurred with the motion in which it was contained."  (*See* Dkt. No. 186 at p. 11-12).

This Court, therefore, should apply the judicial admissions doctrine and conclude, as a matter of law, that Progressive had the right to control the actions of Mr. McMaster in the Birk Lawsuit.  Then, applying Kansas law, the Court should hold that Mr. McMaster was acting as Progressive's agent.  *See Hoidale*, 789 F. Supp. at 1122 (quoting *Brinkley*, 485 F.2d at 1286).

C.     <u>The evidence regarding Progressive's control of McMaster is strong, and therefore this Court should feel comfortable in exercising its discretion to hold Progressive to its prior representations to this Court.</u>

As noted above, both the doctrines of judicial estoppel and judicial admissions provide the Court with discretion in determining their applicability.  Judicial estoppel is always a matter of court discretion, while judicial admissions are discretionary when the statement at issue was made in a brief.  *See New Hampshire*, 532 U.S. at 750; *Boardwalk Apartments*, 11 F. Supp. 3d at 1087.  One reason for the Court to exercise its discretion and hold Progressive to its prior representations is that those representations are supported by substantial evidence.  There is strong evidence that Progressive was, in fact, controlling Mr. McMaster through its policies and through its purse strings.

Mr. McMaster testified that he acted in line with Progressive's policies when representing the Birk Defendants.  (Statement of Facts at ¶ 29).  In fact, when referring to the Progressive claims manager from Omaha, Nebraska, and two in-house Progressive attorneys from Austin, Texas who traveled to Kansas City, Kansas for a meeting regarding the Birk Lawsuit and then called McMaster to discuss the Birk Lawsuit, Mr. McMaster referred to them

as "[t]he bosses."  (*Id.* at ¶ 28).  Progressive's guidelines required all of the following of the

counsel that it hired, including Mr. McMaster:

- To obtain authorization to engage in more than one hour of research, (*Id.* at ¶ 30);

- To discuss written discovery responses with the claims representative and receive approval before proceeding with oral discovery, (*Id.* at ¶ 37);

- To discuss any proposed motions with the claims representative, (*Id.* at ¶ 39);

- To involve claims management in the decision-making with regard to retaining any expert witnesses, (*Id.* at ¶ 41);

The evidence further shows that these guidelines were taken seriously.  Mr. McMaster

sought Progressive's permission before engaging in legal research.  (Statement of Facts at ¶¶ 31-

34).  These were not perfunctory requests; rather, they were supported with substantial detail to

justify the need for the research, sometimes even including detailed outlines of the various topics

to be addressed in proposed motions, the necessary research pertaining to each of the various

topics to be addressed in the proposed motions, and the estimated research time for each of the

topics anticipated to be addressed.  (*See id.* at ¶¶ 31, 34).  These requests for approval of legal

research were sent even when time was of the essence.  (*See id.* at 32).  The claims

representative, Mr. Hansel, testified that such prior approval was required if the attorney wants to

get paid. (*Id.* at ¶ 35).  He also acknowledged that Mr. McMaster seemed to believe that he

**needed** Progressive's approval to proceed.  (*Id.* at ¶ 36).  Similarly, Mr. McMaster complied

with Progressive's expectations related to discussions about proposed motions and certain phases

of litigation.  (*Id.* at ¶¶ 29, 38, 40, 42).  And, Mr. McMaster sent urgent messages to Progressive,

attempting to gain approval to retain certain experts for the defense, informing Progressive that

"time is of the essence" and that he required "your approval, ASAP" in order to meet expert deadlines.  (*Id.* at ¶¶ 43, 44).

