**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **PROGRESSIVE NORTHWESTERN** | ) |
| **INSURANCE COMPANY,** | ) |
| | ) |
| **Plaintiff/** | ) |
| **Counterclaim Defendant,** | ) |
| | ) |
| **v.** | ) **Case No. 2:15-CV-09267-JAR-KGG** |
| | ) |
| **GABRIEL GANT,** | ) |
| | ) |
| **Defendant/** | ) |
| **Counterclaim Plaintiff.** | ) |

**PROGRESSIVE NORTHWESTERN INSURANCE COMPANY'S**
**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**FRANKE SCHULTZ & MULLEN, P.C.**          **COLE, SCOTT & KISSANE, P.A.**


     /s/ *Christopher M. Harper*                    /s/ *Joseph T. Kissane*
JOHN L. MULLEN      #22994          JOSEPH T. KISSANE
CHRISTOPHER M. HARPER #23273          BRIAN J. AULL
8900 Ward Parkway          4686 Sunbeam Road
Kansas City, Missouri  64114          Jacksonville, Florida 32257
(816) 421-7100          (904) 672-4000
(816) 421-7915 (fax)          (904) 672-4050 (fax)
jmullen@fsmlawfirm.com          joseph.kissane@csklegal.com
charper@fsmlawfirm.com          brian.aull@csklegal.com

**Attorneys for Plaintiff/Counterclaim Defendant Progressive Northwestern Insurance Co.**

## TABLE OF CONTENTS

**Table of Authorities – ii-v**
**Index of Exhibits – vi-vii**

**MEMORANDUM OF LAW - p. 1**

**Introduction – p. 1**
**Progressive's Statement of Uncontroverted Material Facts- p. 2**
**Argument and Authority – p. 38**

   **I.**    **Summary Judgment Standard – p. 38**

  **II.**    **Overview of Insurer Bad Faith in Kansas – p. 39**

 **III.**    **The Subject Agreement Nullifies Gant's Claim – p. 40**

 **IV.**    **Progressive is not Vicariously Liable for Alleged Litigation Conduct of McMaster – p. 45**
        a.  Gant's unprecedented theory is legally unsupported – p. 45
        b.  Progressive did not direct or control McMaster's litigation conduct – p. 49

  **V.**    **Progressive is Entitled to Judgment as a Matter of Law on the Claim asserted by Gant (on behalf of the Birks) for Alleged Breach of the Duty to Settle – p. 53**
        a.  No settlement demand was made – p. 54
        b.  Gant's "failure to settle" theory is unsupported, unprecedented, and unavailing – p. 54

 **VI.**    **No actions of Progressive Caused Damage to the Birks – p. 58**
        a.  Progressive did not cause the damages sought in this case: the excess verdict – p. 58
        b.  The excess judgment resulted from Gant's effort to "set up" this bad faith suit – p. 64

 **VII.**    **The Trial Court's Sanctions and Other Rulings Cited by Gant are Legal Nullities and/or Did Not Harm the Birks – p. 66**
        a.  Monetary sanctions issued against McMaster had no impact on the Birks – p. 66
        b.  Striking of the Birks' cell phone expert as inadmissible – p. 67
        c.  Requests for Admissions had no impact – p. 69
        d.  The reverse alter-ego sanction was a legal nullity – p. 72
        e.  Failure to disclose insurance had no impact – p. 76

**VIII.**    **Conclusion – p. 78**

# **TABLE OF AUTHORITIES**

Page

**Cases**

*Aetna Cas. & Sur. Co. v. Protective Nat'l Ins.*
  *Co. of Omaha*, 631 So. 2d 305, 306 (Fla. 3d DCA. 199) ......................................................... 46

*Amoco Chemicals Corp. v. Bach,*
  567 P.2d 1337 (Kan. 1977) ....................................................................................................... 78

*Anchondo v. Dunn,*
  511 Fed. Appx. 736 (10th Cir. 2002) ........................................................................................ 80

*Apperson v. Security State Bank,*
  215 Kan. 724, Syl. ¶7 , 528 P.2d 1211 (1974) ......................................................................... 61

*Aselco, Inc. v. Hartford Ins. Group,*
  28 Kan. App. 2d 839, 851, *rev. denied*, 272 Kan. 1417 (2001) ............................................... 48

*Asshauer v. Wells Fargo Foothill,*
  263 S.W. 3d 468 (Tx. Ct. App. 2008) ....................................................................................... 78

*Associated Wholesale Grocers, Inc. v.*
  *Americold Corp.*, 261 Kan. 806, 934 P.2d 65 (1997) ............................................................... 56

*Bacchus Industries, Inc. v. Arvin Industries,*
  *Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) .................................................................................. 38

*Bank IV Wichita v. Arn, Mullins, Unruh,*
  *Kuhn & Wilson*, 827 P.2d 758 (Kan. 1992) .............................................................................. 45

*Bell v. Tilton*, 234 Kan.
  461, 465, (Kan. 1983) ................................................................................................................ 47

*Bethany Med. Center v. Wallace, Saunders,*
  *Austin, Brown & Enochs, Chtd.,* 19 Kan. App. 2d 1111, Syl. ¶ 2, 880 P. 2d 1289 (1994) ...... 50

*Bettis v. Hall,*
  2011 Lexis 40884 (D. Kan. 2011) ............................................................................................. 79

*Blanco-Diaz v. Maus,*
  2012 WL 718919 (Kan App. 2012) ........................................................................................... 69

*Blann v. Rogers,*
  22 F.Supp.3d 1169 (D. Kan. 2014) ........................................................................................... 56

*Bollinger v. Nuss*,
  449 P.2d 502, 508 (1969) ........................................................................... 40

*Brocato v. Prairie State Farmers Ins. Assn.*,
  520 N.E.2d 1200, 1203 (Ill. App. Ct. 1988) ............................................ 46

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 327 (1986) ........................................................................... 38

*Feliberty v. Damon*,
  527 N.E.2d 261, 265 (N.Y. 1988) ............................................................. 47

*Floyd v. IRS*,
  151 F.3d 1295 (10th Cir. 1998) ................................................................. 79

*Gaynes v. Conn*,
  347 P.2d 458 (Kan. 1959) ........................................................................... 77

*Gibson v. Casto*,
  504 S.E.2d 705, 708 (Ga. Ct. App. 1998) ................................................ 46

*Gillespie v. Seymour*,
  876 P.2d 193, 200 (Kan. Ct. App. 1994) .................................................. 78

*Glenn v. Fleming*,
  799 P.2d 79, 90 (Kan. 1990) ............................................................... passim

*Hackman v. W. Agric. Ins. Co.*,
  275 P.3d 73 (Table) 2012 WL 1524060, at *11 (Kan. Ct. App. 2012) ............................ passim

*Hawkins v. Dennis*,
  905 P.2d 678, 690 (Kan. 1995) ........................................................... 40, 61

*Heinson v. Porter*,
  244 Kan. 667 (Kan. 1989) ........................................................................... 41

*Herbert Sullivan, Inc. v. Utica Mut. Ins. Col.*,
   788 N.E. 2d 522, 540-41 (Mass. 2003) .................................................. 46

*Hoelting Enterprises v. Nelson*,
  929. P.2d 183 (Kan. App. 1996) ............................................................... 77

*In Re Tutu Water Wells Contamination*
  *Litig*, 78 F.Supp. 2d 423, 432 (V.I. 1999) ............................................... 42

*Ingersoll-Rand Equip Corp. v. Tranp.*
   *Ins. Co.*, 963 F. Supp. 452, 454 (M.D. Pa. 1997) ................................................. 46

*Insurance Company of North America v.*
   *Medical Protective Company*, 768 F.2d 315 (1985) ............................................. 48

*Kannaday v. Ball*,
   2014 WL 4259152, *13-17 (D. Kan. 2014) ........................................................... 69

*Kemp v. Hudgins*, No.
   12-2739-JAR, 2015 WL 5568082, *14 (D. Kan. Sep. 22, 2015) ...................... 55, 68

*Kilpatrick Bros. v. Poynter*,
   473 P.2d 33, 42 (Kan. 1973) ................................................................................ 78

*Lifestar Response of Ala., Inc. v.*
   *Admiral Ins. Co.*, 17 So.3d 200, 218 (Ala. 2009) ................................................. 46

*McKenzie v. New York Life Ins. Co.*,
   112 P.2d 86, 90 (Kan. 1941) ................................................................................ 57

*Meritt v. Reserve Ins. Co.*,
   110 Cal Rptr. 511, 527 (Cal. App. 1973) .............................................................. 46

*Moses v. Halstead*,
   581 F.3d 1248, 1251 (10th Cir. 2009) ................................................................... 39

*Pacific Employers Insurance Company v.*
   *Hoidale*, 789 F.Supp. 1117 (D. Kan. 1992) ..................................................... 45, 47

*Pape v. Law Offices of Frank N. Peluso*,
   *P.C.*, 2015 Lexis 136742 (D. Conn. 2015) ........................................................... 80

*Patel v. Snapp*,
   2013 U.S. Lexis 180999, *5 (D. Kan. 2013) ......................................................... 44

*Prog. Nw. Ins. Co. v. Gant*,
   2016 WL 4430669, at *4 (D. Kan. Aug. 22, 2016) ......................................... passim

*Roberts v. Printup*,
   595 F.3d 1181, 1187 (10th Cir. 2010) ............................................................. 40, 56

*Smith v. Blackwell*,
   791 P.2d 1343 (Kan. App. 1989) .......................................................................... 56

*Snodgrass v. State Farm Ins. Co.*,
    804 P.2d 1012, 1021 (Kan. Ct. App. 1991) ............................................................... 40

*State ex rel. Stovall v. Reliance Ins. Co.*,
    278 Kan. 777, 789 (Kan. 2005) ................................................................................ 61

*State Farm Mut. Auto. Ins. Co. v.*
    *Traver*, 980 S.W.2d 625, 627 (Tex. 1998) ............................................................... 47

*Strahin v. Sullivan*,
    647 S.E. 2d 765 (W. Va. 2007) ................................................................................ 42

*Wade v. EMCASCO Ins. Co.*,
    483 F.3d 657, 660 (10th Cir. 2007) .............................................................. 40, 55, 68

**Secondary Sources**
K.S.A. § 60-226(3) ...................................................................................................... 79
KRPC 1.8(f) (2011 Kan. Ct. R. Annot. 494) .................................................... 49, 50
KRPC 5.4(c) (2011 Kan. Ct. R. Annot. 593) ....................................................... 49
PIK Civ. 4th 124.01-A ........................................................................................... 39

**Rules**
Fed.R.Civ.Pro. 26(a)(1)(iv) ...................................................................................... 79
Rule 56 of the Federal Rules of Civil Procedure ............................................... 1, 38
Rule 56.1 of the District of Kansas Local Rules ...................................................... 1

## INDEX OF EXHIBITS

**A.**      Progressive Northwestern Insurance Policy Declaration Page for Policy of Insurance Issued to Edward and Linda Birk

**B.**      Bituminous Casualty Company (Bitco) Policy of Insurance issued to B&B Cooperative Ventures, a general partnership

**C.**      Edward Birk Deposition Excerpts

**D.**      Excerpts from Progressive's Face Sheet Notes

**E.**      Robert Hansel Deposition Excerpts

**F.**      Kevin McMaster Deposition Excerpts

**G.**      June 23, 2011 email from Robert Hansel to Kevin McMaster

**H.**      June 20, 2011 Robert Hansel letter to Edward Birk

**I.**      June 20, 2011 Robert Hansel letter to Justin Birk

**J.**      Daniel Lykins Deposition Excerpts

**K.**      August 26, 2011 letter from Daniel Lykins to Kevin McMaster enclosing Affidavit

**L.**      Gabriel Gant Deposition Excerpts

**M.**      December 14, 2011 Memorandum to file by Daniel Lykins

**N.**      Gabriel Gant's Responses to Progressive Insurance Company's Request for Admissions

**O.**      May 11, 2015 post-mediation letter to counsel by William H. Sanders, Jr.

**P.**      James Campbell Deposition Excerpts

**Q.**      April 5, 2012 email from McMaster to Hansel

**R.**      September 2, 2015 letter from John Kieffer to Dan Lykins

**S.**      Statement of Monetary Damages in underlying action

**T.**      Linda Birk Deposition Excerpts

**U.**      Brian Wright Deposition Excerpts

**V.**      Laura Birk Deposition Excerpts

**W.**      April 30, 2013 letter from John Ambrosio to Edward and Linda Birk

**X.**      Kansas Corporation Commission Motor Carrier Informational Page

**Y.**      May 10, 2013 letter from Kevin McMaster to Robert Hansel re: no other coverage

**Z.**      February 4, 2015 email from McMaster to Kelly

**AA.**      Allan Provorse Deposition Excerpts

**BB.**      January 26, 2015 email – Allan Provorse to Robert Hansel

**CC.**      Shelly Storey Deposition Excerpts

**DD.**      Jean Kelly Deposition Excerpts

**EE.**      Justin Birk Deposition Excerpts

**FF.**      April 9, 2015 letter from Kevin McMaster to Eric Ostrom and Jean Kelly

**GG.**      August 26, 2014 Kevin McMaster letter to Robert Hansel

**HH.**      Partnership Agreement for B&B Cooperative Ventures

**II.**      Emails between Gant and Birks' counsel in underlying case re: Gant's objection to Birks admitting liability

**JJ.**      May 10, 2013 letter to the Birk Defendants from Kevin McMaster with attached signed conflict waiver

**KK.**      Agreement and an Assignment of Rights and Claims dated May 11, 2015

**LL.**      Trial Transcript Excerpts

**MM.**      Journal Entry and Judgment following June 2015 Gant v. Birk trial

**NN.**      Gant's Motion to Address Attorney Lien

**OO.**      Birk Oil Financial Statement

**PP.**      August 22, 2014 Journal Entry re: monetary sanctions

**QQ.**      Journal Entry re: second monetary sanctions

**RR.**      Gabriel Gant's Motion to Strike Testimony of Expert, Lance Watson

**SS.**      Journal Entry dated June 1, 2015 excluding testimony of expert, Lance Watson

**TT.**      McMaster's initial response to Request for Admissions in underlying action

**UU.**      Journal Entry dated February 4, 2014 re: reverse alter ego sanction

**VV.**      Progressive Expert Report of Gene Balloun

**WW.**      Progressive Expert Rebuttal Report of Gene Balloun

**XX.**      Progressive Expert Report of Dan Doucette

**YY.**      Birks' interrogatory responses dated February 26, 2014

**ZZ.**      August 24, 2011 letter from McMaster to Lykins

**AAA.**      Affidavit of Lori Slepski

**BBB.**      April 24, 2015 Hearing Transcript Excerpts

**CCC.**      Allan Windt Deposition Transcript Excerpts

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| PROGRESSIVE NORTHWESTERN | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| **Plaintiff/** | ) | |
| **Counterclaim Defendant,** | ) | |
| | ) | |
| **v.** | ) **Case No. 2:15-CV-09267-JAR-KGG** | |
| | ) | |
| GABRIEL GANT, | ) | |
| | ) | |
| **Defendant/** | ) | |
| **Counterclaim Plaintiff.** | ) | |

**MEMORANDUM IN SUPPORT OF**
**PROGRESSIVE NORTHWESTERN INSURANCE COMPANY'S**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

Plaintiff/Counterclaim Defendant Progressive Northwestern Insurance Company, by and through undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the District of Kansas Local Rules, and offers this Memorandum in Support of its Motion for Summary Judgment.

<u>**INTRODUCTION**</u>

This action was commenced by Progressive seeking a declaration that it fulfilled its contractual obligations to its insureds, the Birks, in good faith and without negligence. Gant, in an Amended Counterclaim, asserts a breach of contract/bad faith claim against Progressive. Gant's claim lacks merit and Progressive is entitled to judgment as a matter of law. However, before considering the undisputed facts which make summary judgment appropriate, it is important to note, at the outset, that this is a "stand in the shoes" bad faith claim, in that Gant asserts the claim through an assignment from his former adversaries, the Birks. As a result, the presented claim, in reality, is the Birks' bad faith claim. In pursuing this action, Gant has been undaunted by the fact

1

that the Birks' personal counsel, James Campbell, Esq. thought the result achieved was exceptional. (Campbell Depo: Ex. P, 62:24-63:12) For his part, Edward Birk, the patriarch of the Birk defendants, testified that Progressive had "saved the day." (Edward Birk Depo.: Ex. C, 35:6-11) In fact, Gant's own expert, Brian Wright, conceded that had he defended the Birks from the outset he was uncertain whether he could have achieved the same "fantastic result" as attorney McMaster. (Wright Depo., Ex. U, 307:23 – 308:4) It is in light of this testimony that the Gant's bad faith claim must be considered.[1]

## PROGRESSIVE'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS

### The Accident

1.      On June 10, 2011, vehicles operated by Justin Birk and Katie Gant collided in Coffey County, Kansas, resulting in Katie Gant's death. (Pretrial Order, Stip. Facts, ¶2)

2.      At the time of the accident, Justin Birk was operating a 2007 Cadillac Escalade that was titled in the names of his mother and father, Edward and Linda Birk. (Pretrial Order, Stip. Facts, ¶3)

### Insurance Policies

### A. The Progressive Policy

3.      Progressive issued Auto Insurance Policy No. 25439759-5, with effective dates of March 22, 2011 through September 22, 2011, to named insureds Edward and Linda Birk. (Progressive Policy declarations page, attached as Ex. A; Pretrial Order, Stip. Facts, Doc. 259, ¶1)

4.      The Progressive Policy provides bodily injury liability limits of $250,000 per person/$500,000 per accident. (Progressive Policy declarations page, Ex. A)

---

1 Progressive moves for summary judgment on its affirmative declaratory action as well as on the Gant amended counterclaim. However, in reality, the granting of Progressive's Motion as to either claim disposes of this case.

5.      The 2007 Cadillac Escalade Justin Birk was driving at the time of the accident is a listed vehicle on the Progressive Policy. (Progressive Policy declarations page, Ex. A)

6.      The Progressive policy was sold to the Birks through Trustpoint Insurance Agency (Progressive Policy declarations page, Ex. A)

### *B. The Bitco Policy*

7.      Bituminous Casualty Insurance Company (referred to as "Bitco") issued Commercial Automobile Policy No. CAP3543660, to named insured B&B Cooperative Ventures, a general partnership. (Bitco Policy, Ex. B hereto)

8.      Birk Oil paid in excess of $30,000 a year in premium for the Bitco policy coverage. (Edward Birk Depo., Ex. C, 55:16-20; see also Bitco Policy, Ex. B, at pg. 7)

9.      Justin Birk is <u>not</u> a listed driver on the Bitco Policy. (Bitco Policy, Ex. B)

10.     The 2007 Cadillac Escalade Justin Birk was driving at the time of the accident is <u>not</u> a listed vehicle on the Bitco Policy.  (Bitco Policy, Ex. B)

11.     The Bitco policy was sold to B&B Cooperative Ventures, a general partnership, through MRH Insurance Agency. (Bitco policy, Ex. B, declarations page, pg. 7)

**Progressive Investigation, Coverage Analysis, and Retention of Defense Counsel McMaster**

12.     The claim was reported to Progressive on or about June 13, 2011, and was assigned to Casualty Specialist Robert Hansel for handling.  (Progressive face sheet notes, Ex. D hereto, at Progressive-0012428, 0012431)

13.     Progressive conducted a factual investigation into the accident and concluded that coverage existed under the Progressive Policy for the accident. (Hansel Depo., Ex. E, 28:17-20; Progressive face sheet notes, Ex D hereto, at Progressive 0012411)

14.     Progressive concluded, based upon the police report as well as an accident reconstructionist retained by Progressive that the accident occurred on Ms. Gant's side of the road. (Progressive face sheet notes, Ex. D, at Progressive-0012411)

15.     Progressive retained attorney Kevin McMaster to represent Justin Birk on or about June 23, 2011 within a couple of weeks after the June 11, 2011 accident. (McMaster Depo., Ex. F, at 56:10-18; 58:11-16; June 23, 2011 Hansel email to McMaster, attached hereto as Exhibit G; Hansel Depo., Ex E, at 291:20-22)

16.     On June 20, 2011, Progressive adjuster Hansel sent letters to both Edward Birk and to Justin Birk, which stated, in pertinent part:

> At this time it appears that the damages may be in excess of your coverage limits. . . Since you are responsible for all damages that may be awarded against you, you may decide to retain an attorney for your personal interests

> Please let us know immediately if you have any insurance policies that may provide coverage to you in excess of this policy. If we do not hear from you concerning such policies, we will assume that no such policies exist.

