**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| PROGRESSIVE NORTHWESTERN INSURANCE COMPANY, | |
| **Plaintiff/Counterclaim Defendant,** | **Case No. 15-9267-JAR-KGG** |
| **v.** | |
| GABRIEL GANT, | |
| **Defendant/Counterclaim Plaintiff.** | |

## MEMORANDUM AND ORDER

Plaintiff Progressive Northwestern Insurance Company ("Progressive") filed this declaratory judgment action seeking a declaration that it fulfilled its contractual obligations in good faith and without negligence under an insurance policy issued to Edward and Linda Birk, whose son was involved in a vehicular homicide that killed Kathryn Gant in June 2011. Defendant Gabriel Gant, as assignee of the Birks' rights against Progressive, counterclaims for breach of contract/bad faith. This matter is before the Court on Gant's Motion for Partial Summary Judgment (Doc. 262), Progressive's Motion for Summary Judgment (Doc. 266), and the parties' motions to strike or exclude each other's expert witnesses (Docs. 264, 268, 270). For the reasons explained in detail below, the Court denies Gant's motion for partial summary judgment, grants in part Progressive's motion for summary judgment, and directs further briefing under Fed. R. Civ. P. 56(f)(2).

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no

genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]  Where the movant bears the burden of proof on a claim or defense, it must show that the undisputed facts establish every element of the claim entitling it to judgment as a matter of law.[8]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to

---

[1]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4]*Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8]*Celotex*, 477 U.S. at 331.

"set forth specific facts showing that there is a genuine issue for trial."[9]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[10]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[11]

The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[12]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[13]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[14]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[15]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[16]

## II.  Uncontroverted Facts

The following material facts are uncontroverted or stipulated to for the purposes of

---

[9]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[10]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[11]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[12]*Adams*, 233 F.3d at 1246.

[13]Fed. R. Civ. P. 56(c)(4).

[14]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[15]*Id.* at 327 (quoting Fed. R. Civ. P. 1).

[16]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

summary judgment.[17]  On June 10, 2011, vehicles operated by Justin Birk and Katie Gant collided in Coffey County, Kansas, resulting in Ms. Gant's death.  At the time of the accident, Justin Birk was operating a 2007 Cadillac Escalade that was titled in the names of his mother and father, Edward and Linda Birk.

**B&B Cooperative Ventures**

B&B Cooperative Ventures, a General Partnership ("B&B"), is the entity colloquially referred to as "Birk Oil."[18]  It is a general partnership formed under the laws of the state of Kansas, including the Kansas Uniform Partnership Act.  There are two partners in B&B, each with a 50% interest: Birk Oil, Inc. (owned by Edward and Linda Birk) and Birk Petroleum (owned by Brian and Laura Birk).  Brian Birk is Edward and Linda Birk's son; his wife, Laura, is involved in the family business and is familiar with the issuance of insurance for the company.[19]

**Insurance Policies**

***The Progressive Policy***

Progressive issued an Auto Insurance Policy with effective dates of March 22, 2011 through September 22, 2011, to named insureds Edward and Linda Birk (the "Progressive Policy").  The Progressive Policy provides bodily injury liability limits of $250,000 per person/$500,000 per accident.  The 2007 Cadillac Escalade Justin Birk was driving at the time of

---

[17]As an initial matter, the parties have made the process of determining the uncontroverted facts in this case unnecessarily difficult for the Court. The parties have set forth a combined total of 764 statements of fact. Rather than stating that the fact is controverted and citing to those portions of the record on which it relies as required by D. Kan. Rule 56(c), the parties often object to each other's attempt to color the testimony and argue that the facts alleged are immaterial, followed by more arguments of counsel. These tactics on both sides are improper and have resulted in many pages of unnecessary briefing by the parties, much additional time and effort expended by the Court, and confusion for all.

[18]Doc 267, Ex. HH.

[19]Doc. 281, Ex. 27 at 12:19–25.

the accident is a listed vehicle on the Progressive Policy. The Progressive Policy was sold to the Birks through Trustpoint Insurance Agency ("Trustpoint").

### *The Bitco Policy*

Bituminous Casualty Insurance Company ("Bitco") issued a Commercial Automobile Policy to named insured B&B (the "Bitco Policy"), which provides a $1 million liability limit. Birk Oil paid in excess of $30,000 a year in premium for the Bitco Policy coverage. Justin Birk is not a listed driver nor is the 2007 Cadillac Escalade a listed vehicle on the Bitco Policy. The Bitco Policy was sold to B&B through MRH Insurance Agency.

### Progressive Investigation, Coverage Analysis, and Retention of Defense Counsel

The Birks' claim arising from the fatality collision was reported to Progressive on or about June 13, 2011, and was ultimately assigned to Casualty Specialist Robert Hansel for handling. Progressive conducted a factual investigation into the accident and concluded that coverage existed under the Progressive Policy. Progressive concluded, based on the police report as well as the finding of an accident reconstructionist retained by Progressive, that the accident occurred on Ms. Gant's side of the road.

On June 20, 2011, adjuster Hansel sent letters to both Edward and Justin Birk, which state in pertinent part:

> At this time it appears that the damages may be in excess of your coverage limits. . . Since you are responsible for all damages that may be awarded against you, you may decide to retain an attorney for your personal interests.
>
> Please let us know immediately if you have any insurance policies that may provide coverage to you in excess of this policy. If we do not hear from you concerning such policies, we will assume that no such policies exist.[20]

---

[20] *Id.*, Exs. H, I.

Neither Edward nor Justin Birk directly responded to Progressive's letter. No such letter was sent to Linda Birk or Birk Oil.

Hansel testified that the intent of this correspondence was for the Birks to disclose any policies that could provide additional coverage based on the facts of the accident, whether excess, umbrella, or any other policies that might come into play.[21] Hansel testified he considered any other policies that might come into play—whether household, business, policies to other family members, and the like—"excess" over the Progressive auto policy that Hansel considered to be the primary coverage for the accident.[22] Hansel testified that he also contacted Linda Birk about the existence of other coverage and was told no such coverage existed; Linda Birk does not recall any such discussion and testified that if Progressive had asked what insurance company insures the business that she and her husband owned, she would have told them Bitco. Hansel also contacted Trustpoint to inquire if there was any other insurance that may provide coverage for the accident.

On June 21, 2011, Gant's attorney, Dan Lykins, sent a letter to Progressive asking, "What insurance company insured the businesses that were owned by Edward and Linda Birk and any business that was owned by Justin Birk?"[23] Lykins represented Gant from approximately June 21, 2011 to May 2012. On or about June 23, 2011, Progressive retained attorney Kevin McMaster to represent Justin Birk. McMaster's representation ultimately expanded to include Edward and Linda Birk and Birk Oil (collectively, "the Birk Defendants"). Hansel testified that once McMaster was retained, any further correspondence or questions were answered or sent

---

[21]*Id.,* Ex. E at 254:18–24.

[22]*Id.* at 254:25–255:20.

[23]Doc. 281, Ex. 39.

through him.[24]

Progressive evaluated potential damages associated with the claim, including non-pecuniary damages up to the statutory $250,000 cap; medical bills; pecuniary losses such as loss of services and support of Ms. Gant; and funeral expenses. Progressive determined and reflected in the claim file within eight weeks of the accident that, based on the fact that Ms. Gant was a 31-year old mother of three and a high wage earner, the claim had a value in excess of $5 million. Progressive accordingly concluded that it would offer its $250,000 liability limit to settle the claim.

**Tender of Policy Limit and Opportunity to Settle**

Progressive tendered the $250,000 policy limit to Gant to settle the claims related to the accident no later than August 24, 2011, pursuant to a letter of that date from McMaster to Lykins.[25] Gant rejected the offer extended by Progressive.

On August 26, 2011, Lykins responded to McMaster regarding the settlement offer and requested Justin Birk execute an assets affidavit and swear under oath that there was no other available insurance coverage that could apply to the accident.[26] Lykins testified that his request for the affidavit stemmed from McMaster and Hansel telling him that the Progressive Policy was the only policy that covered the accident, and that there was no business, umbrella, or excess insurance.[27]

Gant had the ultimate decision-making authority whether to settle the underlying claim, though he was consulting with family members including Katie Gant's parents and his own

---

[24]*Id.,* Ex. 3 at 81:8–21.

[25]Doc. 267, Ex. ZZ.

[26]*Id.,* Ex. K.

[27]Doc. 281, Ex. 6 at 22:6–12.

parents. Gant testified that he rejected Progressive's tender of its $250,000 policy limit because he wanted more information, including investigation about other policies. He explained that Lykins had expressed "there was nothing else that was going to be offered" above the Progressive Policy limit and "it just felt like there was more investigating to do."[28] Gant testified he believed the value of the wrongful death claim was worth substantially more than $250,000.

McMaster testified that he understood that the completion of the assets affidavit and sworn statement of no other insurance coverage were conditions of settlement, and that if additional insurance were to be disclosed, he would not expect the proposed settlement for the Progressive Policy limit would have been completed.[29] Lykins testified that McMaster told him that the Birks did not have other insurance, including business insurance, and that McMaster verbally told him over the phone the contents of the affidavit, which McMaster would not provide unless the case settled.[30] Lykins also wanted Justin Birk to swear under oath whether at the time of the accident he was, or was not, in the course and scope of his employment with Birk Oil because, even if Birk Oil did not have applicable insurance, Birk Oil had assets that could compensate Gant for the loss.[31] McMaster told Lykins that the affidavit would reflect that Justin Birk was not in the course and scope of his employment.

Lykins testified he believed the value of the case was between $5 to 8 million. Lykins agreed that, even if an additional $1 million of coverage was available, that $1.25 million was far below what he believed was the value of the case. During the time Lykins represented Gant, he never made a claim against Birk Oil or Edward and Linda Gant, only Justin Birk.

---

[28]*Id.,* Ex. 7 at 47:3–8.

[29]Doc. 267, Ex. F at 167:8–25.

[30]*Id.,* Ex. J at 23:14–24:10.

[31]*Id.* at 28:17–29:1, 17:16–38:8.

Ultimately, the affidavit was never received by Lykins. Lykins testified that even if the affidavit was returned and stated all of the terms required, he still would not have recommended settlement, but would have required a personal contribution from the Birks over and above the $250,000 Progressive Policy limit.[32] Lykins testified that the amount of any personal contribution by the Birks to settle the case would need to be at least an additional $250,000 above the Progressive Policy limit.[33] McMaster never told Lykins whether the Birks would be willing to make a personal contribution to settlement.[34]

After Lykins was discharged, Gant was represented by Wagstaff & Cartmell (the "Wagstaff firm") beginning in approximately June 2012. Between the date of retention and the date the lawsuit was filed, no settlement demands or offers to settle were made by the Wagstaff firm on behalf of Gant. The Wagstaff firm never indicated that the Progressive Policy limit would settle the case. McMaster communicated a settlement offer that included the $250,000 Progressive Policy limit as well as an offer to purchase Gant's residence in Burlington, Kansas; Gant did not accept the offer. McMaster testified that he repeatedly called counsel for Gant to discuss settlement, and there was never any indication from the Wagstaff firm that any question concerning the existence of other insurance was a factor in the case not settling.[35] Hansel testified that in 2011 through 2012, he followed up with McMaster and Lykins every thirty days to try to settle the claim.[36]

---

[32]*Id.* at 74:17–75:18.

[33]*Id.* at 81:14–82:10.

[34]*Id.* at 79:3–17.

[35]Doc. 267, Ex. F at 201:25–202:11.

[36]*Id.*, Ex. E at 294:9–14.

9

**Justin Birk Criminal Case**

Justin Birk was criminally charged with Involuntary Manslaughter for his actions with respect to the fatality collision. He retained counsel John Ambrosio with respect to the criminal charges and, on March 5, 2013, entered a guilty plea to "vehicular homicide."

**The Birk Lawsuit**

On April 26, 2013, Gant filed a wrongful death lawsuit in the District Court of Coffey County, Kansas (the "Birk Lawsuit"). Gant alleged the fatality collision was caused by Justin Birk, alleged a negligent entrustment claim against Edward and Linda Birk, and a claim against Birk Oil on the theory that the accident may be imputed to the company.[37]

**The Birks' Disclosure of Other Insurance**

Edward and Linda Birk testified they did not put Bitco on notice of the accident immediately because the Bitco Policy was issued to Birk Oil, and the Birks believed the accident only involved Justin Birk personally, not the company. Justin Birk's criminal attorney, John Ambrosio, also sent a letter to the Birks in April 2013, shortly after the Birk Lawsuit was filed, advising that they should place all of their insurance carriers on notice of the accident.[38] No one at Progressive advised the Birks they should not put Bitco on notice of the accident. The Birks believed, in conjunction with advice from McMaster, that the Bitco Policy did not provide coverage for the accident because Justin Birk was not on the job at the time of the accident.

Hansel testified that he relies on the insured to provide information concerning any other potentially applicable insurance policies, and that if the insured does not disclose that information, he does not know what other coverage there may be. Hansel also expected defense

---

[37]Doc. 6, Ex. E.

[38]Doc. 267, Ex. W.

counsel hired by Progressive, as well as any personal counsel advising the insureds, to counsel the insureds about other applicable insurance, including insurance available to any business that could potentially be involved.[39]  After the underlying litigation was filed, Hansel contemporaneously reflected in the claims notes his understanding that McMaster was placing all insurance carriers on notice.[40]  Hansel looked into whether any other Progressive policies existed that could provide coverage for the accident and found none.

