**FILED**
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

**April 30, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

PROGRESSIVE NORTHWESTERN
INSURANCE COMPANY,

     Plaintiff Counter Defendant –
     Appellee,

v.

GABRIEL GANT, individually and as heir
at law of Kathryn Gant, deceased and next
friend of MG, FG and CG estate of
Kathryn Gant,

     Defendant Counterclaimant –
     Appellant.

No. 18-3226
(D.C. No. 2:15-CV-09267-JAR)
(D. Kan.)

_____

### JUDGMENT

_____

Before **HARTZ**, **KELLY**, and **MATHESON**, Circuit Judges.

_____

This case originated in the District of Kansas and was argued by counsel.

The judgment of that court is affirmed.

Entered for the Court

CHRISTOPHER M. WOLPERT, Clerk

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**April 30, 2020**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

**Christopher M. Wolpert**
**Clerk of Court**

_____

PROGRESSIVE NORTHWESTERN
INSURANCE COMPANY,

      Plaintiff Counter Defendant -
      Appellee,

v.

GABRIEL GANT, individually and as heir
at law of Kathryn Gant, deceased and next
friend of MG, FG and CG estate of
Kathryn Gant,

      Defendant Counterclaimant -
      Appellant.

No. 18-3226

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:15-CV-09267-JAR)**

_____

Adam S. Davis, Wagstaff & Cartmell, LLP, Kansas City, Missouri (Jonathan P. Kieffer
and Vanessa H. Gross, Wagstaff & Cartmell, LLP, Kansas City, Missouri, with him on
the briefs) for Defendant Counterclaimant-Appellant.

Joseph T. Kissane, Cole, Scott & Kissane, P.A., Jacksonville, Florida (Brian J. Aull,
Cole, Scott & Kissane, P.A., Jacksonville, FL, John L. Mullen and Christopher M.
Harper, Franke Schultz & Mullen, P.C., Kansas City, Missouri, with him on the brief) for
Plaintiff-Counterclaim Defendant-Appellee.

_____

Before **HARTZ**, **KELLY**, and **MATHESON**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Progressive Northwestern Insurance filed suit in the United States District Court for the District of Kansas to obtain a declaratory judgment that it had not violated any duty to its insureds in the defense of a wrongful-death suit.  The underlying suit had been brought in 2013 by Gabriel Gant against Justin Birk; his parents, Edward and Linda; and the Birks' family company, Birk Oil.  The suit alleged that Justin had negligently killed Kathyrn Gant (Gabriel's wife) in a car accident; that his parents were liable because they had negligently entrusted the vehicle to him; and that Birk Oil was liable under the doctrine of respondeat superior because Justin was driving the vehicle incidental to his employment by the company.

Gant's attorneys estimated damages of many million dollars.  This far exceeded the defendants' insurance coverage:  The Birks' Progressive automobile-liability policy (the Policy) had a liability limit of $250,000; and Birk Oil had an automobile-liability policy with Bituminous Casualty Insurance Company (Bitco) with a policy limit of $1 million.  The defendants had assets from which Gant could have collected additional money on a judgment against them.  But his attorneys apparently thought that a better way to collect a large judgment would be if the defendants had a claim against Progressive for not representing them properly and exposing them to a judgment far exceeding their insurance coverage.  Accordingly, shortly before trial Gant entered into an agreement with the Birks in which Gant promised not to execute any judgment against the Birks, and in exchange the Birks assigned to Gant their rights to the policy limits

under the Progressive and Bitco policies and any claims the Birks had against Progressive for breach of contract, negligence, or bad faith.

The case was tried to a judge, who awarded Gant $6.7 million in damages. Progressive then brought this declaratory-judgment action and Gant counterclaimed, arguing that Progressive (1) breached its duty to discover and disclose the Bitco policy; (2) was negligent in hiring attorney Kevin McMaster to defend the suit; and (3) was vicariously liable for McMaster's conduct. The district court granted summary judgment in favor of Progressive on its claim and the counterclaims.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the district court. Progressive did not violate any duty to discover and disclose the Bitco policy; it was not negligent in hiring McMaster and any alleged negligence was not harmful to Gant; and it is not vicariously liable for McMaster's conduct because it did not impose on his independent judgment as an attorney.