Progressive also exercised its control by its draconian review of expenses.  As one example, Progressive denied mileage from Wichita to Garnett, Kansas—a distance of approximately 141 miles—because that travel was within the "local area."  (Statement of Facts at ¶¶ 47-48).  Progressive even rejected a bill from Mr. McMaster's office for a $7 QuikTrip sub sandwich purchased during a day of roundtrip travel to Tulsa, Oklahoma for a meeting with a cellphone expert who was examining evidence.  (*Id.* at ¶ 49).  When Mr. McMaster complained about discounting his own bills before submitting them to Progressive, and then having Progressive further "hack the heck out of it," he was told these were "simply protocols that must be followed."  (*Id.* at ¶ 50). As reflected in an e-mail sent from Dana Harris—the partner of Brette Hart, who was brought in to defend Justin Birk— in response to Progressive's cutting of their bills in the Birk Lawsuit, such nickel-and-dime policies resulted in controlling defense counsel by limiting what they feel that they can do.  (*Id.* at ¶¶ 51-52).

Perhaps even more dramatically, when Progressive notified the Birk Defendants, in self-serving language, that it was no longer willing to allow Mr. McMaster to take the lead in defending the case or directing defense strategy, McMaster responded, on behalf of the Birk Defendants, that "we disagree with your statement that, prior to signing the agreement, Progressive acquiesced and allowed Mr. McMaster to direct and lead the defense of this matter." This is further powerful evidence of Progressive's control over McMaster. (*See id.* at ¶¶ 45-46).

4852-8805-6922, v. 4

Progressive's policies and actions demonstrate actual control over Mr. McMaster in the Birk Lawsuit.[5]  In fact, Progressive even retained an attorney who sent a letter to McMaster, in May 2015, explaining its position that Progressive, rather than Progressive's insureds, is McMaster's client. (*Id.* at ¶ 21). Thus, Progressive's prior representations to this Court were absolutely accurate.  Progressive does, in fact, exercise control over the attorneys that it hires— and in particular, Mr. McMaster in the Birk Lawsuit—such that he should be considered the agent of Progressive.  This is yet another reason that this Court should exercise its discretion to apply the doctrine of judicial estoppel, or hold Progressive to its judicial admissions.  Either way, the Court should grant summary judgment to Mr. Gant on the issue of agency.

### III. Progressive's prior motions clearly demonstrate that the Court should grant summary judgment on the issue of whether Mr. McMaster's actions and inactions constituted a breach of a duty to provide the Birk Defendants with a defense in good faith and without negligence.

The Court should also apply the doctrines of judicial estoppel and judicial admissions to grant summary judgment to Mr. Gant on the issue of whether Mr. McMaster's actions and inactions constituted a breach of a duty to provide the Birk Defendants with a defense in good faith and without negligence.  If the Court also holds that Mr. McMaster was Progressive's agent, then these two rulings would determine, as a matter of law, that Progressive breached its duty to the Birk Defendants—whose claim Mr. Gant possesses based on an assignment.[6]

---

[5] Similarly, Progressive delegated the authority to McMaster to review, analyze available insurance policies, make coverage determinations, and put other insurance carriers on notice of the claims in the Birk Lawsuit. (Statement of Facts at ¶¶ 25-27).

[6] Mr. Gant also asserts claims against Progressive based on Progressive's own actions in hiring Mr. McMaster, failing to monitor him, and otherwise acting negligently and in bad faith in defending and failing to satisfy its duty to settle the Birk Lawsuit.  However, this summary judgment motion is not based on Progressive's direct liability through its own actions and omissions.  This motion is limited to the actions of Mr. McMaster, and thus summary judgment against Progressive would require a determination that Mr. McMaster was Progressive's agent. However, even if the Court were to rule that agency is a question of fact, the Court could

Under Kansas law, a claim against an insurer for bad faith or negligence in defending the insured implicates a mix of tort and contract law.  Because the insurer's obligation arises from a contract, the claim brought by Mr. Gant—as assigned from the Birk Defendants—is for breach of contract.  *Roberts v. Printup*, 595 F.3d 1181, 1186 (10th Cir. 2010).  However, "even though an insurer's duties to its insured are contractually based, breach of such duties is determined by a tort standard of care."  *Id.* (citing *Moses v. Halstead*, 581 F.3d 1248, 1251 (10th Cir. 2009)).  "As a result, Kansas courts use negligence, due care, and other tort concepts to describe the substance of this contract duty."  *Id.*