(June 20, 2011 Hansel letter to Edward Birk, Ex. H hereto; 6/20/11 Hansel letter to Justin Birk, Ex. I hereto)

17.     Neither Edward Birk nor Justin Birk directly responded to Progressive's letter requesting any other insurance policies which may apply to the accident. (Hansel Depo., Ex. E, 255:21-24)

18.     Progressive, through Hansel, also contacted Linda Birk about the existence of other coverage and was told no such coverage existed. (Hansel Depo., Ex. E, 263:17-264:5)

19.     Hansel also made two phone calls to the Birks' personal lines insurance agent, Trustpoint, attempting to determine whether other coverage existed. (Hansel Depo., Ex. E, 54:19-55:18; 68:8-19; 71:2-15; 123:15-18; 263:17-264:5)

4

20.     Progressive evaluated potential damages associated with the claim, including non-pecuniary damages up to the statutory $250,000 cap; medical bills; pecuniary losses such as loss of services and support of Ms. Gant; and funeral expenses. (Progressive face sheet notes, Ex. D, at Progressive-0012411; Hansel Depo., Ex. E, 42:24-43:4)

21.     Progressive determined and reflected in the claim file within weeks of the accident, that based on the fact that Ms. Gant was a 31-year-old mother of three and a high wage earner—that the claim had a value in excess of $5 million. (Hansel Depo., Ex. E, 122:21-123:11; Progressive face sheet notes, Ex. D, at Progressive-0012411)

22.     Progressive accordingly concluded that it would offer its $250,000 liability limit to settle the claim. (Progressive face sheet notes, Ex. D, at Progressive-0012411)

**Progressive Promptly Tendered its $250,000 Policy Limit**

23.     Progressive tendered its $250,000 policy limit to Gant to settle the claims related to the accident no later than August 24, 2011, pursuant to a letter of that date from McMaster to Lykins. (McMaster Depo, Ex. F, 162:19-163:10; Hansel Depo, Ex. E, at 292:16-293:7; 312:19-23 and McMaster August 24, 2011 letter, Ex. ZZ)

24.     Gant rejected the $250,000 settlement offer extended by Progressive. (Gant Amended Counterclaim, ¶21)

**No Opportunity to Settle for the Progressive $250,000 Policy Limit**

25.     Following the June 10, 2011 accident, Gant was represented by attorney Dan Lykins from approximately June 21, 2011 to May 2012. (Lykins Depo., Ex. J, 11:6-11; 15:23-16:9; 18:1-14)

26.     On August 26, 2011, Gant's attorney Lykins responded to the McMaster letter tendering the Progressive $250,000 liability limit by sending a letter requesting that Justin Birk

execute an assets affidavit and swear under oath that there was no other available insurance coverage which could apply to the accident.  (McMaster Depo., Ex. F, 164:6-167:25; See Lykins August 26, 2011 letter and affidavit, attached as Ex. K hereto)

27.     Lykins told Gant in a meeting in approximately December 2011 that the most important thing was for the Birks (Justin Birk, Ed and Linda Birk, and their companies) to sign the affidavit concerning assets and verify under oath that there was no available insurance coverage from any source. (Lykins Depo., Ex. J, 21:16-22:18)

28.     Gant had the ultimate decision-making authority whether or not to settle the underlying claim, though he was consulting with family members including Katie Gant's parents and his own parents. (Gant Depo., Ex. L, 56:24-58:5)

29.     Gant testified that Progressive's tender of the $250,000 policy limit was not accepted to settle the claim because he believed there was still more investigation and gathering of information that needed to be completed. (Gant Depo., Ex. L, 61:20-25)

30.     Gant believed the value of the wrongful death claim was worth well in excess of $250,000. (Gant Depo., Ex. L, 64:4-8)

31.     Gant believed the value of the wrongful death claim was worth substantially in excess of $1.25 million as well. (Gant Depo., Ex. L, 76:3-7)

32.     Gant's attorneys asked for well over $15 million at trial, which Gant agreed was a good indication that there was a sizeable difference between the $250,000 Progressive policy limit and what Gant believed was a reasonable value of the claim. (Gant Depo., Ex. L, 64:9-21)

33.     If the $1.25 million combined limits of the Progressive and Bitco policies had been offered in 2011, Gant could not say either way whether he would have accepted that amount to settle the claim. (Gant Depo., Ex. L, 72:22-73:11; 90:6-12)

34.     If the $1.25 million combined limits of the Progressive and Bitco policies had been offered in 2011, Gant indicated it was "likely" he would still want his lawyers to do an investigation into other assets the Birks may have that could be potentially recovered by the Gant family. (Gant Depo., Ex. L, 76:24-77:13)

35.     Gant indicated that settlement was "never as much [about] money as—a feeling of completion, of all the facts are gathered, that we were happy with…not pulling the trigger too fast and not leaving anything incomplete.  So enough money is—I don't—I would not say that, that it was a money factor, per se." (Gant Depo., Ex. L, 79:12-80:1)

36.     Concerning the April 2015 mediation, at which the $1.25 million was actually offered, Gant still could not say for sure whether he had all of the information necessary to make a decision with respect to the issue of settlement. (Gant Depo., Ex. L, 81:10-25)

37.     Gant rejected the combined offer of $1.25 million at mediation. (Gant Depo., Ex. L, 154:13-155:8; 166:17-20)

38.     At the time of mediation when the $1.25 million was offered, Gant made the decision not to accept the $1.25 million because he wanted to go to trial. (Gant Depo., Ex. L, 84:21-85:2)

39.     Specifically, Gant wanted to see the case through trial so that the work that had been put into the case would "not pay off in terms of money, but pay off in terms of just—of justice." (Gant Depo., Ex. L, 85:3-17)

40.     Gant indicated this was never about the money, including at the time he rejected the $1.25 million offer at mediation and up to the date of the trial. (Gant Depo., Ex. L, 86:5-22)

41.     Gant rejected the $1.25 million because he wanted his day in court, wanted justice, and wanted closure. (Gant Depo., Ex. L, 87:7-23; 89:15-23)

42.     Gant testified:

Q:  [G]iven your desire to have closure, the facts determined in court to protect your wife's legacy, seek justice, and you said all of those things existed throughout the case, is there ever a time within the litigation that $1,250,000 would have settled the case?

A:  I couldn't say either way.

(Gant Depo., Ex. L, 90:6-12)

43.     Gant is not sure whether he would have even agreed to the Agreement and Covenant Not to Execute with the Birks, had he known there was an indication that Birk Oil had a net worth of $15 million. (Gant Depo., Ex. L, 119:10-21)

44.     Even if the Bitco policy had been disclosed in 2011, Gant would have wanted to make sure there was no other insurance by way of an affidavit from the Birks. (Gant Depo., Ex. L, 160:8-19)

45.     The decision to reject Progressive's offer of its $250,000 policy limit was made by Gant. (Gant Depo., Ex. L, 166:8-16)

46.     The decision to reject the offer of the $1.25 million combined policy limits of Progressive and Bitco was made by Gant. (Gant Depo., Ex. L, 166:8-20)

47.     McMaster understood that the completion of the assets affidavit and sworn statement of no other insurance coverage were conditions of settlement, and further that if additional insurance were to be disclosed, the proposed settlement for the $250,000 Progressive liability limit would not be completed. (McMaster Depo., Ex. F, 167:20-25)

48.     Lykins testified that McMaster told him that the Birks did not have other insurance, including business insurance, and that McMaster verbally told him over the phone the contents of the affidavit, which McMaster would not provide unless the case settled. (Lykins Depo., Ex. J, 23:14-24:10)

8

49.     Lykins also wanted Justin Birk to swear under oath whether he was, or was not, in the course and scope of his employment with Birk Oil because, even if Birk Oil did not have applicable insurance, Birk Oil had assets that could be collected to compensate Gant for the loss. (Lykins Depo., Ex. J, 28:17-29:1; 17:16-38:8)

50.     Lykins believed the value of the case was between $5-8 million. (Lykins Depo., Ex. J, 44:24-45:12)

51.     Lykins agreed that, even if an additional $1 million coverage was available, that $1.25 million was far below what Lykins believed was the value of the case. (Lykins Depo., Ex. J, 45:13-17)

52.     During the time Lykins represented Gant, he never made a claim against Birk Oil or Linda and Edward Birk, only Justin Birk. (Lykins Depo., Ex. J, 62:2-22)

53.     The affidavit of the Birks required by Lykins to settle the case was never received. (Lykins Depo., Ex. J, 29:20-24; 65:15-17)

54.     Lykins testified that, even if the affidavit was returned and it stated under oath that there was no other applicable insurance and that Justin Birk was not in the course and scope of his employment, Lykins still would not have recommended settlement—Lykins would have required a personal contribution from the Birks over and above the $250,000 Progressive limit. (Lykins Depo., Ex. J, 74:17-75:18)

55.     Lykins testified that the case was not going to settle without a financial contribution from Ed and Linda Birk and/or Birk Oil, in addition to the $250,000 Progressive limit. (Lykins Depo., Ex. J, 77:20-78:7)

56.     Lykins testified that the amount of any personal contribution by the Birks to settle the case would need to be at least an additional $250,000 above the $250,000 Progressive limit. (Lykins Depo., Ex. J, 81:14-82:10)

57.     In addition to McMaster, Lykins also communicated with the Birks' personal attorney, James Campbell, regarding the affidavit. (Lykins Depo., Ex. J, 57:16-58:16)

58.     Lykins testified that, even if $1.25 million in insurance coverage was offered, he would have required the Birks to make a personal contribution above that amount. (Lykins Depo., Ex. J, 136:15-137:9)

59.     The Birks' personal attorney, Campbell, also testified that attorney Lykins was seeking a personal contribution from the Birks to settle the case. (Campbell Depo., Ex. J, 13:5-14:5)

60.     Campbell testified that he requested more details about the personal contribution from Lykins, but Lykins did not respond, which Campbell later understood was because Lykins was discharged by Gant. (Campbell Depo., Ex. J,14:10-22)

61.     McMaster never told Lykins whether the Birks would be willing to make a personal contribution to settlement. (Lykins Depo., Ex. J, 79:3-17)

62.     For his part, Edward Birk did not believe he or his wife had any obligation to make a personal contribution towards settlement. (Edward Birk Depo., Ex. J, at 37:18-21)

63.     There was a meeting on or about December 13, 2011, at which Gant met with the various attorneys he was communicating with about the case, including his retained counsel Lykins, an attorney named Murphy, and his subsequent counsel Gross. Both Murphy and Gross were relatives of Gant. (December 14, 2011 Lykins memo, Ex. M hereto; Lykins Depo., Ex. J, 113:2-114:12)

64.     Lykins dictated a memo concerning what transpired at the December 13, 2011 meeting. (Lykins Depo., Ex. J, 115:24-116:2)

65.     After Lykins was discharged, Gant was represented by attorneys Kieffer and Gross from the Wagstaff & Cartmell law firm (collectively, the "Wagstaff firm") beginning in approximately June 2012. (Gant RFA responses, No. 1, Ex. N hereto))

66.     Between the date of their retention and the date suit was filed, the Wagstaff firm communicated no settlement demands or offers to settle Gant's claim. In fact, no settlement offer was ever made within the Progressive $250,000 limit or the combined $1.25 million Progressive/Bitco policy limits, and the only reference by Gant to settlement was at mediation where he offered to negotiate in a range between $6 - $10-million. (Sanders post-mediation letter dated May 11, 2015 to all counsel, Ex. O hereto)

67.     The Birks' personal attorney Campbell understood from early on that the value of the claim was in excess of the Progressive policy limit and presented personal exposure to the Birks in excess of the policy limit. (Campbell Depo., Ex. P, 130:10-22)

68.     In his December 2011 memorandum, Mr. Lykins placed the value of the Gant wrongful death claim at $5 - $10-million. (Lykins memorandum, Ex. M hereto)

69.     McMaster wrote an email dated April 5, 2012 to Robert Hansel, in which McMaster indicated based on conferral with the Birks' personal counsel that Gant was seeking a personal contribution from Edward and Linda Birk above the policy limit. McMaster further indicated that the Birks were consulting with yet another personal attorney on the matter, Mike Helbert. (April 5, 2012 McMaster email, Ex. Q hereto)

70.     Attorney Kieffer, on behalf of Gant, took the position on Lykins' fee request that it would have been inappropriate to settle for the $250,000 without a substantial personal contribution by the Birks. (September 2, 2015 Kieffer letter, Ex. R)

71.     Kieffer faulted Lykins for not discovering that Birk Oil Company had net worth in excess of $15 million. (Lykins Depo., Ex. J, 107:20-108:2; Kieffer letter to Lykins, Ex. R hereto)

72.     Kieffer also faulted Lykins for not discovering the existence of the Bitco policy and urged that no one could have reasonably relied upon McMaster's statement regarding other insurance because it was equivocal in the extreme. (Kieffer letter to Lykins, Ex. R)

73.     McMaster communicated a settlement offer to Gant which included the $250,000 Progressive liability limit, as well as an offer to purchase Mr. Gant's residence in Burlington, Kansas, which was not accepted by Gant. (McMaster Depo., Ex. F, 219:25-220:9)

74.     Gant never made a settlement demand, for any amount, during the time period that McMaster was handling the case. (McMaster Depo., Ex. F, 202:12-15)

75.     Gant's counsel Kieffer never indicated at any point in time that the $250,000 Progressive liability limit would settle the case. (McMaster Depo., Ex. F, 202:16-18)

76.     Gant's counsel Kieffer never indicated at any point in time that the combined $1.25 million policy limits of the Progressive and Bitco policies would settle the case. (McMaster Depo., Ex. F, 202:19-22)

77.     In pleadings, Gant alleged that his monetary damages were $20 million. (November 4, 2013 Statement of Monetary Damages, Ex. S hereto)

78.     Prior to suit being filed, McMaster repeatedly called counsel for Gant to discuss settlement, and was frequently not responded to.  When conversations occurred, there was never

any indication from counsel for Gant that any question concerning the existence of other insurance coverage was a factor in the case not settling. (McMaster Depo., Ex. F, 201:25-202:11; 204:8-15)

79.     Progressive frequently followed up, at least every 30 days if not sooner, to try and continue settlement discussions on behalf of the Birks. (Hansel Depo., Ex. E, 294:9-14)

### Attorney McMaster used his own independent legal judgment and was not controlled by Progressive

80.     McMaster understood that, when hired by an insurance company to defend an insured, his client was the insured and not the insurance company. (McMaster Depo., Ex. F, 26:8-16)

81.     When McMaster was first retained in connection with the Gant/Birk accident, McMaster understood his sole client at that time was Justin Birk. (McMaster Depo., Ex. F, 27:17-28:13)

82.     McMaster was not retained as legal counsel to represent the interests of Progressive in connection with the Gant/Birk accident, claim and lawsuit. (McMaster Depo., Ex. F, 28:19-23)

83.     Ultimately, McMaster's representation expanded and following institution of litigation he then also represented Edward and Linda Birk, as well as the company that is colloquially referred to as Birk Oil. (McMaster Depo., Ex. F, 29:14-20; 32:24-33:2; 43:16-22)

84.     McMaster understood that his sole clients were the Birks. (McMaster Depo., Ex. F, 43:16-44:1)

85.     McMaster believed he had a professional obligation to zealously represent Justin Birk, Edward and Linda Birk, and Birk Oil. (McMaster Depo., Ex. F, 33:3-6)

86.     McMaster testified that Progressive never did anything that in any manner constrained McMaster's own independent professional judgment as to how to best represent the Birks. (McMaster Depo., Ex. F, 34:19-24)

87.     McMaster testified that Progressive did not limit or restrict McMaster from doing anything he wanted to do in the defense of the Birks. (McMaster Depo., Ex. F, 35:20-24)

88.     McMaster testified that there is nothing he wanted to do in representing his clients that Progressive in any manner limited, curtailed, or failed to approve—in the Gant/Birk case or any case. (McMaster Depo., Ex. F, 40:18-25)

89.     McMaster testified that his efforts in defending an insured is a collaborative effort between himself and his insured-clients. (McMaster Depo., Ex. F, 41:1-11)

90.     McMaster testified he would never allow any third-party payor, like an insurance company, to interfere with his independent professional judgment as to how to best defend the insured. (McMaster Depo., Ex. F, 41:12-18)

91.     McMaster testified that Progressive did not interfere—either directly or indirectly—with the representation McMaster provided to the Birks. (McMaster Depo., Ex. F, 42:8-18)

92.     McMaster testified that Progressive provided him with all of the resources he needed to completely defend the Birks. (McMaster Depo., Ex. F, 40:13-17)

93.     McMaster testified that all of the actions he took on behalf of the Birk defendants were based upon McMaster's belief it was the best way to provide the defense the Birks wanted. (McMaster Depo., Ex. F, 52:24-53:6)

94.     McMaster testified that Progressive did not engage in any conduct that in any manner involved or resulted in either of the two instances in which McMaster was sanctioned monetarily by the trial court for discovery violations. (McMaster Depo., Ex. F, 63:13-64:23)

95.     McMaster testified, "Progressive was not involved in providing the defense. Progressive was paying me to provide the defense. Progressive didn't show up in court.