Laura Birk testified that she did not do anything to hide the existence of any insurance policies and that she gave the Bitco Policy to McMaster.[41]  McMaster reviewed several insurance policies issued to one or more of the Birks, including the Bitco Policy, as well as a Commercial General Liability policy issued to Birk Oil, a workers' compensation policy issued to Birk Oil, and a homeowner's policy issued to Edward and Linda Birk.[42]  McMaster testified he evaluated whether the Bitco Policy provided coverage for the accident and concluded it did not.[43]  On May 10, 2013, McMaster sent a letter to Hansel, copying the Birks and their personal attorney, James Campbell, which stated:

> With the assistance of our clients' personal counsel, we have reviewed the insurance coverage available to the Defendants at the time of the accident. It appears that the Progressive policy provides the only coverage for this accident. Therefore, the Defendants understand that the likely exposure of this case is in excess of the applicable coverage.[44]

---

[39]*Id.,* Ex. E, 85:6–22.

[40]*Id.,* Ex. D.

[41]Doc. 281, Ex. 27 at 17:15–21; 157:11–15.

[42]Doc. 267, Ex. F., 118:19–120:13.

[43]*Id.* at 121:5–15.

[44]*Id.,* Ex. Y.

The Birks' initial interrogatory responses indicated the only applicable insurance coverage was the Progressive Policy, based at least in part on McMaster's conclusion that the Bitco Policy did not provide coverage for the accident.[45]  McMaster testified that it was his responsibility to assert legal objections to discovery seeking the disclosure of liability insurance. McMaster repeatedly represented to the trial court that the only applicable policy was the Progressive Policy because McMaster had reached the conclusion, based on his review of the Bitco Policy, that it did not apply.[46]  At the January 23, 2014 hearing concerning discovery disputes, McMaster represented to the trial court that Gant had all the insurance coverage required by statute, that the Birks were not hiding any insurance coverage from anyone, and that they had given Gant's counsel information on liability insurance that potentially covered the accident.[47]  At the hearing, the trial court stated, "I just know that if Birk Oil has an insurance policy, you're going to have to give it to the plaintiffs."[48]  The Birk Defendants were not present at the hearing.

On February 26, 2014, the Birk Defendants disclosed to Gant via supplemental responses to interrogatories the existence of the Bitco Policy and other policies.[49]  McMaster did not forward the Bitco Policy to anyone at Progressive until February 4, 2015, when he explained that "[a]fter suit was filed I reviewed the policies and confirmed no coverage."[50]  McMaster informed

---

[45]*Id.,* Ex. F., 156:8–15.

[46]*Id.* at 154:16–22.

[47]Doc. 281, Ex. 16.

[48]*Id.* at 18:15–17.

[49]Doc. 267, Ex. F, 129:2–132:6; Ex. YY.

[50]*Id.,* Ex. Z.

the Birks there was no coverage under the Bitco Policy,[51] and testified he still believes there is no coverage afforded under the Bitco Policy.[52]

Neither Gant nor his counsel formally put Bitco on notice of the accident once the existence of the Bitco Policy was disclosed.[53] Steven Pigg, an attorney later hired by Progressive to represent Birk Oil, ultimately placed Bitco on notice in February 2015.[54] On March 13, 2015, a Bitco representative prepared an internal report recommending to "try to settle the case against all parties for the policy limits available[.]"[55]

**Rulings/Sanctions Against McMaster and/or the Birks**

***Monetary Sanctions Against McMaster Personally***

The trial court ordered two rounds of monetary sanctions against McMaster personally. First, in the amount of $2,500 predicated upon "Defendants' refusals to comply with discovery and prior court orders."[56] Second, in the amount of $5,000, predicated on McMaster's discovery conduct with respect to Laura Birk's deposition testimony.[57] On August 26, 2014, McMaster sent a letter to Hansel explaining that he had been sanctioned and as a result of either misrepresentations by either Laura Birk to McMaster, or McMaster to the court, the trial court stated he should either sit for a deposition or withdraw from the case.[58] McMaster relayed that the Birks were present at the hearing, did not request he withdraw as counsel, and requested he

---

[51]*Id.*

[52]*Id.,* Ex. F at 371:24–372:13.

[53]*Id.,* Ex. N, Nos. 58–59.

[54]Doc. 281, Ex. 50.

[55]*Id.*

[56]Doc. 267, Ex. PP.

[57]*Id.*, Ex. QQ.

[58]Doc. 281, Ex. 47.

pass this information on to Hansel for further discussion.[59]  Progressive referred the matter to its

legal department, and Progressive ultimately determined to let McMaster continue as counsel of

record per the Birks' wishes, and McMaster did not withdraw from the Birk Lawsuit.

Following the conclusion of the Birk Lawsuit, McMaster appealed the $7,500 sanctions.

The Kansas Court of Appeals upheld the imposition of sanctions, and stated: "the record

demonstrates that McMaster misled the court regarding relevant evidence and delayed the

proceeding for months."[60]

Gant never moved for sanctions regarding the failure by McMaster or the Birk

Defendants to disclose the Bitco Policy.

### Striking the Birks' Cell Phone Expert

Gant filed a motion to strike the Birks' cell phone expert, Lance Watson, who the Birk

Defendants designated to offer testimony in support of their theory that Kathryn Gant was using

a cell phone at the time of the accident.  The trial court granted Gant's motion as a discovery

sanction under K.S.A. 60-237, specifically Watson's failure to produce at his deposition the two

reports that provided the evidence for his expert investigation.[61]  The court did not permit any

evidence at trial related to the allegation that Ms. Gant was using her phone at or near the time of

the accident.[62]  The court also determined that Watson's opinion was inadmissible because it is

unreliable under the standards set by K.S.A 60-456, as none of the traditional *Daubert* factors

favor admission:  " the theory or technique at issue has not been tested; it has not been subjected

to peer review and publication; there is no error rate; and Mr. Watson had no knowledge as to

---

[59]*Id.*

[60]*Id.,* Ex. 46.

[61]Doc. 267, Ex. SS at 2.

[62]*Id.*

general acceptance in the scientific community."[63]  The court also expressed concerns about the "Lantern" extraction program Watson used and inconsistencies in Watson's testimony regarding the information on which he relied.[64]  Finally, the court further excluded Watson's testimony under K.S.A. 60-445 because such testimony would be more prejudicial than probative.[65]

### Requests for Admission

Gant propounded 538 Requests for Admission to the three individual Birk Defendants. McMaster objected to the Requests for Admission as improper, irrelevant, and on the basis that defendants did not have the requisite knowledge to answer.[66]  During a hearing on October 7, 2013, the trial court overruled McMaster's objections.  During a later hearing on April 24, 2015, the trial court held that the Admissions were not timely answered and thus deemed them admitted.  Despite deeming the Requests for Admission as admitted, the trial court held that the admissions would not preclude the parties from presenting evidence on the issues referenced therein.[67]  Gant's counsel sought to admit approximately 375 Requests for Admission deemed admitted at the close of trial.

### Reverse Alter-Ego Sanction

After a November 17, 2014 hearing, after noting that the Birk Defendants engaged in a "continuing course of providing untruthful, incorrect, and misleading responses to discovery," the court found:

> The untruthful, incorrect, and misleading information set forth by Defendants (such as information regarding the payment or the use of funds from the corporation for personal vehicles) relates to

---

[63]*Id.*

[64]*Id.* at 2–3.

[65]*Id.* at 3.

[66]Doc. 267, Ex. TT.

[67]*Id.*, Ex. BBB at 46:20–48:3.

dispositive issues with regard to claims of "alter ego" and "course and scope of employment;"

The information requested is not merely cumulative information. Instead, it is extra information that was never provided initially and was not provided until further insistence by the Court and imposition of monetary sanctions;

Based on the testimony of Laura Birk and arguments by Defendants' counsel, it is unclear whether the discovery has been provided to date. Defendants continue to take the stance that prior requests, if directed at Birk Oil Company, do not apply to B & B Cooperative Ventures, a general partnership. If the Court were to accept that proposition as true, all discovery would have to be resubmitted to clarify prior discovery responses provided in this case. Thus, based on Defendants' arguments, this Court finds that it is unclear whether Defendants have provided all discovery at this time;

Although alternative sanctions have already been ordered in this case, they have not proven successful to deter the Defendants from the conduct described above.[68]

The court found Defendants and their counsel "have not shown proper candor with the Court on the issue of the name of the corporate defendant throughout the course of this case," in an apparent excuse for not complying with court orders.[69]  The court found that there was no reason to differentiate Birk Oil Company from B&B Cooperative Ventures, a General Partnership, from B&B Cooperative Ventures, LLC or B&B Enterprises, and found those companies to be "one and the same."[70]  The trial court further found Birk Oil Company to be the alter ego of Edward and Linda Birk.[71]  Accordingly, B&B would be jointly liable with Edward and Linda Birk on any negligent entrustment judgment.

---

[68]*Id.,* Ex. UU at 2–3.

[69]*Id.* at 3.

[70]*Id.*

[71]*Id.*

**Progressive Retains New Counsel for the Birk Defendants**

In the fall of 2014, Birk Oil retained attorney Steven Pigg to represent their interests in addition to McMaster. Progressive ultimately agreed to pay for attorney Pigg's representation of Birk Oil.

On January 26, 2015, McMaster's office sent Hansel a letter stating "please see attached Order regarding sanctions," apparently referring to the alter ego sanction.[72] After receiving the Order, Hansel requested a copy of Justin Birk's deposition transcript.[73] Alan Provorse, of Progressive, responded with an email to Hansel with "Please call me on this one" included in the subject line and inquiring, "did we file clms and or get cvg denials from the business commercial auto pol and general liabl policy?"[74] The next day, the claims notes indicate that Progressive would ask McMaster to copy and send files to its legal department and to new counsel being retained, Todd Barrett.[75]

In February 2015, Progressive hired additional counsel to represent the Birk Defendants. Specifically, Progressive retained Todd Barrett to represent Edward and Linda Birk, and Brette Hart to represent Justin Birk. Progressive requested McMaster to withdraw from the case, but did not remove him at that time because the Birks were "adamant" that McMaster remain their counsel, and Progressive was giving consideration at that time to what the Birks wanted.[76]

In February 2015, Todd Barrett and Steven Pigg prepared Pretrial Reports for Progressive in anticipation of the upcoming June 1 trial.[77] Barrett and/or Pigg brought to Progressive's

---

[72]Doc. 281, Ex. 55.

[73]*Id.*

[74]*Id.,* Ex. 56.

[75]*Id.,* Ex. 57.

[76]*Id.,* Ex. 35 at 215:16–216:24.

[77]Doc. 263, Ex. 48.

attention events that had transpired in the Birk Lawsuit that Progressive was not aware of, which made it appear that the trial court had lost confidence in McMaster.[78]  Progressive was not advised until approximately February 2015 that hundreds of requests for admission propounded to the Birks had been deemed admitted by the trial court due to failure to timely answer them.[79]

On April 3, 2015, Jean Kelly, Progressive's Corporate Claims Attorney, sent McMaster a letter terminating McMaster from the underlying case as well from Progressive's panel of defense counsel for its insureds.[80]  Kelly explained Progressive's decision as follows:

> This letter follows our conversation earlier this afternoon, in which we discussed the concerns Progressive has with respect to your representation of our insureds in and your handling of the *Gant v. Birk* matter. Those concerns include the potential conflict of interest inherent in your representing all of our insureds, and the repeated discovery sanctions from the bench—including, most recently, the Court's consideration of default judgment against our insureds as a sanction for perceived discovery violations. The Court's ruling that requests for admissions as to our insureds Justin Birk, Edward Birk, and Linda Birk have been deemed is also of deep concern, notably those admissions by the Birks that Justin was speeding, was left-of-center, that Kathryn Gant is deceased as a result of Justin's material deviation from the standard of care, and that Edward and Linda Birk had knowledge of all of Justin's traffic violations.
>
> I appreciate your coordinating the meeting with the Birks . . . This will give us the opportunity to inform our insureds about our concerns with respect to this litigation, and understand what their defense goals and desires are going forward.
>
> We also discussed that at this point, unfortunately we do not feel the necessary trust, candor, and cooperation exist between you and Progressive for you to continue representing Progressive insureds on our panel of defense counsel.
>
> . . .

---

[78]Doc. 267, Ex. DD, 59:2–17.

[79]*Id.,* at 128:15–130:3.

[80]Doc. 263, Ex. 40.

> Lastly, John Mullen will be calling you to set up a time to speak with you and your partners about the matters addressed in this letter, as well as Progressive's suggestion that your firm notifies its malpractice carrier about the sanctions and admissions in this matter.[81]

Kelly testified that "I thought it was a good idea to report this to his carrier and see if they would be willing to participate in mediation."[82]

### Mediation is Unsuccessful

The parties mediated the case on April 27, 2015. Progressive and Bitco offered $1.25 million, the total policy limits, and Gant responded he would negotiate within a range of $6 to $10 million.[83] Gant offered a number of reasons why he did not accept the $1.25 million combined policy limits. Gant explained that by the time of mediation, he "felt like we had a lot of work into it at that point, and we were . . . getting close to trial so we thought . . . we kind of just wanted to see it through," and "let it play out."[84] Gant testified the settlement was

> never as much [about] money as—a feeling of completion, of all the facts are gathered, that we were happy with . . . not pulling the trigger too fast and not leaving anything incomplete. So enough money is—I don't—I would not say that, that it was a money factor, per se.[85]

Gant testified he wanted his day in court, wanted justice, and wanted closure.[86]

Gant further testified:

> Q: [G]iven your desire to have closure, the facts determined in court to protect your wife's legacy, seek justice, and you said all of those things existed throughout the case, is there ever a time within the litigation that $1,250,000 would have settled the case?