## I.    BACKGROUND

On June 10, 2011, Gant's wife Kathryn was killed when her vehicle collided head-on with a vehicle driven by Justin Birk. At the time of the accident Justin was driving a Cadillac Escalade owned by his parents, Edward and Linda Birk. The trial judge found that Justin was on the job with Birk Oil at the time of the accident. In the criminal case stemming from the accident, Justin pleaded guilty to vehicular homicide on March 5, 2013.

Progressive had issued an automobile liability-insurance policy to Edward and Linda Birk that provided a bodily-injury liability limit of $250,000 per person. The

Progressive policy listed as a covered vehicle the Escalade that Justin was driving at the time of the accident.  Bitco had issued a commercial-automobile policy to Birk Oil with a liability limit of $1 million.  The Bitco policy did not list the Escalade as a covered vehicle, nor did it list Justin as a named insured.

The accident was reported to Progressive on June 13, 2011.  A week later, Robert Hansel, a Progressive adjuster, sent identical letters to Justin and Edward Birk making the following request:

> Please let us [Progressive] know immediately if you have any insurance policies that may provide coverage to you in excess of this policy.  If we do not hear from you concerning such policies, we will assume that no such policies exist.

Aplt. App., Vol. VIII at 1582, 1584.  Neither of the Birks responded to the letter.  Hansel testified that he also asked Linda Birk and the agent who sold the Birks the Progressive policy whether any additional insurance existed but that he was not alerted to other coverage.  Linda Birk testified that she could not recall someone from Progressive specifically asking her about business insurance and that she would have responded to such a request with information about the Bitco policy.

On June 21, 2011, Gant's counsel at the time, Dan Lykins, sent Progressive a letter asking several questions, including:  "What insurance company insured the businesses that were owned by Edward and Linda Birk and any business that was owned by Justin Birk?"  Aplt. App., Vol. XV at 3218–19.  Kevin McMaster, the attorney hired by Progressive to represent Justin Birk, wrote Lykins on August 24, 2011:  "It has been represented to me that [the] adjuster handling this matter has determined that there exist[]

4

no other policies (auto, excess, or umbrella) affording coverage to this accident." *Id.* at

3220–21.

McMaster's letter also offered Gant the $250,000 limit in the Progressive policy.

Lykins responded two days later that, as a condition of settlement, Justin would need to

execute an assets affidavit stating, among other things, that he was covered by no

automobile-insurance policy other than the Progressive policy and that no umbrella or

excess coverage was applicable.  Lykins testified that settlement would have required not

just the completed affidavit but also the Birks' personal contribution of at least $250,000

in addition to the policy limit.  Lykins said that he valued Gant's claim between $5

million and $8 million, and Gant ultimately rejected McMaster's settlement offer.

Gant discharged Lykins, who was replaced by the firm of Wagstaff and Cartmell,

LLP in June 2012.  McMaster testified that he called on Gant's new counsel monthly to

discuss settlement, but that they did not make any settlement demand or request

information about insurance coverage for Birk Oil.  McMaster once again offered the

$250,000 Progressive policy limit, this time with an offer to purchase Gant's home, but

the offer was rejected.

On April 26, 2013, Gant filed a wrongful-death action in Kansas state court

against the three members of the Birk family (Justin, Edward, and Linda) and Birk Oil.

Within a few days, McMaster represented to Progressive that he was putting all carriers

on notice, and Justin Birk's criminal-defense attorney wrote the Birks advising them to

put all insurers, including the company carriers, on notice of the civil lawsuit.  On

May 10, McMaster obtained a written conflict waiver signed by the three individual Birk

defendants and by Edward Birk as president of Birk Oil, confirming that McMaster had

spoken to the Birks and their personal attorney about individual and collective

representation.  The waiver stated, in relevant part:

> Consistent with our discussions there exist[s] a possibility that a conflict
> could arise in the future.  All your questions regarding the potential of a
> conflict have been discussed and answered and it is our understanding that
> you have agreed to waive any potential conflict and you have no objections
> to the undersign[ed]'s representation of you individually and collectively.