In particular, an insurer has a duty to act in good faith and without negligence in defending its insureds.  *See Glenn v. Fleming*, 247 Kan. 296, 305, 799 P.2d 79, 85 (1990) ("An insurance company may become liable for an amount in excess of its policy limits if it fails to act in good faith and without negligence when defending and settling claims against its insured.").  This Court should determine that no reasonable factfinder could conclude that Mr. McMaster acted in good faith and without negligence in defending the Birk Defendants.  *See Blehm v. Jacobs*, 702 F.3d 1193, 1203 (10th Cir. 2012) (summary judgment should be granted when "no reasonable jury could find for" the non-moving party).

A.     Progressive sought to remove Mr. McMaster from the Birk Lawsuit due to his inadequate performance, and Progressive identified six rules of professional conduct that it believed Mr. McMaster had violated.

Again, Progressive's own statements provide the basis for summary judgment, applying the doctrines of judicial estoppel and judicial admissions.  During the lead-up to trial of the Birk Lawsuit, Progressive filed a remarkable motion, in which it vigorously attacked its own hired

---

determine breach and/or causation by McMaster as a matter of law, leaving it to Mr. Gant to prove agency to the factfinder.  *See* Fed. R. Civ. P. 56(a) (stating that a party may move for summary judgment on a "part of" a "claim or defense").

counsel, Mr. McMaster.  As in *Master Machinery*, Progressive filed a Motion to Intervene, to which it attached a *Motion to Disqualify and/or Compel the Withdrawal of Defendants' Attorney Kevin McMaster*.  (Statement of Facts at ¶¶ 7, 17).

*In the Motion to Intervene*, Progressive wrote that it had retained additional counsel on behalf of the Birk Defendants "because of concerns regarding ["Mr. McMaster's"] handling of the case as hereinafter described."  (*Id.* at ¶ 53(a)).  Progressive wrote that Mr. McMaster had been "repeatedly sanctioned" for his "obstreperous conduct during discovery"; that he had failed to respond to hundreds of Requests for Admission, "to the extreme detriment" of the Birk Defendants; and that Progressive had terminated Mr. McMaster as panel counsel.  (*See generally id.* at ¶ 53).  In the corresponding *Motion to Disqualify*, Progressive wrote that, based on Mr. McMaster's conduct in the case, Progressive was "justifiably concerned regarding Mr. McMaster's ability to effectively advocate on behalf of the defense to minimize the damages awarded in any judgment in this case which may be collected from Progressive."  (*Id.* at ¶ 54(g)).  Progressive further wrote that it "should be accorded the right to have competent counsel of its choosing representing the defendants at the trial of this matter."  (*Id.* at ¶ 54(h)).  Clearly, based on the statements in its motion, Progressive did not view Mr. McMaster as "competent counsel."

Finally, and perhaps most importantly, Progressive listed several provisions of the Kansas Rules of Professional Conduct that it believed Mr. McMaster had violated while defending the Birk Defendants.  According to Progressive, Mr. McMaster breached his duties of:

- Competence (*see* KRPC 1.1);

- Diligence (*see* KRPC 1.3);

- Making meritorious claims and contentions (*see* KRPC 3.1);

- Expediting litigation (*see* KRPC 3.2);

41

- Candor the tribunal (*see* KRPC 3.3); and

- Fairness to opposing party and counsel (*see* KRPC 3.4).

(Motion to Disqualify, Dkt. No. 6-5, at pp. 10-11, ¶¶ 17-23; *see also* Statement of Facts at ¶ 54(i)).  Again, this motion was signed by counsel who are representing Progressive in this case.  (*See* Statement of Facts at ¶ 53).  In addition, Ms. Kelly, in-house counsel for Progressive, testified that she reviewed an advance copy of the *Motion to Intervene*, that "if I wanted anything to be changed, I – I would have had the opportunity to provide my edits and my revisions," and that "I agreed with our attorneys, who were representing us, that in drafting this and filing this, this was the best thing for Progressive to do[.]"  (*Id.* at ¶ 55).