14

Progressive didn't answer discovery. Progressive didn't oversee me showing up in court or interact with me and my clients in responding to discovery." (McMaster Depo., Ex. F, 64:13-23)

96.     The Birks believed that Justin Birk was not at fault in the accident, and they wanted McMaster to pursue a defense on that basis. (Edward Birk Depo., Ex. C, 22:15-24; 23:7-24:14; Linda Birk Depo., Ex. T, 11:11-21; 38:21-39:12)

97.     The Birks believed, and still believe, that Justin Birk was not on the job in his capacity as an employee of Birk Oil at the time of the accident, and communicated this position to McMaster and wished for him to advance that position in the underlying lawsuit. (Linda Birk Depo., Ex. T, 10:16-11:10)

98.     McMaster testified that Progressive did not engage in any conduct that ultimately led to the reverse "alter-ego sanction" imposed by the trial court. (McMaster Depo., Ex. F, 87:6-88:7)

99.     McMaster testified that the imposition of monetary sanctions did not curtail or limit his ability to provide a vigorous and effective defense for the Birks. (McMaster Depo., Ex. F, 66:24-67:4)

100.     McMaster testified he is not aware of any damage that was caused to the Birks by the "alter-ego sanction" that otherwise would not have existed. (McMaster Depo., Ex. F, 88:21-89:3)

101.     Even in instances in which McMaster requests approval from an insurance company for research or other tasks in a case, he does not wait for approval before doing what needs to be done. (McMaster Depo., Ex. F, 257:5-258:3)

102.    McMaster never allowed anything contained in any insurance company's defense counsel guidelines to interfere with any obligation he had in the defense of his clients. (McMaster Depo., Ex. F, 383:17-24; 386:8-23)

103.    McMaster did not use or allow Progressive's defense counsel guidelines to factor into what McMaster did or did not do in connection with defending the Birks: rather, McMaster defended the Birks to the best of his ability irrespective of the defense counsel guidelines. (McMaster Depo., Ex. F,384:10-385:15)

104.    Progressive's Defense Counsel Guidelines set forth, in part:

**Progressive expects counsel to exercise independent professional judgment in rendering legal services to Progressive insureds. Counsel should never allow anything contained in these guidelines to interfere with any ethical directive or obligation governing conduct as defense counsel**  (emphasis in original)

105.    Progressive's Defense Counsel Guidelines set forth, in part:

To the extent that any local laws or rules conflict with any of the provisions contained herein, the local law or rule shall govern. In the event a bona fide dispute arises between Progressive and defense counsel as to how best to protect the interests of a Progressive insured, Progressive will always defer to the independent professional judgment of defense counsel.

106.    McMaster is aware of nothing he wanted to do in the defense of the Birks that was not approved by Progressive, and similarly he is aware of no instance in which Progressive curtailed or limited his ability to expend any amount of money in the defense of the Birks. (McMaster Depo., Ex. F, 387:14-388:24)

107.    McMaster further testified that, even if Progressive had not approved an expense or otherwise curtailed McMaster's representation of the Birks, McMaster would nevertheless have done what he believed he needed to do in order to fully defend the Birks. (McMaster Depo., Ex. F, 387:25-388:4)

108.    Progressive adjuster Hansel, who hired McMaster, testified that he does not direct defense counsel and does not tell them what to do—rather he expects counsel (including McMaster) to do whatever is needed within the scope of their representation to represent the insureds, including investigating issues of liability, damages, additional insurance policies, and defending the insureds in a lawsuit if one is filed. (Hansel Depo., Ex. E, 66:3-67:20)

109.    Progressive adjuster Hansel never denied McMaster approval for anything McMaster wanted to do in defense of the Birks. (Hansel Depo., Ex. E, 203:21-25)

110.    Progressive adjuster Hansel testified that McMaster had ultimate responsibility for the direction, control, and strategy employed in the defense of the Birks. (Hansel Depo., Ex. E, 279:9-12)

111.    Concerning the liability defense prosecuted by McMaster on behalf of the Birks in the underlying action, Progressive adjuster Hansel testified that it's "not for me to say that he should give up that argument…that's a discussion that he has to have with my insured, and that's a discussion they decide to---on how best to proceed." (Hansel Depo., Ex. E, 113:12-25)

112.    Progressive adjuster Hansel does not get involved with directing defense counsel's legal strategy, and not once in 30 years with Progressive has Hansel suggested to defense counsel they should not pursue a stated legal strategy on behalf of an insured. (Hansel Depo., Ex. E, 117:18-118:22)

113.    Gant's own expert, Brian Wright, could not identify any actions by Progressive through which it attempted to control or restrict the conduct of McMaster. (Wright Depo., Ex. U, 348:4-10)

## The Birks' Disclosure of Other Insurance

114.    Progressive sent a letter to Justin Birk, and a letter to Edward Birk, which provides as follows: "Please let us know immediately if you have policies that may provide coverage to you in excess of this policy. If we do not hear from you concerning such policies, we will assume that no such policies exist."  (Hansel 6/20/11 letters, attached hereto as Ex. H and Ex. I; Hansel Depo., Ex. E, 55:5-10; 59:17-25)

115.    Progressive adjuster Hansel, who sent the letter, indicated that the intent of this correspondence was for the Birks to disclose any policies that could provide additional coverage based on the facts of the accident, whether excess, umbrella, or any other policies that might come into play. (Hansel Depo., Ex. E, 254:18-24)

116.    Progressive adjuster Hansel considered any other policies which might come into play, whether household, business, policies to other family members, and the like, "excess" over the Progressive auto policy which Hansel considered to be the primary coverage for the accident. (Hansel Depo., Ex. E, 254:25-255:20)

117.    The Birks never responded to Progressive's letters to Justin and Edward Birk inquiring as to other potentially applicable coverage. (Hansel Depo., Ex. E, 255:21-24; Laura Birk Depo., Ex. V, 53:20-24)

118.    The Birks did not put Bitco on notice of the accident immediately because the Bitco policy was issued to Birk Oil, and the Birks believed the accident involved only Justin Birk personally, not the company. (Edward Birk Depo., Ex. C, 30:14-31:13; Linda Birk Depo., Ex.T, 15:15-16:2; 26; 20-25; Laura Birk Depo., Ex. V, 48:9-49:1)

119.    Justin Birk's criminal attorney, John Ambrosio, also sent a letter to the Birks in April 2013, shortly after litigation was filed, advising that they should place all of their insurance carriers on notice of the accident. (John Ambrosio letter of April 30, 2013, Ex. W hereto)

120.    No one at Progressive advised the Birks they should not put Bitco on notice of the accident. (Laura Birk Depo., Ex. V, 66:7-14)

121.    The Birks believed, in conjunction with advice from McMaster that the Bitco policy did not provide coverage for the accident because it was their belief that Justin Birk was not on the job at the time of the accident. (Laura Birk Depo., Ex. V, 57:1-25)

122.    Progressive also contacted one of the Birks' insurance agents, Trustpoint Insurance Agency, to inquire if there was any other insurance which may provide coverage for the accident. (Hansel Depo., Ex. E, 55:5-10)

123.    Progressive also contacted Linda Birk by telephone, inquired about other potentially applicable insurance, and was informed that none existed. (Hansel Depo., Ex. E, 58:16-59:16)

124.    Progressive adjuster Hansel testified that he relies on the insureds to provide information concerning any other potentially applicable insurance policies, and that if the insured does not disclose that information, then he does not know what other coverage there may be. (Hansel Depo., Ex. E, 73:1-22)

125.    Progressive adjuster Hansel also expected defense counsel hired by Progressive, as well as any personal counsel advising the insureds, to counsel the insureds about other applicable insurance, including insurance available to any business that could potentially be involved. (Hansel Depo., Ex. E, 85:6-22)

126.    Following the filing of litigation, Progressive adjuster Hansel contemporaneously reflected in the claims notes his understanding that McMaster was placing all insurance carriers on notice. (Progressive face sheet notes, Ex. D, at Progressive0012400)

127.    Progressive looked into whether any other Progressive policies existed which could provide coverage for the accident and found none. (Hansel Depo., Ex. E, 133:4-14)

128.    McMaster, the Birks, and the Birks' personal counsel, reviewed the insurance policies available to the Birks at the time of the accident and concluded that the Progressive policy was the only coverage applicable to the accident. (McMaster Depo., Ex. F, 117:17-118:8; May 10, 2013 letter from McMaster to Hansel, copying the Birks and attorney Campbell, Ex. Y hereto)

129.    McMaster reviewed several insurance policies issued to one or more of the Birks, including the Bitco commercial auto policy, as well as a CGL policy issued to Birk Oil, a workers' compensation policy issued to Birk Oil, and a homeowner's policy issued to Ed and Linda Birk. (McMaster Depo., Ex. F, 118:19-120:13)

130.    McMaster wrote a May 2013 letter to Progressive, copying the Birks and their personal attorney Campbell, in which McMaster stated:

> With the assistance of our clients' personal counsel, we have reviewed the insurance coverage available to the Defendants at the time of the accident.  It appears that the Progressive policy provides the only coverage for this accident.  Therefore, the Defendants understand that the likely exposure of this case is in excess of the applicable coverage.

(May 10, 2013 letter, Ex. Y hereto)

131.    McMaster evaluated whether the Bitco policy provided coverage for the Gant/Birk accident and concluded the Bitco policy did not provide coverage. (McMaster Depo., Ex. F, 121:5-19)

132.    The Birks, through McMaster, disclosed to Gant the existence of the Bitco insurance policy, and other insurance policies, no later than February 26, 2014. (McMaster Depo.,

Ex. F, 129:2-132:6; Birks' interrogatory responses dated February 26, 2014 (Ex. YY); See also Gant Am. Counterclaim in this action, at ¶160; See also Order on Progressive's Motion to Dismiss Gant Am. Counterclaim, Doc. 237, at p. 11)

133.   The fact that Bitco had issued insurance to Birk Oil was a public record available through the Kansas Corporation Commission. (McMaster Depo., Ex. F, 108:3-109:15; Kansas Corporation Commission report, Ex. X hereto)

134.   McMaster did not forward the Bitco policy to anyone at Progressive until 2015. (McMaster Depo., Ex. F, 143:12-19; 145:25-147:11; 2/4/15 email from McMaster to Kelly, et al., Ex. Z)

135.   McMaster and the Birks' personal counsel informed the Birks there was no coverage under the Bitco policy. (McMaster Depo., Ex. F, 147:12-148:20; See 2/4/15 email Ex. Z hereto)

136.   McMaster represented to the underlying trial court that the only applicable policy of insurance was the Progressive policy because McMaster had reached the conclusion, based on his review of the Bitco policy, that it did not apply. (McMaster Depo., Ex. F, 154:16-22)

137.   The Birks' initial interrogatory responses indicating that the only applicable insurance coverage was the Progressive policy was based, at least in part, on McMaster's conclusion that the Bitco policy did not provide coverage for the accident. (McMaster Depo., Ex. F, 156:8-15)

138.   McMaster still believes there is no coverage afforded under the Bitco policy. (McMaster Depo., Ex. F, 371:24-372:13)

139.    Gant learned of the existence of the Bitco policy in the underlying case no later than February 26, 2014. (See Am. Counterclaim, ¶160; Order partially granting Progressive Motion to dismiss, Doc. 237 at p. 13.)

140.    Progressive was not made aware of the Bitco policy until a year later, in approximately January 2015. (Provorse Depo., Ex. AA, at 173:1-174:7; Provorse January 26, 2015 email to Hansel, Ex. BB hereto)

141.    Neither Gant, nor his counsel, formally put Bitco on notice of the accident once the existence of the Bitco policy was disclosed. (Gant RFA responses, Nos. 58-59, Ex. N; Shelley Storey (Bitco) Depo., Ex. CC hereto, 69:6-13) There is no record evidence that Gant ever did anything with this information.

142.    Steve Pigg, attorney for Birk Oil who was paid for by Progressive, ultimately placed Bitco on notice and got them involved in February 2015, approximately one year after the existence of this policy was disclosed. (Shelley Storey (Bitco) Depo., Ex. CC hereto, 69:6-13; Jean Kelly Depo., Ex. DD 53:21-54:5)

**The Birks approved of McMaster's representation**

143.    The Birks were pleased with the representation provided by McMaster, believed McMaster had the best interest of the family and family company at heart in his representation, and indicated that McMaster kept the Birks advised about the lawsuit. (Edward Birk Depo., Ex. C, 15:16-16:19; Justin Birk Depo., Ex. EE, 10:4-10)

144.    Nothing McMaster did in the handling of the lawsuit caused Edward Birk any concern. (Edward Birk Depo., Ex. C, 17:3-7)

145.    Edward Birk does not believe that anything McMaster did in his handling of the case caused injury or harm to anyone in the family or the company. (Edward Birk Depo., Ex. C, 17:8-12)

146.    Likewise, Linda Birk believes that McMaster did a good job in his representation of the Birks, and that McMaster did not cause the Birks any difficulties or problems. (Linda Birk Depo., Ex. T, 8:20-23; 9:10-15)

147.    McMaster testified that, to his knowledge, the Birks never complained to Progressive or anyone that they were dissatisfied with the work or representation McMaster had provided. (McMaster Depo., Ex. F, 44:2-12)

148.    McMaster kept the Birks fully informed of all significant developments in the case. (McMaster Depo., Ex. F, 44:13-17)

149.    McMaster wrote in a letter to Progressive dated April 9, 2015, following a meeting with supervisor-level personnel of Progressive with the Birks and McMaster, expressing the Birk family's thanks to Progressive for the meeting; expressing that the Birks believed that a good defense had been provided in the case; and expressing the Birks' belief that McMaster's representation provided independent counsel as provided by Kansas law. (McMaster Depo., Ex. F, 216:11-218:8 and April 9, 2015 letter from McMaster to Ostrom and Kelly, Ex. FF)

150.    In spite of efforts taken by Progressive to transition the case from McMaster to other counsel, the Birks continued to want McMaster to represent them in some capacity in the Gant litigation. (McMaster Depo., Ex. F, 222:16-23 and Ex. FF)

151.    McMaster is not aware of any complaints by the Birks to Progressive, or that the Birks wanted him removed from the case: rather, McMaster is only aware of representations made

by the Birks that they were happy with the services McMaster provided them. (McMaster Depo., Ex. F, 222:24-223:5)

152.    Neither the Birks, nor their personal counsel Campbell, ever complained to Progressive about the services provided by McMaster—on the contrary they seemed satisfied. (Hansel Depo., Ex. E, 271:24-272:18; Edward Birk Depo., Ex. C, 26:12-16)

153.    The Birks were present for court hearings and generally were engaged in what was transpiring in the lawsuit, and McMaster explained to the Birks what was happening in laymen's terms. (Edward Birk Depo., Ex. C, 19:16-6; 34:6-18; Justin Birk Depo., Ex. EE, 10:20-22; Laura Birk Depo., Ex. V, 87:12-23)

154.    The Birks were present in court during the hearings in which McMaster was sanctioned. (See McMaster August 26, 2014 letter to Progressive, Ex. GG hereto)

155.    The Birks never heard McMaster say anything at hearings in the underlying lawsuit that they disagreed with. (Edward Birk Depo., Ex. C, 58:18-59:1)

156.    Even when Progressive brought in attorneys Hart, Barrett, and Pigg as additional counsel to represent each of the Birk defendants, the family wanted McMaster to continue in the case because they believed McMaster was doing a good job. (Edward Birk Depo., Ex. C, 17:13-18:7; Laura Birk Depo., Ex. V, 79:14-80:10 and Ex. FF)

157.    The Birks' personal attorney Campbell believed the Birks liked McMaster and believed he was doing a good job in zealously representing their interests. (Campbell Depo., Ex. P, 128:24-129:5)

158.    Edward Birk was satisfied with the ultimate result of the Gant wrongful death lawsuit, testifying that **"Progressive came and saved the day."** (Edward Birk Depo., Ex. C, 35:6-11) (emphasis added)

159.     Edward Birk was satisfied with the result in that with the encouragement and consultation of attorneys retained by Progressive, the Birks were fully protected. (Edward Birk Depo., Ex. C, 35:6-36:14)

160.     Pursuant to the Agreement and Covenant Not to Execute, the Birks have been fully protected and no one has tried to collect any portion of the judgment from the Birk Family or Birk Oil. (Edward Birk Depo., Ex. C, 36:15-22)

161.     The Birks' personal attorney Campbell described the ultimate outcome for the Birks as "a phenomenal result" insofar as they were insulated from liability and did not make a personal contribution of any kind. (Campbell Depo., Ex. P, 62:24-63:12)

162.     Gant's own expert, Brian Wright, testified that he does not know if he could have achieved the same fantastic result as McMaster. (Wright Depo., Ex. U, 307:23-308)

## B&B Cooperative Ventures, a General Partnership

163.     B&B Cooperative Ventures, a General Partnership, is the entity which is colloquially referred to as Birk Oil. (Ed Birk Depo., 47:1-3; B&B General Partnership Agreement, Ex. HH hereto)

164.     B&B Cooperative Ventures, a General Partnership is a general partnership formed under the laws of the state of Kansas, including the Kansas Uniform Partnership Act. (General Partnership Agreement, Ex. HH, ¶1)

165.     There are two partners in B&B Cooperative Ventures, Inc., each with a 50% interest: (1) Birk Oil, Inc. (owned by Edward and Linda Birk); and (2) Birk Petroleum (Brian and Laura Birk). (General Partnership Agreement, Ex. HH, p. 1, prefatory paragraph and ¶¶1-5, and p. 5)

166.     Edward and Linda Birk have a 50% combined ownership interest in B&B Cooperative Ventures, a General Partnership. (General Partnership Agreement, Ex. HH, p. 5)

**Progressive's retention of additional counsel for the Birks**

167.     In approximately Fall 2014, Birk Oil retained attorney Steve Pigg to represent their interests in addition to McMaster. (Laura Birk Depo., Ex. V, 81:24-83:12)

168.     Progressive ultimately agreed to pay for attorney Pigg's representation of Birk Oil. (Jean Kelly Depo., Ex. DD, 53:21-54:5)

169.     In late 2014 or early 2015, Progressive hired additional counsel to represent the Birks: Specifically, Progressive retained Todd Barrett to represent Ed and Linda Birk, and retained Brette Hart to represent Justin Birk. (Jean Kelly Depo., Ex. DD, 53:7-20)

170.     Progressive decided to bring Barrett, and eventually Hart, on board to represent the Birks because the lawsuit was not settled and was heading towards a lengthy trial which would require intensive motion practice. (Jean Kelly Depo., Ex. DD, 53:7-20; 113:2-13)

171.     In approximately February 2015, attorneys Barrett and/or Pigg brought to Progressive's attention that events had transpired in the lawsuit which Progressive was not aware of, specifically the so-called "alter ego sanction" and other issues that made it appear that the Court had lost confidence in McMaster. (Jean Kelly Depo., Ex. DD, 59:2-17)

172.     Progressive decided to remove McMaster from the underlying case, not because of his conduct in handling the defense as much as his reporting to Progressive, in particular the accuracy and timeliness of his reporting, and the lack of confidence in McMaster by the Court as demonstrated in the sanctions issued against McMaster. (Jean Kelly Depo., Ex. DD, 124:13-126:2)

173.     Progressive was not advised until approximately February 2015 that hundreds of requests for admissions propounded to the Birks had been deemed admitted by the trial court due to failure to timely answer them. (Jean Kelly Depo., Ex. DD, 128:15-130:3)

174.     McMaster resisted Progressive's efforts to remove him from the case. On April 9, 2015, McMaster wrote to Progressive advising that the "Birks chose not to discharge me as their counsel of record at this time." Laura Birk was copied on this correspondence. (April 9, 2015 letter, Ex. FF.)