---

[81]*Id.*

[82]Doc. 281, Ex. 35 at 225:13–16.

[83]Doc. 267, Doc. O.

[84]Doc. 281, Ex. 7 at 82:11; 84:8–10.

[85]*Id.* at 79:12–80:1.

[86]*Id.* at 87:7–23–89:15–23.

A: I couldn't say either way.[87]

When asked if the $1.25 million combined policy limits had been offered in 2011, Gant indicated it was "likely" he would still want his lawyers to do an investigation into other assets the Birks might have that could potentially be recovered, but it depended on whether it "felt complete" that all of the insurance policies had been disclosed.[88]

Lykins testified that if he had been told there was another million dollars available, he probably would not have insisted on a personal contribution from Edward and Linda Birk or Birk Oil when Progressive initially tendered its Policy limit.[89] Lykins testified that "I would have settled the case for $1,250,000 if Mr. McMaster would have given me the proper information."[90]

**The Agreement, Assignment, and Covenant Not to Execute**

Gant and the Birk Defendants entered into an Agreement and Assignment of Rights and Claims (the "Agreement") against Bitco and Progressive, and Covenant Not to Execute, dated May 11, 2015.[91] The Agreement was entered into prior to the June 2015 trial, and the parties agreed to submit the case for decision to Judge Godderz:

> Judge Godderz will make independent determinations regarding fault and damages based on the evidence and witnesses identified in this case at the time the pretrial order is entered. Liability will be determined based on objective evidence such as law enforcement reports and testimony, witness testimony and statements, and accident reconstruction reports and/or testimony. Damages will be determined based on objective evidence such as medical and funeral bills, economists' reports, witness testimony and other relevant and necessary evidence. Judge Godderz will serve as the trier of fact and

---

[87]Doc. 267, Ex. L at 90:6–12.

[88]*Id.* at 76:24–77:13.

[89]Doc. 281, Ex. 6 at 126:5–17.

[90]*Id.* at 135:15–18.

[91]Doc. 267, Ex. KK.

will enter judgment that he believes to be fair, reasonable and supported by the evidence.[92]

The parties further agreed that Gant would initiate proceedings in his own name against Progressive to collect the unpaid balance of the judgment and that the Birk Defendants would bear no cost in the prosecution of such proceedings.[93] The Birk Defendants assigned Gant the $250,000 Progressive Policy limit and the $1 million Bitco Policy limit.[94] The Birk Defendants further assigned Gant "any and all of their rights against Progressive for breach of contract, negligence and/or bad faith, and agree[d] to cooperate fully in subsequent proceedings to enforce those rights and, when asked, give a statement to [Gant's] attorneys, produce documents, appear at hearings and/or depositions, and testify truthfully."[95] As consideration for the policy assignments, Gant agreed not to execute on the judgment against the Birk Defendants.[96] The Agreement further provides that it will enable Gant "to expedite prosecution of a negligence and/or bad faith action against Progressive."[97]

Counsel for the Birk Defendants sought to admit liability at trial, but Gant's counsel objected because admitting liability would be construed by Gant as a breach of the Agreement because the Agreement "clearly requires that liability be determined by the Court based on objective evidence presented at a contested trial."[98]

---

[92]*Id.* ¶ 1.

[93]*Id.* ¶ 2.

[94]*Id.* ¶¶ 3, 4.

[95]*Id.* ¶ 4.

[96]*Id.* ¶ 5.

[97]*Id.* ¶ 14.

[98]Doc. 267, Ex. II.

### McMaster Withdrawal

McMaster resisted Progressive's efforts to remove him from the case. On April 9, 2015, McMaster wrote Progressive advising that the "Birks chose not to discharge me as their counsel of record at this time."[99] On May 1, 2015, J. Nick Badgerow, a lawyer retained on behalf of Progressive to collect McMaster's Progressive files, sent a letter to McMaster explaining that "the client files belong to the client, and should be promptly returned on request, without condition."[100]

On May 15, 2015, John Mullen of Franke Shultz & Mullen, on behalf of Progressive, sent a letter to Edward and Linda Birk explaining that he had been retained by Progressive, and was responding to an alleged request from Mr. and Mrs. Birk to allow McMaster to direct and lead the defense of their case at trial:

> Prior to signing this Agreement, Progressive acquiesced to your recent request to allow Mr. McMaster to direct and lead the defense of this matter. Progressive did so because it believed that you should be permitted to direct the choice of counsel and direct the defense strategy since you would be responsible for any excess judgment. However, as a result of your execution of The Agreement, Progressive is the only entity from which the judgment may be collected. Therefore, Progressive is no longer willing to allow you to direct Mr. McMaster to take the lead in defending this case or directing defense strategy.[101]

McMaster responded to McMullen on behalf of the Birks on May 19, 2015, stating, in part, "We agree that Progressive, in a timely manner, offered its liability limits and undertook other actions in an attempt to secure a release. We disagree with your statement that, prior to signing the

---

[99]*Id.,* Ex. FF.

[100]Doc. 263, Ex. 9.

[101]*Id.,* Ex. 28.

[A]greement, Progressive acquiesced and allowed Mr. McMaster to direct and lead the defense of this matter."[102]

On May 20, 2015, Steven Pigg sent a letter to John Mullen stating as follows:

> I have consulted further with Edward, Linda, Brian and Laura Birk following the May 19, 2015 letter you received from Kevin McMaster in response to your letters dated May 15, 2015 to the Birks. Based upon my advice, and after further consideration, the Birks trust that Progressive . . . will not take any action that will jeopardize the Birks' benefits under the Agreement and Assignment of Rights and Claims Against BITCO . . . and Progressive. . . and Covenant Not to Execute and therefore agree that the defense of the pending lawsuit against them be directed by Progressive. . . They also understand that Progressive has determined strategically to defend only the damage claim and waive liability defenses. They also understand that Progressive had determined that Kevin McMaster should not represent the defendants at trial. Accordingly, the Birks will ask Kevin McMaster to withdraw as counsel of record for all of the defendants in the pending lawsuit. The Birks acknowledge their agreement to Progressive directing the defense and trial by their signatures to this letter.[103]

Also on May 20, 2015, Progressive filed a Motion to Intervene in the Birk Lawsuit.[104] Attached as an exhibit was a Motion to Disqualify and/or Compel Withdrawal of Defendants' Attorney, Kevin McMaster.  Progressive explained to the trial court that because of concerns regarding McMaster's handling of the Birk Lawsuit, it had retained other counsel to represent the Birk Defendants.[105]  In the Motion to Disqualify and/or Compel Withdrawal, Progressive represented, in part:

> In August 2011, Progressive offered its entire policy limit in an attempt to settle the claim against [D]efendants.

---

[102]*Id.,* Ex. 29.

[103]Doc. 281, Ex. 28.

[104]Doc. 6, Ex. E.

[105]*Id.* at 2.

Initially, Progressive engaged Kevin McMaster to represent all Defendants. However, because of concerns regarding his handling of the case as hereinafter described, Progressive has retained other counsel to represent the Defendants. Progressive has requested that Mr. McMaster withdraw, but he has refused.

Progressive has retained new counsel for Defendants: attorney Steve Pigg on behalf of Birk Oil Company; Brette Hart on behalf of Defendant Justin Birk; and Todd Barrett on behalf of Defendants Edward and Linda Birk.

As the Court is aware, Defendants have been and continue to be represented in this matter by Mr. McMaster.

On or about May 11, 2015, Defendants executed a *Glenn v. Fleming* agreement with Plaintiff. Pursuant to the terms of this agreement, defendants have no personal exposure for any judgment rendered herein and any judgment rendered in excess of the liability policy may **only** potentially be collected from Progressive. Pursuant to the terms of this agreement, Defendants have no personal exposure for any judgment rendered herein. Instead, Plaintiff has agreed to pursue only Progressive for any judgment rendered in excess of the liability policies.

As the Court is also aware, Mr. McMaster has been repeatedly sanctioned and required to compensate Plaintiff and/or their counsel for obstreperous conduct during discovery, including being (in this Court's words) "obstructionist."

Additionally, Mr. McMaster also failed to respond to hundreds of Requests for Admission in this matter, to the extreme detriment of Defendants.

At the August 22, 2014 discovery hearing, the Court indicated that ordering Mr. McMaster to be removed from the case could be "an alternative."

Due to Mr. McMaster's conduct and handling of this matter, Progressive has terminated Mr. McMaster's relationship with Progressive as panel counsel for Progressive insureds and has retained separate counsel for all defendants in this case.

Progressive has requested that Mr. McMaster withdraw from his representation of the Defendants in this matter. However, Mr. McMaster has refused and has stated to Progressive that Defendants wish for him to continue. Mr. McMaster has thus continued to

represent Defendants in a "personal counsel" capacity, albeit at the expense of Progressive.

Now that Defendants have entered into the *Glenn v. Fleming* agreement, Defendants and their assets are no longer at risk in this matter. Accordingly, Defendants are no longer the real party in interest in this matter.

"Ordinarily the control of attorneys' conduct in trial litigation is within the supervisory powers of the trial judge . . . except where a purely legal issue is involved, a district court's order of disqualification will be reversed only if the court has abused its discretion." *Venters v. Sellers*, 293 Kan. 87, 92 (2011).

. . .

Additionally, Mr. McMaster wholly failed to timely respond to Plaintiff's Requests for Admission, despite the Court specifically directing him to do so. These matters have been deemed admitted and are highly prejudicial to Defendants and Progressive.

Mr. McMaster's repeated misconduct, in spite of the Court's sanctions and admonishments, warrants disqualification or other removal of Mr. McMaster from representing Defendants in this action.

. . .

Given that the professional relationship between Mr. McMaster and Progressive has been irreparably severed, Progressive has legitimate concerns about Mr. McMaster's involvement in this matter.

There has risen a significant dispute between Progressive and Mr. McMaster regarding not only his continued involvement in this case, but defense strategy as well. From Progressive's vantage point, (especially in light of Mr. McMaster's failure to timely respond to the Request for Admissions thereby effectively negating any potential liability defense), this trial is primarily about the appropriate damages. Progressive is justifiably concerned regarding Mr. McMaster's ability to effectively advocate on behalf of the defense to minimize the damages awarded in any judgment in this case which may be collected from Progressive.

. . .

> Progressive should be accorded the right to have competent counsel of its choosing representing the defendants at the trial of this matter since it is the only entity from which the plaintiff may seek to satisfy a judgment rendered herein.[106]

In addition, Progressive cited multiple Kansas Rules of Professional Conduct ("KRPC") that it believed McMaster had violated, or that were otherwise relevant to McMaster's actions in the Birk Lawsuit: KRPC 1.1 (Competence); KRPC 1.3 (Diligence); KRPC 3.1 (Advocate: Meritorious Claims and Contentions); KRPC 3.2 (Advocate: Expediting Litigation); KRPC 3.3 (Candor to the Tribunal); and KRPC 3.4 (Fairness to Opposing Party and Counsel).[107]

On May 22, 2015, McMaster filed a voluntary Notice of Withdrawal from the Birk Lawsuit,[108] and on May 27, 2015, Mullen notified the trial court that he was withdrawing the Motion to Intervene.[109]

On June 24, 2015, Progressive filed a similar Motion to Intervene for the purpose of filing a motion to withdraw McMaster from another pending civil lawsuit, *Master Machinery Transport v. Stowell*, 15-7993-CM-TJJ (D. Kan.).[110] That motion was later withdrawn and held by the court as moot.[111] In the motion to compel McMaster's withdrawal in that case, Progressive stated that it had terminated McMaster's relationship with Progressive as panel counsel for Progressive insureds, but he had refused to withdraw from the case.[112] Progressive

---

[106]*Id.* at 8–12 (emphasis in original).

[107]*Id.* at 10–11.

[108]Pretrial Order, Doc. 259, ¶ 16.

[109]Doc. 263, Ex. 37.

[110]*Id.* Ex. 4, ¶ 2.

[111]*Id.* Ex. 5.

[112]*Id.*

asserted, "[b]ecause insurer holds the exclusive right to 'employ and control' counsel, they may modify or change representation if necessary."[113]

**The Underlying Bench Trial and Judgment**

Per the Agreement, the case proceeded to a bench trial before Judge Godderz in June 2015, which lasted five days. The Birks did not appear at the trial. Gant presented a substantial amount of independent evidence to support his claims and requested more than $15 million in damages.