Aplt. App., Vol. IX at 1839–40.  McMaster sent a copy of the waiver to Hansel,

Progressive's adjuster, with a cover letter stating that there was no other insurance

coverage:

> With the assistance of our clients' personal counsel we have reviewed the
> insurance coverages available to the defendants at the time of the accident.
> It appears that the Progressive policy provides the only coverage for this
> accident.  Therefore, the defendants understand that the likely exposure in
> this case is in excess of the applicable coverage.

Id. at 1778–80.  The cover letter was copied to the Birk defendants and their personal

attorney, James Campbell.

About nine months later, on February 26, 2014, the Birk defendants disclosed the

existence of the Bitco policy, among other policies, in a supplemental response to Gant's

interrogatories.  On February 4, 2015, McMaster sent Progressive a copy of the Bitco

policy.  The cover email stated that he had reviewed the policy and had not tried to

deceive Gant regarding coverage:

> I assume no formal denial letter because the agent and personal counsel
> both told them 'no coverage.'  After suit was filed I reviewed the [Bitco]
> policies and confirmed no coverage.  After the fighting that [Gant's]
> counsel put up trying to convince the judge that we were hiding policies
> and coverages (despite the fact it would be disadvantageous to clients and

counsel) I got the attached policies from the carriers and reviewed to make
sure no coverage.

*Id.* at 1782.  Bitco received written notice of the claim on February 16, 2015, from

Steven Pigg, an attorney hired by Progressive to represent Birk Oil.  A Bitco claims agent

recommended "try[ing] to settle the case against all parties for the policy limits

available . . . ."  Aplt. App., Vol. XVIII at 4105.

At a mediation on April 27, 2015, Gant rejected an offer of $1.25 million, the

combined limits of the Progressive and Bitco policies, and indicated that he would

instead negotiate between $6 million and $10 million.  When asked at his deposition

whether "the reason [he] rejected the million two fifty was because [he] wanted [his] day

in court and [he] wanted justice," Gant answered, "Yeah, we wanted to see it through."

Aplt. App., Vol. VIII at 1650.

On May 11, 2015, shortly before trial, Gant entered into an agreement with the

Birk defendants, who assigned Gant their rights to the proceeds of the Progressive and

Bitco liability policies, in exchange for Gant's covenant not to collect any judgment from

the Birks personally.  The agreement also assigned Gant the Birks' rights against

Progressive for breach of contract, negligence, and bad faith.

Progressive filed on May 20, 2015, a motion to intervene so that it could move to

compel McMaster's withdrawal.  In February 2015 Progressive had hired additional

counsel to represent the Birk defendants and had asked McMaster to withdraw; but he

refused, in part because of the Birks' wish to retain him.  The intervention motion cited

several concerns with McMaster's handling of the Birks' defense, including the

imposition of sanctions that resulted in the deemed admission of hundreds of requests for admission and a finding that Birk Oil was the alter ego of Edward and Linda Birk. Two days later, before the court could rule on the motion, McMaster voluntarily withdrew.

The June 2015 bench trial lasted five days. Gant requested more than $15 million in damages. The trial court concluded that Justin Birk was liable for the death of Gant's wife; Edward and Linda Birk were liable for negligently entrusting the vehicle to Justin; and Birk Oil was liable under the doctrine of respondeat superior. The trial court awarded Gant $6,723,021 in damages. Because of the pretrial agreement between Gant and the Birks, none of that amount could be collected from the defendants. Any exposure was limited to the insurance companies.

After the state-court trial, Progressive filed an action in federal district court seeking a declaratory judgment that it had fulfilled its duties to the Birks under the Policy and was not liable beyond the $250,000 limit of liability in the Policy. Based on the rights the Birks had assigned to him, Gant counterclaimed and alleged, among other things, that Progressive breached its contractual duty to defend the Birks in good faith and without negligence. Progressive filed a motion for summary judgment, which the district court granted.

## II.   DISCUSSION

The parties agree that this diversity case is governed by the substantive law of Kansas. When Kansas law has not addressed the specific issue before us, our task is to predict how the Kansas Supreme Court would rule. *See Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 906 F.3d 926, 930–31 (10th Cir. 2018). To make this prediction, we

may look to "lower state court decisions, decisions of other states, federal decisions, and the general weight and trend of authority." *Id.* (brackets and internal quotation marks omitted).