Mr. Balloun, one of Progressive's experts, testified that the rules of professional conduct provide minimum standards for an attorney, and that if "the lawyer did not do what the rules require, then, of course, he didn't meet the standard."  (Statement of Facts at ¶ 59).  Mr. Balloun added that Mr. McMaster acted "inappropriately"; that "his conduct in discovery was not up to standard"; that if Mr. McMaster allowed Requests for Admission to go unanswered or failed to disclose insurance policies, that this was also inappropriate conduct; and that "[i]f he was less than candid with the Court, that's inappropriate."  (*Id.* at ¶ 60).  Clearly, if Mr. McMaster did not meet the minimum standards for competence, diligence, and making meritorious claims and contentions, he could not have defended the Birk Lawsuit in good faith and without negligence.  Thus, if Progressive is held to its prior statements, summary judgment should be granted to Mr. Gant on the issue of breach of duty.

B.      Progressive should be held to its prior representations as to Mr. McMaster's
        conduct of the Birk Lawsuit, based on the doctrines of judicial estoppel and
        judicial admissions.

As with the agency issue, the Court should determine that Progressive is judicially estopped from denying that Mr. McMaster acted in bad faith or was negligent. Or, alternatively, Progressive's statements should be treated as judicial admissions. Again, this Court has discretion in the application of both doctrines. *See New Hampshire*, 532 U.S. at 750; *Boardwalk Apartments*, 11 F. Supp. 3d at 1087.

Regarding judicial estoppel, the first factor is satisfied because Progressive is now taking a different position. *See New Hampshire*, 532 U.S. at 750. Having laid bare all of Mr. McMaster's failures for the Coffey County District Court—including accusing Mr. McMaster of six ethical violations—Progressive has in this case denied that he acted negligently or in bad faith in defending the Birk Defendants. (*See* Progressive Answer to Amended Counterclaim, Dkt. No. 247, at ¶ 765). The second issue is whether Progressive benefited from its prior representations. *New Hampshire*, 532 U.S. at 750-51. Progressive did succeed on its motion, in that Mr. McMaster promptly withdrew from the Birk Lawsuit, allowing Progressive to proceed with its preferred trial team consisting of "competent counsel of its choosing." (Statement of Facts at ¶¶ 54(h), 67). Finally, it would be unfair to Mr. Gant to allow Progressive to now deny Mr. McMaster's negligence or bad faith.

Given the nature of Progressive's prior allegations, it would seriously damage the integrity of the judicial system to allow Progressive to now deny Mr. McMaster's negligence and bad faith. *See New Hampshire*, 532 U.S. at 749 (stating that the doctrine of judicial estoppel is designed to protect the integrity of the judicial process). Progressive stated in court pleadings, in no uncertain terms, that Mr. McMaster violated six ethical rules, in addition to various other

transgressions.  Thus, to deny summary judgment on negligence/bad faith, this Court has to conclude that Progressive can allege six ethical violations in one case, and then take those allegations back in another case; or, this Court has to conclude that an attorney can commit six ethical violations, as well as the other transgressions set forth by Progressive, without falling below the standard of care.  Neither conclusion should be tenable to the Court.

In addition, there is ample evidence to suggest that Mr. McMaster's performance was, in fact, negligent and in bad faith.  That evidence need not be laid out in great detail here, as Progressive's prior motion makes the case quite ably.  But it is noteworthy that Progressive was trying so vigorously to have Mr. McMaster removed from the Birk Lawsuit.  It was certainly an extraordinary motion that Progressive filed—the likes of which Mr. Hansel and others at Progressive had never seen before.  (Statement of Facts at ¶¶ 61, 62, 65).  Likewise, it was based on conduct and sanctions the likes of which Mr. Hansel and others had not seen before. (*See id*. at ¶¶ 63-64.)  Surely, Progressive would not have been so eager to get Mr. McMaster off of the case unless Progressive also felt that his performance fell below the standard of care.  That fact is further borne out in correspondence from Ms. Kelly to Mr. McMaster.