175.     Ultimately, after the withdrawal of McMaster in May 2015, additional counsel sought to admit liability at trial, but Gant's counsel objected and stated that admitting liability would constitute a breach of the parties' Agreement, Assignment and Covenant not to Execute. (Emails between defense counsel and Jonathan Kieffer, Ex. II hereto)

### Conflict of Interest

176.     McMaster evaluated and considered the potential that there may be a conflict of interest between the Birk defendants. (McMaster Depo., Ex. F, 54:22-55:6)

177.     McMaster obtained a written conflict waiver when his representation expanded to include Ed and Linda Birk and Birk Oil in addition to Justin Birk. (McMaster Depo., Ex. F, 55:7-13; 112:13-25)

178.     McMaster testified that his general practice is to explain the potential conflict to his clients, advise them of circumstances in which a conflict could arise, and otherwise fully explain the potential conflict to the clients. (McMaster Depo., Ex. F, 113:1-23)

179.     McMaster discussed the conflict issue with the Birks as well as the Birks' personal counsel, and sent a copy of the conflict waiver to the Birks' personal counsel. (McMaster Depo., Ex. F, 114:8-23; 5/10/13 McMaster letter to Birks/Campbell re: potential conflict, Ex. JJ hereto)

180.    The Birks' personal attorney Campbell was involved in the Birks' signing the conflict waiver and McMaster testified that the potential conflict issue had been discussed, that the Birks understood it, and that the Birks were moving forward in unison. (McMaster Depo., Ex. F, 114:24-115:17)

181.    The written conflict waiver executed by each of the Birks was faxed to Progressive from the office of their personal counsel, James Campbell. (See Ex JJ, fax stamp)

182.    The Birks' personal attorney Campbell was involved periodically to consult on issues concerning the claim and lawsuit, and was kept in the loop by attorney McMaster and carboned on key correspondence. (Campbell Depo., Ex. P, 36:11-23; 41:10-22)

## McMaster Qualifications

183.    McMaster has been a practicing attorney since 1984 and is licensed to practice law in the state of Kansas. (McMaster Depo., Ex. F, 11:4-20)

184.    McMaster is licensed to practice law in Kansas state and federal courts, as well as the Tenth Circuit Court of Appeals. (McMaster Depo., Ex. F, 47:19-48:4)

185.    McMaster's license to practice law has never been revoked, suspended, or curtailed in any way. (McMaster Depo., Ex. F, 51:16-20)

186.    Since 1984, McMaster has served in the capacity as a civil trial lawyer defending defendants involved in civil litigation. A significant portion of his practice is in the area of insurance defense. (McMaster Depo., Ex. F, 13:17-21; 14:17-15:3)

187.    McMaster has handled files representing insureds for more than a dozen insurance companies, including Nationwide, Allstate, and Empire Insurance. (McMaster Depo., Ex. F, 22:8-23:10)

188.    McMaster has handled thousands of files in the capacity of insurance defense counsel, including hundreds and perhaps even more than a thousand files involving serious bodily injury and/or wrongful death claims. (McMaster Depo., Ex. F, 15:16-16:23)

189.    McMaster has handled cases involving high-speed collisions, serious bodily injury or death claims, and multiple defendants, for many years. (McMaster Depo., Ex. F, 45:14-46:4)

### The Agreement, Assignment and Covenant Not to Execute

190.    Gant and the Birks entered into an Agreement and Assignment of Rights and Claims, and Covenant not to Execute, dated May 11, 2015. (Agreement, attached as Ex. KK hereto)

191.    The May 11, 2015 Agreement was entered into prior to the underlying June 2015 trial. (Agreement, Ex. KK)

192.    The parties agreed to submit the case for decision to Judge Godderz, Judge of the District of Coffey County, Kansas. (Agreement, Ex. KK, at ¶1)

193.    The agreement states:

Judge Godderz will make independent determinations regarding fault and damages based on the evidence and witnesses identified in this case at the time the pretrial order is entered. Liability will be determined based on objective evidence such as law enforcement reports and testimony, witness testimony and statements, and accident reconstruction reports and/or testimony.  Damages will be determined based on objective evidence such as medical and funeral bills, economists' reports, witness testimony and other relevant and necessary evidence.  Judge Godderz will serve as the trier of fact and will enter judgment that he believes to be fair, reasonable and supported by the evidence.

(Agreement, Ex. KK, at ¶1)

194.    Pursuant to the Agreement, Progressive paid its $250,000 policy limit, and Bitco paid its $1 million policy limit, following the entry of judgment. (Agreement, Ex. KK, at ¶¶3, )

195.     Pursuant to the Agreement, the Birks were completely insulated from liability prior to the trial in the Underlying Litigation. Gant further agreed not to execute on the judgment against any assets of the Birks. (Agreement, Ex. KK, at ¶5)

196.     The Agreement provides that it will enable Gant "to expedite prosecution of a negligence and/or bad faith action against Progressive." (Agreement, Ex. KK, at ¶14)

**The Underlying Bench Trial**

197.     Per the parties' Agreement, the case proceeded to a bench trial before Judge Godderz, which lasted five days. (Journal Entry & Judgment, Ex. MM)

198.     The Birks did not appear at the trial. (Tr. Transcript, Ex. LL, p. 1, 2)

199.     At trial, Gant presented a substantial amount of independent evidence to support his claims, specifically 18 witnesses and 295 exhibits. (See Trial Transcript, Ex. LL, at p. 3-7)

200.     Gant requested that the trial court award $15.8 million in damages. (Judgment and Journal Entry, hereinafter "Judgment," Ex. MM, at p. 7)

201.     Gant believed that the trial court was fair to both Gant and Birk in his consideration of this case. (Gant Depo., Ex. L, 24:23-25:20)

202.     Gant does not believe the trial court based its judgment and verdict on anything other than the independent evidence and testimony presented at trial. (Gant Depo., Ex. L, 23:25-24:21)

203.     Gant's Amended Counterclaim in this matter admits that there was overwhelming independent evidence supporting each element of Gant's claims at trial. (See, e.g., Amended Counterclaim, Doc. 160, at ¶¶39-112)

**The Judgment and Journal Entry Following Trial**

204.    After the trial concluded, the trial court issued detailed findings of fact and conclusions of law, as well as judgment and verdict from the bench. (See Trial Transcript, Ex. LL at pp. 1040-1069)

205.    In doing so, the trial court specifically linked its findings of fact, conclusions of law, judgment and verdict to the evidence and testimony presented at trial. (Trial Transcript, Ex. LL, at pp. 1040-1069)

206.    The trial court's findings of fact, conclusions of law, judgment and verdict were ultimately recorded in a written 13-page Journal Entry and Judgment which was drafted and approved by all counsel in the case. (Judgment, Ex. MM hereto)

207.    The Judgment sets forth, in detail, the trial court's findings of fact and conclusions of law and links the findings to independent evidence presented at trial. (Judgment, Ex. MM hereto)

208.    Concerning liability of Justin Birk in causing the accident, the trial court found that "there is simply no evidence to support any other scenario" and specifically cited the testimony of the three law enforcement officers and accident reports received into evidence as well as the fact that Justin Birk had previously pled guilty to vehicular homicide. (Judgment, Ex. MM, p. 4)

209.    Concerning liability of Edward and Linda Birk for negligently entrusting the vehicle to Justin Birk, the trial court concluded that they were liable and made detailed factual findings supporting its conclusion, including that Edward and Linda knew about Justin Birk's habitual carelessness and reckless in operating a motor vehicle, his prior bad driving record including numerous traffic infractions or arrests, Edward and Linda's payment of fines and legal expenses Justin accumulated concerning his offenses, and also that Edward and Linda had been

31

named in a prior wrongful death action involving the entrustment of a vehicle to Justin. (Judgment, Ex. MM, at p. 5)

210.   Concerning liability of Birk Oil on the basis of *respondeat superior*, the trial court found it was liable and made detailed factual findings supporting its conclusion, citing in particular the fact Justin Birk told responding officers he was on his way to work, timecards of Justin Birk on the date of the accident, Justin Birk's work-related phone calls made earlier that morning, and Birk Oil's expectation that an employee is "on the job" when traveling to and from work sites. (Judgment, Ex. MM, at p. 5-6)

211.   Concerning damages, the trial court noted that "the most hotly contested aspect of the trial was the issue of economic damages." (Judgment, Ex. MM, at p. 7)

212.   The court further observed that Gant asked for "more than $15 million in damages, almost all of which he characterized as economic." (Judgment, Ex. MM, at p. 7)

213.   The court set forth detailed findings as to economic damages, which it based on the testimony of the expert economists offered by both sides:  The court awarded $4,368,067 for Ms. Gant's lost earnings (Judgment, Ex. MM, p. 9); $546,235 for Ms. Gant's lost household services (*Id*. at p. 9); $481,242 for loss of advice and counsel to Mr. Gant and their children (*Id*., p. 10); and $1,027,477 in *Wentling* damages (Judgment, Ex. MM, p. 11).

214.   Gant requested $500,000 in non-economic damages, including the state maximum of $250,000 for the non-economic pain and suffering of the Gant family and $250,000 for the non-economic pain and suffering of Ms. Gant in the minutes she was conscious prior to her passing. (Judgment, Ex. MM, pp. 11-12)

215.   The trial court awarded the requested $250,000 for the non-economic damages of the Gant family, but only awarded $50,000 for Ms. Gant's non-economic damages, based on a

calculation of $10,000 per minute for the approximately five minutes she was conscious prior to her death. (Judgment, Ex. MM, p. 11-12)

216.   The trial court's total award, based on these discrete categories of damages was $6,723,021. (Judgment, Ex. MM, p. 13)

217.   The trial court stated that it "reached all of the conclusions stated above based on an independent evaluation of the evidence presented at trial." (Judgment, Ex. MM, at p. 14)

218.   Concerning the trial court's prior alter ego ruling, the Judgment provides that the ruling "stands as given, but as that issue was not a part of the trial, its impact on this judgment will not be discussed in this Journal Entry." (Judgment, Ex. MM, at p. 14)

219.   Following the trial, Progressive and Bitco paid their $1.25 million combined limits, leaving $5,473,021 of the judgment unsatisfied. (Amended Counterclaim, Doc. 160, ¶36)

### Post-Trial dispute over fees between Gant's two law firms

220.   After Gant's initial counsel Lykins was terminated in May of 2012 in favor of the Wagstaff firm, Lykins filed a Notice of Attorney's Lien which was later the subject of a motion. (Gant's Motion to Address Attorney Lien, Ex. NN hereto)

221.   After trial, a dispute arose between Lykins and the Wagstaff firm concerning the amount of the fee Lykins was entitled to, which was the subject of motion practice and a hearing before the Court. (See, e.g., Gant's Motion to Address Lykins Attorney Lien, Ex. NN hereto; See 9/2/15 letter from Kieffer to Lykins, Ex. R hereto))

222.   The Wagstaff firm took issue with Lykins' investigative and other actions taken on the file, specifically faulting Lykins for failing to discover that a 2011 financial statement concerning Birk Oil revealed a net worth in excess of $15 million. (See 9/2/15 letter, Ex. R hereto; and Birk Oil financial statement, Ex. OO.)

223.    The Wagstaff firm also took issue with Lykins' alleged failure to discover other insurance which provided coverage to the Birks asserting that statements by McMaster were "equivocal in the extreme." (9/2/15 letter, Ex. R hereto)

**Rulings/Sanctions issued by the trial court against McMaster and/or the Birks**

### A.  *Monetary sanctions against McMaster personally*

224.    The underlying trial court issued two rounds of monetary sanctions against McMaster personally: the first monetary sanction was in the amount of $2,500 and was predicated upon "Defendants' refusals to comply with discovery and prior court orders." (8/22/14 Journal Entry, Ex. PP hereto)

225.    The second monetary sanction was in the amount of $5,000 and was predicated upon discovery conduct of McMaster. (Ex. QQ)

226.    Gant never moved for sanctions regarding the failure by McMaster/the Birks to disclose the Bitco policy.

### B.  *Striking of the Birks' cell phone expert*

227.    Gant filed a motion to strike the Birks' cell phone expert Lance Watson, who the Birks designated to offer testimony in support of the Birks' theory that Ms. Gant was using a cell phone at the time of the accident.  Gant argued there was no proof that Ms. Gant was on her cell phone at the time of the accident and no way to determine whether Ms. Gant was looking at her phone at the time of the incident, irrespective of when data may have been received or transmitted by the device. (Gant Motion to Strike Watson, Ex. RR hereto)

228.    In support of the effort to strike Watson, Gant relied on testimony in which Watson conceded there was no way to determine where and when Ms. Gant may have sent messages to

34

friends using the What's App application on her phone without engaging in speculation. (Gant Motion, Ex. RR)

229.    The trial court struck Lance Watson as an expert and barred his testimony, in a Journal Entry which provides as follows:

a.      "The Court also has determined that Mr. Watson's opinion is inadmissible because it is unreliable under the standards set by K.S.A. 60-456. None of the traditional Daubert factors favor admission: the theory or technique at issue has not been tested; it has not been subject to peer review and publication; there is no error rate; and Mr. Watson had no knowledge as to general acceptance in the specific community." (Journal Entry dated June 1, 2015, attached as Ex. SS.)

b.      The trial court also held that Watson's testimony was "substantially more prejudicial than probative." (Id., at p. 3)

c.      The trial court found Watson had no familiarity with the program that had been used to extract data from Ms. Gant's phone, that the data was actually extracted by an independent contractor, and that Watson made no effort to verify the data. (Id. at p. 2,3)

d.      The trial court noted that Watson knew very little about the "What's App" application that Ms. Gant was allegedly using and confirmed he was unable to testify about its functionality. (Id. at p. 3)

e.      The trial court further noted Justin Birk's prior guilty plea to vehicular homicide as well as physical evidence in reaching the conclusion that, "there is no actual evidence that texting was occurring at the time of the accident or if it was that it had anything to do with the wreck at all." (Id. at p. 3)

f.      The trial court concluded that the "low probative value of any testimony about texting in this cause" made the admission of such evidence too prejudicial. (Id. at 3)

g.      The trial court concluded: "For all of these reasons, the Court hereby GRANTS Plaintiff's Motion to Strike Mr. Watson's testimony as a discovery sanction, and also grants Plaintiff's Daubert Motion to exclude Mr. Watson's testimony as both unreliable and more prejudicial than probative." (Id. at 3)

### C.  Requests for Admissions

230.    Gant propounded 538 Requests for Admissions to the three individual Birk defendants.

231.    McMaster objected to the Requests for Admission as improper. (Objection, Ex. TT hereto)

232.    During a hearing on October 2014 date, the trial court overruled McMaster's objections. (Amended Counterclaim, Doc. 160, ¶604)

233.    During a later hearing on April 24, 2015, the trial court held that the Requests for Admissions were not timely answered and thus deemed them admitted. (Amended Counterclaim, Doc. 160, ¶603, 604)

234.    Despite deeming the Requests for Admissions as admitted, the trial court held that the admissions would not preclude parties from presenting evidence on the issues referenced in the Requests for Admissions, and indeed at trial the parties were able to present evidence as to any disputed issue without regard to the requests for admissions having been deemed admitted. (April 24, 2015 Hr'g Transcript, 46:20-48:3; See Tr. Transcript generally)

235.    Gant's counsel sought to admit approximately 375 Requests for Admissions deemed admitted at the close of the trial, "as a housekeeping matter." (Amended Counterclaim, Doc. 160, ¶661 and Tr. Transcript excerpt, Ex. LL, 881:14-16; 884:9-24)

236.    Gant's counsel did not refer to the Requests for Admissions in his closing argument and the Court made no mention of them in its verbal rulings from the bench or 13-page Final Judgment. (Trial Transcript excerpts, Ex. LL; Final Judgment, Ex. MM)

### D.   *"Reverse" Alter-Ego Sanction*

237.    Due to apparent frustration with the progress of discovery concerning the identity of the Birk Oil entity involved in the case, the trial court entered a reverse alter-ego sanction finding that "Birk Oil Company (also referenced to at times throughout the course of this lawsuit as B&B Cooperative Ventures, LLC and B&B Cooperative Ventures, a general partnership) should be found the alter ego of Edward and Linda Birk." (Journal Entry dated February, 2014, Ex. UU)

238.    While noting that the alter ego sanction stands as given the trial court indicated it would not further consider the issue as it was not part of the trial. Thereafter, no further judgment, amended judgment or other journal entry transferred liability from one defendant to another based on the alter ego sanction. (Judgment, Ex. MM, p. 13)

### Resources Furnished to Defense Counsel by Progressive

239.    The total legal bills submitted by Kevin McMaster for his work on behalf of the Birks were in the amount of $202,038.19. (Aff. of Lori Slepski, Ex. AAA hereto, at ¶¶2)

240.    Of the $202,038.19 billed by McMaster, Progressive paid McMaster (and/or his law firm) $196,550.47.  (Aff. of Lori Slepski, Ex. AAA, at ¶3)

241.    Progressive adjusted McMaster's bills by $5,210.60, or 2.58% of the total bill. (Aff. of Lori Slepski, Ex. AAA, at ¶4)

242.    Taking into account the four (4) law firms ultimately involved in defense of the Birks, Progressive paid a total of $449,008.34, after adjustments totaling $1.75% of the total amount billed. (Aff. of Lori Slepski, Ex. AAA, at ¶¶5-6)

**Gant's Counsel Fee Arrangement Provides for Extra Payment for Recovery in Excess of Policy Limit**

243.    Gant and the Wagstaff law firm entered into a Contract for Employment of Attorneys which provides, in part, that "For any recovery of $250,000 or less, [t]he contingent attorney fee will equal 25% (Twenty-Five Percent) of the total amount recovered after all litigation expenses have been reimbursed[.]"  (Gant RFA responses, Ex. N, at Nos. 2-3)

244.    By contrast, the Contract for Employment for Employment of Attorneys also provides, in part, that "For any recovery greater than $250,000[,] [t]he contingent attorney fee will equal 40% (Forty Percent) of the total amount recovered after all litigation expenses have been reimbursed." (Gant RFA responses, Ex. N, at Nos. 2-3)

## ARGUMENT AND AUTHORITY

### I.    Summary Judgment Standard

Progressive is entitled to summary judgment by showing "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."  F.R.C.P 56(a). Summary judgment is not a "disfavored procedural shortcut" but rather is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

While Progressive, as the moving party, has the initial burden to show an absence of evidence supporting Gant's case and its entitlement to judgment as a matter of law, the burden then shifts to the party opposing summary judgment—here Gant—to show a genuine issue of material fact. *Bacchus Industries, Inc. v. Arvin Industries, Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Accordingly, Gant is required to "present sufficient evidence in specific, factual form for a jury to return a verdict" in his favor and may not rest upon allegations or denials in his pleadings to avoid summary judgment.  *Id.*

## II.   Overview of Insurer Bad Faith in Kansas

Under Kansas law, an action to address an insurer's breach of the duty to act in good faith in defending or settling a claim against its insured sounds in contract.  *Moses v. Halstead*, 581 F.3d 1248, 1251 (10th Cir. 2009).  The essential elements of a breach of contract claim under Kansas law are: (1) the existence of a contract; (2) sufficient consideration to support the contract; (3) the plaintiff's performance in compliance with the contract; (4) the defendant's breach of the contract; and (5) damage to plaintiff caused by the breach. (See PIK Civ. 4th 124.01-A).  Kansas courts hold that an insurer's duties are contractually-based but use a tort standard of care in determining whether the contractual duty has been breached.  *Glenn v. Fleming*, 799 P.2d 79, 90 (Kan. 1990)

In the context of a liability insurance contract, an insurer must exercise good faith in defending a lawsuit and in settlement negotiations.  *Hackman v. W. Agric. Ins. Co.*, 275 P.3d 73 (Table) 2012 WL 1524060, at *11 (Kan. Ct. App. 2012) The duty to exercise good faith includes "the duty to hire counsel that is competent to defend the allegations against its insured and to provide such counsel with adequate resources to competently defend the suit." *Id*. Under Kansas law, an insurer's negligent or bad faith rejection of an offer to settle within the policy's limits constitutes a breach of the contract and gives rise to potential liability in excess of the policy limits. *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 660 (10th Cir. 2007) (citing *Bollinger v. Nuss*, 449 P.2d 502, 508 (1969)); *Glenn*, 799 P.2d at 82. Further, "there must be a causal link between the insurer's conduct and the excess judgment against the insured." *Roberts v. Printup*, 595 F.3d 1181, 1187 (10th Cir. 2010) (quoting *Hawkins v. Dennis*, 905 P.2d 678, 690 (Kan. 1995)) (citing *Snodgrass v. State Farm Ins. Co.*, 804 P.2d 1012, 1021 (Kan. Ct. App. 1991))

## III.   The Subject Agreement Nullifies Gant's Claim

The instant action is dependent upon an Agreement, Assignment and Covenant Not to

Execute between the Birks and Gant (hereinafter the "Agreement," See Ex. KK).  The Agreement is not in accord with *Glenn v. Fleming* and provides an insufficient basis for Gant's claim. A singular deficiency in this Agreement is that it fully insulated the Birks from potential liability for any resulting judgment in the underlying wrongful death action ***before*** the matter went to trial. As a result, the Birks never had even potential liability for any judgment entered in the Underlying Litigation. Thus, any purported claim which the Birks attempted to assign is illusory because at the time of assignment there was simply no damage.