At the end of trial, the court issued detailed findings of fact and conclusions of law, as well as judgment and verdict, from the bench.[114] The trial court's findings of fact and conclusions of law were summarized in a written thirteen-page Journal Entry and Judgment, which was drafted and approved by all counsel in the case.[115] With respect to the liability of Justin Birk in causing the accident and wrongful death of Kathryn Gant, the trial court found that "there is simply no evidence to support any other scenario," and specifically cited the testimony of three law enforcement officers and accident reports received into evidence, as well as the fact that Justin Birk had pled guilty to vehicular homicide.[116] Concerning the liability of Edward and Linda Birk for negligently entrusting the vehicle to Justin Birk, the trial court concluded that they were liable, finding the Birks knew about Justin's habitual carelessness and recklessness in operating a motor vehicle, his prior bad driving record including numerous traffic infractions or arrests, the Birks' payment of fines and legal expenses Justin accumulated for his offenses, and the fact that the Birks had been named in a prior wrongful death action involving the entrustment

---

[113]*Id.*

[114]Doc. 267, Ex. LL.

[115]*Id.,* Ex. MM.

[116]*Id.* at 4.

of a vehicle to Justin.[117]  And with respect to the liability of Birk Oil on the basis of respondeat superior, the trial court found it was liable, citing in particular the fact that Justin Birk told responding officers he was on his way to work, Justin's timecards on the date of the accident, Justin's work-related phone calls made earlier that morning, and Birk Oil's expectation that an employee is "on the job" when traveling to and from work sites.[118]

Turning to damages, the trial court noted that "the most hotly contested aspect of the trial was the issue of economic damages."[119]  The trial court awarded $4,368,067 for Kathryn Gant's lost earnings; $546,235 for lost household services; $481,242 for loss of advice and counsel to Gant and their children; and $1,027,477 in *Wentling* damages.[120]  Gant requested $500,000 in non-economic damages, including the state maximum of $250,000 for the pain and suffering of the Gant family and $250,000 for the pain and suffering of Kathryn Gant in the minutes she was conscious prior to her death.[121]  The trial court awarded the requested $250,000 to the Gant family, but only awarded $50,000 for Kathryn Gant's non-economic damages, based on a calculation of $10,000 per minute for the approximately five minutes she was conscious prior to her death.[122]  The total award, based on these discrete categories of damages, was $6,723,021.[123]  The trial court stated that it "reached all of the conclusions stated above based on an independent evaluation of the evidence presented at trial."[124]  Further, the court's "prior *alter ego* ruling

---

[117]*Id.* at 5.

[118]*Id.* at 5–6.

[119]*Id.* at 7.

[120]*Id.* 9–11.

[121]*Id.* 11–12.

[122]*Id.*

[123]*Id.* at 14.

[124]*Id.*

stands as given, but as that issue was not a part of the trial, its impact on this judgment will not be discussed in this Journal Entry."[125]  Thereafter, no further judgment, amended judgment, or other journal entry transferred liability from one defendant to another based on the alter ego sanction.  The $1.25 million combined policy limit was applied to the judgment, leaving $5,473,021 unsatisfied.

### Post-Trial Dispute over Fees

After Gant's initial counsel Lykins was terminated in May 2012 in favor of the Wagstaff firm, Lykins filed a Notice of Attorney's Lien that was later the subject of a motion.[126]  After trial, a dispute arose between Lykins and the Wagstaff firm concerning the amount of the fee Lykins was entitled to, which led to a hearing before the trial court.  The Wagstaff firm took issue with Lykins for failing to discover that a 2011 financial statement reflected a net worth for Birk Oil in excess of $15 million.[127]  In a letter dated September 2, 2015, Gant's current counsel also chastises Lykins for not discovering other insurance, asserts that statements by McMaster were "equivocal in the extreme," and specifically cites the Bitco Policy as an example of something that Lykins failed to obtain on behalf of Gant.[128]

### Resources Furnished to Defense Counsel by Progressive

The total legal bills submitted by McMaster for his work on behalf of the Birks were in the amount of $202,038.19.  Of that amount, Progressive paid McMaster and/or his law firm $196,550.47.  Progressive adjusted McMaster's bills by $5,210.60, or 2.58% of the total bill.  Taking into account the four law firms ultimately involved in the defense of the Birks,

---

[125]*Id.*

[126]Doc. 267, Ex. NN.

[127]*Id.*, Ex. R at 2–3; Ex. OO.

[128]*Id.*, Ex. R at 2–3.

Progressive paid a total of $449,008.34, after adjustments totaling 1.75% of the total amount billed.

### Recovery in Excess of Policy Limit

Gant and the Wagstaff firm entered into a Contract for Employment of Attorneys, which provides, in part, that "For any recovery of $250,000 or less, [t]he contingent attorney fee will equal 25% (Twenty-five Percent) of the total amount recovered after all litigation expenses have been reimbursed[.]"[129] The Contract also provides, in part, that "[f]or any recovery greater than $250,000[,] [t]he contingent attorney fee will equal 40% (Forty Percent) of the total amount recovered after all litigation expenses have been reimbursed."[130]

### Kevin McMaster

McMaster has been a practicing attorney since 1984 and is licensed to practice law in the State of Kansas. His license to practice has never been revoked, suspended, or curtailed in any way. Since 1984, McMaster has practiced as a civil defense trial lawyer, with a significant portion of his practice in the area of insurance defense. He has represented insureds for more than a dozen insurance companies, including Nationwide, Allstate, and Empire Insurance. McMaster has handled hundreds of files involving serious bodily injury and wrongful death claims, including high-speed collisions.

McMaster testified he understood that, when hired by an insurance company to defend an insured, his client was the insured and not the insurance company.[131] When he was first retained in connection with the fatality collision, McMaster understood his sole client at that time was Justin Birk. McMaster testified that at no point was he retained as legal counsel to represent the

---

[129]*Id.,* Ex. N.

[130]*Id.*

[131]*Id.,* Ex. F at 26:8–16.

interests of Progressive in connection with the Gant/Birk accident, claim, and lawsuit.

McMaster's representation ultimately expanded, and following institution of litigation he also represented Edward and Linda Birk as well as Birk Oil/B&B Cooperative Ventures. McMaster testified that throughout the course of the underlying litigation, he understood that his sole clients were the Birk Defendants, and that he believed he had a professional obligation to zealously represent the Birk Defendants. When asked if Progressive ever did anything during his representation of the Birk Defendants that in any manner constrained his own independent professional judgment as to how best to represent the insureds, McMaster answered, "Not that I'm aware of."[132] McMaster answered "no" when asked if there was anying that he wanted to do in the defense of the Birk Defendants in the underlying case that Progressive in any manner limited or restricted or prevented him from doing.[133] McMaster testified that there is nothing he wanted to do in representing his clients that Progressive in any manner limited, curtailed, or failed to approve, in the Gant/Birk case or any case.[134] He testified that defending an insured is a collaborative effort between himself and his insured-clients.[135] McMaster testified he would not allow any third-party payor, like an insurance company, to interfere with his independent professional judgment as to how best to defend the insured.[136] McMaster testified that Progressive did not interfere, either directly or indirectly, with the representation he provided to the Birks.[137] McMaster testified that Progressive provided him with all of the resources he

---

[132]*Id.* at 34:19:24.

[133]*Id.* at 35:20–24.

[134]*Id.* at 40:19–25.

[135]*Id.* at 41:1–11.

[136]*Id.* at 41:12–18.

[137]*Id.* at 42:8–18.

needed to completely defend the Birks.[138] McMaster testified that Progressive did not engage in any conduct that in any manner involved or resulted in either of the two instances where McMaster was sanctioned monetarily by the court for discovery violations, and that "Progressive was not involved in providing the defense. Progressive didn't show up in court. Progressive did not answer any discovery. Progressive didn't oversee me showing up in court or interact with me and my clients in responding to discovery."[139]

Edward and Linda Birk believed that Justin Birk was not at fault for the accident and they believed McMaster carried out that message in his defense of the case, albeit unsuccessfully. The Birks believed, and still believe, that Justin Birk was not on the job in his capacity as an employee of Birk Oil at the time of the accident, and communicated this position to McMaster and wished for him to advance that position in the underlying lawsuit.

McMaster testified that he was unaware of any conduct by Progressive that ultimately led to the alter ego sanction imposed by the trial court.[140] McMaster testified that the imposition of monetary sanctions did not curtail or limit his ability to provide a vigorous and effective defense for the Birks. McMaster testified he is not aware of any damage that was caused to Edward and Linda Birk by the alter ego sanction that otherwise would not have existed. McMaster testified that he does not wait for approval from an insurance company before doing what needs to be done in a case, such as research or other tasks.[141]

Progressive's Defense Counsel Guidelines set forth, in part:

> Progressive expects counsel to exercise independent professional judgment in rendering legal services to Progressive insureds.

---

[138]*Id.* at 40:13–17.

[139]*Id.* at 63:13–64:23.

[140]*Id.* at 87:6–88:7.

[141]*Id.* at 257:5–258:3.

> Counsel should never allow anything contained in these guidelines to interfere with any ethical directive or obligation governing conduct as defense counsel.
>
> To the extent any local laws or rules conflict with any of the provisions contained herein, the local law or rule shall govern. In the event a bona fide dispute arises between Progressive and defense counsel as to how best to protect the interests of a Progressive insured, Progressive will always defer to the independent professional judgment of defense counsel.[142]

McMaster never allowed anything contained in any insurance company's defense counsel guidelines to interfere with any obligation he had in the defense of his clients.[143] McMaster testified that he did not use or allow Progressive defense guidelines to factor into what he did or did not do in connection with defending the Birk Defendants; rather, McMaster defended the Birk Defendants to the best of his ability irrespective of the defense counsel guidelines.[144]

McMaster testified he is aware of nothing he wanted to do in the defense of the Birk Defendants that was not approved by Progressive, and similarly, he is aware of no instance in which Progressive curtailed or limited his ability to expend any amount of money in defense of the Birk Defendants.[145] McMaster further testified that, even if Progressive had not approved an expense or otherwise curtailed McMaster's representation of the Birk Defendants, McMaster would nevertheless have done what he believed he needed to do in order to fully defend the Birk Defendants.[146]

Progressive adjuster Hansel, who hired McMaster, testified that he does not direct defense counsel and does not tell them what to do; rather, he expects counsel to do whatever is

---

[142]Doc. 278, Ex. 7.

[143]Doc. 267, Ex. F. at 383:17–24, 386:8–23.

[144]*Id.* at 384:10–385:15.

[145]*Id.* at 387:14–388:24.

[146]*Id.* at 387:25–388:4.

needed within the scope of their representation to represent the insureds, including investigating issues of liability, damages, additional insurance policies, and defending the insureds in a lawsuit if one is filed.[147] Hansel testified that McMaster had ultimate responsibility for the direction, control, and strategy employed in the defense of the Birk Defendants.[148] Concerning the liability defense prosecuted by McMaster on behalf of the Birk Defendants in the underlying action, Hansel testified that it is "not for me to say that he should give up that argument . . . that's a discussion that he has to have with my insured, and that's a discussion they decide to—on how to best proceed."[149] Hansel does not get involved with directing defense counsel's legal strategy, and not once in thirty years with Progressive has Hansel suggested to defense counsel they should not pursue a stated legal strategy on behalf of an insured.[150]

McMaster testified that he evaluated and considered the potential conflict of interest between the Birk Defendants, and obtained a written conflict waiver when his representation expanded to include Edward and Linda Birk and Birk Oil in addition to Justin Birk.[151] McMaster testified that his general practice is to explain the potential conflict to his clients, advise them of circumstances in which a conflict could arise, and otherwise fully explain the potential conflict to the clients.[152] McMaster discussed the conflict issue with the Birks and sent a copy of the waiver to the Birks and their personal counsel, James Campbell, and adjuster

---

[147]Doc. 267, Ex. E at 66:3–67:20.

[148]*Id.* at 279:9–12.

[149]*Id.* at 113:12–25.

[150]*Id.* at 117:18–118:22.

[151]*Id.,* Ex. F at 54:22–55:6; 55:7–13; 112:13–25.

[152]*Id.* 113:1–23.

Hansel.[153]  The written waiver was faxed to Progressive from Campbell's office.[154]  Campbell did not enter an appearance in the lawsuit on behalf of the Birks, but was involved periodically to consult on issues concerning the claim and lawsuit and copied on key correspondence.[155]

**Progressive's Notice of Issues with McMaster**

Before Progressive hired him to defend the Birk Defendants, it had hired McMaster on numerous prior cases.  Progressive received several complaints about McMaster prior to the filing of the Birk Lawsuit, including:

- In 2006-2007, a Kansas attorney informed Progressive he would not agree to a settlement if Progressive planned to retain McMaster with regard to any aspect of the settlement because McMaster is known for causing delay and increased expenses; McMaster remained on the case and failed to appear at the settlement hearing;[156]

- In 2009, the same law firm complained to Progressive that McMaster had refused to schedule a friendly settlement hearing, which was characterized as a "common problem with Mr. McMaster";[157]  that lawfirm then filed a Petition in state court asserting claims against Progressive and McMaster for breach of contract and against McMaster for tortious interference with a contract;[158]

- Steve Brave, a lawyer in Wichita, Kansas, informed Progressive around the time of the filing of the Birk Lawsuit that McMaster was "not likely to act reasonably

---

[153]Doc. 267, Ex. JJ

[154]*Id.*

[155]Doc. 267, Ex. P, 36:11–23; 41:10–22; 51:3–11.

[156]Doc. 281, Ex. 20.

[157]*Id.,* Ex. 21.