Kansas law recognizes that insurance contracts "contain[] an implied term that if the insurer assumes the defense of an insured, then the insurer owes to the insured the duty to act in good faith and without negligence." *Aves ex rel. Aves v. Shah*, 906 P.2d 642, 648 (Kan. 1995) (internal quotation marks omitted).  Gant contends that the district court erred by granting summary judgment on the following three claims of breach of duty by Progressive:  (1) a failure-to-settle claim based on Progressive's failure to discover and disclose the Bitco policy; (2) a negligent-hiring claim for retaining Kevin McMaster to represent the Birk defendants, despite allegations of prior misconduct and despite an alleged conflict in the various interests of the Birks and Birk Oil as separate defendants; and (3) a vicarious-liability claim seeking to hold Progressive liable for McMaster's actions during litigation.  We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party.  *See Navair, Inc. v. IFR Ams., Inc.*, 519 F.3d 1131, 1137 (10th Cir. 2008). Summary judgment is appropriate when "there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). We hold that the district court properly granted summary judgment on Progressive's claim and each counterclaim.

### A.   Failure to Settle

We have recognized that under Kansas law, "[w]hen an insurer negligently or in bad faith declines a settlement offer within the policy limits, takes the case to trial, and a verdict is rendered against the insured in excess of policy limits, the insurer is liable to the insured for the excess judgment." *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 660 (10th Cir. 2007) (citing *Bollinger v. Nuss*, 449 P.2d 502, 508 (Kan. 1969)); *see also Aves ex. rel. Aves*, 906 P.2d at 648 ("If the insurer negligently or in bad faith refuses to settle a case within the policy limits, the insurer has breached . . . the insurance contract.").  But that is not what happened here.  Progressive never rejected a policy-limits settlement offer.  On the contrary, it early and repeatedly offered to pay the $250,000 policy limit but was rebuffed by Gant.

Gant argues, however, that the broader obligations of an insurer to defend its insureds in good faith and without negligence include "the duty to make reasonable efforts to settle the case," which, in this case, included the duty to discover and disclose the Bitco policy.  Aplt. Br. at 27.  He contends that if the Bitco policy had been disclosed, the case could have settled within policy limits.  We are not persuaded.  Even assuming without deciding that a "duty to make reasonable efforts to settle" exists, we are confident that the Kansas Supreme Court would not hold that Progressive breached a duty to the Birks to investigate and disclose information about their insurance coverage with other companies.

At the outset Progressive made written and verbal requests to the Birks, and contacted the insurance agent who sold the Progressive policy to the family, to inquire

10

about any additional coverage.  And the attorney hired by Progressive, Kevin McMaster,

later reviewed the Birks' policies with the family's personal counsel and represented to

Progressive that all agreed that there was no other applicable coverage.

Gant concedes that no Kansas court has recognized the duty he urges us to impose

on Progressive.  But he cites *American Star Insurance Co. v. Allstate Insurance Co.*, 508

P.2d 244, 250 (Or. Ct. App. 1973), and *Casualty Indemnity Exchange Insurance Co. v.*

*Liberty National Fire Insurance Co.*, 902 F. Supp. 1235, 1240 (D. Mont. 1995), which

both declared that a liability-insurance company has a duty to the insured to inquire about

the existence of other liability insurance that may protect the insured.  In neither case was

the court considering a claim by the insured against the insurer in excess of the liability-

coverage limit.  Rather, in both cases a liability insurer that had settled the claim against

the insured then sought partial contribution from (1) another insurer who had received

untimely notice of the claim or of a tender of the defense and, additionally in *American*

*Star*, (2) the insured who had failed to give timely notice.  The settling insurer was denied

contribution because it had failed to exercise due diligence in determining whether there

was another insurer.  Both opinions note that it would be helpful to the insured to know if

there was additional coverage.  But they do not adequately explain why an insurer has a

duty to tell an insured about its other insurers.  We agree with the Sixth Circuit that

"neither decision . . . is particularly persuasive," *Nat'l Sec. Corp. v.  Hartford Cas. Ins.*

*Co*., 493 F.3d 752, 760–61 (6th Cir. 2007), at least insofar as either relies on the

purported duty urged here.  As our fellow circuit court stated, the insured "presumably

knows from whom it has obtained insurance."  *Id.* at 760.