Ms. Kelly's letter expressed concern about the potential conflict of interest in Mr. McMaster representing all of the insureds [possibly yet another ethical violation], and about the repeated discovery sanctions from the bench, including the court giving serious consideration to a default judgment based on discovery violations.  She further expressed "deep concern" that the court had deemed admitted all of the Requests for Admission, in light of the facts that could no longer be contested.  (Statement of Facts at ¶ 66).  Ms. Kelly further suggested that Mr. McMaster's firm notify its malpractice carrier about the sanctions and admissions.  (*Id*.).

Progressive would not be making such statements had Mr. McMaster been performing his job appropriately.

For all of these reasons, the Court should determine that Progressive is judicially estopped from contradicting its prior representations about Mr. McMaster.  Alternatively, the Court should exercise its discretion to declare Progressive's prior statements judicial admissions. *See Boardwalk*, 11 F. Supp. 3d at 1087 (allowing statements in briefs to serve as judicial admissions, as the court's discretion).  This Court should correspondingly hold that Progressive's statements establish, as a matter of law, that Mr. McMaster's actions and inactions constitute a breach of a duty to defend the Birk Defendants in good faith and without negligence. The Court, therefore, should grant summary judgment to Mr. Gant on that issue.

IV.   **Summary judgment should be granted on the issue of causation because Progressive has admitted that Mr. McMaster's conduct was "highly prejudicial" to the Birk Defendants.**

The final issue on which Mr. Gant seeks summary judgment is causation.  Specifically, this Court should conclude, as a matter of law, that Mr. McMaster's actions and inactions in the defense of the Birk Defendants caused harm to the Birk Defendants.  Mr. Gant is not asking for summary judgment on **damages**, and therefore is not asking for a specific figure.  Rather, the motion seeks this Court's determination that Mr. McMaster caused some degree of harm to the Birk Defendants, with the extent of that harm to be determined at trial.  Put another way, Progressive should be estopped from asserting at trial that Mr. McMaster's actions were harmless to the Birk Defendants.

A.     Progressive admitted that Mr. McMaster's failure to respond to hundreds of Requests for Admission was an "extreme detriment" to the Birk Defendants, and the counsel who tried the case agreed that this and other mis-steps by Mr. McMaster made it much more difficult to limit damages.

While there are numerous ways in which Mr. McMaster's actions and inactions harmed the Birk Defendants, this motion will focus on Progressive's admissions.  First, Progressive has admitted, in its prior motion, that Mr. McMaster's failure to respond to hundreds of Requests for Admission was "to the **extreme detriment** of Defendants."  (Statement of Facts at ¶ 68).  In the accompanying *Motion to Disqualify*, Progressive explained that "[t]hese matters have been deemed admitted and are **highly prejudicial** to Defendants and Progressive."  (*Id.* at ¶ 69).  Progressive should be estopped from now claiming that the failure to respond to hundreds of Requests for Admission—thereby causing them to be deemed admitted—was anything other than to the "extreme detriment" of the Birk Defendants, and "highly prejudicial" to their defense.  Thus, the Court should determine that the Birk Defendants were damaged by the failure to respond to the requests for admission.