A *Glenn v. Fleming* agreement, which purports to assign causes of action, is appropriately executed following either a settlement or judgment. In such circumstances, the insured is subject to, at least, the possibility of damage arising from the resulting judgment or the agreed-upon settlement. Under *Glenn v. Fleming*, the insured may, in order to eliminate the responsibility of such financial exposure, agree to a covenant not to execute and assignment. Here, this necessary prerequisite never occurred, as there was no potential that any damages could be imposed against the Birks at the time of the assignment. Instead, on May 11, 2015, weeks before the trial of the Underlying Litigation, the Birks were completely insulated from any resulting damage. In this regard, the Agreement provides:

> 5.   As consideration for the assignment set forth in Paragraphs 3 and 4, plaintiffs covenants not to execute on the judgment against the defendants. Plaintiff agrees that he will not attach, garnish, levy or execute on the personal assets or income of defendants, and will in no way attempt to collect against defendants on the judgment under any circumstances.

(Ex. KK) This illustrates the irreparable flaw with the purported ensuing assignment. Gant purports to bring this claim pursuant to an assignment from the Birks. However, at the time of this assignment the Birks had already been fully insulated from any possible damage resulting from the subsequent trial. Since there was no potential that the Birks would incur even the hypothetical possibility of damage, they were simply in position of having nothing to assign.

In *Glenn v. Fleming*, the assignment and covenant not to execute were entered into <u>after</u> a jury verdict. *Glenn*, 247 Kan. at 316. In a prior decision, *Heinson v. Porter*, 244 Kan. 667 (Kan. 1989), the Kansas Supreme Court had held that a bad faith action is a tort claim which could not be assigned. This holding was overruled, in part, in *Glenn v. Fleming*, which found that the bad faith action was a contract claim which could be assigned. The *Glenn* court further distinguished *Heinson* by noting that the covenant in *Heinson* had been provided to the insured prior to judgment. *Glenn*, 247 Kan. At 216. Further, by fully insulating the Birks from potential liability, prior to trial or settlement, the timing of the agreement completely dis-incentivized them from aggressively pursuing the matter at trial. Indeed, no Birk defendant even attended the underlying trial.

The District Court in *In Re Tutu Water Wells Contamination Litig,* addressed an analogous situation when considering the impact of a pre-trial consent judgment and covenant not to execute. In commenting upon the timing of the consent judgment and covenant not to execute, the court stated:

> It is important to note that, while the above-mentioned cases allowed an injured third party to recover in excess of policy limits, *all of these cases involved a post-verdict assignment of rights by the insured*. Thus, at some point *prior to* the insured's assignment, the insured was faced with the harsh reality that it was financially accountable to the judgment creditor for an outstanding verdict in excess of its policy limits. This represents an important distinction from the instant matter, where the insured's liability was effectively extinguished at the very moment it was acknowledged.

(emphasis in original) 78 F.Supp. 2d 423, 432 (V.I. 1999). Progressive acknowledges that non-collusive pretrial settlements and assignments in an insurer bad faith context can be valid under Kansas law. However, *Glenn v. Fleming* does not appear to sanction an assignment and covenant not to execute which eliminates any financial jeopardy to the insured before it even exists.

A similar issue was addressed by the Supreme Court of West Virginia in *Strahin v. Sullivan*, 647 S.E. 2d 765 (W. Va. 2007). In that case, the court examined the effect of a pre-trial

assignment and covenant not to execute. In concluding that the insured's pretrial discharge of liability precluded enforcement of a subsequently-entered verdict, the court noted:

> Since the covenant at issue here was executed before the jury rendered its verdict, the resulting judgment was not enforceable against [the insured]. In fact as previously noted, it could not even be recorded. Therefore since [plaintiff] stands in [the insured's] shoes as his assignee, he simply cannot satisfy the essential elements of a *Shambling* claim.

*Id*. at 773. In the typical *Glenn v. Fleming* scenario, the insured has arguably been harmed by some decision by the insurer–either a refusal to accept a policy limits demand or a refusal to defend, neither of which are present here–such that the insured is permitted to enter into an agreement with the claimant to protect itself. This action is not appropriately characterized as "failure to settle" case, as it is undisputed that Progressive tendered its policy limit of $250,000 shortly after the underlying accident. This conclusion is strengthened by the fact that no settlement demand within policy limits, of any kind or amount, was ever made by Gant. This is also not a "failure to defend" case where the insurer abandoned or otherwise refused to defend its insureds. To the contrary, the Birks were defended throughout this matter and ultimately had four experienced lawyers, paid for by Progressive, representing them as trial approached. Finally, this is not a case where Progressive failed to hire qualified counsel. Lead counsel in this matter, Kevin McMaster, was and is a well-credentialed and highly experienced lawyer with significant personal injury trial experience.[2][3]

When stripped to its essence, Gant's claim is exposed as an improperly assigned and thinly-veiled legal malpractice action, in which Gant seeks to collect an excess judgment based upon the alleged improper conduct of opposing counsel.[4] A review of post- *Fleming* caselaw reveals there

---

2 Mr. McMaster has been a licensed practicing lawyer in Kansas since 1984. For almost the entirety of his practice he has focused on civil litigation. During that time, he handled thousands of files and he testified that there were very few lawyers in his area of Kansas that have tried more jury trials. He was retained by Progressive on behalf of the Birks within weeks of the subject accident and well before any ensuing litigation. [183-189]
3 See also Expert Report of Dan Doucette, Ex. XX, at pp. 8-14.
4 It is interesting to note that Gant's expert, Brian Wright, has only previously been retained as an expert

is not a single Kansas case which has sanctioned an assignment by an insured/client to his adversary of a claim predicated upon his own counsel's allegedly deficient performance. That Gant incorrectly asserts it is the insurer which should be liable for counsel's allegedly deficient performance on a vicarious liability theory, does not change the nature of what is actually being assigned. Permitting such assignments would represent a marked deviation from those claims traditionally recognized as assignable pursuant to *Glenn v. Fleming*. It would also make this court the first in Kansas, state or federal, to permit the assignment of such a claim. Such a rule would also implicate grave public policy concerns, insofar as it would authorize assignments and settlements premised upon an adversary's unilateral assessment of the opposing lawyer's litigation conduct and strategy. *Compare Patel v. Snapp*, 2013 U.S. Lexis 180999, *5 (D. Kan. 2013) ("Public policy considerations preclude assignment of legal malpractice claims because such claims are personal to the client.") It does not take much to envision the type of strange bedfellows this would make or the mischief that would proliferate should such a rule be adopted.

In this regard, the fact that the current claim is presented under the auspices of *Glenn v. Fleming* does not change the nature of the claim, which is premised upon a lawyer's performance.[5] An analogous situation was addressed by the Kansas Supreme Court in *Bank IV Wichita v. Arn, Mullins, Unruh, Kuhn & Wilson*, 827 P.2d 758 (Kan. 1992) ("This case involves a non-client, third party legal malpractice claim arising from the triangular relationship of borrowing lender and counsel for the borrower.") In that case, a bank sought to maintain an action against a former borrower's legal counsel. The bank asserted that such a claim was sustainable because its rights

_____

in cases involving legal malpractice. (Wright, 12:23-13:2)

[5] Almost all of the conduct of which Gant complains arises from a series of discovery disputes in the Underlying Litigation. Progressive acknowledges that certain conduct by Mr. McMaster in that action was inappropriate. This conduct has already been addressed by the trial court. Moreover, as will be discussed, none of this discovery conduct was directed or controlled by Progressive nor did it result in damage to the Birks.

were obtained via foreclosure and not assignment. The bank also asserted a right to maintain a malpractice claim as a successor in interest under the National Labor Relations Act and as the subrogor of its borrowers. The Court rejected these claims, focusing instead upon the fact that the claim involved duties owed to client which were personal in nature and non-transferable.

Certain cases cited by this Court in its prior Orders in this matter are also instructive. The case of *Pacific Employers Insurance Company v. Hoidale*, 789 F.Supp. 1117 (D. Kan. 1992) involved, *inter alia*, an attempt to hold an insurance carrier responsible for the negligent conduct of retained defense counsel. This post-*Fleming* decision is significant because it involved a direct action by the insured/client against an insurer. Similarly, in the more recent case of *Hackman,* 2012 WL 1524060 (Kan. App. 2012) the insured, following an adverse verdict, attempted unsuccessfully to hold his insurer responsible for alleged deficiencies in defense counsel's performance. Once again, this was maintained as a direct action by the insured/client against the insurer and also involved a legal malpractice claim brought directly by the client against the lawyer. These decisions are instructive because neither sanctioned a *Fleming* assignment of a claim involving an allegedly deficient performance by an insured's attorney. Respectfully, the instant assignment failed to transfer any valid or enforceable rights as no damage jeopardy ever attached to any of the Birk defendants. Further, nothing in *Glenn v. Fleming* or its progeny sanctions the assignment of a legal malpractice action to an adversary in the guise of an insurer bad faith action.

## IV.   Progressive is not Vicariously Liable for Alleged Litigation Misconduct of McMaster

Gant's breach of contract claim is largely based on the erroneous assumption that Progressive is vicariously liable for the allegedly wrongful litigation conduct of McMaster. As discussed elsewhere herein, McMaster's alleged wrongful litigation conduct was directed or endorsed by the Birks and, regardless, was not a cause-in-fact of the claimed damage.  But Gant's

heavy reliance on McMaster's conduct fails for a more fundamental reason: *Progressive is not vicariously liable for McMaster's conduct as a matter of Kansas law.* Thus, Gant's allegations premised upon McMaster's conduct provide an insufficient basis to support the asserted claim.

### a.  Gant's unprecedented theory is legally unsupported

Kansas is among the shrinking minority of jurisdictions that have recognized the potential that an insurer, under limited circumstances, may be vicariously liable for negligence of defense counsel retained for an insured.[6]  However, even Kansas courts confine such liability to a narrow subset of circumstances not at issue here. Initially, Progressive notes that this case presents an unprecedented context for a vicarious liability claim of this nature under Kansas law, insofar as the claim is not brought directly by the Birks but rather by Gant as their assignee.[7]  Progressive is unaware of another case where a vicarious liability claim, premised upon alleged litigation conduct of the insured's defense counsel, has been successfully prosecuted via assignment against an insurer. Thus, Gant's claim is dependent upon a significant expansion of Kansas law.

Gant's unprecedented theory fails under existing law.  As noted in *Hoidale*, merely hiring counsel to represent an insured does not make an insurer liable for counsel's conduct unless the insurer commanded, directed or knowingly authorized the conduct. 789 F. Supp. at 1722. This principle was expanded upon in *Hackman* wherein the Court noted:

Citing Kansas law, the Federal Court in *Pacific Employers Ins.* began its analysis by

---

6 Progressive notes that the majority of jurisdictions who have addressed the issue of whether an insurer may be held vicariously liable for the conduct of defense counsel retained for an insured have rejected this proposition. *See*, e.g., *Ingersoll-Rand Equip Corp. v. Tranp. Ins. Co.*, 963 F. Supp. 452, 454 (M.D. Pa. 1997); *Lifestar Response of Ala., Inc. v. Admiral Ins. Co.*, 17 So.3d 200, 218 (Ala. 2009); *Meritt v. Reserve Ins. Co.*, 110 Cal Rptr. 511, 527 (Cal. App. 1973); *Aetna Cas. & Sur. Co. v. Protective Nat'l Ins. Co. of Omaha*, 631 So. 2d 305, 306 (Fla. 3d DCA. 199); *Gibson v. Casto*, 504 S.E.2d 705, 708 (Ga. Ct. App. 1998); *Brocato v. Prairie State Farmers Ins. Assn.*, 520 N.E.2d 1200, 1203 (Ill. App. Ct. 1988); *Herbert Sullivan, Inc. v. Utica Mut. Ins. Col.*, 788 N.E. 2d 522, 540-41 (Mass. 2003); *Feliberty v. Damon*, 527 N.E.2d 261, 265 (N.Y. 1988); *State Farm Mut. Auto. Ins. Co. v. Traver*, 980 S.W.2d 625, 627 (Tex. 1998).
7 In fact, exhaustive research by Progressive has not yielded an analogous case anywhere in the country, further emphasizing the unsupported and marginal nature of Gant's novel theory.

> acknowledging the general rule in Kansas that merely hiring an attorney to represent an insured will not make the insurer vicariously liable for the attorney's negligence.

2012 WL 1524060, *16.  Similarly, the Kansas Supreme Court has ruled that "The mere fact an insurance company retains an attorney to represent an insured against a lawsuit does not mean the attorney is also the insurance company's attorney capable of binding the insurance company." *Bell v. Tilton*, 234 Kan. 461, 465 (Kan. 1983).  The Tenth Circuit has also adopted this position:  In *Insurance Company of North America v. Medical Protective Company*, 768 F.2d 315 (1985), the Tenth Circuit analyzed a situation where defense counsel had allegedly misrepresented the amount of insurance coverage, which conduct was properly attributed to his client and not to the insurer. The Court, in affirming the district court's decision, said:

> . . . the court was correct in concluding that, in spite of the fact that [the insurer] paid [the lawyer's] bill, any misconduct of which [the lawyer] may have been guilty could be attributed only to his client, Dr. Fieldman.

*Id*. at 321.  These principles were echoed and adopted by this Court in a prior ruling in this case, observing that an insurer has a duty to defend a lawsuit against its insured in good faith, hire competent counsel, and provide counsel with adequate resources. *Prog. Nw. Ins. Co. v. Gant*, 2016 WL 4430669, at *4 (D. Kan. Aug. 22, 2016).

To establish a claim for vicarious liability in this context, the claimant must prove there was an unusual—and unethical—level of control exerted by the insurer over the attorney, to which the attorney acquiesces contrary to ethical standards.  Further, where there is a potential excess exposure to an insured, the insurer has a common-law duty to provide independent counsel whose legal responsibility is to the insured. *Hackman*, WL 1524060, *14, citing *Harmon,* 240 Kan. at 712; *Aselco, Inc. v. Hartford Ins. Group,* 28 Kan. App. 2d 839, 851, *rev. denied*, 272 Kan. 1417 (2001).[8] This common-law duty is also required by the Kansas Rules of Professional Conduct.

---

8 In *Hackman*, the court found no breach of the duty to defend even though the retained lawyer had been;

Specifically, KRPC 1.8(f) provides:

> A lawyer shall not accept compensation for representing a client from one other than the client unless:
>
> (1) the client gives informed consent;
>
> (2) *there is no interference with the lawyer's independence or professional judgment or with the client-lawyer relationship;* and
>
> (3) information relating to representation of a client is protected as required by Rule 1.6.

(emphasis added) (2011 Kan. Ct. R. Annot. 495).  As Comment (11) to KRPC 1.8 explains:

> Lawyers are frequently asked to represent a client under circumstances in which a third person will compensate the lawyer, in whole or in part. The third person might be a relative or friend, an indemnitor (*such as a liability insurance company*) or a co-client (such as a corporation sued along with one or more of its employees). *Because third-party payers frequently have interests that differ from those of the client, including interests in minimizing the amount spent on the representation and in learning how the representation is progressing, lawyers are prohibited from accepting or continuing such representations unless the lawyer determines that there will be no interference with the lawyer's independent professional judgment and there is informed consent from the client.*" (Emphasis added.) (2011 Kan. Ct. R. Annot. 498)

Further, KRPC 5.4(c) (2011 Kan. Ct. R. Annot. 593) provides: "A lawyer shall not permit a person who recommends, employs, or *pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services.*" (emphasis added)

These rules clearly provide that when an insurer hires an attorney to defend an insured, the attorney's client is the insured and not the insurer. Accordingly, Gant's allegation that Progressive is vicariously liable for alleged misconduct of McMaster is a contention which runs "contrary to the rules in Kansas governing the professional conduct of lawyers practicing in Kansas, which prohibit a third-party paying for legal services on behalf of another from directing or interfering with that representation."  *Hackman*, 2012 WL 1524060 at *15, citing KRPC 1.8(f) (2011 Kan.

---

1) sued for malpractice by the involved insurer in the past; 2) had been removed from that insurer's panel counsel list; and, 3) had been previously sanctioned for attorney misconduct. The Court found these issues immaterial to whether the insured had, in fact, been adequately defended. *Id*. at *13-14.

Ct. R. Annot. 494)  It is <u>only</u> when the attorney violates these rules and allows the insurer to direct or control the attorney's actions that the attorney will be considered the agent of the insurer. *Hackman*, 2012 WL 1524060 at *15, citing *Bethany Med. Center v. Wallace, Saunders, Austin, Brown & Enochs, Chtd.,* 19 Kan. App. 2d 1111, Syl. ¶ 2, 880 P. 2d 1289 (1994).

Gant's theory is further undermined by persuasive authority authored by Gant's own expert, Allan Windt, author of the treatise, *Insurance Claims & Disputes*.  Progressive wholly concurs with Mr. Windt when he writes:

> Section 4.40 – Insurer's inadequate defense—Negligence of insured's defense counsel

> We do not accept the claim that vicarious liability falls on one who retains independent trial counsel to conduct litigation on behalf of a third party when retained counsel have conducted the litigation negligently. …. In our view independent counsel retained to conduct litigation in the courts act in the capacity of their conduct and not subject to the control and direction of their employer over the details and manner of their performance.

 (Windt, Insurance Claims & Disputes (6th ed.), §4.40)  Gant's vicarious liability theory is thus unsupported by both the law of Kansas and his own expert.