[158]*Id.,* Ex. 22.

and promptly" in getting a case settled, that McMaster was "wholly

untrustworthy," and that McMaster's obstructionist tactics were placing

Progressive's insureds at substantial risk for an excess judgment, punitive

damages, and unnecessary litigation. The matter was ultimately resolved after the

attorney and Progressive agreed to waive the friendly settlement hearing that

would have required McMaster's participation.[159]

**Progressive's Relationship with McMaster**

Progressive paid McMaster for the time during which he reviewed and analyzed the

insurance policies in the Birk Lawsuit and made coverage determinations.[160] A May 1, 2013

entry in Progressive's claims notes states "Kevin is putting all carriers on notice."[161] A May 13,

2013 letter from McMaster to Hansel states, "[w]ith the assistance of our client's personal

counsel, we have reviewed the insurance coverages available to the defendants at the time of the

accident. It appears that the Progressive policy provides the only coverage for the accident."[162]

On February 24, 2015, McMaster sent an email to the Birks relaying a meeting between

McMaster and additional counsel Pigg, Barrett, and Hart, in which McMaster refers to certain

individuals from Progressive as "[t]he bosses."[163]

When asked at deposition if he believed he kept Progressive "promptly and fully

informed of significant events" in the Birk Lawsuit, McMaster answered, "I timely responded to

all their inquiries, I reported in a fashion that they either had guidelines or expectations, and I

---

[159]*Id.,* Ex. 24.

[160]Doc. 263, Ex. 10.

[161]*Id.,* Ex. 11.

[162]*Id.,* Ex. 12.

[163]*Id.,* Ex. 13.

more importantly would report to them events that I thought or things that I thought it was important for them to know."[164] McMaster testified that the reason he details his plan of action in writing is to make "the adjuster's file look nicer."[165]

Progressive's Defense Counsel Guidelines state, in part, that "prior authorization is required for more than one hour of research."[166] Between February 2014 and January 2015, McMaster sent four email requests to Hansel at Progressive requesting approval for legal research involving motions for summary judgment, motions in limine, a motion for protective order, appeal or mandamus related to the trial court's ruling on privileged communications and sanctions, and *Daubert* motions. Hansel explained that Progressive requires its attorneys to seek prior approval for any time spent on legal research, and that although they can do any research they want, "if they want to be paid . . . they're required to seek approval of that time in advance."[167] Hansel admitted, based on correspondence, that "Mr. McMaster certainly appears to be of the view that he cannot move forward with this [requested] research until such time as he receives approval[.]"[168]

Progressive's Defense Counsel Guidelines state, in part, that "Once the claims rep has received responses to written discovery, has discussed the future handling with the handling attorney, and all have agreed to the plan of action, oral discovery phase activities are to proceed."[169] In February 2014, McMaster sent a letter to Progressive setting forth depositions he

---

[164]*Id.,* Ex. 14 at 22:1–9.

[165]Doc. 291, Ex. C at 256:15–23.

[166]Doc. 278, Ex. 7.

[167]Doc. 263, Ex. 20 at 184:18–22; 185:14–19.

[168]*Id.* at 183:9–13.

[169]*Id.,* Ex. 15.

"request[s] taking" and asking Hansel to contact him to discuss his plan of action.[170]

The Guidelines further state, "[a]ll motions should be discussed with the claims rep prior to being initiated[.]"[171] In July 2015, McMaster sent a letter to Hansel stating that he was "considering" filing a motion asking for Gant to be sanctioned and an order to show cause why Gant should not be found in contempt of court.[172]

Progressive's Defense Counsel Guidelines further state, "Claims management expects to be involved in the decision-making on the retention of any expert, whenever possible."[173] Between February and April 2014, McMaster wrote or emailed Hansel requesting approval of a damage expert, an economist, and a cell phone expert.[174]

Gant offers examples of Progressive's billing practices as evidence of its control over McMaster, which Gant characterizes as "micromanaging" which expenses would be approved.

- McMaster billed for his time traveling "t[o] and from Garnett, Kansas for arguments on various discovery disputes and scheduling conference."[175] Progressive reduced the billable time, stating that "Per page 7 of the Claims Billing Protocols, Progressive's expectation is that you will not charge for local travel time within your firm's geographic area. Roundtrip travel time of one hour or less is considered local travel. We will therefore reimburse at the approved hourly rate, after the first one hour of travel."[176]

---

[170]*Id.*, Ex. 22.

[171]*Id.*, Ex. 15.

[172]*Id.*, Ex. 24.

[173]*Id.*, Ex. 15.

[174]*Id.*, Exs. 22, 26, 27.

[175]Doc. 263, Ex. 30.

[176]*Id.*

- Progressive failed to pay $176.40 of mileage because "Per page 7 of the Claims Billing Protocols, mileage is not reimbursable."[177]

- Progressive rejected a bill from McMaster's office for a $7 QuikTrip sub sandwich purchased during a day of roundtrip travel to Tulsa, Oklahoma, for the attorney's attendance at a meeting where a cellphone expert inspected the phone that was in Katie Gant's possession at the time of the accident.[178]

- McMaster sent an April 9, 2014 email to Progressive stating that he was "busting my but[t] to keep time and expenses down in this case," that Progressive's "latest write downs are unwarranted," and that "I would rather not be placed in a position of having to write everything down for submission and then have someone hack the heck out of it."  The email chain reflects that McMaster called to apologize for the tone of his email and that Progressive supervisor Mark Campbell indicated that the billing issue is "not an indictment on [McMaster's] conviction to defend our insureds."[179]

**The Birks' Relationship with McMaster**

The Birks were pleased with the representation provided by McMaster, believed he had the best interests of the family and family company at heart in his representation, and indicated that McMaster kept the Birks advised about the lawsuit.  In a letter to Progressive dated April 9, 2015, following a meeting with McMaster, Progressive representatives, and the Birks, McMaster expressed the Birk family's thanks to Progressive for the meeting, that the Birks believed that a

---

[177]*Id.*

[178]*Id.,* Ex. 31.

[179]*Id.*, Ex. 32.

good defense had been provided in the case, and the Birks' belief that McMaster's representation provided independent counsel as provided by Kansas law.[180]  The Birks initially resisted McMaster's withdrawal, but ultimately consented.  Edward Birk subsequently testified that he was not informed that Progressive had filed the motion to intervene with the trial court detailing how McMaster had mishandled his case.

Linda Birk testified that once McMaster was retained as counsel, she relied on him to defend the lawsuit and to coordinate whatever was needed with respect to insurance issues, because "[w]e didn't know anything."[181]  Linda Birk testified that she does not recall McMaster, in or around the period of June through August 2011, ever asking her what insurance company insured the business that she and Edward Birk owned, and she would have told him if he specifically asked that question.[182]  She further testified that if Progressive had asked her or Laura Birk the same question in June 2011, she would have provided that information.[183]

Justin Birk testified he does not recall having any discussions with McMaster about insurance coverage or policies that may provide coverage.[184]

Edward Birk testified that Progressive encouraged the Birks to sign the Agreement to protect themselves and represented that Progressive would take responsibility for everything else

---

[180]Doc. 267, Ex. FF.

[181]Doc. 281, Ex. 4 at 71:6–12.

[182]*Id.* at 63:24–64:9.

[183]*Id.* at 63:1–15.

[184]*Id.*, Ex. 18 at 52:3–7.

from there.[185]  The Birks' personal counsel, James Campbell, also advised the Birks to sign the Agreement.[186]  Edward Birk testified that Progressive "saved the day" in doing so.[187]

## III.  Discussion

Progressive seeks a declaration that it fulfilled its contractual obligations to its insureds, the Birks, in good faith and without negligence.  Gant, as the assignee of the Birk Defendants, alleges Progressive breached its insurance policy contract with the Birks and the duties arising therefrom both directly and through the actions of counsel McMaster, and seeks to collect the balance of the $6,723.021 judgment against the Birk Defendants.

### A.  Overview of Insurer Bad Faith

"Inherent in virtually every contract—including an insurance policy—is the duty of all parties to perform their contractual obligations in good faith."[188]  "In the context of a liability insurance contract, an insurer must exercise good faith in defending the lawsuit and in negotiations related to settlement."[189]  Under long-standing Kansas law, an action to address an insurer's alleged breach of the duty to act in good faith in defending and settling a claim against its insured sounds in breach of contract.[190]  The elements of a breach of contract claim are: (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damage to plaintiff caused by the

---

[185]Doc. 267, Ex. C at 36:9–14.

[186]Doc. 291, Ex. G at 35:6–36:8.

[187]*Id.* at 35:6–23, 36:9–14.

[188]*Estate of Draper v. Bank of Am.*, 205 P.3d 698, 710 (Kan. 2009).

[189]*Hackman v. W. Agr. Ins. Co.*, 275 P.3d 73 (Table), 2012 WL 1524060, at *11 (Kan. Ct. App. Apr. 27, 2012).

[190]*Moses v. Halstead*, 581 F.3d 1248, 1251 (10th Cir. 2009) (citing *Glenn v. Fleming*, 799 P.3d 79, 90 (Kan. 1990)).

breach.[191]  Kansas has adopted "the principle that the insurer's duties are contractually based and then approved a tort standard of care for determining when the contract duty has been breached."[192]

Gant asserts both failure to defend and failure to settle theories of liability to support his assigned claims of bad faith/breach of contract against Progressive.

### B.  Nullification

As a threshold issue, Progressive urges that the terms of the Agreement nullify Gant's bad faith/breach of contract claim, which he asserts as assignee of the Birks in this action. Although the insurer's duty runs only to its insured, the Kansas Supreme Court held in *Glenn v. Fleming* that the insured may assign his breach of contract claim for bad faith or negligent refusal to settle against the insurance company to another party.[193]  Progressive first argues that the Agreement is not in accord with *Glenn* because the Birk Defendants had already been fully insulated from any possible liability for any resulting judgment in the underlying lawsuit before the matter went to trial.  Since the Birk Defendants never had even potential liability for any judgment, Progressive argues, any purported claim the Birk Defendants attempted to assign is illusory because at the time of the assignment there was simply no damage.

Progressive argues that in "typical" cases brought pursuant to a *Glenn v. Fleming* agreement, the insurer had either wrongfully refused to defend, denied coverage, and/or had acted in bad faith in failing to accept a settlement demand within its policy limit.  Progressive contends that in those cases, there is a causal connection between the wrongful act of the insurer and damage to the insured prior to trial.  Progressive argues those wrongful actions are absent in

---

[191]PIK Civ. 4th 124.01-A.

[192]*Glenn*, 799 P.3d at 90.

[193]*Id.* at 90–91 (Kan. 1990).

this case, because Progressive accepted coverage, immediately offered its policy limit to settle the claim, and furnished counsel both before and after commencement of litigation. Since Gant's theory of liability is primarily premised on the alleged litigation misconduct and negligence of McMaster, any purported harm to the Birk Defendants caused by that conduct was eliminated by the Agreement, which was negotiated by attorneys provided to the Birk Defendants by Progressive.

Progressive's theory appears to have been rejected in *Glenn v. Fleming*, however, when that court considered whether to allow the assignment of bad faith claims against an insurer. In *Glenn*, the court reversed its previous decision in *Heinson v. Porter* holding that such claims are tort actions and unassignable.[194] *Glenn* involved an assignment of a post-trial verdict against the insured in excess of policy limits.[195] The court noted that one of the arguments against permitting such an assignment was that "bad faith actions are mere contingencies or possibilities and are not assignable (particularly when the assignment occurs before the injured party obtains a judgment on his personal injury claim)."[196] The court found this objection unpersuasive and endorsed findings of other courts that considered and rejected the objection.[197]

Although *Glenn* did not involve a pre-judgment settlement between an insured and a third party, the court approved of such settlements.[198] The court addressed the ruling in *Heinson* that an insured had no actual damages because the covenant not to execute freed him of liability for

---

[194]*Id.* (discussing *Heinson v. Porter*, 772 P.2d 778 (Kan. 1989)).

[195]*Id.* at 91.

[196]*Id.* at 90.

[197]*Id.* (citing *Critz v. Farmers Ins. Group*, 230 Cal. App. 2d 788, 795 (Ct. App. 1964)) (rejecting argument that the insured has no cause of action against his insurance company until such time as he suffers and satisfies a judgment in excess of the policy limit); *Gray v. Nationwide Mut. Ins.Co.*, 223 A.2d 8,10 (Pa. 1966) (holding "it is not necessary for the insured to allege that he has paid or will pay a judgment in excess of the policy limits in an action against an insurer for breach of duty to act in good faith.")).

[198]*See Assoc. Wholesale Grocers, Inc. v. Americold Corp.*, 934 P.2d 65, 81–82 (Kan. 1997).

the payment of any judgment to the injured party.[199] The court noted that unlike *Heinson*, the assignment and covenant not to execute in this case were entered into after a jury verdict and thus the amount may be assumed to be realistic.[200] The court noted that prejudgment covenants not to execute have been approved,[201] and expressed concern over assignments/covenants not to execute in which the amount of the judgment assigned has been determined by the agreement of the parties, because such a settlement "may not represent an arm's length determination of the value of the plaintiff's claim."[202] As a "prescription" for this concern, it adopted a test requiring the insurer to show that the settlement is not reasonable and held "[a] non-jury verdict judgment may be enforced against an insurer contingent upon proving bad faith or negligence in refusal to settle. The assignment/covenant not to sue may be utilized if the judgment is reasonable in amount and entered into in good faith."[203]

Although the facts surrounding the settlement are more complex than the "typical" agreement, it appears that an assignment and covenant not to execute such as the Agreement here that was entered prior to a judgment determined at trial is in accord with *Glenn*. Progressive's argument that the Birks never had potential liability for any judgment is not distinguishable from the assigned consent judgments discussed in *Glenn*, as any pre-judgment assignment would necessarily involve assignment of a claim from an insured who was insulated from execution on that judgment. And in the context of the *Glenn v. Fleming* Agreement, Progressive's argument that the Birks did not suffer any actual damages because of the pre-judgment Agreement are

---

[199]*Glenn*, 799 P.2d at 91.