We can think of no doctrinal support, or other good reason, for ruling that an insurer cannot rely on its insured's assurance that there is no other coverage with another insurer, when, as here, there is no reason to think that the insurer has special or superior access to information regarding other coverage. Just as the Sixth Circuit concluded that the Kentucky Supreme Court would not "impose a duty on an insurance company to investigate whether its insured has other insurance coverage," *id.* at 761, we predict that the Kansas Supreme Court would not hold that Progressive breached a duty to the Birks in failing to discover and disclose the Bitco policy. The district court properly rejected this claim.[1]

### B.     Negligent Hiring

Gant also maintains that Progressive's decision to hire McMaster to represent the Birk defendants was negligent because (1) McMaster had mishandled settlement discussions in the past and (2) allowing McMaster to represent all the Birk defendants created potential conflicts of interest.[2]

---

[1] In the alternative, Gant argues that there is a question of fact as to whether Progressive had a duty to discover and disclose the Bitco policy. Because the existence of a duty can sometimes depend on the foreseeability of harm, he contends that summary judgment is improper. But that argument fails because he offers no possible facts that would support liability in this case.

[2] Progressive asserts that we need not reach the merits of Gant's negligent-hiring claim because it was not pleaded below and because such a claim cannot be assigned. But the issue was preserved by the allegation in Gant's amended counterclaim that Progressive negligently and in bad faith breached its contractual duty to hire competent counsel. And because the negligent-hiring claim is part of Gant's breach-of-contract claim asserting bad faith and negligence—not a separate tort claim as Progressive contends—it appears to be assignable. *See Glenn v. Fleming*, 799 P.2d 79, 91 (Kan. 1990).

As to the first claim, Progressive does not dispute that it was contractually obligated to provide the Birks with competent counsel to defend the claim.  The Kansas Court of Appeals has explained that "[i]nherent within the duty to exercise good faith in hiring independent counsel is the duty to hire counsel that is competent to defend the allegations against its insured and to provide such counsel with adequate resources to competently defend the suit."  *Hackman v. W. Agric. Ins. Co.*, No. 104,786, 2012 WL 1524060, at *11 (Kan. Ct. App. Apr. 27, 2012).  The Restatement of the Law of Liability Insurance recognizes that breach of the duty can create liability[3]:

> If an insurer undertakes to select counsel to defend a legal action against the insured and fails to take reasonable care in so doing, the insurer is subject to liability for the harm caused by any subsequent negligent act or omission of the selected counsel that is within the scope of the risk that made the selection of counsel unreasonable.

Restatement of the Law of Liability Insurance, § 12(1) (2019) (Restatement of Liability Insurance).  Gant's briefs in this court have endorsed § 12 of the Restatement.

As evidence of what Gant characterizes as McMaster's "extensive history of impeding settlements," Aplt. Br. at 35, Gant offers statements from three attorneys informing Progressive of McMaster's alleged misconduct while representing Progressive insureds.  One attorney notified Progressive in 2007 that McMaster had failed to appear for a settlement-approval hearing and stated that "McMaster is known for causing delay

---

[3]  The district court declined to use the Restatement "as a means to overturn or expand Kansas law" in part because the text had not yet been published.  *Progressive NW. Ins. Co. v. Gant*, No. 15-9267-JAR-KGG, 2018 WL 4600716, at *6 (D. Kan. Sept. 24, 2018). But it has since been published.

13

and increased expenses," causing Progressive's insureds to "continue[] to have excess

personal exposure . . . ." Aplt. App., Vol. XIII at 2748. Another attorney, from the same

law firm as the first, informed Progressive in 2009 that "McMaster has still refused to

schedule a friendly settlement hearing," thereby "exposing Progressive's insureds to a

lawsuit and personal excess liability." *Id.* at 2750. The same letter alleged that this issue

was "a common problem with Mr. McMaster." *Id.* The third attorney submitted an

affidavit in this case asserting that during the same week that Gant's complaint was filed,

he had informed Progressive in another matter that "McMaster's obstructionist tactics

w[ere] placing Progressive's insured at substantial risk for an excess judgment, punitive

damages, and being forced to participate in unnecessary litigation." *Id.* at 2757.