The elements of judicial estoppel are met with regard to causation.  First, Progressive has again contradicted its prior representations to the court in the Birk Lawsuit.  Having previously asserted that Mr. McMaster's failure to respond to requests for admission was "to the extreme detriment" of the Birk Defendants and "highly prejudicial" to the Birk Defendants, Progressive now denies that Mr. McMaster's actions were harmful.  (Statement of Facts at ¶¶ 70-71).  Second, as discussed above with regard to breach of duty, Progressive's representations to the Coffey County court achieved the desired effect.  Mr. McMaster promptly withdrew from the case.  (*Id.* at ¶ 41).  Finally, it would be unfair to Mr. Gant for Progressive to be able to now assert that no harm was done from Mr. McMaster's conduct.  Progressive represented that Mr. McMaster **was** causing harm, when Progressive sought to remove Mr. McMaster from the case,

46

in an effort to prevent or limit the judgment that Mr. Gant was seeking in the Birk Lawsuit. That effort was successful. Progressive should not be permitted to trumpet the "highly prejudicial" nature of Mr. McMaster's actions when trying to limit Mr. Gant's recovery in the Birk Lawsuit, then assert that Mr. McMaster's actions were irrelevant to try to prevent Mr. Gant, in the present matter, from recovering the entire judgment that he was awarded in the Birk Lawsuit. As with the other estoppel issues, it would damage the integrity of the judicial system if Progressive were now able to repudiate its statements that Mr. McMaster was harming the Birk Defendants. *See New Hampshire*, 532 U.S. at 749.

In addition, there is again substantial evidence that Mr. McMaster actually did harm the Birk Defendants—both in the ways that Progressive admitted, and in additional ways. Todd Barrett, the later-hired counsel for Edward and Linda Birk, referred to the unanswered Requests for Admission as a "ticking time bomb." (Statement of Facts at ¶ 82). Steve Pigg, the later-hired counsel for Birk Oil Company, wrote in a letter to Laura Birk: "We face a significant problem in that Kevin never answered the Requests for Admissions that were served by [Gant's counsel] with the petition." (*Id.* at ¶ 93). Clearly, the attorneys trying the case felt that these admissions were very harmful to their defense. As Ms. Kelly recognized, the requests for admission were particularly damaging to any effort to defend Edward and Linda Birk against a claim of negligent entrustment, because they established Edward and Linda's knowledge of every driving infraction that Justin Birk had ever incurred. (*See id.* at ¶ 66). As another individual from Progressive explained, additional counsel that ultimately was retained to represent the Birk Defendants "is counsel we had to bring in to clean-up for McMasters [sic] on the Birk case[.]" (*Id.* at 91).

There are also several more general comments from the attorneys trying the case that show how they were affected by Mr. McMaster's various blunders. Mr. Barrett wrote that Mr.

McMaster's "counterintuitive defense strategy" had "diverted defense counsel's attention from doing adequate pre-trial discovery on the significant damages issues presented." (Statement of Facts at ¶ 83). He explained that there were "over 9,000 pages of well-documented liability and damages on one side and obstructionist legalism on the other in this voluminous file," and that Mr. McMaster left "a knotty discord of issues" that Mr. Barrett said "has proven difficult to untangle." (*Id.* at ¶¶ 78, 85). Notably, Jean Kelly agreed with Mr. Barrett's position about Mr. McMaster's actions and omissions, as set forth in his email describing the "obstructionist legalism" and the "rudderless ship" that represented the defense by Mr. McMaster. (*Id.* at ¶¶ 78-80). Mr. Pigg explained in a letter to Progressive that his defense was "hamstrung by the Court's having entered a discovery sanction that the partnership is the alter ego of Edward and Linda." (*Id.* at ¶ 86). Mr. Pigg wrote that "[t]he evidence is insufficient to establish an alter ego claim against B&B on its merits[,]" but that "the Court has already entered a discovery sanction" on alter ego, thereby causing the business to be held "liable for any percentage of fault assessed against Ed and Linda on the negligent entrustment claim." (*Id.* at ¶ 87). In a letter from Mr. Barrett, he wrote that this alter ego sanction "dramatically changes the legal landscape[.]" (*Id.* at ¶ 92). Mr. Barrett also stated that "the Court at best has become tone deaf to [Mr. McMaster's] high-pitched whining about irrelevant discovery disputed issues, and at worst **imposed draconian discovery sanctions for good reason** after his patience wore thin with defense counsel." (*Id.* at 84) (emphasis added).