### b.  Progressive did not direct or control McMaster's litigation conduct

It is important to note that whether an insurer exerts a level of direction and control over a lawyer such that he/she acts unethically is not a determination made in a vacuum or by reference to generalized legal principles. Instead, it is dependent upon proof that such alleged unethical control in fact occurred. Here, the uncontroverted evidence overwhelmingly proves that Progressive did not exert an unusual level of direction or control over McMaster in violation of Kansas ethical rules.  For his part, McMaster believed and understood that his clients were solely the Birks, not Progressive, and McMaster believed his professional and ethical obligations were to zealously represent the interests of only the Birks. [80-85] Further, McMaster stated that Progressive did not direct, interfere with, or constrain his independent judgment in representing

the Birks. [86-88, 90-92]  McMaster explained that the defense he provided to the Birks was crafted pursuant to his independent legal judgment in collaboration with input from the Birks, not Progressive, and further McMaster stated that he provided the defense the Birks wanted. [89, 93] McMaster further confirmed that Progressive was not involved in the discovery disputes in the underlying case and had nothing to do with the events in the case that resulted in monetary sanctions being issued against McMaster, requests for admissions being deemed admitted, the alter ego sanction being entered, or the Birks' cell phone expert being stricken.[9] [94, 95, 98]  Indeed, McMaster emphatically stated that he would never allow any third-party payor, like an insurance company, to interfere with his independent professional judgment as to how to best defend his clients. [90] In addition to not interfering with McMaster's independent professional legal judgment, McMaster testified that Progressive furnished the resources he needed to defend the case and that there is nothing he wanted to do in representing the Birks that Progressive failed to approve or in any manner curtailed or limited[10].  [92, 106]

A review of the testimony of Brian Wright, one of Gant's own experts confirms the lack of evidence establishing that Progressive directed or controlled the actions of McMaster.

> Q. I'm not talking about the reporting and things he needed to do with regard to the insurance company. I'm wondering whether or not you saw anything in the file that Progressive ever mandated or dictated that McMaster take any type of action on behalf of the insured in the defense of these insureds that he did not believe was advisable or he did not want to undertake?

---

[9] As discussed *infra*, these sanctions and rulings were either legal nullities or ultimately caused no actual harm to the Birks.  However, if the Court concurs that Progressive is not vicariously liable for the actions of McMaster and/or the Birks that resulted in these sanctions and rulings, the Court can grant summary judgment to Progressive without further consideration of the nature and effect of those sanctions and rulings.

[10] Notably, McMaster's bills to Progressive in the Gant v. Birk case totaled $202,038.19, of which Progressive paid $196,550.47 (after a routine adjustment of 2.58%) [239-240] Ultimately, with four law firms representing the Birk defendants, Progressive paid $449,008.34 in total to defend the Birks, after a combined 1.75% reduction of all counsels' bills. [241-242]  Thus the uncontroverted evidence shows that Progressive furnished defense counsel with adequate resources.

A. I don't think so.

(Wright Depo, Ex. U, 217:11-25) When pressed to provide any details as to how Progressive may have directed or limited the actions of McMaster, Wright was only able to weakly state that Progressive did not pay for a $7 sandwich and some mileage expenses submitted by McMaster. Hardly the stuff of significant direction and control. (*Id.* at 348:4-10) [see also SOF ¶103]

Similarly, for its part Progressive does not direct defense counsel—rather, Progressive expects counsel to do whatever is needed within the scope of their representation to advance the interests of the insured. [108]  With regard to McMaster, Progressive adjuster Hansel, who retained McMaster to represent the Birks and was the primary handler of the claim, testified that McMaster had ultimate responsibility for the direction, control, and strategy employed in the defense of the Birks. [109-110]  Hansel indicated he does not get involved with directing defense counsel's legal strategy, emphasizing he has never once in 30 years with Progressive suggested that defense counsel not pursue a legal strategy which he believed advisable. [112]  Hansel further confirmed that he never denied approval for anything McMaster wanted to do in defense of the Birks. [109]

It is anticipated that Gant may attempt to establish a certain level of control over McMaster by citing to Progressive's Defense Counsel Guidelines, which set forth certain broad expectations for the legal representation of Progressive insureds. Gant misreads these Guidelines and, upon scrutiny, these general directives do not raise a justiciable issue.[11]  First, on its face, the Guidelines contain numerous provisions emphasizing the independent nature of defense counsel and repeatedly set forth Progressive's directive that counsel exercise their own professional judgment in representing Progressive insureds. Only two paragraphs in the substantive portion of these

---

11 Virtually all insurance carriers have guidelines which govern the defense of their insureds. Gant's position, pursued to its logical end, posits that all lawyers defending insureds act unethically and under the direction and control of the carrier simply because they adhere to requirements relating to reporting, budgeting and progress of the case. Progressive has found no legal support for such a position.

50

guidelines are in bold typeface and each specifically instructs counsel to use their own independent judgment in providing legal service to Progressive's insureds. In this regard, the very first paragraph of the Guidelines provides:

> **Progressive expects counsel to exercise independent professional judgment in rendering legal services to Progressive insureds. Counsel shall never allow anything contained in these guidelines to interfere with any ethical directive or obligation governing conduct as defense counsel.**

(emphasis in the original) This same directive is also provided in the very last paragraph of the Guidelines. [104] In fact, the Guidelines actually go further and provide that in the case of a dispute regarding applicability of the Guidelines to a particular case, that Progressive will always defer to the independent professional judgment of defense counsel. [105] In this respect, Progressive's Guidelines are fully aligned with Kansas law concerning appropriate actions by a third-party payor and, further, demonstrate that Progressive does not exercise control over the independent judgment of counsel. See *Hackman*, 2012 WL 1524060 at *15; See also Windt Depo., Ex. CCC, at 100:13-24; 101:18-102:9; Expert Report of Eugene Balloun, Ex. VV hereto, at pp. 20-23.

Moreover, even if the Guidelines displayed some effort by Progressive to direct defense counsel retained for its insureds (which they do not), McMaster unequivocally testified that he does not allow the Guidelines to dictate his actions in defense of Progressive's insureds and specifically did not do so in his representation of the Birks. [102, 103] To the extent the Guidelines request defense counsel to seek preapproval of certain activity, McMaster testified that even when he requests approval, he does not wait for a response before going ahead and performing the work. [101] McMaster further testified that, even if Progressive declined to approve a particular expense or task (which it did not in this case), McMaster would nevertheless do what he believed necessary to defend the Birks despite any lack of approval. [106-107] Thus, Gant's strained effort to construe the Guidelines to establish the unusual level of control necessary to support his vicarious liability

51

theory is unavailing. In this regard, the proper question is not what the Guidelines may or may not state, but rather whether there was, in fact, any attempt by Progressive to direct and control the actions of McMaster. Here, the uncontroverted evidence confirms that Progressive never attempted to control the conduct, strategy or tactics of McMaster during the pendency of the underlying case and specifically did not do so as to the conduct Gant asserts caused damage to the Birks.

Again, Gant brings the breach of contract claim as assignee of the Birks—thus, Gant "steps into the shoes" of the Birks. Notably, the Birks were pleased with McMaster's representation, thought McMaster was zealously representing their interests, never complained to Progressive or anyone about McMaster's representation, and sought to have McMaster continue their representation even as Progressive brought additional counsel into the case. [143-152] James Campbell, the Birks' personal counsel, also confirmed that he never complained to Progressive about Mr. McMaster's representation. [157] After Progressive conferenced with McMaster about the monetary sanctions in August of 2014, he wrote a letter to Progressive, copied to the Birks, confirming that they wanted him to remain as counsel. (Ex. FF) Progressive's lack of control over McMaster is also underscored by the fact that, when Progressive sought to remove McMaster from the representation of the Birks, McMaster resisted Progressive's efforts and again confirmed that the Birks wanted him to remain involved.[149, 156] Indeed, McMaster wrote a letter to Progressive in February 2015 in which McMaster communicated the Birks' belief that McMaster had provided a good defense in the case and had satisfied Progressive's duty to provide independent counsel. [149] The Birks' approval and support of McMaster emphasizes the awkward posture of Gant's claim, which is asserted as assignee of their interests: If the Birks felt aggrieved by McMaster's conduct, they could have brought a legal malpractice claim against him (as the insured did in the *Hackman* case), but they have not done so, for the obvious reason that they were satisfied with the

defense he provided.  This is aptly illustrated by Edward Birk's testimony:

> Q. At any point in time when Mr. McMaster was representing you did you ever voice any concern to Progressive about any problems or difficulties you had with Mr. McMaster's representation?
> A. No.
> Q. Did Mr. McMaster ever do anything that you think was harmful or damaging to the family in the course of its representation in this case?
> A. No.

(Edward Birk Depo. Ex. C, 26:12-20)

Progressive is entitled to judgment as a matter of law on Gant's breach of contract claim because Progressive is not vicariously liable for McMaster's alleged litigation misconduct.

## V.    Progressive is Entitled to Judgment as a Matter of Law on the Claim asserted by Gant (on behalf of the Birks) for alleged Breach of the Duty to Settle

Under Kansas law, a so-called bad faith "failure to settle" claim necessarily involves (1) a demand or other opportunity to settle within the insurance policy limit by the claimant, and (2) a wrongful refusal of such offer or an unreasonable delay in accepting such offer. *See, e.g.*, *Wade*, 483 F. 3d at 667 (discussing the bad faith failure to settle cause of action); *Kemp v. Hudgins*, No. 12-2739-JAR, 2015 WL 5568082, *14 (D. Kan. Sep. 22, 2015).  Because there was no opportunity to settle for an amount within the Progressive policy limit which was wrongfully rejected, Progressive is entitled to judgment as a matter of law on Gant's "failure to settle" claim.

### a.   No settlement demand was made

Gant's putative "failure to settle" claim asserted on behalf of the Birks fails from the outset because it is undisputed that Gant never made a demand for an amount within the $250,000 Progressive policy limit. It is also undisputed that, no later than August 2011 (approximately two months after the accident), Progressive offered its full $250,000 policy limit to Gant, which Gant rejected. [23, 24, 29] This simple fact places Gant's putative claim far outside the typical Kansas "failure to settle" case, which ordinarily involves a demand for settlement within the insurer's

policy limit which the insurer either refused or exercised undue delay in accepting.[12]  The fact there was never a demand to settle for Progressive's policy limit—and that, instead, Gant actually rejected Progressive's timely policy-limits offer—is fatal to Gant's "failure to settle" claim.[13]

Given that Gant never made a settlement demand for an amount within Progressive's $250,000 policy limit, it follows that Progressive could not have refused or unreasonably delayed accepting it.  Accordingly, Gant's "failure to settle" claim fails as a matter of law.

### b. Gant's "failure to settle" theory is unsupported, unprecedented, and unavailing

As discussed above, Gant's "failure to settle" theory is not, and cannot be, premised upon the allegation that Progressive failed to settle the underlying claim for an amount within its $250,000 policy limit: Gant never made a demand within the Progressive policy limit and he rejected the offer when it was made. Rather, Gant's failure to settle claim is premised upon the unprecedented theory that Progressive failed to settle the claim for an amount <u>within another insurer's policy limit</u> – specifically, the $1 million liability limit provided by the policy issued by Bitco to Birk Oil.  There is no authority for this proposition under Kansas law—or any state's law. Gant's novel theory is also belied by the facts in this case, inasmuch as it is premised upon the impermissible stacking of "inference upon inference." *McKenzie v. New York Life Ins.,* 112 P.2d 86, 90 (Kan. 1941)("This would be piling presumption and inference upon presumption and

---

[12] See, e.g., *Roberts v. Printup*, 595 F.3d 1181 (10th Cir. 2010)(plaintiff sued the insured after a car accident and the insurer rejected a policy limits settlement offer); *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 261 Kan. 806, 934 P.2d 65 (1997)(tenants sued storage facility for damages sustained in fire; the insurer rejected the tenants' policy limits settlement offer); *Blann v. Rogers*, 22 F.Supp.3d 1169 (D. Kan. 2014)(plaintiff sued the insured after a car accident; the insurer failed to accept the plaintiff's settlement offer).

[13] To the extent there is Kansas case law which may require an insurer to proactively engage in settlement negotiations – even in the absence of an explicit demand - Progressive undoubtedly satisfied any such requirement by promptly offering its $250,000 liability limits, which Gant rejected. *See Smith v. Blackwell*, 791 P.2d 1343 (Kan. App. 1989) (insurer has duty to initiate settlement negotiations regardless of actions of third party claimant.)

54

inference. It is elementary that that may not be done and that burden of proof may not be met by mere conjecture.") To even consider whether an earlier tender of Bitco's policy limits would have settled the claim, one must first infer that: (1) Gant would promptly put Bitco on notice, that (2) Bitco would have accepted coverage, that (3) Bitco would have evaluated this matter as creating potential liability against Birk Oil, against which a claim had not yet been asserted, that (4) Bitco would have tendered its full policy limits of $1 million during the requisite timeframe, and (5) This amount would have been accepted by Gant to settle the claim. There is nothing in the record before this Court to establish any of the enumerated points, let alone all five. As a result, any contention that a policy limit offer by Bitco would have resolved this claim is rank speculation.[14]

But even if this Court entertains the unprecedented theory that Progressive had a duty to discover the Bitco policy and could have somehow forced Bitco to offer its limit in 2011-2012, the issue is put to rest by a simple fact: The uncontroverted evidence shows there was no opportunity to settle the claim for $1.25 million. In order to prove a claim for failure to settle within the Progressive/Bitco policy limits, at a minimum Gant must prove he would have settled for that amount. In *Hackman*, the court considered an analogous situation in a legal malpractice context:

> In order to survive a summary judgment on the issue of causation related to her second claim of legal malpractice, Hackman must come forward with evidence from which a fact finder could find that Hackman and Hanson **would have settled** the underlying litigation but for Hasty's deficient performance as identified by the experts.

2012 WL 1524060 * 10. (emphasis added) After reviewing the available evidence, the *Hackman*

---

14 Whether Bitco ever would have offered its full $1 million policy limits during the relevant timeframe is something questioned by Gant himself. Post-trial, Gant, through Mr. Kieffer, aggressively challenged his former lawyer, Daniel Lykins, fee request. In so doing, Gant argued that Lykins had done little to evaluate either the respondeat superior claim or the negligent entrustment claim during the 2011-2012 timeframe. See Ex. R. Assuming Gant's position in this regard is correct, it raises the question of whether any prudent business auto insurer would have made a seven-figure settlement offer during the relevant timeframe. This is underscored by the fact that no claim for respondeat superior liability was even filed in the Underlying Litigation until September 2014.

court determined that plaintiff "had failed to come forward with evidence from which a legitimate inference could be made that [the parties] would have reached an agreement to settle the underlying intentional tort claims for an ascertainable amount less than the judgment rendered." *Id*.

Here, the evidence establishing there was no opportunity to settle for $1.25 million is overwhelming, but it is illustrative to start with the testimony of Mr. Gant himself. Gant testified that, for him, resolving the case was not so much about money as closure and justice,[15] stating as follows:

Q:  [G]iven your desire to have closure, the facts determined in court to protect your wife's legacy, seek justice, and you said all of those things existed throughout the case, is there ever a time within the litigation that $1,250,000 would have settled the case?

A:  I couldn't say either way.

[42][16]  Tellingly, when the $1.25 million was actually offered by Progressive and Bitco at the pre-trial mediation, Gant rejected it. [37, 38, 41, 45] According to Gant, he rejected the $1.25 million offer at mediation because he wished to go to trial and see the case through, pursuant to a quest for justice. [37-42, 46] Gant further testified that, if $1.25 million had been offered in 2011, it is "likely" he still would have requested that his attorneys continue to investigate other insurance, press for an affidavit of no other insurance and seek personal assets of the Birks that could be accessed for settlement. [34, 44] Thus, even if one navigates the considerable conceptual hurdle

---

[15] See SOF ¶¶41, 42.

[16] It is anticipated that, in opposition to this Motion, Gant will point to testimony that his counsel coaxed out of him on cross-examination, in which Gant stated he would have "strongly considered" a hypothetical $1.25 million offer in 2011 and, after his counsel pressed him further with a leading question, agreed that he "more likely than not" would have accepted $1.25 million to settle the case.  Progressive submits that Gant's equivocal testimony speaks for itself and indicates that even under the prodding of his own counsel, he could not say with any degree of certainty that he would have settled in 2011-2012 timeframe for a hypothetical $1.25 million offer.  Progressive further submits that Gant's testimony on this issue—even in response to highly leading questions by his own counsel in a failed effort to "rehabilitate" Gant's admission, further underscores how far this matter is outside of the typical Kansas "failure to settle" case, which invariably involve a clear, unambiguous offer to settle within the subject insurer's policy limit.

that the Birks can present a valid claim for the non-disclosure of their own policy, there is still the necessary element of causation: Gant must establish that, had the policies been offered prior to filing suit, the case would have settled and that the Birks would have been protected by an appropriate release. Respectfully, when Mr. Gant, as the ultimate decision-maker, can only weakly assert that such an offer <u>probably</u> would have been <u>considered</u>, there is no issue of fact presented.

That the case would not have settled for $1.25 million is confirmed by further actions taken by Gant and his counsel. Gant never issued a settlement demand of any kind in the underlying case, let alone a settlement demand for the $250,000 Progressive policy limit or the $1.25 combined Progressive/Bitco policy limits.[17] Progressive further questions whether the case should have settled early for $1.25 million, given it unquestionably involved very large damages and virtually absolute liability on Justin Birk.[18] Gant's initial counsel Lykins valued the claim at $5-10 million. [50, 68]  Gant's subsequent counsel filed a pleading alleging monetary damages of $20 million, later demanded $15 million at mediation, then sought to negotiate in a bracket of $6-10 million. [77, 66] Ultimately, Gant's counsel requested in excess of $15 million dollars at trial for economic/*Wentling* damages alone. [32, 200]  Progressive itself valued the claim at more than $5 million within weeks of the accident. [21]  Gant's expert Allan Windt believed there was a likely verdict range of $2 to 6.7 million, resulting (per Windt) in a "settlement value" of $4.35 million. [See Rebuttal Expert Report of Gene Balloun, Ex. WW, at pp. 7-9 for further discussion]  Given that everyone who evaluated the claim believed it was worth multiple millions, Gant's present self-serving contention that the case would have settled, at some unspecified time, for $1.25 million is

---

17 Gant has done nothing to establish when, exactly, he would have accepted the combined limits of $1.25 million. Clearly, those limits were rejected at the March 2015 mediation even though there had been no material change in the presented facts. When asked the last date the case could have been settled, Gant's own expert said: "I have no idea." (Wright, 164:16-19)
18 See Gene Balloun Rebuttal expert report, Ex. VV, at pp. 4-9.

unfounded.  This is particularly true given that Gant's counsel had in his possession a financial statement indicating that Birk Oil had a net worth of $15 million and monthly income of $500,000 per month.[19] [222] Again, Gant's previous counsel testified he would not have recommended the case settle for even $1.25 million without a personal contribution from the Birks, who from all the information known had assets and likely very substantial assets to contribute. [58] Given this powerful evidence that Gant did not and would not accept $1.25 million during the pendency of the underlying claim, unsupported speculation to the contrary does not create an issue of fact.[20]

This discussion is somewhat academic, since the Birks were not damaged when the case did not settle early and were later fully insulated from liability by the Agreement.

## VI.    No Actions of Progressive Caused Damage to the Birks

Gant's sole remaining claim is a breach of contract claim against Progressive, which Gant brings as assignee of the Birks.  Two essential elements of any breach of contract claim, are (1) damage, which (2) is caused by the alleged breach.  "The basic principle of contract damages is to make a party whole by putting it in as good a position as the party would have been had the contract been performed . . . A party is not entitled to recover damages which are 'not the proximate result of the breach of contract.'" *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 789 (Kan. 2005)(quoting *Apperson v. Security State Bank*, 215 Kan. 724, Syl. ¶7 , 528 P.2d 1211 (1974) In

---

[19] In this case, Gant has attempted to minimize the financial statement as being unaudited/unverified, but notably Gant's counsel relied upon the financial statement and presented briefs and argument to the underlying trial court based on the financial statement.  As noted, following trial, Gant's previous and current counsel had a dispute concerning a lien that previous counsel filed.  Gant's current counsel disputed previous counsel's entitlement to a fee, premised in part on the argument that previous counsel negligently failed to discover that Birk Oil was worth $15 million. (See Kieffer letter of 9/2/15 (Ex. R) to Lykins noting that "…discovery in the lawsuit (obtained simply by serving a subpoena) revealed that in 2011 (the year of this accident) Birk Oil reported a net worth in excess of $15-million. It was in large part to protect those substantial assets from the risk of a substantial judgment that motivated Justin Birk and the other Birk defendants to enter a *Glenn v. Fleming* agreement.")