[200]*Id.* at 92.

[201]*Id.* (citations omitted).

[202]*Id.* at 92.

[203]*Id.*

similarly unavailing.[204]  Thus, the Court finds Progressive's nullification argument

unpersuasive.[205]

## C.  Failure to Defend

An insurer's duty to exercise good faith includes "the duty to hire counsel that is

competent to defend the allegations against its insured and to provide such counsel with adequate

resources to competently defend the suit."[206]  In addition, "there must be a causal link between

the insurer's conduct and the excess judgment against the insured."[207]  Gant claims that

Progressive breached its good faith duty to defend the Birk Defendants, both directly and

vicariously through the negligent actions of its agent, McMaster.  Progressive argues that the

vicarious liability action could not be assigned under the Agreement and, even if it could, Gant

has failed to come forward with evidence to show Progressive should be deemed vicariously

liable for McMaster's conduct as a matter of law.  Progressive further argues that it did not cause

any damage to the Birk Defendants.  The Court discusses these issues in turn.

### 1.  Vicarious Liability

#### a.  Assignment

Although it disagrees with Progressive's general nullification theory, the Court does find

Progressive's related argument warrants reconsideration.  Progressive argues that at its essence,

---

[204]*See Smotherman v. Caswell*, No. 89-2374-V, 1990 WL 252481, at *1–2 (D. Kan. Nov. 28, 1990)
(applying *Glenn* in holding that a plaintiff who enters into a covenant not to execute against an insured who is liable
to pay a judgment to the plaintiff is not precluded from garnishing the insurer to collect a judgment in excess of the
policy limits, even where the language of the covenant not to execute relieves the insured of any liability for
payment of the judgment).

[205]The Court notes Gant argues that if the assignment is a nullification, the Agreement is invalid and thus
Gant would take the position that the Agreement was void *ab initio* for lack of consideration.

[206]*Hackman v. W. Agr. Ins. Co.*, 275 P.3d 73 (Table), 2012 WL 1524060, at *11 (Kan. Ct. App. Apr. 27,
2012).

[207]*Roberts v. Printup*, 595 F.3d 1181, 1187 (10th Cir. 2010) (quoting *Hawkins v. Dennis*, 905 P.2d 678, 690
(Kan. 1995)).

Gant's vicarious liability claim is an improperly assigned legal malpractice action, in which Gant seeks to collect an excess judgment based upon the improper conduct of opposing counsel McMaster. As Gant notes, this Court previously rejected Progressive's argument raised in the context of its motion to dismiss Gant's Amended Counterclaim.[208] But as Progressive argues, this case appears to present a legal first brought pursuant to *Glenn v. Fleming*, and the particular posture of this case is unusual, to say the least. To resolve this tension, the Court *sua sponte* reconsiders its order denying Progressive's motion to dismiss on this ground.[209]

As previously discussed, an insured's action for damages for breach of an insurer's duty to defend is contractual in nature. Under Kansas law, an insurance company has a duty to defend its insured whenever the underlying facts suggest even a remote possibility of coverage.[210] "Inherent within the duty to exercise good faith in hiring independent counsel is the duty to hire counsel that is competent to defend the allegations against its insured and to provide such counsel with adequate resources to competently defend the suit."[211] The *Glenn* court based its holding allowing assignments of bad faith and negligent defense actions in part because breach of contract actions are not personal to the insured.[212] Accordingly, the Agreement properly assigned the Birk Defendants' bad faith claim against Progressive for failure to provide an adequate defense in the underlying lawsuit. The question raised by Progressive is whether that assignment is limited to actions of Progressive relative to its contractual good-faith duty to

---

[208]*See* Doc. 237 at 10.

[209]*See Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1224–25 (10th Cir. 2007) (explaining "law of the case" doctrine is discretionary, and that district courts remain free to reconsider their earlier interlocutory rulings made before the entry of judgment).

[210]*Hackman*, 2012 WL 1524060, at *12 (citing *Southgate St. Bank & Trust Co. v. United Pac. Ins. Co.*, 588 P.2d 486, 488 (Kan. 1979)).

[211]*Id.*

[212]799 P.2d 90–91.

defend, or whether the assignment necessarily extends to any claim for vicarious liability based on actions attributable to retained counsel for its insureds, McMaster.

In its Order denying Progressive's motion to dismiss, the Court rejected Progressive's brief argument that any claim based on McMaster's conduct is actually a legal malpractice claim and thus unassignable, citing *Pacific Employers Insurance Company v. Hoidale Company, Inc.*[213] In *Hoidale*, the court held that any negligence on the part of the attorney hired by the primary insurer to defend the insured in a personal injury action was attributable to the insurer for purposes of bad faith in defending the claim.[214] The court explained that the insured sought to hold the insurer liable for its attorney's negligence in fulfilling the insurance company's contractual duty to defend it in good faith and with due care; to the extent the attorney's conduct did not conform to this standard, the insurer could not claim that it had performed its duty.[215] As Progressive argues, *Hoidale* can be distinguished, as it did not involve a *Glenn v. Fleming* assignment, but instead was a direct action brought by the excess insurer and the insured based on the primary insurer's bad faith and/or negligence in handling the claims made against its insured.[216] Unlike this case, the insured in *Hoidale* was a party and asserted in conjunction with its excess carrier that the primary insurer should pay an excess judgment based on the malpractice of the lawyer in failing to communicate settlement offers.[217]

As Progressive further argues, a review of post-*Glenn v. Fleming* case law does not find a single Kansas case that has sanctioned an assignment by an insured to a third party of a claim

---

[213]789 F. Supp. 1117 (D. Kan. 1992).

[214]*Id.* at 1123.

[215]*Id.*

[216]*Id.* at 1120.

[217]*Id.* at 1119.

predicated upon his own counsel's deficient performance. For example, in *Hackman v. Western Agricultural Insurance Company*,[218] the insured, following an adverse verdict, brought a direct action against her insurer attempting to hold it vicariously liable for defense counsel's alleged negligence because the insurer had hired counsel to fulfill its obligation to provide her with a defense.[219] Notably, the plaintiff insured also brought a direct bad faith claim against the insurer for breach of its duty to provide a competent defense and a legal malpractice claim against defense counsel.[220] Like *Hoidale*, however, the case did not involve a *Glenn v. Fleming* agreement or assignment of claims by the insured.

Accordingly, the Court reconsiders its previous ruling and concludes that Gant's attempt to hold Progressive vicariously liable for McMaster's negligence is not sustainable under the Agreement. The fact that Gant's bad faith claim is brought under *Glenn* does not change the nature of his allegations, which are premised on McMaster's negligent performance or malpractice; they do not support a failure to defend cause of action. Indeed, when Progressive notified McMaster that it was terminating its representation, it advised him and his law firm to notify their malpractice carrier. Because Gant's attempt to impose liability on Progressive is based on McMaster's litigation conduct, his bad faith claim is, in effect, based on vicarious liability for legal malpractice. Kansas law is clear that claims sounding in legal malpractice are personal to the client and may not be assigned.[221] "[This] policy applies regardless of whether

---

[218] 275 P.3d 73 (Table), 2012 WL 1524060 (Kan. Ct. App. Apr. 27, 2012).

[219] *Id.* at *14.

[220] *Id. at* *5, 14.

[221] *See Bank IV Wichita v. Arn, Mullins, Unruh, Kuhn & Wilson*, 827 P.2d 758, 765 (Kan. 1992) ("Public policy considerations preclude assignment of legal malpractice claims because such claims are personal to the client.").

the claims sound in contract or tort."[222]  Nothing in *Glenn v. Fleming* or its progeny sanctions the assignment of a legal malpractice claim to an adversary in the guise of an insurer bad faith action, and the Court declines to be the first court in Kansas to expand the law in this manner.

### b. Agency

Even if Gant's vicarious liability claim could be assigned, however, the Court finds that summary judgment for Progressive is warranted because Gant has failed to demonstrate material disputed facts on the issue of whether Progressive exercised the degree of control over McMaster's independent legal judgment such that Progressive should be deemed vicariously liable for his litigation conduct.

As previously discussed, "Kansas law requires an insurer to provide a defense to an insured if there is a potential for liability under the policy."[223]  Where there is a potential excess exposure to an insured, the insurer has a duty to provide independent counsel whose legal responsibility is to the insured.[224]  This common-law duty is also required by the Kansas Rules of Professional Conduct ("KRPC").  KRPC 1.8(f) provides:

> A lawyer shall not accept compensation for representing a client from one other than the client unless:
>
> (1) the client gives informed consent;
>
> (2) there is no interference with the lawyer's independence or professional judgment or with the client-lawyer relationship; and
>
> information relating to representation of a client if protected as required by Rule 1.6.[225]

---

[222]*Id.*

[223]*Davin v. Athletic Club of Overland Park*, 96 P.3d 687, 690 (Kan. Ct. App. 2004) (citing *State Farm Fire & Casualty Co. v. Finney*, 770 P.2d 460, 466 (Kan. 1989)).

[224]*Patrons Mut. Ins. Ass'n v. Harmon*, 732 P.2d 741, 745 (Kan. 1987); *Aselco, Inc. v. Hartford Ins. Group*, 21 P.3d 1011, 1020 (Kan. Ct. App. 2001).

[225]2011 Kan. Ct. R. Annot. 495.

KRPC 5.4(c) further states, "a lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services."[226]

The general rule in Kansas is that merely hiring an attorney to represent an insured will not make the insurer vicariously liable for the attorney's negligence.[227] Kansas also recognizes, however, that the attorney-client relationship is grounded in agency principles,[228] and that "an attorney hired by an insurer to represent an insured can be considered an agent of the insured, making the insurer vicariously liable for the attorney's actions—if, at the time in question, the attorney's acts or omissions were directed, commanded, or knowingly authorized by the insurer."[229] "When there are facts to demonstrate that the attorney violated these rules and allowed the insurer to direct or control the attorney's actions in defending the insured, the attorney likely will be considered the agent of the insured and, in turn, the insurer may be held vicariously liable for the attorney's negligent conduct."[230]

Here, there is no material evidence from which a jury could conclude that Progressive exercised this degree of direction or control over McMaster's legal judgment—or correspondingly, that McMaster allowed his legal judgment to be compromised or influenced by Progressive—in litigating the underlying Birk Lawsuit. There is no evidence that Progressive

---

[226] 2011 Kan. Ct. R. Annot. 593.

[227] *Pac. Emp'rs Ins. Co. v. P.B. Hoidale Co., Inc.*, 789 F. Supp. 1117, 1122 (D. Kan. 1992) (citing *Bell v. Tilton*, 674 P.2d 468 (Kan. 1983)).

[228] *Id.* (citing *Prof'l Serv. Indus. v. Kimbrell,* 758 F. Supp. 676, 681 (D. Kan. 1991)).

[229] *Hackman v. W. Agr. Ins. Co.,* 275 P.3d 73 (Table), 2012 WL 1524060, at *16 (citing *Hoidale*, 789 F. Supp. at 1122); *see Bell v. Tilton*, 674 P.2d 468, 472 (Kan. 1983) ("The mere fact an insurance company retains an attorney to represent an insured against a lawsuit does not mean the attorney is also the insurance company's attorney capable of binding the insurance company.").

[230] *Id.* (citing *Bell*, 674 P.2d at 472).

placed limitations, financial or otherwise, on McMaster's authority to marshal a defense, and there is no evidence that Progressive directed McMaster to utilize a particular method or strategy in defending the Birks.

It is undisputed that McMaster had significant communication with the Birks as well as their personal counsel, Campbell. Both McMaster and Edward Birk testified that McMaster kept the Birks apprised of material events in the litigation. There is no evidence that Progressive controlled or influenced McMaster's defense strategy in his representation of the Birks. Instead, McMaster testified that he devised the legal strategies used in the case. Similarly, Progressive adjuster Hansel testified he defers to counsel on matters of legal strategy. Nor is there evidence that the Birks were mere spectators to the proceeding, but instead, that they actively participated in the defense and that McMaster provided the defense they desired. There is no evidence that Progressive and McMaster mutually adopted a course of conduct suggesting that counsel's first allegiance was to the insurance company that hired him, rather than the insured client. In fact, the record shows the Birks wanted McMaster to continue as their counsel even after issues were raised about his conduct; it was not until after execution of the Agreement in May 2015 that Progressive terminated McMaster and stepped in to direct the defense at trial.