But in the highly competitive world of personal-injury litigation, complaints of

allegedly unreasonable conduct of opposing counsel are hardly uncommon. McMaster's

career had already spanned more than 30 years. He testified that he had served as

defense counsel for an insurer over a thousand times, that he had handled thousands of

suits involving serious bodily injury or wrongful death, and that there were very few

lawyers in his area of the country who had tried more jury trials than he had. His law

license had never been revoked, suspended, or otherwise limited. And Gant does not

dispute Progressive's contention that the cases he offers to support McMaster's alleged

incompetence all settled without excess exposure to Progressive's insureds. In that light,

the complaints of the three attorneys relied on by Gant are inadequate to support a finding

that Progressive was unreasonable in thinking that McMaster would provide competent

representation of the Birks.

In addition, Gant has not provided the necessary evidence of causation. Progressive would be liable only for "harm caused by any subsequent negligent act or omission of the selected counsel that is *within the scope of the risk that made the selection of counsel unreasonable*."  Restatement of Liability Insurance § 12(1) (emphasis added); *see also Roberts v. Printup*, 595 F.3d 1181, 1187 (10th Cir. 2010) (recognizing Kansas law that "'there must be a causal link between the insurer's conduct and the excess judgment against the insured'" (quoting *Hawkins v. Dennis*, 905 P.2d 678, 690 (Kan. 1995)).  Yet Gant has made no effort to draw a connection between the types of deficiencies of McMaster alleged in the past (unresponsiveness in settlement discussions) and the failure to determine that the Bitco policy provided coverage and subsequently disclose it.  There is no allegation that McMaster actually knew there was coverage under the Bitco policy.  And even if he was negligent in not realizing there was coverage (although Gant has not argued that McMaster was negligent in that respect), Gant has offered no evidence that Progressive was on notice that McMaster was inept in interpreting insurance policies.  We also question whether there is adequate evidence that Gant would have settled even had the Bitco coverage been discovered earlier.  *See, e.g*., Aplt. App., Vol. VIII at 1650 (Gant deposition testimony that he rejected the offer of $1,250,000 because "we wanted to see it through").

Moreover, there was no apparent harm from the deficiencies in McMaster's performance (none of which related to alleged obstructive misconduct in settlement negotiations) that led to his dismissal by Progressive.  Gant points to McMaster's role in the imposition of sanctions causing the admission of hundreds of requests for admission

15

(RFAs), the exclusion of Birks' cell-phone expert, and the treatment of Birk Oil as an alter ego of Mr. and Mrs. Birk.  But the state trial court indicated that deemed admission of the RFAs would not preclude the introduction of independent evidence, Gant's counsel did not refer to them during his closing argument at the state trial, and the trial court's opinion rendering judgment for Gant made no mention of them.  As for the Birks' cell-phone expert, his testimony was excluded not only as a sanction but also on the ground that it was inadmissible under the rules of evidence because it was unreliable and would be substantially more prejudicial than probative.  And the alter-ego sanction turned out to make no difference because Birk Oil is a general partnership of which Mr. and Mrs. Birk are members (so it apparently would not matter whether liability was assessed against them personally or against the company).

The second component of Gant's negligent-hiring claim is that Progressive was negligent in retaining McMaster to represent all the Birk defendants despite potential conflicts of interest.  Gant asserts that the conflict "derive[d] from the right of all parties to compare the fault of one another, and from Birk Oil's potential vicarious liability for Justin Birk's actions."  Aplt. Reply Br. at 20.  He relies on his expert's claim that "there existed a clearly divergent conflict of interests among the four Birk Defendants which neither Progressive nor McMaster timely recognized, addressed and/or attempted to resolve."  Aplt. App., Vol. XIII at 2671.  But the family members had no desire to place blame on one another.  As Linda Birk testified and the district court recognized, the family sought to advance a unified position that Justin was not at fault for the accident and that he was not on the job at the time of the accident.