On the issue of Katie Gant's alleged texting during the accident, Mr. Pigg wrote that the exclusion of the Defense's expert—which was also a discovery sanction—was "a significant detriment to the defense on liability. Judge Godderz is correct that such evidence is highly prejudicial. If admitted, such evidence could have resulted in a jury placing significant fault on

Gant, maybe as much as 35%." (Statement of Facts at ¶ 89). More generally, Mr. Pigg wrote that it "appears that the Judge has become disenchanted with Mr. McMaster's defense tactics and cannot be expected to lean in defendants' favor on issues within the discretion of the Court." (*Id.* at ¶ 88). In proposing that Mr. McMaster be removed from the case, Mr. Pigg wrote: "I believe, and I think Todd and Brette also believe, that Kevin has and would continue to fight battles that cannot be won, which only causes further loss of credibility for the defense with Judge Godderz[.]" (*Id.* at ¶ 93).

Thus, Progressive has admitted in signed court filings that Mr. McMaster's conduct was "extremely detriment[al]" and "highly prejudicial" to the Birk Defendants, and those comments are further supported by the attorneys who were brought in to—as one Progressive employee described it—"clean-up for McMasters [sic] on the Birk case." (Statement of Facts at ¶ 91). For these reasons the Court should exercise its discretion to estop Progressive from denying that Mr. McMaster's conduct caused harm to the Birk Defendants. Alternatively, the Court should treat as judicial admissions Progressive's statements that Mr. McMaster's actions were to the "extreme detriment" of the Birk Defendants, and also "highly prejudicial" to them. As such, this Court should grant summary judgment to Mr. Gant on the issue of causation.

## CONCLUSION

Progressive previously admitted, in pleadings to this Court and to the Coffey County District Court, that Progressive has the right to control Kevin McMaster when he was hired by Progressive to litigate a case; that Mr. McMaster's conduct in the Birk Lawsuit violated at least six of the Kansas Rules of Professional Conduct, and was otherwise deficient in many respects; and that Mr. McMaster's failure to respond to hundreds of Requests for Admission was to the "extreme detriment" of the Birk Defendants and "highly prejudicial" to them. This Court should

49

hold Progressive to its prior admissions, through the doctrines of judicial estoppel and judicial admissions. As Judge Gale noted in a prior order for this case, Progressive should not be permitted to "put this cat back in the proverbial bag."

Progressive's admissions establish that Mr. McMaster was Progressive's agent, that Mr. McMaster's actions constitute breaches in providing the Birk Defendants with a defense in good faith and without negligence, and that Mr. McMaster's actions caused harm to the Birk Defendants. If the Court agrees on all three points, then those rulings establish that Progressive is liable to Mr. Gant for the bad faith and/or negligence of its hired counsel, Mr. McMaster. The amount of damages should be determined by the factfinder.

For these reasons, Mr. Gant respectfully requests that this Court grant him summary judgment on the issues of agency, breach of duty, and causation.

Respectfully submitted,

WAGSTAFF & CARTMELL LLP

/s/ Vanessa H. Gross
Jonathan P. Kieffer          KS #18707
Vanessa H. Gross            KS #24005
Adam S. Davis               KS #24263
4740 Grand Ave., Ste 300
Kansas City, MO 64112
Office: 816-701-1100
FAX: 816-621-3395
vgross@wcllp.com
jpkieffer@wcllp.com
**ATTORNEYS FOR DEFENDANT/**
**COUNTERCLAIM PLAINTIFF GANT**

4852-8805-6922, v. 4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed the foregoing document via the CM/ECF electronic filing

system on January19, 2018, thereby sending notice of the filing to all counsel of record of this

matter.

/s/ Vanessa H. Gross
Attorney for Defendant/Counterclaim Plaintiff Gant

4852-8805-6922, v. 4