20 As late as February 2012, Gant, through a family member and attorney by the name of Patrick Murphy, was advising Lykins "…I still cannot accept that a settlement is proper without knowing that there is no sustainable claim against the parents."

disputes arising under insurance contracts, Kansas law only permits an insurer to be held liable "for the damages traceable to its conduct." *Sours*, 25 Kan. App. 2d at 625; see also *Hawkins v. Dennis*, 258 Kan. 329, 347, 905 P. 2d 678 (1995) (recognizing that there must be a "causal link" between the insurer's conduct and the claimant's damages")  A court will not "presume" causation and damages. *Id*. at 354. Here, Progressive is entitled to judgment as a matter of law because Gant cannot show any damage to the Birks caused by any breach by Progressive, and in particular cannot show a connection between conduct of Progressive and damages actually sought by Gant in this case—i.e. the balance of the excess judgment. See *Sours*, 25 Kan. App. 2d 620 (if insured cannot prove damages sought were caused by insurer's breach, the claim fails as a matter of law).

### a.   Progressive did not cause the damages sought in this case: the excess verdict

The damages Gant (via the Birks) seeks in this matter consist of the balance of the $6.7 million judgment entered in the Underlying Litigation.[21]  Accordingly, Gant's primary burden is to establish that the $6.7 million award by the trial court was somehow caused by Progressive's conduct—but Gant cannot meet this burden as a matter of law.

A multi-million dollar verdict was predetermined on June 10, 2011, when Justin Birk crossed the center line and struck the vehicle driven by Katie Gant, causing her death. At the time of the accident, Ms. Gant was a 31 year-old married mother of three small children who was employed as the Director of Imaging Services at Allen County Hospital earning $74,000 per year. The unfortunate reality of this sad case is that the damages sustained by Ms. Gant and her estate were largely economic and irrefutably set at the moment of impact. This conclusion becomes self-evident after one reads the trial court's findings of findings of fact and conclusions of law announced from the bench following trial.[204-205] Gant's strained attempt to create an

---

21 As noted, pursuant to Progressive and Bitco's payment of the combined $1.25 million policy limits towards the judgment, there is a balance remaining of $5,473,021.

alternative "cause" for this damage is effectively dispelled by these findings. Gant's claim as pled is nothing more than an improper post-litigation autopsy intent on dissecting the performance of an adversary's legal counsel. However, no amount of scrutiny in this regard can establish that any conduct by Progressive caused the excess judgment. In the absence of any damage, the allegations in this case are better suited as a bar complaint to the Kansas disciplinary administrator.[22]

**_No Judicial Misconduct_:** It cannot be overemphasized that Gant is asking this Court to do a rather extraordinary thing—to infer that the $6.7 million verdict was not based on the trial court's sober consideration of the independent evidence adduced at trial, but rather due to personal animus. This would require a finding that Judge Godderz violated the Kansas Code of Judicial Conduct by improperly inflating his damage award because of unarticulated prejudice which he harbored against the Birks, McMaster, and/or Progressive. In the complete absence of available proof, to unfairly malign Judge Godderz's considerable efforts in the Underlying Litigation is unwarranted.

**_Value of the Claim_:** As noted, everyone who analyzed the value of Gant's claim came to the inescapable conclusion that the claim was worth multiple millions of dollars. Gant's own pleading in this case alleges (and thus judicially admits) that the claim was worth multiple millions of dollars in economic damages alone. (See Am. Counterclaim, Doc. 160, at ¶118).  Progressive adjuster Hansel noted in the claim file within weeks of the accident that the economic damages alone would approach $5 million. [21]  Any contention that the amount awarded by Judge Godderz was improperly inflated is dispelled by Gant's own expert, Allan Windt, who proffered a likely verdict range of $2 to 6.7 million and a settlement value of $4.35 million and conceded in his deposition that the amount awarded was reasonable. [Windt Depo., Ex. CCC, at 100:13-24;

---

22 Again, the ultimate result in the underlying matter for the Birks was that they were insulated from liability before trial, which the Birks' personal counsel described as a "phenomenal result" and Edward Birk noted that Progressive "saved the day."  See also Expert Report of Dan Doucette, Ex. XX hereto, at pp. 4-5.

101:18-102:9] As a result, any contention that the amount awarded by the Court in the underlying

action was somehow caused by Progressive is unsupported by the evidence. Stated differently,

there is no evidence that the amount of the underlying judgment would have been in any manner

different even had McMaster's litigation conduct been exemplary.

**_The Agreement_**: That the trial court's verdict was the result of its careful consideration of

independent evidence, and not influenced by any conduct of Progressive, is further confirmed by

the Agreement. (See Ex. KK)  In the Agreement, the parties recited that Gant sustained pecuniary

damages, specifically "loss of past and future wages and employee benefits, loss of past and future

household and family services . . . loss of complete family, loss of protection, funeral and burial

expenses, and other pecuniary damages pursuant to _Wentling_." The parties further recited that Gant

sustained non-pecuniary damages, specifically "mental anguish, suffering, bereavement, and loss

of society, comfort, companionship, care, attention and consortium." (Agreement, Ex. KK, at pp.

2-3)  In the Agreement, the parties waived their right to a jury trial and agreed to "accept the

Court's _independent determination of liability and damages_ and the resulting entry of judgment."

(_Id_., at p. 4)(emphasis supplied) Notably, the Agreement provides that the trial court:

> . . . will make **independent determinations** regarding fault and damages based on the
> evidence and witnesses identified in this case at the time the pretrial order is entered.
> Liability will be determined based on **objective evidence** such as law enforcement reports
> and testimony, witness testimony and statements, and accident reconstruction reports
> and/or testimony. Damages will be determined based on objective evidence such as
> medical and funeral bills, economist's reports, witness testimony and other relevant and
> necessary evidence. [The trial court] will serve as the trier of fact and will enter judgment
> that he believes to be fair, reasonable and supported by the evidence.

(emphasis added, Agreement, Ex. KK, at pp. 4-5)[23]  Thus, the contention that the trial court's

verdict was somehow inflated by Progressive's conduct is unfounded: Gant and the Birks

---

23 The lack of impact that certain deemed Request for Admissions had on the trial court's ultimate findings
will be discussed _infra_, however, it is worth noting that the considerable objective evidence that the court
was tasked with considering, per the parties' agreement, does not include these admissions.

*stipulated and agreed* that the trial court would exercise its independent judgment, consider objective evidence, and enter a judgment that is fair, reasonable and supported by the evidence.

**_The Trial and Resulting Judgment_:**  Pursuant to the Agreement, the matter was tried by the court for five days in June 2015.  Following the close of evidence, the trial court issued a 13 page written Judgment which set forth factual and legal findings and awarded damages in favor of Gant. [*See* Ex. MM] In the Judgment, the trial court stated that the "court's findings and conclusions" were "based on the evidence presented at trial, including the testimony noted above and many of the admitted exhibits." (*Id.*, p. 2)  The court listed all the witnesses presented by the parties at trial, of which 18 were presented on behalf of Gant, including three law enforcement officers, Mr. Gant himself, and witnesses and experts who testified concerning pecuniary/economic damages. (*Id.*)  From this evidence the trial court made the following findings:

*Liability:* The court determined that Justin Birk was liable for causing the accident, based upon the testimony of three law enforcement officers and the accident reports. The court found "there is simply no evidence to support any other scenario" than that Justin Birk's vehicle crossed the center line and struck Ms. Gant. (*Id.*, p. 4)  The court noted that Justin Birk had previously pled guilty to vehicular homicide, which is defined as "the killing of a human being committed by operation of an automobile…in a manner which creates an unreasonable risk of injury to the person or property of another and which constitutes a material deviation from the standard of care…" K.S.A. 21-5406, (Doc. 105, ¶75, *Id.* at 3.) The court attributed liability to Ed and Linda Birk for negligent entrustment and made detailed fact findings supporting its conclusion. (*Id.*, pp. 4-5) Likewise, the court evaluated liability of Birk Oil on the basis of the doctrine of *respondeat superior* and made similar detailed findings of fact which it found supported the liability of Birk Oil. (*Id.*, at pp. 5-6)  Further, in his Amended Counterclaim, Gant himself concedes that there was

no defense to the liability of Justin Birk in causing the underlying accident. (Doc. 105, ¶46.)

***Damages:*** In its Judgment, the trial court noted that "the most hotly contested aspect of the trial was the issue of economic damages." (*Id.*, p. 7)  The court noted that Gant asked for "more than $15 million in damages, almost all of which he characterized as economic."[24] (*Id.*)  The court set forth detailed findings as to economic damages, which it based on the testimony of the expert economists offered by both sides.  The court awarded $4,368,067 for Ms. Gant's lost earnings (*Id.*, p. 9); $546,235 for Ms. Gant's lost household services (*Id.* at p. 9); $481,242 for loss of advice and counsel to Mr. Gant and their children (*Id.*, p. 10); and $1,027,477 in *Wentling* damages (*Id.*, p. 11).  Gant requested $500,000 in non-economic damages, including the state maximum of $250,000 for the non-economic pain and suffering of the Gant family and $250,000 for the non-economic pain and suffering of Ms. Gant in the minutes she was conscious prior to her passing. (*Id.*, p. 11-12)  The state court awarded the requested $250,000 for the non-economic damages of the Gant family, but notably only awarded $50,000 for Ms. Gant's non-economic damages, based on a calculation of $10,000 per minute for the estimated five minutes she was conscious prior to her death.[25] (*Id.*, p. 12)  The state court's total award, based on these discrete categories of damages, which the trial court carefully supported by citation to independent evidence presented at trial, was $6,723,021.

***Progressive did not cause the excess judgment***:  As indicated in the underlying Judgment, and as stipulated by Gant and the Birks in the Agreement, the Judgment and damages awarded

---

[24] This places Gant in the unenviable position of contending that McMaster's conduct somehow resulted in an inflated Judgment, when the total award was less than half the amount his own lawyer contended he was entitled to for economic/*Wentling* damages alone.

[25] Had the trial court wanted to maximize the amount of the award in order to surreptitiously "punish" McMaster and/or the Birks—of which Progressive stresses there is absolutely no evidence—the trial court could have no doubt justifiably awarded the statutory $250,000 maximum for Ms. Gant's conscious pain and suffering, something which it declined to do. The court also declined to allow Gant to pursue a claim for punitive damages.

were based on the court's independent evaluation of the evidence.  The primary driver of the damages award consisted of $6,423,021 in economic damages, which comprise 95% of the total award. To a large extent, this damage award was a mathematical computation based upon the wage-earning history and life expectancy of Ms. Gant. It is for this reason that Gant concedes in the Amended Counterclaim that "[e]conomic damages for Katie Gant's lost wages alone were in excess of several million dollars." (Doc. 105, ¶118). As a result, there is no credible basis upon which to assert that the amount of the Judgment was caused by any conduct of Progressive (or McMaster).  Rather, the verdict, pursuant to its stated terms, is directly linked to the court's careful evaluation of the evidence presented at trial.  There is absolutely no mention in either the Judgment or the trial court's oral pronouncement of its verdict from the bench that any conduct by Progressive or McMaster increased or in any manner affected the amount of damages awarded. (See Judgment, Ex. MM; Tr. Transcript, Ex. LL, at 1040-1069)

Gant's claim that the $6.7 million verdict was caused by Progressive's breach of the insurance contract is unfounded and belied by the uncontroverted evidence in this case. In fact, to suggest that the trial court based its Judgment on anything other than the evidence painstakingly described in the Judgment (let alone based on a personal vendetta against Progressive, McMaster or the Birks, as Gant would have this Court believe) is rank speculation and serves no purpose other than to malign the actions of Judge Godderz.[26]

**b.  The excess judgment resulted from Gant's effort to "set up" this bad faith suit**

The absence of causal connection between any act of Progressive and the excess judgment is underscored by the acts and motivations of Gant in setting up this bad faith suit.  In *Wade*, the

---

26 Even Gant's own expert, Brian Wright, readily conceded that it would be entirely speculative to assert that the underlying judgment was somehow impacted by an unarticulated prejudice harbored by Judge Godderz. (Wright Depo., Ex. U, 33:9-14, 34:4-15).

Tenth Circuit held that the claimant, not the insurer, causes the excess verdict where claimant's conduct in declining to settle evinces an effort to set up a bad faith claim. In *Wade*, the claimant made a time-limited demand for policy limits which was initially declined by the insurer. Therefore, the claimant declined a policy-limits offer by the insurer, which the court found was merely a device to set up the bad faith lawsuit. *Wade*, 483 F.3d at 674. The *Wade* court concluded that "it would be turning the cause of action on its head by holding an insurance company liable where it eventually offered to settle the claim for the policy limits, but a claimant rejected the offer precisely in order to manufacture a lawsuit against the insurer for bad-faith refusal to settle." *Id.*

This Court, applying *Wade*, has likewise found that where a claimant rejects a policy limits settlement for the purpose of setting up a bad faith claim, there is no causation as a matter of law. *Kemp*, 133 F.Supp.3d at 1296. As in *Wade*, in *Kemp* the claimant rejected policy limit offers during the pendency of the lawsuit, with an eye towards a bad faith suit to recover amounts in excess of the policy limit. *Id.*  In addition to the claimant's rejection of policy limits offers, this Court found causation lacking because the claimant requested a multi-million stipulated excess judgment and also that claimant's counsel's fee agreement provided for payment upon recovery of an amount in excess of the policy limit.  *Id.*  Similarly, here Gant rejected Progressive's offer of its $250,000 policy limit and also later rejected Progressive/Bitco's later combined $1.25 million policy limit. Tellingly, Gant initially rejected the $1.25 million combined Progressive/Bitco policy limits offer, but shortly thereafter accepted that amount in connection with the Agreement/Assignment which on its face stated its purpose was to "expedite" Gant's prosecution of this bad faith claim. [196] Gant's counsel's fee agreement also provides for enhanced compensation to counsel upon recovery in excess of the policy limit. [243-244] In this regard, Gant's rejection of the $1.25 million combined limits and the ensuing underlying trial were merely pretextual devices to set-up this bad

faith claim. Thus there is no causation as a matter of law pursuant to Gant's own conduct. *Kemp*, 133 F.Supp.3d at 1295-1296; See also *Kannaday v. Ball*, 2014 WL 4259152, *13-17 (D. Kan. 2014)(noting the parties had "utterly no motive…to seek such a worthless, pointless judgment other than a pretext for a bad faith claim" thus plaintiff "utterly failed to show causation as a matter of law."); *Blanco-Diaz v. Maus*, 2012 WL 718919 (Kan App. 2012)(plaintiff's time-limited settlement demand and later *Fleming* agreement were arbitrary device to set up bad faith case).

## VII.   The Trial Court's Sanctions and Other Rulings Cited by Gant Are Legal Nullities and/or Did Not Harm the Birks

Gant simply cannot demonstrate, as he must, that the damage sought in this matter—the $6.7 million verdict—was caused by Progressive.  Instead, Gant focuses on five (5) rulings made by the trial court that could be broadly characterized as sanctions issued against McMaster and/or the Birks, alleging generally that these rulings harmed the Birks and thus entitle Gant (as the Birks' assignee) to collect the balance of the $6.7 judgment.  Gant's theory fails, because there is simply no connection between any of these rulings and the $6.7 million verdict. Further, there is absolutely no evidence that the conduct which resulted in sanctions was directed, controlled or authorized by Progressive. To the contrary, the sanctions arose entirely from discovery disputes between the lawyers in the hotly contested underlying litigation. Accordingly, even if the Court finds that one or more of the five rulings was, or could have been, "harmful" to the Birks, Gant's theory still fails because there is no causal link between any of these rulings and the conduct of Progressive.

### a.   Monetary sanctions issued against McMaster had no impact on the Birks

Two of the trial court's rulings cited by Gant were discovery-related sanctions entered directly against McMaster. The first sanction was in the amount of $2,500 and was predicated upon "Defendants' refusals to comply with discovery and prior court orders." [224] The second monetary sanction was in the amount of $5,000 and was predicated upon the discovery conduct of

McMaster.  [225]  Each of these monetary sanctions were directly against McMaster and he personally paid same, albeit with some reluctance, into the registry of the court.[27] There is no basis to contend that these monetary sanctions imposed against Mr. McMaster in any manner impacted or damaged the Birks.

### b.  Striking of the Birks' cell phone expert as inadmissible

This issue is a red herring. While it is true that the trial court struck the Birks' cell phone expert Lance Watson, in part, as a discovery sanction for his failure to bring his entire file to his deposition, the trial court, in its Journal Entry, also provided two alternative and independent grounds for striking Watson:

> The Court also has determined that Mr. Watson's opinion is inadmissible because it is unreliable under the standards set by K.S.A. 60-456. None of the traditional Daubert factors favor admission: the theory or technique at issue has not been tested; it has not been subject to peer review and publication; there is no error rate; and Mr. Watson had no knowledge as to general acceptance in the specific community.

[229a]  In its order, the trial court also found that Watson had no familiarity with the program that had been used to extract information from Ms. Gant's phone and made no effort to verify the information using any other program. [229c]  The trial court noted that the disputed data retrieval had actually been done by an independent contractor. [229c] The trial court also relied upon the fact that Watson had testified inconsistently at his deposition and a later hearing on the scope of information retrieved and reviewed from Ms. Gant's phone. [228] Finally, the trial court concluded that Watson knew very little about the "What's App" application that Mrs. Gant was allegedly using and confirmed that he was unable to testify as to its functionality.[28] [229d]

---

[27] Mr. McMaster's appeal of the monetary sanctions against him has been affirmed.

[28] There is no evidence to suggest that Progressive was involved in or controlled Mr. McMaster's retention of this expert or the directions to this witness as to what items to bring to his deposition.

Additionally, the trial court struck Watson as an expert witness because it found that his testimony was "substantially more prejudicial than probative." [229f-g] The trial court noted both Justin Birk's prior guilty plea to vehicular homicide as well as physical evidence in reaching the conclusion that: "there is no actual evidence that texting was occurring at the time of the accident or if it was that it had anything to do with the wreck at all." [229e] Ultimately, the Court concluded that the "low probative value of any testimony about texting in this cause" made the admission of such evidence too prejudicial. [229f-g] As a result, any contention that Mr. Watson's testimony was excluded solely based upon a perceived discovery violation is simply wrong.[29] Gant cannot establish that, but-for the referenced discovery sanction, Mr. Watson would have otherwise been permitted to testify.

Further, there is no evidence to suggest that Mr. Watson's testimony would have altered or affected the Judgment entered in the underlying action. In this regard, there was no proof that Katie Gant was on her phone at the time of the collision. In fact, this was a centerpiece of Gant's own motion to exclude this witness. [227] In that motion, Gant urged that there was simply no way to determine whether Ms. Gant was looking at her phone at the time of the accident, irrespective of when data may have been received or transmitted from this device.