Gant cites Progressive's Defense Counsel Guidelines as evidence of Progressive's level of control over McMaster. Those Guidelines, however, begin and end with disclaimers that explicitly state: "Progressive expects counsel to exercise independent professional judgment in rendering legal services to Progressive insureds. Counsel should never allow anything contained in these guidelines to interfere with any ethical directive or obligation governing conduct of defense counsel." Gant cites Guidelines that require defense counsel to seek authorization for retaining an expert or for significant legal research, and that require defense counsel to keep

Progressive apprised about discovery and progress of the case. While these examples may establish a level of economic scrutiny by Progressive to assure that claims are being handled in a cost-effective manner, they fall short of establishing actual control over McMaster's independent legal judgment and decision-making. In fact, Progressive paid McMaster approximately 97% of the bills submitted in the Birk Lawsuit, and did not deny McMaster any requests for expenses made to assist in his defense of the Birks.

Moreover, McMaster testified that he does not allow the Guidelines to dictate his actions in defense of Progressive's insureds and specifically did not do so in his representation of the Birks. McMaster testified that even when he requests approval from Progressive, he does not wait for a response before going ahead and performing the work. McMaster further testified that, even if Progressive declined to approve a particular expense or task, which did not happen in this case, McMaster would still do what he believed necessary to defend the Birks despite any lack of approval. Accordingly, the Court finds that Gant's effort to use the Guidelines to establish the level of control necessary to support his vicarious liability theory is belied by what McMaster actually did in his defense of the Birks. The record demonstrates that McMaster defended the Birks pursuant to a litigation strategy that he alone developed and implemented without direction or control by Progressive.

Finally, Gant argues that Progressive controlled McMaster by its ratification of his conduct. "Ratification is the adoption or confirmation by a principal of an act performed on his behalf by an agent which act was performed without authority."[231] "The doctrine of ratification is based upon the assumption that there has been no prior authority, and ratification by the

---

[231]*C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1344 (D. Kan. 2008) (citing *Schraft v. Leis*, 686 P.2d 865, 874 (Kan. 1984)).

principal of the agent's unauthorized act is equivalent to an original grant of authority."[232]

"Once the principal discovers the agent's unauthorized act, the principal must promptly repudiate the act or the court will presume the principal ratified the act."[233]  Gant's invocation of this doctrine is unavailing, as ratification requires the existence of an agency relationship, which the Court has rejected.

### c. *Judicial Estoppel and Admissions*

In the face of this steep applicable legal standard for holding an insurer vicariously liable, Gant contends that the doctrines of judicial estoppel and/or judicial admissions apply in this circumstance to preclude Progressive from now denying what it openly admitted to this Court: that as an employer of McMaster, it had the right to control him in litigation and thus he acted as Progressive's agent.  Gant's claim is without merit.[234]

### i.  Judicial Estoppel

"Judicial estoppel is an equitable remedy designed to 'protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'"[235]  "The burden falls on the moving party to show the need for its application—a difficult task given 'our reluctance to impose the harsh remedy.'"[236]  The Tenth Circuit views the doctrine as a "powerful weapon" to be used only when "less forceful remedies are inadequate," and therefore applies it "both narrowly and cautiously."[237]

---

[232]*Id.* (citing *Town Center Shopping Ctr., LLC v. Premier Mtg. Funding, Inc.*, 148 P.3d 565, 571 (Kan. Ct. App. 2006)).

[233]*Id.*

[234]Gant stresses that he is seeking partial summary judgment on his vicarious liability claim only, and that his claim based on Progressive's direct liability for failure to defend is based on its own actions and omissions.

[235]*Asarco, LLC v. Noranda Mining, Inc.*, 844 F.3d 1201, 1207 (10th Cir. 2017) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) (internal quotation marks and citations omitted)).

[236]*Id.* (quoting *Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc.*, 767 F.3d 987, 988 (10th Cir. 2014)).

[237]*Id.* at 1207–08 (quoting *Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1227 (10th Cir. 2011)

The Supreme Court has identified three factors to be considered in determining whether to apply the doctrine: (1) whether a party takes a position that is "clearly inconsistent" with its earlier position; (2) whether adopting the later position would create the impression that "either the first or the second court was misled"; and (3) whether allowing the party to change its position would give it "an unfair advantage or impose an unfair detriment on the opposing party if not estopped."[238]

Gant argues that statements made by Progressive in its motions to intervene in the underlying Gant lawsuit and the *Master Machinery* case "bind" Progressive to its position that it had the right to control both the litigation and McMaster. Because Progressive has unequivocally admitted to having the right to control McMaster in litigation, Gant argues, this Court should conclude that McMaster acted as Progressive's agent. The Court disagrees.

The Court finds that Gant has not met his burden of showing that the judicial estoppel factors are met in this case. First, Progressive's position in this case is not "clearly inconsistent" with the position articulated in its motions to intervene. Those statements must be considered in context, as they were made on a limited basis in an effort to remove McMaster from ongoing litigation matters after the Birk Defendants had executed the Agreement insulating them from exposure. While there is no dispute that Progressive asserted it has the ultimate authority to remove defense counsel, the issue presently before the Court involves whether Progressive exercised the necessary level of control over McMaster such that his independent professional judgment was compromised in his defense of the Birk Defendants. The Tenth Circuit "has set a high bar for estoppel proponents seeking to show that two positions are clearly inconsistent."[239]

(citation omitted)).

[238] *New Hampshire*, 532 U.S. at 750–51; *see also Hansen*, 641 F.3d at 1227.

[239] *U.S. v. Supreme Ct. of N.M.*, 839 F.3d 888, 911 (10th Cir. 2016) (citing *Vehicle Mkt. Research*, 767 F.3d

The Tenth Circuit requires a "narrow and cautious approach" to this issue, and "[i]f the statements can be reconciled there is no occasion to apply an estoppel."[240]  A party's "facially inconsistent" arguments are not clearly inconsistent where there is "a factual basis in the record for distinguishing the arguments."[241]

As the Court reads it, the substance of Progressive's argument before the trial court and before this Court are not clearly inconsistent.  In this case, Progressive argues that it is not vicariously liable for the alleged misconduct or malpractice of McMaster in his representation of the Birk Defendants.  As previously discussed, Progressive's legal position is premised on Kansas law that holds that an insurance company may only be vicariously liable for litigation conduct or malpractice of defense counsel if the insurance company has exercised an unusual and unethical level of control over defense counsel's independent legal judgment.  In *Gant v. Birk* and *Master Machinery*, Progressive asserted its right to fire defense counsel retained on behalf of its insureds in order to transition the case from McMaster to other counsel after he refused Progressive's request that he withdraw and after the Birk Defendants had executed the Agreement with Gant.  Gant argues that the statements in the Motion to Intervene that Progressive had the first right to control litigation, to employ counsel, and to control the litigation meet the test for agency under Kansas law: whether the principal has the "right to direct and control" the agent's activities.[242]  While that may be the general standard for agency, however, it is not the heightened standard for agency employed when determining whether to hold an insurer vicariously liable for the conduct of counsel retained for its insured.  Nothing in

---

at 944–96; *Ellis v. Ark. La. Gas Co.*, 609 F.2d 436, 440 (10th Cir. 1979)).

[240]*Id.* (citing *BancInsure, Inc. v. FDIC*, 796 F.3d 1226, 1240 (10th Cir. 2015)).

[241]*Id.* (quoting *U.S. v. Apple, Inc.*, 791 F.3d 290, 337 (2d Cir. 2015)).

[242]*See Hoidale*, 789 F. Supp. at 1122 (quoting *Brinkley v. Farmers Elevator Mut. Ins. Co.*, 485 F.2d 1283, 1286 (10th Cir. 1973)).

Progressive's motions to intervene suggest that Progressive took the position that McMaster was its agent or that it, in fact, controlled McMaster's independent legal judgment in his defense of the Birk Defendants. Instead, the factual positions asserted by Progressive suggest the opposite—that Progressive had learned the extent of the sanctions and other rulings in the Birk Lawsuit that made it appear that the trial court had lost confidence in McMaster, and that as a result of this misconduct it had terminated McMaster from its panel of defense counsel.

Second, neither court in *Gant v. Birk* or *Master Machinery* ever ruled upon or was persuaded to adopt any factual position articulated in Progressive's motions, as Progressive withdrew its motions in both cases after McMaster voluntarily withdrew. Gant argues that because McMaster withdrew from the cases, the motions to intervene should be deemed successful because Progressive obtained the relief its motions to intervene sought to achieve. The Court disagrees, as such an application would improperly expand the Tenth Circuit's limited application of this doctrine. Similarly, even if the Court accepted Gant's position, neither this Court nor the trial court appear to have been misled by Progressive, as the issue of whether McMaster was Progressive's agent was never an issue before the trial court.

Finally, allowing Progressive to assert that McMaster was not its agent in this litigation will not allow Progressive an unfair advantage. Gant did not rely to his detriment on any factual assertion in Progressive's Motion to Intervene in the Birk Lawsuit, as that motion was filed after the Agreement was executed and was ancillary to the issues brought by the parties at trial. Neither party should be allowed to circumvent its burden of proof on the issue of whether Progressive is vicariously liable for McMaster's conduct. Because the matter Gant claims was admitted is a proposition of law, the doctrine is not applicable.[243]

---

[243]*Brecek & Young Adv'rs, Inc. v. Lloyds of London Synd. 2003*, No. 09-2516-JAR, 2011 WL 1060955, at *7 (D. Kan. Mar. 21, 2011) (citing *Harrington v. City of Nashua*, 610 F.3d 24, 31 (1st Cir. 2010)) ("legal

###     ii.     Judicial Admissions

"Judicial admissions are 'formal admissions which a party or his attorney makes in a
judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about
which there is no real dispute.'"[244]  The alleged admission cited by Gant is a block citation of
Kansas law concerning an insurance company's right to hire or fire defense counsel retained for
its insureds.[245]  Because the matter Gant claims was admitted is a proposition of law, the doctrine
is not applicable.[246]  Moreover, judicial admissions must be "deliberate and clear."[247]  By
arguing that it had the right to control the Birk Lawsuit by terminating McMaster, there is no
indication that Progressive was making any deliberate admission of fact as to whether McMaster
was acting as its agent for purposes of a claim of vicarious liability for his litigation conduct,
which was not an issue in the underlying trial.

Because the Court declines to apply judicial estoppel or judicial admission to these facts,
Gant's motion for partial summary judgment is denied on this issue.[248]  Progressive's motion for
summary judgment on Gant's vicarious liability claim is granted.[249]

---

conclusions are rarely considered to be binding judicial admissions") (internal quotation omitted); *In re Teleglobe
Comm. Corp.*, 493 F.3d 345, 377 (3d Cir. 2007) (holding judicial admissions "must be statement of fact that require
evidentiary proof, not statements of legal theories")).

[244]*Asarco, LLC v. Noranda Mining, Inc.*, 844 F.3d 1201, 1212 n.3 (10th Cir. 2017) (quoting *U.S. Energy
Corp. v. Nukem, Inc.*, 400 F.3d 822, 833 n.4 (10th Cir. 2005)).

[245]*See* Doc. 263, Ex. 5.

[246]*Brecek*, 2011 WL 1060955, at *7.

[247]*Id.*

[248]Gant also seeks partial summary judgment based on judicial estoppel and admissions on the issues of
breach and causation, both of which are predicated on his theory that Progressive is vicariously liable for
McMaster's litigation conduct.  Because the Court has ruled against Gant on the vicarious liability/agency issue, it
does not reach these issues.

[249]Because the Court has determined that Gant has not come forward with evidence to establish that
Progressive is vicariously liable for McMaster's conduct as alleged above, it does not reach the issue of whether
Gant has presented evidence that McMaster's negligence caused the $6.7 million excess policy verdict to be
assessed against the Birks in the underlying lawsuit.  The Court notes that Gant focuses on three rulings made by the
trial court broadly characterized as sanctions against McMaster that he alleges harmed the Birks:  the deemed

## 2. Direct Liability

Gant also claims that Progressive affirmatively engaged in conduct constituting a breach of its duty to provide a defense. Gant asserts that Progressive failed to provide competent counsel, failed to appreciate a conflict of interest and provide separate counsel for the Birks, failed to monitor McMaster, and otherwise acted negligently and in bad faith in defending the Birk Lawsuit.[250] It also appears that Gant asserts a claim for negligent hiring and supervision.[251] Gant contends that McMaster's reputation as a obstreperous lawyer was well known, both before and during the Birk Lawsuit, and Progressive "knew what it was getting into with Mr. McMaster."[252] Progressive does not move for summary judgment on this specific claim, but argues generally that Gant's breach of contract claim fails as a matter of law because Gant cannot show any damage to the Birk Defendants caused by any breach by Progressive, and in particular cannot show a connection between the conduct of Progressive and the $6.7 million damage judgment sought by Gant.[253]

The record and argument before the Court indicate that Gant's claim is without merit. As previously discussed, "[i]nherent within the duty to exercise good faith in hiring independent counsel is the duty to hire counsel that is competent to defend the allegations against its insured and to provide such counsel with adequate resources to competently defend the suit."[254] In

---

admitted Requests for Admission; the stricken cell phone expert; and the reverse alter-ego sanction. Progressive argues that the trial court's judgment and award was not caused by any conduct of McMaster but instead was linked to the court's careful evaluation of the "objective evidence" at trial. As noted below, the Court has directed supplemental briefing on the issue of Gant's claim against Progressive based on its own actions in hiring McMaster; to the extent there is any overlap with Gant's causation arguments, the Court defers any further analysis of this issue until the parties have submitted their briefs.

[250]Doc. 263 at 39 n.6; Doc. 281 at 154.