Most importantly, McMaster obtained a conflict waiver signed by all defendants (Justin, Linda, and Edward, both individually and as president of Birk Oil) after consultation with their personal attorney.  It states in relevant part:

> This is [sic] will confirm that we have spoken to you and your personal counsel regarding representing you individually and collectively in connection with the above referenced matter. We have reviewed and discussed the facts and circumstances surrounding the accident together with all the claims being presented and determined that there currently exists no conflict which would prohibit us from representing you individually and collectively.
>
> Consistent with our discussions there exist[s] a possibility that a conflict could arise in the future. All your questions regarding the potential of a conflict have been discussed and answered and it is our understanding that you have agreed to waive any potential conflict and you have no objections to the undersign[ed]'s representation of you individually and collectively. You are also aware that if an unforeseen and unexpected conflict w[]ere to arise during our representation you will have the right to review this waiver of conflict.

Aplt. App., Vol. IX at 1839.  Gant asserts for the first time in his reply brief that "McMaster failed to appreciate the legal conflict among the four Birk Defendants and, therefore, could not have obtained a knowing waiver from his clients."  Aplt. Reply Br. at 20.  We need not consider this untimely argument.  *See In re Motor Fuel Temperature Sales Practices Litig.*, 872 F.3d 1094, 1105 n.2 (10th Cir. 2017) (declining to consider "different, albeit related, argument" of district-court error raised for first time in reply brief).  But even if we did, we fail to see any factual basis.  Gant has offered no evidence of what explanation was given to the Birks by their personal attorney or McMaster; and he has not explained how their interests could conflict if they had a common view of the

17

facts and wished to advance a common defense.  On the record and arguments presented

to it, the district court properly granted summary judgment on this claim.

### C.   Vicarious Liability

Gant next argues that Progressive is vicariously liable for McMaster's allegedly

negligent representation of the Birks.  He has a steep hill to climb to prevail on such a

claim.  Under Kansas law the general rule is that "merely hiring an attorney to represent

an insured will not make the insurer vicariously liable for the attorney's negligence."

*Hackman*, 2012 WL 1524060, at *16.  Gant relies on *Pacific Employers Insurance Co. v.

P.B. Hoidale Co.*, 804 F. Supp. 137, 142 (D. Kan. 1992), which recognized an exception

to this rule where the insurer and the attorney it hired to represent the insured "adopted a

course of conduct suggesting that [the attorney's] first allegiance was to the insurance

company that hired him, rather than the insured client."[4]  He contends that this district-

court case stands for the proposition that an insurer is liable as a principal for the conduct

of its agent if it has the right to exert control over the agent.  But we decline to go that far.

Such a rule would fail to recognize the ethical obligation of the attorney to exercise

independent judgment, and the leading authorities therefore reject it.

---

[4]  Gant claims that the Kansas Supreme Court's decision in *Anderson v. Southern Surety
Co.*, 191 P. 583 (Kan. 1920), serves as another example of when "an insurance company
[was] liable for an excess judgment, based on the performance of counsel hired by the
insurer." Aplt. Br. at 47.  We disagree.  Although the opinion in *Anderson* did hold the
insurer liable for "its negligence in conducting the defense in an action against the
[insured]," *id.* at 583, the issue of the appropriateness of vicarious liability for the
deficiencies of the attorney was apparently not raised since the opinion never discusses it,
*see id.* at 584–85.

The Restatement (Third) of the Law Governing Lawyers § 134 (2000), permits "[a] lawyer's professional conduct on behalf of a client [to] be directed by someone other than the client [only] if . . . the direction does not interfere with the lawyer's independence of professional judgment." *See also Brinkley v. Farmers Elevator Mut. Ins. Co.*, 485 F.2d 1283, 1287 (10th Cir. 1973) (noting that insurer had "no right to direct or control [defense counsel's] courtroom activities"). And "[b]ecause of this professional obligation, most courts have *not* applied general principles of agency and tort law—such as the doctrines of actual or apparent authority or the related doctrine of respondeat superior—to impose vicarious or direct liability on insurers for the professional malpractice of defense counsel." Restatement of the Law of Liability Insurance § 12, cmt. d (2019) (emphasis added); *see* George M. Cohen, *Liability of Insurers for Defense Counsel Malpractice*, 68 Rutgers U. L. Rev. 119, 125–26 (2015) ("[A] majority of jurisdictions have rejected vicarious liability of liability insurers, and to the extent that one can identify a 'trend' in the cases, almost all of the more recent cases, as well as most cases decided by the larger jurisdictions, reject vicarious liability.").