Gant is now forced to contend that prejudice somehow flowed from the exclusion of testimony that he himself established never rose above the level of rank speculation. Further, Gant has judicially admitted in his own Amended Counterclaim that Ms. Gant's cellphone showed no texting or phone call near the time of the accident and affirmatively alleges that the last data transfer to this phone was 18 minutes before the accident. (Amended Counterclaim, Doc. 160, ¶ 477)  Accordingly, because the trial court struck the Birks' cell phone expert under *Daubert* and

---

29 Curiously, Gant makes no mention of these alternative grounds for excluding Mr. Watson's testimony in his prolix, 824 paragraph Amended Counterclaim.

other applicable Kansas standards for the admission of expert testimony, such testimony would not have been allowed regardless of the referenced discovery sanction.

### c.   Requests for Admissions had no impact

Gant propounded 538 Requests for Admissions to the individual Birk Defendants.[30] These Requests for Admissions were timely objected to by McMaster. [231] However, McMaster apparently failed to realize that a later ruling by the trial court made further responses to these Requests for Admissions necessary.  During his testimony, he characterized his failure to respond to these Request for Admissions as inadvertent and unintentional.[31] There is no evidence to suggest that Progressive participated in or was even aware that these Request for Admissions remained outstanding and unanswered, and McMaster himself testified Progressive was uninvolved in discovery. [95] Indeed, Progressive did not learn of these outstanding Request for Admissions until the time to respond had long since expired. Despite Progressive's lack of involvement with this discovery, Gant now contends that it should be responsible because the failure to respond to these Request for Admissions somehow altered the outcome of this case.[32] The undisputed evidence, however, confirms that this contention is erroneous for several reasons.

The trial court heard five (5) days of testimony. Gant did not use or rely upon the disputed Requests for Admissions in proving any necessary or essential element of his claims. In closing

---

[30] This type of over-the-top discovery appears, in part, to have led to the antagonism between counsel which is evident in the underlying record. Gant's own expert, Mr. Wright, testified that he had never seen this type of extensive discovery in a wrongful death proceeding and called it "extraordinary." (Wright Depo., Ex. U, 188:21-189:7)

[31] The Requests for Admissions are not technically a sanction. Rather, the court simply deemed them admitted because of a failure to timely respond. Ultimately, 375 of the disputed Requests for Admissions were received into evidence. (Amended Counterclaim, Doc. 160, ¶ 662)

[32] For the reasons set forth in Section IV, *infra*, Progressive is not vicariously liable for any litigation conduct or putative malpractice of McMaster as a matter of Kansas law. So, even if this Court finds that the trial court's ruling concerning the Requests for Admissions harmed the Birks' defense in some material respect, Progressive is not vicariously liable for McMaster's failures in that regard.

argument summarizing the extensive evidence presented at trial, Gant's counsel did not make a single reference to the disputed Requests for Admissions. The trial court's oral ruling from the bench made no reference to these Requests for Admission. [236] Finally, the trial court's thirteen (13) page Judgment identifying the evidence supporting Plaintiff's claims also makes no mention of the Requests for Admissions. [236] The fact that this discovery played no role in the outcome of the Underlying Litigation is confirmed by the fact that Gant's counsel sought to admit these Request for Admissions only "as a housekeeping matter" at the conclusion of his case.[33] Had he actually intended to rely upon these Requests for Admissions, there would have been no need for a five-day trial, particularly on issues of liability of each of the Birk Defendants—Gant's counsel could have simply presented the Requests for Admissions to the Court and rested Gant's case. However, abbreviating the trial was not Gant's intent: Instead, the underlying trial was a necessary part of the overall plan, which was designed to set-up this bad faith action. The evidence on both liability and damages was gut-wrenching, which is why the three experienced lawyers who ultimately represented the Birks at trial attempted to admit liability. [175] Gant would not agree, arguing an admission of liability would violate the Agreement, as it was his intent to maximize the damage award by putting on available evidence in painstaking detail. [175] Having chosen this route, it is somewhat disingenuous for Gant to now assert that the disputed Requests for Admissions, which received only passing reference in the week-long trial, were somehow an evidentiary game-changer which altered the outcome of the Underlying Litigation.

---

33 Again, Progressive relies, in part, on the testimony of Gant's own expert, Mr. Wright. He testified that the independent evidence put on by Gant at trial was the "belt" with the Requests for Admissions simply acting as "suspenders." This rather telling admission fully acknowledges the independent proof put on by Gant at trial in support of his claims, irrespective of the disputed Requests for Admissions. (Wright Depo., Ex. U, 42:2-24)

Gant's case on liability consisted of three primary claims: (1) That Justin Birk was liable for the subject accident; (2) That Edward and Linda Birk were guilty of negligent entrustment, and; (3) That Justin Birk was within the course and scope of his employment at the time of the accident. Gant presented 18 separate witnesses and introduced 295 exhibits during the course of the 5-day trial. Indeed, Gant's own Amended Counterclaim confirms Gant's belief that each of the elements of his claims in the underlying action were conclusively proven by a veritable mountain of independent evidence. (See Am. Counterclaim, Doc. 160, ¶¶39-102) Gant's allegations in this regard are judicial admissions and Gant should be estopped or otherwise barred from improperly attempting to create an issue of fact by simultaneously arguing that McMaster's litigation conduct somehow deprived the Birks of meaningful substantive defenses.

On the issue of Justin Birk's liability for the accident, the Court specifically found that "Justin Birk pleaded guilty to vehicular homicide following the accident." The trial court also noted that it relied upon the testimony of three officers of the Kansas Highway Patrol and received their reports into evidence. [208] On the ultimate issue of Justin Birk's liability in causing the accident, the Court concluded "there is simply no evidence to support any other scenario." [208]

With respect to the issue of negligent entrustment, the Court found that Edward and Linda "knew about Justin Birk's habits of carelessness or recklessness in the operation of a motor vehicle." [209] Justin Birk's driving records were introduced into evidence and confirmed that he "had more than 15 arrests or citations during a five year period." [209] Further, the presented evidence established that he had never gone more than five months without a traffic infraction or arrest. [209] The Court also found that Edward and Linda Birk had been named in a prior wrongful death action involving the entrustment of a vehicle to Justin. [209] Finally, the Birks' own testimony during the underlying case confirmed that they had "hired attorneys, attended court

hearings and paid various fines" relating to Justin's prior infractions. [209] In reaching these conclusions, the trial court made absolutely no reference to the Requests for Admissions.

Gant fares no better in trying to establish that the trial court's *respondeat superior* determination would have been different but for the Requests for Admissions. In its Judgment, the trial court noted that "the time cards and testimony" established that Justin Birk was generally on the job as of the time of the collision. [210] The trial court further relied upon independent evidence establishing that Justin Birk had made two work-related phone calls prior to the accident. [210] The trial court noted that Justin Birk's deposition, which was played at trial, confirmed that he had told investigating officers that he was on his way to work at the time of the accident. [210] The Court also found it "notable that Birk Oil employees were considered to be at work when travelling to and from the jobsite." [210] On this basis, the Court ruled that Justin Birk was within the course of his employment at the time of the accident. Again, there is nothing to suggest that this determination was based, in any manner, on the disputed Requests for Admissions.

Given the nature and volume of independent proof at trial, there is no support for the contention that, but for the admitted Request for Admissions, the outcome of this cause would have been different. Thus, the evidence does not support a finding that the disputed discovery was a cause in fact of any damage to the Birks—let alone the cause of the damages actually being sought in this action, the balance of the $6.7 million judgment.

### d.   The reverse alter-ego sanction was a legal nullity

The business entity operated by the Birks was a Kansas general partnership by the name of B&B Cooperative Ventures which, according to the Birks, is colloquially referred to as "Birk Oil." [163] B&B Cooperative Ventures was owned by its partners, Brian Birk, Laura Birk and Birk Oil, Inc. [165] Birk Oil, Inc. in turn was owned by Edward and Linda Birk. [165] Birk Oil, Inc. was

forfeited for failing to file an annual report by the State of Kansas in 2009, but the partners in B&B Cooperative Ventures did not amend their partnership agreement upon that forfeiture.

In a Journal Entry dated February 4, 2014, the trial court imposed a reverse alter-ego sanction finding that "Birk Oil Company (also referenced to at times throughout the course of this lawsuit as B&B Cooperative Ventures, LLC and B&B Cooperative Ventures, a general partnership) should be found to be the alter ego of Edward and Linda Birk."[34] Typically, an alter-ego sanction holds individuals responsible for the activity and debts of a corporate entity, but that is not what the trial court did here. Instead, the trial court, through clear language, imposed a reverse alter-ego sanction, effectively making the partnership responsible for the individuals. No party sought to amend or otherwise seek a clarification of this ruling.

In its Judgment, the Court found Justin Birk 75% at fault, B&B Cooperative Ventures, a general partnership, 75% at fault based on *respondeat superior* and Ed and Linda Birk each 12.5% responsible for negligent entrustment. [Ex. MM, p. 13] However, the Judgment never transferred any liability from one defendant to another based upon the alter ego sanction. In fact, although noting the existence of the alter-ego sanction, the trial court stated in its Judgment that since **the "issue was not part of the trial, its impact on this judgment will not be discussed in this Journal Entry."** [Id.] Thereafter, no further journal entry, judgment or amended judgment was ever entered imposing any additional liability on any of the Birk defendants based upon the alter-ego sanction. Presumably, Gant did not follow up in this regard since he had previously immunized the Birks from any potential liability and always intended on proceeding against Progressive to collect his damages. In short, Gant apparently decided that how liability was ultimately divided

---

[34] There is no dispute that the actual entity employing Justin Birk and which was involved in the underlying wrongful death action was B&B Cooperative Ventures, a general partnership.

between the Birk defendants was of no consequence, given his intention to seek recovery of the entire amount from a third party. Ultimately, the reverse alter-ego sanction became a non-issue and ineffectual, inasmuch as it was a contingency which was never reduced to judgment or any other executable form which could have resulted in damage to any Birk defendants.

### *The alter ego doctrine is inapplicable to a general partnership*

Ultimately, however, the fact that the subject entity is a general partnership eliminates any potential damage from this alter-ego sanction. Simply put, the concept of alter-ego has no real applicability in a partnership setting, because the partners remain personally responsible for unpaid debts of the partnership, and a partnership interest itself is an executable asset of an individual partner once the partnership's legitimate debts have been paid. *See Gaynes v. Conn*, 347 P.2d 458 (Kan. 1959) (noting that a partner's individual interest in a partnership may be garnished after payment of partnership debts and settlement of accounts between partners.) and *Hoelting Enterprises v. Nelson*, 929 P.2d 183 (Kan. App. 1996) (confirming that if a partnership is without assets a judgment debt against it can be collected from individual partners.)

Alter ego is also a legal vehicle utilized to pierce a corporate veil. Its inapplicability is self-evident in this instance as there is no corporate veil to pierce. *See Kilpatrick Bros. v. Poynter,* 473 P.2d 33, 42 (Kan. 1973) ("…the doctrine of alter ego fastens liability on the individual who uses a corporation merely as an instrumentality to conduct his own business," and *Amoco Chemicals Corp. v. Bach*, 567 P.2d 1337 (Kan. 1977) ("When the corporation is the mere alter ego or business conduit of a person, the corporate fiction may be disregarded…"   In Kansas, general partners remain responsible for the unpaid debts of the partnership. As a result, any piercing of the corporate veil would be entirely superfluous given the existent liability already imposed by law. *Gillespie v. Seymour*, 876 P.2d 193, 200 (Kan. Ct. App. 1994) ("Each partner is jointly and severally liable for

debts resulting from partnership business. This includes judgments.") This principle of law was

discussed by the court in *Asshauer v. Wells Fargo Foothill*, 263 S.W. 3d 468 (Tx. Ct. App. 2008),

wherein commenting on the inapplicability of alter ego in a partnership setting the court noted:

> Therefore in a limited partnership, the general partner is always liable for the debts and
> obligations of the partnership. As such, alter ego or piercing the corporate veil is
> inapplicable with regard to a partnership because there is no veil that needs piercing…;

*Id.* at 473.474. Thus, even if the court had imposed a traditional alter ego sanction, existing Kansas

partnership would have rendered this a legal nullity.

 The language of the Court's Journal Entry, however, cannot be ignored. The trial court

made Birk Oil the alter ego of Ed and Linda Birk. This is known as a reverse alter ego sanction:

imposing the liability of individuals on the corporate entity-- a legal concept not recognized or

enforced in Kansas. *Floyd v. IRS*, 151 F.3d 1295 (10th Cir. 1998) and *Bettis v. Hall*, 2011 Lexis

40884 (D. Kan. 2011). As a result, the sanction imposed was ultimately not enforceable.

### e.  Failure to disclose insurance earlier had no impact

 Gant asserts that Progressive breached its contract by failing to disclose the existence of an

insurance policy issued to B&B Cooperative Ventures by Bitco. Initially, there is an element of

absurdity to this claim which requires comment, as the Birks (through Gant) are effectively suing

Progressive for failing to disclose their own insurance policy. For his part, Gant cannot point to

any provision within the Progressive policy which would require it to disclose a policy of insurance

issued by a different insurer to a different named insured and Kansas law places no such obligation

on a carrier. This is confirmed from a review of K.S.A. § 60-226(3) which notes that a party "may

obtain discovery" of the existence and contents of any insurance agreement. Similarly,

Fed.R.Civ.Pro. 26(a)(1)(iv) provides that a "party must," without waiting for a discovery request,

provide for inspection and copying any insurance agreement under which an insurance business

may be liable to satisfy all or part of a possible Judgment. As these authorities note, the obligation remains on the parties through the discovery and disclosures process, to produce potentially applicable insurance coverage. There is nothing within the law of Kansas which places any duty on an insurer to disclose for a <u>different named insured</u> a policy issued by a <u>different insurer</u>. Further, available authority confirms that a party's failure to disclose insurance information during the discovery process is best left to the inherent sanction authority of the presiding court. *Anchondo v. Dunn*, 511 Fed. Appx. 736 (10th Cir. 2002) and *Pape v. Law Offices of Frank N. Peluso, P.C.*, 2015 Lexis 136742 (D. Conn. 2015)

The lack of merit of this claim is also exposed by the undisputed facts. At the outset, it is important to note that the Bitco policy, *inter alia*, provided commercial auto coverage to B&B Cooperative Ventures, a general partnership. Justin Birk was not a named insured under the Bitco policy, and the Cadillac Escalade involved in this accident was not a listed vehicle. [9-10] Regardless, shortly after the accident Progressive advised the Birks of the need to disclose additional coverages: In separate letters to both Edward and Justin Birk dated June 20, 2011, Progressive requested that it be informed <u>immediately</u> "if you have any insurance policies that may provide coverage to you in excess of this policy." Progressive expressly noted in this correspondence that if it did not hear back from the Birks it would assume no such coverage existed. [16] Progressive adjuster Hansel, also contacted the Birks to inquire personally as to the existence of any other insurance coverage and was advised that no additional coverage existed. [18] Mr. Hansel also testified that he made two separate calls to the Birks' insurance agent, again inquiring about the potential for other applicable coverage.[35] [19] It is undisputed that,

---

[35] The agency contacted by Progressive was not the same agency which had procured the Bitco policy. Progressive contacted the personal lines agent, the identity of the commercial insurance agency was unknown to Progressive.

notwithstanding these inquiries, Progressive was never notified by the Birks of the existence of any other potentially applicable policies, including the subject Bitco policy. [17] Further, upon the initiation of the underlying litigation in May 2013, McMaster wrote a letter to Progressive confirming that he had met with the Birks and their personal counsel and that they determined that no other insurance coverage existed for this accident:

> With the assistance of our clients' personal counsel, we have reviewed the insurance coverage available to the Defendants at the time of the accident. It appears that the Progressive policy provides the only coverage for this accident. Therefore, the Defendants understand that the likely exposure of this case is in excess of the applicable coverage.

[130]  Notably, this letter was copied to the Birks' personal counsel, James Campbell, the Birks and Birk Oil. At no point, did Progressive ever receive any information which contradicted or amended this statement of no other applicable coverage. As a result, Progressive is effectively now being sued by the Birks for *failing to disclose a policy which Progressive directly inquired about and was told did not exist.*[36]

Upon the filing of the underlying litigation, the Birks were also advised by Justin Birk's criminal lawyer, John Ambrosio, to "put all of your insurance companies on notice of this lawsuit." [119] For his part, McMaster actually confirmed for Progressive that he was putting all other insurers on notice. [126] Progressive had no reason to question that this was being done. In fact, as was noted by both Gant and McMaster, it was in the Birks' best interest to have as much coverage as possible.

Ironically, the Birks' failure to disclose additional insurance coverage was the subject of multiple hearings in the trial court. The insurance information which was not provided to Progressive was also concealed from the lower court and Gant in the Underlying Litigation. In fact, Gant, notwithstanding the power of subpoena, was unable to secure the disclosure of other

---

36 See also Expert Report of Dan Doucette, Ex. XX, at pp. 5-8.

potential insurance by the Birks for approximately one (1) year after suit was filed. Further, although Gant is currently claiming that the failure to disclose the potential applicability of the Bitco policy was a significant impediment to settlement, the undisputed facts confirm that once available, this information was never acted upon by Gant. When the Birks disclosed the existence of the Bitco policy in February 2014, Gant's counsel, took absolutely no steps to put Bitco on notice or otherwise make use of this information.[37] [141] If this information was as critical as Gant now contends, it begs the question as to why it was wholly ignored by his counsel once disclosed.

## <u>CONCLUSION</u>

For the foregoing reasons, Progressive moves for Summary Judgment in its favor on its claim for Declaratory Relief and on the bad faith claim asserted by Gant in his Amended Counterclaim.

---

37 Mr. Kieffer's failure in this regard is hard to explain unless he reached the same conclusion as Mr. McMaster that coverage for this unlisted vehicle and driver was not provided under the Bitco commercial auto policy--or Mr. Kieffer specifically did not submit a claim with Bitco in order to manufacture a bad faith claim against Progressive and/or Bitco.

**FRANKE SCHULTZ & MULLEN, P.C.**          **COLE, SCOTT & KISSANE, P.A.**


___/s/ *Christopher M. Harper*_____          ___/s/ *Joseph T. Kissane*_____
JOHN L. MULLEN      #22994          JOSEPH T. KISSANE
CHRISTOPHER HARPER #23273          BRIAN J. AULL
8900 Ward Parkway          4686 Sunbeam Road
Kansas City, Missouri  64114          Jacksonville, Florida 32257
(816) 421-7100          (904) 672-4000
(816) 421-7915 (fax)          (904) 672-4050 (fax)
jmullen@fsmlawfirm.com          joseph.kissane@csklegal.com
charper@fsmlawfirm.com          brian.aull@csklegal.com

**Attorneys for Plaintiff/Counterclaim Defendant Progressive Northwestern Insurance Co.**



**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy
Of the foregoing was filed and delivered via
the court's electronic filing and notification
this 19th day of January, 2018 to:

Jonathan Kieffer
Adam S. Davis
Vanessa Gross
Wagstaff & Cartmell, LLP
4740 Grand Avenue
Suite 300
Kansas City, MO 64112
jpkieffer@wcllp.com
adavis@wcllp.com
vgross@wcllp.com
**ATTORNEYS FOR GABRIEL GANT**

/s/ *Christopher M. Harper*_____
**Attorneys for Plaintiff**