[251]Doc. 281 at 170.

[252]*Id.* at 147.

[253]Doc. 278 at 71–74.

[254]*Hackman v. W. Agr. Ins. Co.*, 275 P.3d 73 (Table), 2012 WL 1524060, at *11 (Kan. Ct. App. Apr. 27,

*Hackman*, the insured claimed that its insurer breached the duty to adequately defend its insured based, in part, on the insurer's knowledge that the lawyer had been sanctioned in other cases, had previously been removed from the insurer's panel of approved counsel, and had been sued for legal malpractice by the insurer in the past.[255]  The court found that even if these accusations were true, such information and whether it was communicated to the insured was "immaterial to the issue of whether [the insurer] breached its duty to provide her with a competent defense in this case."[256]  Similarly, it appears that it is immaterial to this case whether Progressive had prior knowledge that opposing counsel in other cases found McMaster difficult to work with, and there is no evidence that Progressive's insureds in those cases sustained any excess exposure. Nor does the record contain any facts from which it could be inferred that, other than the personal monetary sanctions, Progressive was aware of specific sanctionable conduct occurring in the underlying Birk Lawsuit until February 2015, when it took action to retain additional counsel and ultimately terminate McMaster from the Birk Lawsuit and Progressive's panel of counsel.

With respect to the alleged conflict of interest, the Birks filed a written waiver; after the alter ego sanction, Progressive retained individual counsel for the individual Birks and for Birk Oil.  Thus, it appears that Gant has failed to come forward with evidence to establish that Progressive breached the duty to adequately defend the Birks as its insureds.

Gant must also prove that there is a causal link between the Progressive's conduct and the excess judgment against the insured.[257]  With respect to the causal relationship requirement,

2012).

[255]*Id.* at *12.

[256]*Id.* at *13–14.

[257]*Hawkins v. Dennis*, 905 P.2d 678, 690 (Kan. 1995).

however, it appears Gant's argument is limited to or conflated with the harm allegedly caused by the conduct of McMaster, not Progressive.

Further, Kansas recognizes that negligent hiring and retention or supervision are separate and distinct torts from respondeat superior.[258] Liability for negligent hiring, retention, and/or supervision is not predicated on a theory of vicarious liability, but instead, liability runs directly from the employer to the person injured.[259] "The employer is negligent in hiring or retaining such an employee when the employer knew or should have known of the employee's incompetence or unfitness."[260] It is clear, however, that tort claims will not lie under Kansas law, as "[t]he Kansas Supreme Court has explicitly rejected the contention that the failure of an insured to meet its contractual duties can give rise to a claim of negligence."[261] To the extent Gant is asserting an independent claim for negligent hiring or supervision, such claim sounds in tort and is not assignable under Kansas law.[262]

Because Progressive did not move for summary judgment on this specific claim, however, out of an abundance of caution, Gant is entitled to "notice and a reasonable time to respond" before the Court may grant summary judgment on this claim.[263] Accordingly, the Court directs further briefing on the direct liability and negligent hiring/supervision claim,

---

[258]*Miller v. Dillard's Inc.*, 47 F. Supp. 2d 1294, 1299 (D. Kan. 1999) (citing *Marquis v. State Farm Fire & Cas. Co.*, 961 P.2d 1213, 1223 (Kan. 1998)).

[259]*Beam v. Concord Hosp., Inc.*, 873 F. Supp. 491, 503 (D. Kan. 1994).

[260]*Lowe v. Surpas Res. Corp.*, 253 F. Supp. 2d 1209, 1245 (D. Kan. 2003).

[261]*Wade v. EMCASCO Ins. Co.*, No. 03-1276-JTM, 2004 WL 5550384, at *12 (D. Kan. Dec. 29, 2004), *aff'd*, 483 F.3d 657 (10th Cir. 2007) (citation omitted).

[262]*Bolz v. State Farm Mut. Auto Ins. Co.*, 52 P.3d 898, 901 (Kan. 2002) (collecting cases).

[263]Fed. R. Civ. P. 56(f)(2); *Teran v. GB Int'l, S.p.A.*, 652 F. App'x 660, 669, n.10 (10th Cir. 2016); *Coward v. Jabe*, 474 F. App'x 961, 963 (4th Cir. 2012) ("After giving notice and a reasonable time to respond, the district court may grant a motion for summary judgment on grounds not raised by a party.").

including specific discussion and analysis of Progressive's duty to defend, its alleged breach, and causal link between Progressive's conduct and damages to the Birks.

### D. Failure to Settle

Gant's second bad faith/breach of contract theory is that Progressive affirmatively engaged in conduct that constitutes a breach of its duty to negotiate a settlement. Established Kansas law holds that an insurance company's negligent or bad faith rejection of an injured party's offer to settle within the policy's limits constitutes a breach of its contract with the insured and gives rise to liability for any judgment in excess of the policy limits.[264] The same rule applies to instances in which the insurance company negligently or in bad faith delays in accepting an offer to settle within the policy's limits.[265] Further, "there must be a causal link between the insurer's conduct and the excess judgment against the insured."[266] Thus, a so-called "failure to settle" claim necessarily involves (1) a demand or other opportunity to settle within the insurance policy limit by the claimant; and (2) a wrongful refusal of such an offer or an unreasonable delay in accepting such offer.[267]

Here, it is undisputed that Gant never made a demand for an amount within the $250,000 Progressive Policy limit. It is also undisputed that, no later than August 2011, approximately two months after the accident, Progressive offered its full $250,000 policy limit to Gant, which Gant rejected. Nevertheless, Gant maintains a failure to settle claim premised upon the theory that Progressive failed to settle the claim for an amount within another insurer's policy limit—

---

[264]*See Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 660 (10th Cir. 2007) (citing *Bollinger v. Nuss*, 449 P.2d 502, 508 (1969)).

[265]*See id.* at 667 (citing *Glenn*, 799 P.2d at 82).

[266]*Roberts v. Printup*, 595 F.3d 1181, 1187 (10th Cir. 2010) (quoting *Hawkins v. Dennis*, 905 P.2d 678, 690 (Kan. 1995) (citing *Snodgrass v. State Farm Mut. Auto Ins. Co.*, 804 P.2d 1012, 1021 (Kan. Ct. App. 1991)).

[267]*Kemp v. Hudgins*, No. 12-2739-JAR, 2015 WL 5568082, at *14 (D. Kan. Sept. 22, 2015).

specifically, the $1 million liability limit provided by the Bitco Policy to Birk Oil. Gant contends that Progressive had a duty to discover and disclose additional insurance coverage and that there is a question of material fact as to whether the case would have settled for $1.25 million had Progressive put Bitco on notice of the accident that implicated Bitco's Policy. Such a settlement, Gant argues, would have saved the Birk Defendants from the excess policy judgment.

Gant's attempt to expand the scope of settled Kansas law concerning an insurer's failure to settle is without merit. Gant cites no Kansas authority for the proposition that an insurer has an affirmative duty to inquire of its insured about insurance policies issued by other carriers to different named insureds. Gant's citation to the general duty of an insurer to undertake an adequate investigation of a claim is addressed by Kansas courts in connection with an insurer's investigation of the facts of a particular loss, in order to determine the strength of the evidence against its insured on the subject of liability.[268] In this case, it is undisputed that Progressive offered its full $250,000 policy limit to Gant as a result of its initial investigation of Justin Birk's liability.

The cases Gant cites from Montana and Oregon as supporting his theory are misleading and inapposite. In both cases, the insurer brought suit for "equitable contribution" against a second insurer that also issued a policy that covered a particular loss, seeking contribution for a prior settlement paid by the first insurer.[269] As Progressive notes, these decisions hold that when an insurer seeks contribution toward a prior settlement from an insured or another insurer that

---

[268] *Wade*, 483 F.3d at 666–67 (discussing factor for consideration of bad faith claim as "failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured").

[269] *See Cas. Indem. Exch. Ins. Co. v. Liberty Nat'l Fire Ins. Co.*, 902 F. Supp. 1235, 1240 (D. Mont. 1995); *Am. Star Ins. Co. v. Allstate Ins. Co.*, 508 P.2d 244, 250 (Or. Ct. App. 1973).

also provides coverage for a loss, the insurer claimant has a duty to inquire as to other available insurance and effectuate a tender of the claim to any other involved insurers.[270]  In this case, Progressive has not asserted a claim for equitable contribution from Bitco, the Birks, or any other party, and accordingly, the duty discussed in these cases is not applicable.  Gant has failed to cite, nor could this Court find, a single Kansas case supporting his theory that an insurer has a duty to its insured to place an entirely separate carrier, which insures a different insured, on notice of a claim.

Undeterred, Gant argues that Progressive had a duty to investigate because there was an "impediment to settlement," namely, attorney Lykins' concern that not all insurance coverage was being disclosed to him, and suggests that Progressive's failure to adequately respond to his inquiries resulted in delay in tendering the claim to Bitco.  By that time frame, however, McMaster had been retained as counsel for the insureds and Progressive understood that he was placing all insurance carriers on notice.  In May 2013, McMaster advised Hansel that he had reviewed the insurance coverage available to the Birks with their personal counsel and determined that the Progressive Policy provided the only coverage.  There is nothing in the record to show that Progressive was aware of the Bitco Policy prior to the Birk Defendants producing it in discovery in February 2014.  Gant's argument effectively seeks to hold Progressive responsible for not discovering insurance that the Birk Defendants, through McMaster, failed to disclose.  Likewise, Gant's argument fails to address Lykins' testimony that the claim would not have settled without Justin Birk's affidavit of assets and no insurance and without a personal contribution by the Birks.

Even if this Court were to accept Gant's theory that Progressive had a duty to discover

---

[270]*Cas. Indem. Exch.*, 902 F. Supp. at 1237; *Am Star Ins.*, 508 P.2d at 250.

the Bitco Policy, and assuming Bitco would have offered the $1 million policy limit to Gant at that time, the uncontroverted evidence shows there was no opportunity to settle the claim for $1.25 million. In order to prove a claim for failure to settle within the Progressive/Bitco policy limits, Gant must "come forward with evidence from which a legitimate inference could be made that [the parties] would have reached an agreement to settle the underlying . . . claims for an ascertainable amount less than the judgment rendered."[271] Here, Gant testified that he "couldn't say either way" if there was ever a time he would have settled for $1.25 million. Later, on cross-examination, Gant agreed he "more likely than not" would have accepted $1.25 million to settle the case.

Moreover, further actions taken by Gant and his counsel indicate Gant would not have settled for $1.25 million. Gant's counsel Lykins valued the claim at $5 to 10 million; subsequent counsel alleged damages of $20 million, later demanded $15 million at mediation, then requested $15 million at trial. Lykins testified he would not have recommended the case settle for $1.25 million without a personal contribution from the Birks. After the Bitco Policy was disclosed in February 2014, neither Gant nor his counsel tendered the claim to Bitco or made a demand for the $1 million policy limit. This evidence, coupled with Gant's equivocal testimony, does not create a material question of fact on this issue.

Accordingly, Progressive is entitled to summary judgment on Gant's failure to settle claim.[272]

---

[271]*Hackman*, 2012 WL 1524060, at *10.

[272]The Court does not reach Progressive's argument that the excess judgment was caused by Gant's rejection of policy limit offers in order to "set up" a bad faith claim. The Court notes, however, that this is does not appear to be a typical set up scenario, as there is no evidence that Gant's motive in rejecting the original policy limits offer was in order to manufacture a bad faith claim. When Gant rejected the $1.25 million policy limits offer at mediation in 2015, the bases for his bad faith claim had transpired. Shortly thereafter, Gant accepted that amount in connection with the Agreement that the Birks executed at the urging of counsel provided by Progressive for the stated purpose to "expedite" Gant's prosecution of the bad faith claim assigned by the Birks while McMaster was still counsel of record, but after Progressive had taken steps to terminate his representation based on his litigation

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant/Counterclaim Plaintiff Gabriel Gant's Motion for Partial Summary Judgment (Doc. 262) is **denied;** Plaintiff/Counterclaim Defendant Progressive's Motion for Summary Judgment on its claim for Declaratory Relief and Gant's Amended Counterclaim (Doc. 266) is **granted in part** with respect to Gant's vicarious liability claim and failure to settle claim;[273]

**IT IS FURTHER ORDERED** that Gant is directed to file a supplemental brief within **fourteen (14)** days of entry of this Order, stating why summary judgment should not be granted to Progressive with respect to Gant's direct breach of duty to defend claim as set forth above; Progressive shall have **fourteen (14)** days from the date of Gant's brief to file a reply. The parties' briefs shall be limited to **twenty (20) pages**. In the interim, the case shall be removed from the September 11, 2018 trial calendar, pending review of the supplemental submissions.

**IT IS SO ORDERED.**

Dated: <u>July 19, 2018</u>

      S/ Julie A. Robinson
      JULIE A. ROBINSON
      CHIEF UNITED STATES DISTRICT JUDGE

---

conduct. *Cf. Wade v. EMCASCO Ins. Co.*, 483 F.3d 657 (10th Cir. 2007); *Kemp v. Hudgins*, 133 F. Supp. 3d 1271, 1296 (D. Kan. 2015).

[273] The Court's entry of summary judgment in favor of Progressive will render the pending motions to strike the parties' respective experts moot; the Court defers ruling on these motions until final judgment is entered.