Because of the soundness of the common rejection of an insurer's general vicarious liability for negligent representation by the insured's attorney, we believe the Kansas Supreme Court is likely to adopt the following test:

> An insurer is subject to liability for the harm caused by the negligent act or omission of counsel provided by the insurer to defend a legal action when the insurer directs the conduct of the counsel with respect to the negligent act or omission *in a manner that overrides the duty of the counsel to exercise independent professional judgment.*

19

Restatement of the Law of Liability Insurance § 12(2) (2019) (emphasis added).

Consistent with this view, the Kansas Court of Appeals did not read *Hoidale* as imposing

vicarious liability on an insurer for the negligence of the attorney selected to defend the

insured but instead limited vicarious liability to those actions of the attorney in which the

insurer was directly involved. *See Hackman*, 2012 WL 1524060, at *16 (permitting

vicarious liability only "if, at the time in question, the attorney's acts or omissions were

directed, commanded, or knowingly authorized by the insurer").

There is no evidence that Progressive intruded on McMaster's professional

judgment. He testified that he believed he exercised independent professional judgment

in defending the Birks, and that there was no instance of Progressive requesting that

something be done or not be done in the litigation. Rather, his actions were "based upon

[his] belief it was the best way to do and provide the defense the Birks wanted," and no

entity, including Progressive, interfered with his ability to do so. Aplt. App., Vol. XII

at 2542. As McMaster summarized, "Progressive was not involved in providing the

defense. Progressive was paying me to provide the defense." *Id.* at 2544. Imposing

vicarious liability under these facts is therefore improper.[5]

Gant's examples of Progressive's "control" over McMaster do not fill the bill. He

first points to Progressive's Defense Counsel Guidelines, which require defense counsel

to obtain prior approval from Progressive for certain tasks, including engaging in over

---

[5] Because we determine that Progressive is not vicariously liable for McMaster's
conduct, we need not decide whether this type of claim can be assigned.

one hour of legal research and filing motions.  But the Guidelines state:  "Progressive expects counsel to exercise independent professional judgment in rendering legal services to Progressive insureds.  Counsel should never allow anything contained in these guidelines to interfere with any ethical directive or obligation governing conduct as defense counsel."  Aplt. App., Vol. XI at 2229.  Moreover, the Guidelines instruct that "[i]n the event a bona fide dispute arises between Progressive and defense counsel as to how best to protect the interests of a Progressive insured, Progressive will always defer to the independent professional judgment of defense counsel."  *Id.* at 2229.

More helpful to Gant is Progressive's contemporaneous statement in a motion to intervene to compel the withdrawal of McMaster in a separate case:  "'The insurance company has the exclusive right to investigate the case, employ and control counsel employed to defend any suit, take full control over the litigation.'"  Aplt. App., Vol. VI at 1108, (quoting *Ash v. Farwell*, 37 F.R.D. 553, 554–55 (D. Kan. 1965) (brackets omitted)).  Gant maintains that Progressive cannot now disclaim its control over McMaster.  But the test for vicarious liability in this context is not the right to control, but the exercise of control.  As the principal, the insurer has the authority to order the attorney to do something or be fired.  But that ultimate authority does not give rise to vicarious liability unless "the insurer directs the conduct of the counsel with respect to the negligent act or omission in a manner that overrides the duty of the counsel to exercise independent professional judgment."  Restatement of the Law of Liability Insurance § 12(2).

Because Gant fails to offer evidence that Progressive interfered with McMaster's independent legal judgment while he represented the Birks, the summary judgment on Gant's vicarious-liability claim was proper.

### III.   CONCLUSION

We **AFFIRM** the district court's grant of summary judgment in favor of Progressive.